**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| GARRISON SOUTHFIELD PARK LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CLOSED LOOP REFINING AND RECOVERY, INC., | ) | Case No. 2:17-CV-783 |
| | ) | |
| BRENT BENHAM, | ) | Judge _____ |
| | ) | |
| DAVID CAUCHI, | ) | |
| | ) | |
| BRIAN LAPOINT, | ) | **JURY DEMAND** |
| | ) | **ENDORSED HEREON** |
| FEDERAL PRISON INDUSTRIES, INC. D/B/A UNICOR, | ) | |
| | ) | |
| KUUSAKOSKI INC., | ) | |
| | ) | |
| KUUSAKOSKI GLASS RECYCLING LLC, | ) | |
| | ) | |
| KUUSAKOSKI US LLC, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| VINTAGE TECH, LLC A/K/A VINTAGE TECH RECYCLERS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**COMPLAINT**

Plaintiff Garrison Southfield Park LLC ("Garrison" or "Plaintiff"), by the

undersigned counsel, as and for its Complaint against defendants Closed Loop Refining

and Recovery, Inc. ("Closed Loop"), Brent Benham, David Cauchi, Brian LaPoint (with

Defendants Benham, Cauchi, and LaPoint, respectively and together with Defendant

Closed Loop, the "Closed Loop Defendants"), Kuusakoski Inc., Kuusakoski Glass

1

Recycling LLC ("Kuusakoski Recycling"), Kuusakoski US LLC, and Vintage Tech, LLC a/k/a Vintage Tech Recyclers, Inc. ("Vintage Tech") (with Defendants Kuusakoski Inc., Kuusakoski Recycling, Kuusakoski US LLC, and Vintage Tech, respectively and together, the "Kuusakoski Defendants"), Federal Prison Industries, Inc. d/b/a UNICOR ("UNICOR"), (with Defendants Kuusakoski Inc., Kuusakoski Recycling, Kuusakoski US LLC, Vintage Tech, and UNICOR, respectively and together, the "Arranger/Transporter Defendants"), allege as follows.

## NATURE OF THE ACTION

1.     This action seeks declaratory relief, cost recovery and common law damages resulting from environmental contamination caused by the Closed Loop Defendants and Arranger/Transporter Defendants at two (2) contiguous warehouses owned by Garrison and located at 1655 and 1675 Watkins Road, Columbus, Ohio 43207 (together, the "Properties"). Plaintiff's claims for relief arise under (i) the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202; (ii) the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended ("CERCLA"), 42 U.S.C. §§ 9601-9675; and (iii) principles of common law.

2.     As more fully demonstrated below, the Closed Loop Defendants and Arranger/Transporter Defendants collaborated in an elaborate sham recycling scheme that extended across the country to profit from the stockpiling and subsequent abandonment of more than 64,000 tons (128 million pounds) of hazardous electronic waste ("e-waste") at the Properties. They collected millions of dollars in illegal revenue over a four year period, leaving Garrison with the costs of removing and remediating nearly 10 acres of hazardous e-waste at the Properties, at a cost that will exceed $14.1 million.

2

3.     The Closed Loop Defendants launched the scheme by leasing the Properties from Garrison, claiming to be a bona fide recycler of cathode ray tubes, which are the glass vacuum tubes that constitute the video display component of televisions, computer monitors, and other electronic devices. They then charged artificially low prices to undercut the national e-waste recycling market and to accept as many CRT-containing electronic devices ("CRTs") as possible, including from the Arranger/Transporter Defendants, to maximize profits. They cherry-picked what valuable commodities they could (such as wire, plastics, aluminum, and steel) from the inbound CRTs, then sold those commodities for additional profit. They cross-contaminated the remaining CRT glass by feeding both the leaded funnel glass and the panel glass together into a mechanical crusher, creating a worthless stream of commingled leaded and nonleaded glass. This ostensibly "processed" CRT glass was then stockpiled in the Properties indefinitely, without any feasible means to recycle it. Contrary to their assertions, the Closed Loop Defendants never had the capacity to install and operate a furnace to recycle this glass, nor did they ever have sufficient downstream markets willing to accept and recycle it.

4.     The Arranger/Transporter Defendants aided and abetted the scheme by transporting and/or arranging for the transport of CRTs and other e-waste to the Properties, despite the fact that they knew or should have known that the Closed Loop Defendants were sham recyclers. The Arranger/Transporter Defendants had the sophistication and the experience in the e-waste industry to ascertain the true nature of the Closed Loop Defendants' sham recycling operation, yet continued to deposit truckload after truckload of CRTs and other e-waste at the Properties to take advantage of the Closed Loop Defendants' artificially low prices. The Arranger/Transporter Defendants fully recognized at the time the arrangements were made and/or at the time the CRTs and other e-waste were

accepted for transport that the Closed Loop Defendants lacked any feasible means to recycle them. They thus provided material support to the sham recycling scheme and should likewise be held accountable for the environmental contamination that resulted.

5. Through four years of misrepresentations, acts, and omissions, the Closed Loop Defendants misled Garrison and the Ohio Environmental Protection Agency ("Ohio EPA") with respect to whether Defendant Closed Loop qualified for a limited regulatory exclusion from federal and state hazardous waste regulations that applies only to legitimate CRT recycling operations ("CRT conditional exclusion"). The Closed Loop Defendants pursued a series of delay tactics designed to mislead Garrison and the Ohio EPA into believing that recycling operations at the Properties qualified for the CRT conditional exclusion and that there was a feasible means of recycling the CRTs and other e-waste that had been accumulating. Throughout all or part of this four year period, the Arranger/Transporter Defendants knew or should have known that the Closed Loop Defendants could not have possibly met all of the elements of the CRT conditional exclusion given the extraordinary volume of e-waste at issue and the Closed Loop Defendants' inability to demonstrate that there was any feasible means of recycling all of it. The Arranger/Transporter Defendants accordingly knew or should have known that the CRTs and other e-waste they were shipping included hazardous waste that was being sent for disposal. Nevertheless, scores of shippers, including the Arranger/Transporter Defendants herein, arranged for the transport of these materials to the Properties as if they were being sent for recycling, benefitting from the scheme through willful blindness or outright conspiracy, in an effort to profit off the Closed Loop Defendants' price point – an offer that no legitimate CRT recycler could possibly beat.

6.     Soon after the Ohio EPA discovered the scheme, the Closed Loop Defendants abandoned the Properties, leaving behind towers of whole CRTs and "processed" CRT glass that had been packed into the warehouses 15-20 feet high. Significant portions of the Properties remain inaccessible given the manner in which the Closed Loop Defendants blocked aisles to make room for more inbound shipments from the Arranger/Transporter Defendants. CRT disassembly lines were halted mid-stream as part of their rushed exit. Employee overalls, boots, and gloves contaminated with hazardous leaded dust were left in piles on the floor. Office furniture and file cabinets were abandoned as well, although the Closed Loop Defendants took the time to remove nearly all of the business records from the Properties, except for those contained in a single file drawer, which was jammed shut.

7.     The Court of Common Pleas in Franklin County, Ohio ("Franklin County Court") recently conducted a bench trial in connection with related state litigation filed by Garrison against the Closed Loop Defendants arising out of the lease agreements for the Properties.  On or about August 7, 2017, the Court found for Garrison, ruling that:

> ". . . Closed Loop was not engaged in legitimate CRT recycling operations at the Properties, but was instead engaged in the speculative accumulation and subsequent abandonment and disposal of the CRT Waste at the Properties without any feasible means of recycling it.  The testimony established that [the Closed Loop Defendants] also failed to segregate leaded funnel glass from panel glass during its CRT recycling operation, resulting in the abandonment of over 113 million pounds of crushed, commingled leaded and unleaded glass at the Properties in addition to approximately 15 million pounds of other electronic waste. . . . [A] legitimate CRT recycling operation at the Properties would not have commingled the CRT glass because the cross-contamination of leaded and unleaded glass would have rendered any available downstream recycling option unprofitable, *i.e.*, no legitimate market existed for this commingled glass as a feedstock for lead smelters or otherwise."

Garrison, however, has been unable to recover the judgment from the Closed Loop Defendants through the Franklin County litigation and discussions leading up to it.

8. Garrison now brings this action to require the Closed Loop Defendants and Arranger/Transporter Defendants to clean up and/or pay for the cleanup of more than 64,000 tons (128 million pounds) of e-waste that currently remains at the Properties.

## PARTIES

9. Plaintiff is a limited liability corporation duly organized and existing under the laws of the State of Delaware, with its principal office and place of business in New York, New York. Plaintiff owns the Properties.

10. Upon information and belief, Defendant Closed Loop is a corporation duly organized under the laws of the state of Arizona, with a principal place of business in Phoenix, Arizona. Starting in 2012 and extending into 2016, Defendant Closed Loop was a tenant occupying the Properties.

11. Upon information and belief, Defendant Brent Benham is an individual with a principal place of residence in Scottsdale, Arizona. Defendant Benham serves, and at all times relevant to the allegations herein, served as the President and Chief Financial Officer of Defendant Closed Loop.

12. Upon information and belief, Defendant David Cauchi is an individual with a principal place of residence in Gilbert, Arizona. Defendant Cauchi serves, and at all times relevant to the allegations herein, served as the Chief Executive Officer of Defendant Closed Loop.

13. Upon information and belief, Defendant Brian LaPoint is an individual with a principal place of residence in Chandler, Arizona. Defendant LaPoint serves, and at all times relevant to the allegations herein, served as the Chief Technology Officer of Defendant Closed Loop.

6

14.     Upon information and belief, Defendant UNICOR is a wholly-owned government corporation pursuant to 31 U.S.C. § 9101(3)(E), with a principal place of business in Washington, DC. Pursuant to 42 U.S.C. § 9620(a)(1), the federal government waived sovereign immunity for purposes of cases arising under 42 U.S.C. § 9607. Starting in 2012 and extending into 2015, Defendant UNICOR arranged for the transport of over 4.5 million pounds of CRTs and other e-waste to the Properties.

15.     Upon information and belief, Defendant Kuusakoski Inc. is a corporation organized under the laws of the state of Delaware, with a principal place of business in Philadelphia, Pennsylvania. Starting in 2012 and extending into 2016, Defendant Kuusakoski Inc. and/or one or more of its related entities, Defendants Kuusakoski Recycling, Kuusakoski US LLC, and Vintage Tech, arranged for the transport of over 48.6 million pounds of CRTs and other e-waste to the Properties, representing more than 35% of the total amount of e-waste abandoned by the Closed Loop Defendants at the Properties. Defendants Kuusakoski Inc., Kuusakoski Recycling, and/or one of their related entities acquired Defendant Vintage Tech in 2014.

16.     Upon information and belief, Defendant Kuusakoski Recycling is a limited liability company organized under the laws of the state of Illinois, with a principal place of business in Plainfield, Illinois. Starting in 2012 and extending into 2016, Defendant Kuusakoski Recycling and/or one or more of its related entities, Defendants Kuusakoski Inc., Kuusakoski US LLC, and Vintage Tech, arranged for the transport of over 48.6 million pounds of CRTs and other e-waste to the Properties, representing more than 35% of the total amount of e-waste abandoned by the Closed Loop Defendants at the Properties. Defendants Kuusakoski Recycling, Kuusakoski Inc., and/or one of their related entities acquired Defendant Vintage Tech in 2014.

17.     Upon information and belief, Defendant Kuusakoski US LLC is a limited liability company organized under the laws of the state of Delaware, with a principal place of business in Plainfield, Illinois. Starting in 2012 and extending into 2016, Defendant Kuusakoski US LLC and/or one or more of its related entities, Defendants Kuusakoski Inc., Kuusakoski Recycling, and Vintage Tech, arranged for the transport of over 48.6 million pounds of CRTs and other e-waste to the Properties, representing more than 35% of the total amount of e-waste abandoned by the Closed Loop Defendants at the Properties. VTKK LLC had previously operated as a joint venture between Defendant Vintage Tech and Defendant Kuusakoski US LLC and/or one or more related entities and before it was merged into Defendant Kuusakoski US LLC in 2015.

18.     Upon information and belief, Defendant Vintage Tech is a limited liability company organized under the laws of the state of Illinois, with a principal place of business in Plainfield, Illinois. Starting in 2012 and extending into 2016, Defendant Vintage Tech arranged for the transport of over 39.7 million pounds of CRTs and other e-waste to the Properties. Defendant Vintage Tech was acquired by Defendants Kuusakoski Recycling, Kuusakoski Inc., and/or one of their related entities in 2014, but continues to conduct business as a separate subsidiary or operating unit.

## JURISDICTION AND VENUE

19.     This Court has original jurisdiction over this civil action pursuant to 42 U.S.C. § 9613(b), 18 U.S.C. § 1965, and 28 U.S.C. § 2201.

20.     This Court has supplemental jurisdiction over Garrison's state law claims pursuant to 28 U.S.C. § 1367, because the state law claims are so related to Garrison's federal claims that they form a part of the same case or controversy.

8

21.     Venue is proper under 42 U.S.C. § 9613(b), 18 U.S.C. § 1965(a), and 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to this lawsuit occurred within this District, including the damages and the release and/or threatened release of hazardous substances, and because the Properties that are the subject of this action are located in this District.

## STATEMENT OF FACTS

**A.     The Properties:  Ownership and Operational History**

**1.     The 1675 Watkins Road Property**

22.     On or about April 6, 2012, Garrison's predecessor-in-interest, MS-South LLC, as Landlord, entered into a Lease Agreement with Defendant Closed Loop, as Tenant, to lease the warehouse premises located at 1675 Watkins Road, Columbus, Ohio 43207 ("1675 Watkins Road").

a.     The Lease Agreement leased the premises to Defendant Closed Loop and listed "[w]arehousing, distribution, electronic recycling and de-manufacturing of cathode ray tubes" as the "Permitted Use."

b.     Upon information and belief, Landlord tendered possession of the premises to Defendant Closed Loop in broom-clean condition.

c.     The Lease Agreement required Defendant Closed Loop:

(i)     to comply with federal and state hazardous waste laws;

(ii)    to make monthly base rent payments starting at $59,131.57 per month and increasing to $64,924.05 per month;

(iii)   to make accelerated rent payments through March 31, 2020, if in default and so demanded by landlord;

        (iv)     to make late fee payments for any payment received more than ten (10) days after the due date thereof;

        (v)     to pay for utilities and services; and

        (vi)     to surrender 1675 Watkins Road "broom clean in as good condition as when received by Tenant."

    d.     The Lease Agreement also provided Defendant Closed Loop with an option to lease approximately 100,000 square feet at the contiguous premises located at 1655 Watkins Road, Columbus, Ohio 43207.

23.    On or about April 15, 2014, following a rent payment default by Defendant Closed Loop, Garrison entered into a First Amendment of Lease with Defendant Closed Loop for 1675 Watkins Road.

    a.     The purpose of the First Amendment of Lease was to allow Defendant Closed Loop to restructure its payment schedule following Defendant Closed Loop's failure to pay rent in exchange for the execution and delivery of guaranties by Defendants Benham, Cauchi, and LaPoint.

    b.     The guaranties provided that Defendants Benham, Cauchi, and LaPoint "absolutely, irrevocably and unconditionally" guaranteed to Garrison all of Defendant Closed Loop's obligations under the Lease Agreement.

24.    Garrison terminated the Lease Agreement on or about February 26, 2016, after Defendant Closed Loop once again failed to pay rent, declaring that all installments of rent for the remainder of the term of the Lease Agreement were immediately payable and due, pursuant to Section 19(b)(i) of the Lease Agreement.

25.    On or about March 4, 2016, Garrison filed a Complaint for Eviction (Forcible Entry and Detainer), Injunction, and Damages Under Lease Agreement and for

Damages Under Guaranties of Lease against Defendant Closed Loop in the Franklin County Court.

26. On or about March 7, 2017, the Franklin County Court granted Garrison's Motion for Default Judgment as to Defendant Closed Loop's liability for breach of contract and resulting damages, leaving the question of damages to be determined later.

27. On or about May 8, 2017, the Franklin County Court held a hearing during which Garrison presented testimony and evidence establishing the damages incurred as a result of Defendant Closed Loop's breach of the Lease Agreement.

28. On or about August 2, 2017, the Franklin County Court held a second hearing during which Garrison presented testimony and evidence establishing the damages incurred as a result of the breach of the Lease Agreement by Defendants Benham, Cauchi, and LaPoint.

29. On or about August 7, 2017, the Franklin County Court issued a Final Judgment Entry, in which the Court, among other things:

a. found that "[Defendant] Closed Loop was not engaged in legitimate CRT recycling operations at the Properties";

b. found that Defendant Closed Loop "was instead engaged in the speculative accumulation and subsequent abandonment and disposal of the CRT Waste at the Properties without any feasible means of recycling it";

c. found that Defendant Closed Loop "failed to segregate leaded funnel glass from panel glass during its CRT recycling operation," which "rendered any available downstream recycling option unprofitable, *i.e.* no legitimate market existed for this commingled glass as a feedstock for lead smelters or otherwise"; and

11

    d.      ordered, adjudged, and decreed that "[j]udgment is entered in favor of Garrison and against [Defendants] Closed Loop, Brent Benham, David Cauchi, and Brian LaPoint, jointly and severally, in the amount of $14,181,533.74 for costs to clean-up the CRT Waste" at the Properties.

### 2.      The 1655 Watkins Road Property

30.      On or about March 24, 2014, Garrison, as Licensor, entered into a Temporary Occupancy Agreement with Defendant Closed Loop, as Licensee, retroactive to December 1, 2013, for the occupancy and use additional square footage in the contiguous premises located at 1655 Watkins Road, Columbus, Ohio 43207 ("1655 Watkins Road").

    a.      The Temporary Occupancy Agreement provided Defendant Closed Loop with a license to occupy a portion of the property "solely for warehousing and storage purposes," which could include the storage of "commercially reasonable" quantities of hazardous materials.

    b.      The purpose of the Temporary Occupancy Agreement was to provide a staging area for Defendant Closed Loop to store inbound CRTs at 1655 Watkins Road for the downstream processing operations at 1675 Watkins Road.

    c.      Garrison tendered possession of the premises to Defendant Closed Loop in good condition and repair and free of trash and debris.

    d.      The Temporary Occupancy Agreement required Defendant Closed Loop:

        (i)      to comply with federal and state hazardous waste laws;

        (ii)      to pay Garrison a monthly use and occupancy fee of $10,518.67;

        (iii)      to pay its pro rata share of utility costs; and

(iv)    to surrender the premises "in good condition and repair, ordinary wear and tear accepted, and free of trash and debris."

31.    Starting in or around January 2015, Defendant Closed Loop failed to pay use and occupancy fees and utility costs in accordance with the Temporary Occupancy Agreement.

32.    Garrison terminated the Temporary Occupancy Agreement as of June 12, 2015, for failure to pay use and occupancy fees.

33.    On or about August 3, 2015, Garrison filed a Complaint for Eviction (Forcible Entry and Detainer, Inunction, and Damages) against Defendant Closed Loop in the Common Pleas Court of Franklin County, Ohio, Civil Division ("Franklin County Court").

34.    On or about August 24, 2015, Defendant Closed Loop and Garrison entered into an Agreed Order requiring Defendant Closed Loop to "remove all personal property, debris, and trash . . . at its cost" from 1655 Watkins Road by October 31, 2015.

35.    Defendant Closed Loop failed to comply with the August 24, 2015 Agreed Order.

36.    On or about May 24, 2016, the Franklin County Court granted Garrison's Motion for Default Judgment as Defendant Closed Loop's liability for breach of contract and resulting damages, leaving the question of damages to be determined later.

37.    On or about May 8, 2017, the Franklin County Court held a hearing during which Garrison presented testimony and evidence establishing the damages incurred as a result of Defendant Closed Loop's breach of the Temporary Occupancy Agreement.

38.    On or about August 7, 2017, the Franklin County Court issued a Final Judgment Entry, in which the Court, among other things:

13

a.    found that "[Defendant] Closed Loop was not engaged in legitimate CRT recycling operations at the Properties";

b.    found that Defendant Closed Loop "was instead engaged in the speculative accumulation and subsequent abandonment and disposal of the CRT Waste at the Properties without any feasible means of recycling it";

c.    found that Defendant Closed Loop "failed to segregate leaded funnel glass from panel glass during its CRT recycling operation," which "rendered any available downstream recycling option unprofitable, *i.e.* no legitimate market existed for this commingled glass as a feedstock for lead smelters or otherwise"; and

d.    ordered, adjudged, and decreed that "[j]udgment is entered in favor of Garrison and against [Defendants] Closed Loop, Brent Benham, David Cauchi, and Brian LaPoint, jointly and severally, in the amount of $14,181,533.74 for costs to clean-up the CRT Waste" at the Properties.

### 3.    Closed Loop's Abandonment of the Properties

39.    The Closed Loop Defendants vacated the Properties in or around May 2016.

40.    The Closed Loop Defendants abandoned more than 64,000 tons (128 million pounds) of CRTs and other e-waste upon vacating the Properties.

41.    CRTs contain lead, a toxic substance that can cause delayed neurological development in children and other adverse health effects in adults.

42.    Used, broken CRTs and processed CRT glass containing lead at concentrations equal to or greater than 5.0 mg/L using the Toxicity Characteristic Leaching Procedure ("TCLP"), if not managed under the CRT conditional regulatory exclusion, are

14

regulated as a hazardous waste under the Resource Conservation and Recovery Act ("RCRA") and as a hazardous substance under CERCLA.

43. Used, intact CRTs containing lead at concentrations equal to or greater than 5.0 mg/L using TCLP that are accumulated speculatively are regulated as a hazardous waste under RCRA and as a hazardous substance under CERCLA.

44. The U.S. Environmental Protection Agency ("U.S. EPA") has observed that "according to recent studies performed at the University of Florida, most color CRTs leach lead in the TCLP test at concentrations above the TC regulatory level of 5 milligrams per liter." *Hazardous Waste Management System; Modification of the Hazardous Waste Program; Cathode Ray Tubes; Final Rule*, 71 Fed. Reg. 42,928, 42,930 (July 28, 2006).

45. Total lead content from samples collected from the Properties far exceeded the 5.0 mg/L regulatory limits using TCLP.

46. Garrison currently estimates the costs of environmental cleanup for the Properties at more than $14.1 million, although cleanup costs may vary significantly based on, among other things, material quantities, the availability of previously-identified disposal/recycling outlets, fuel costs, the extent of Ohio EPA's oversight over remediation of the site, and other contingencies.

**B.    The Sham Recycling Scheme**

47. Section 107(a) of CERCLA, 42 U.S.C. § 9601(a), imposes strict and joint and several retroactive liability on:

a.    "the owner and operator of a vessel or a facility";

b.    "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of";

c.  "any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and";

d.  "any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance . . . ."

48.  The Closed Loop Defendants operated the Properties at the time of the disposal of hazardous substances; therefore, they are strictly, jointly and severally liable for environmental cleanup costs under CERCLA.

49.  The Arranger/Transporter Defendants transported and/or arranged for the transport of hazardous substances to the Properties; therefore, they are strictly, jointly and severally liable for environmental cleanup costs under CERCLA.

50.  RCRA established a cradle-to-grave program that regulates the generation, transportation, and disposal of hazardous wastes and provides for a conditional exclusion for legitimate CRT recycling operations – but only if certain criteria are met.

51.  The Closed Loop Defendants misled Garrison and Ohio EPA with respect to whether the Closed Loop Defendants' qualified for the CRT conditional exclusion from RCRA hazardous waste regulation, which applies only to legitimate CRT recycling operations, thereby generating millions of dollars in illegal revenue and imposing upon Garrison potential liability for millions of dollars in environmental cleanup costs.

52.  The Arranger/Transporter Defendants transported and/or arranged for the transport of tens of millions of pounds of CRTs and other e-waste to the Properties, despite the fact that they knew or should have known that the Closed Loop Defendants were

operating a sham recycling operation and did not qualify for the CRT conditional exclusion from RCRA hazardous waste regulation, thereby generating millions of dollars in illegal revenue and imposing upon Garrison potential liability for millions of dollars in environmental cleanup costs.

### 1. The Closed Loop Defendants

53. From 2012 and continuing to the present, the Closed Loop Defendants orchestrated an extensive scheme to defraud Garrison through the sham recycling operation at the Properties.

54. The Closed Loop Defendants selected Ohio as the state to launch its scheme given that Ohio lacks e-waste legislation requiring original equipment manufacturers to certify that CRTs are recycled in accordance with federal and state law and that Ohio does not have a CRT landfill disposal ban.

55. Surrounding and nearby states Michigan, Illinois, Indiana, West Virginia, Pennsylvania, New Jersey, New York, and Virginia among others, each have e-waste legislation and CRT landfill disposal bans, which incentivizes the e-waste industry to arrange for e-waste to be transported to Ohio in a nationwide "race to the bottom."

56. The Closed Loop Defendants also selected Ohio in purview of a tax credit provided in 2012 by the Ohio Tax Credit Authority to bring jobs to Columbus.

57. Defendant Closed Loop secured the Lease Agreement and Temporary Occupancy Agreement from Garrison, based on false representations that Defendant Closed Loop would actually pay the rent; would be providing legitimate e-waste recycling services; and would otherwise be operating in compliance with federal and state hazardous waste laws.

58.     The Closed Loop Defendants entered the Ohio e-waste recycling market in 2012, with an offer to accept inbound CRTs at prices as low as $0.0750 per pound, which undercut the then-prevailing U.S. market rates of $0.11-0.12 per pound.

59.     No other U.S. e-waste recycler could compete with Defendant Closed Loop's rate, as no e-waste recycler with a similar business model and low profit margin could have met all of the elements of, and thus, qualified for, the CRT conditional exclusion from RCRA hazardous waste regulation.

60.     Over the next four years, the Closed Loop Defendants implemented a series of delay tactics designed to mislead Garrison and the Ohio EPA into believing that recycling operations at the Properties were lawful and that there was a feasible means of recycling the CRTs and other e-waste that had been accumulating at the Properties.

61.     These delay tactics enabled the Closed Loop Defendants to continue to collect revenue for inbound CRTs and other e-waste, without ever having to incur the costs of actually recycling them.

62.     During this four year period, the Closed Loop Defendants speculatively accumulated tens of millions of pounds of CRTs and other e-waste, generating well over $20 million in revenue for recycling services that were never performed.

a.      The Closed Loop Defendants received more than $11 million in revenue from inbound shipments of used CRTs and other e-waste from 2012 through 2016, based on records produced by the Closed Loop Defendants.

b.      The Closed Loop Defendants likely received an equivalent revenue stream from outbound shipments of commodities extracted from these CRTs, including yokes, copper wire, aluminum, steel, plastic, and circuit boards,

based on the revenue streams of similarly situated entities in the e-waste industry.

c.    The Closed Loop Defendants had minimal overhead expenses given their failure to pay rent, lower labor costs associated with their failure to segregate leaded funnel glass from panel glass, and their failure to meet applicable Ohio EPA and Occupational Safety and Health Administration ("OSHA") regulatory requirements.

63.    The Closed Loop Defendants were able to continue to accept inbound shipments of used CRTs and other e-waste (and the accompanying revenue streams) for four years, based on a series of misrepresentations, acts and omissions designed to mislead Garrison and Ohio EPA with respect to Defendant Closed Loop's compliance with the following three elements, discussed in turn below, of the CRT conditional exclusion from RCRA hazardous waste regulation: (a) the 75% recycling requirement; (b) the existence of a feasible means to recycle the CRTs; and (c) a prohibition against using the CRTs in a manner constituting disposal.

64.    In or around May 2016, when its scheme was discovered, the Closed Loop Defendants abandoned the Properties, leaving Garrison, as the landlord, to incur more than $14.1 million in environmental cleanup costs.

### a.    75% Recycling Requirement

65.    The qualifying criteria for the CRT conditional exclusion includes, *inter alia*, a prohibition on "speculative accumulation," which is comprised of two components. 40 C.F.R. § 261.39(a)(4) & (c).

66.    The first component of the CRT conditional exclusion requires a demonstration that: "during the calendar year, commencing January first, the amount of

19

material that is recycled, or transferred to a different site for recycling, equals at least seventy-five per cent by weight or volume of the amount of that material accumulated at the beginning of the calendar year."

67. From 2012 through 2016, Defendant Closed Loop repeatedly misrepresented that it qualified for the CRT conditional exclusion through statements to Ohio EPA that the weight of the processed CRT glass that was recycled at the Properties, or was transferred to a different site for recycling, equaled at least 75% of the weight of the processed CRT glass that had accumulated at the beginning of each calendar year.

68. The Closed Loop Defendants' business model was to process inbound CRTs through disassembly and glass breaking within the calendar year during which they were received, but then to store indefinitely the processed CRT glass in the center of 1675 Watkins Road, where it would be obstructed from the view of Ohio EPA inspectors and in violation of 40 C.F.R. § 261.39(c) (regarding speculative accumulation).

69. Garrison currently estimates that there are nearly 30,000 Gaylords (*i.e.*, pallet-sized, cardboard containers) of processed CRT glass that were speculatively accumulated and abandoned at the Properties.

70. Garrison currently estimates that there are more than 14,500 Gaylords or wooden pallets of used, intact CRTs that were speculatively accumulated and abandoned at the Properties.

**(i)  BAN Warns the Arranger/Transporter Defendants that Closed Loop Lacked a Clear Pathway to Compliance.**

71. The Basel Action Network ("BAN") is an environmental non-profit group that describes itself as an investigative watchdog for sham electronic waste recyclers.

72.     On or about January 22, 2013, Closed Loop Glass Solutions ("CLGS"), an affiliate or subsidiary of Defendant Closed Loop controlled by the Closed Loop Defendants, applied for an air quality permit-to-install a glass furnace to recycle processed CRT glass in connection with its operations at the Properties.

73.     On or about September 26, 2013, BAN provided public comments in response to Defendant Closed Loop's permit application in which it expressed concerns with the risk of speculative accumulation and sham recycling that would arise from Defendant Closed Loop's conduct:

> "This is an important matter because an influx of cash comes into a business of this kind upon receipt of CRT glass and the actual subsequent processing of the CRTs is a very large subsequent expense. The economic temptation to avoid latter [sic] costs, in the face of large influxes of cash is real and thus holding to Speculative Accumulation rules is vital unless there is a clear pathway for meeting the processing goals, and avoiding accumulation is seen as a reality in the near-term. Already numerous CRT storage-for-later processing sites around the nation have been found abandoned with massive amounts of glass still on site due to this factor (see Luminous Recycling, Denver, Dow Management, Yuma)."

74.     BAN's public statements regarding the Defendant Closed Loop situation were widely disseminated and, upon information and belief, were known to participants in the industry, including the Arranger/Transporter Defendants.

75.     The Arranger/Transporter Defendants had the requisite sophistication and experience in the e-waste industry such that they were aware or should have been aware of BAN's public warning regarding the "economic temptation" for the Closed Loop Defendants to circumvent the speculative accumulation requirements in exchange for "large influxes of cash."

76.     For the next three years, the Arranger/Transporter Defendants nevertheless knowingly transported and/or arranged for the transport of tens of millions of pounds of CRTs and other e-waste to the Properties.

(ii)     **Closed Loop Seeks to Protect Its Scheme When Ohio EPA Begins to Express Concerns Regarding Speculative Activity.**

77.     In or around 2014, Ohio EPA began expressing concerns with Defendant Closed Loop's ability to meet speculative accumulation requirements, which coincided with evasive actions by the Closed Loop Defendants to prevent their sham recycling scheme from being discovered.

78.     On or about June 19, 2014, in assessing how to respond to a media inquiry regarding Defendant Closed Loop, Ohio EPA expressed concern in an internal e-mail regarding operations at the Properties that "we don't really have a break down of how much material went where."

a.     Ohio EPA's June 19, 2014 e-mail indicated that Defendant Closed Loop provided insufficient information for Ohio EPA to determine compliance with speculative accumulation requirements.

b.     Upon information and belief, the Closed Loop Defendants were withholding information regarding speculative accumulation from Ohio EPA to conceal their sham recycling scheme.

79.     On or about June 25, 2014, in discussing a request by Defendant Closed Loop for a variance from speculative accumulation requirements, Ohio EPA warned Defendant Closed Loop in a phone call of its potential to abandon large amounts of hazardous waste at the Properties in violation of the speculative accumulation provision.

80.     On or about June 26, 2014, Ohio EPA observed in an internal e-mail that Defendant Closed Loop was "storing millions of pounds of CRTs and processed glass"; that it wants to "continue to store the lead glass as a feedstock . . ."; and that it "will likely

trigger our speculative accumulation rules and the hazardous CRT glass will be a regulated hazardous waste at that point."

81.     On or about October 21, 2014, a concerned citizen advised Ohio EPA in an e-mail that Defendant Closed Loop transported 200 truckloads of processed CRT glass from the Properties to a new property leased by Defendant Closed Loop or a Closed Loop affiliate located at 2200 Fairwood Avenue, Columbus, Ohio 43207 ("2200 Fairwood Avenue"), in an effort to mislead Ohio EPA into finding Defendant Closed Loop to be in compliance with speculative accumulation requirements.

82.     On or about October 21, 2014, and in reaction to the concerned citizen's report, Ohio EPA commented in an internal e-mail: "This will not get them out of speculative accumulation. We should be looking into this."

83.     On or about January 5, 2015, an internal Ohio EPA e-mail characterized these shipments as follows: "Seems a little convenient that the new facility is located where they were already rumored to be 'hiding' shipments of glass…."

84.     On or about October 27, 2014, Defendant Closed Loop applied for a variance from the speculative accumulation requirements based on the "limitations of the primary and secondary lead smelters['] ability to absorb the volume generated within the USA," which led to the "current stock pile of clean panel cullet and funnel cullet in North America."

85.     The only reason Defendant Closed Loop would have applied for the variance was because it could not comply with the speculative accumulation requirements.

86.     Defendant Closed Loop never received the variance.

87.     The Closed Loop Defendants nevertheless continued to accept inbound CRTs and other e-waste at the Properties for the next 15-17 months, despite these market

conditions and despite knowing that Defendant Closed Loop would be out of compliance with speculative accumulation requirements without a variance.

88. On or about November 21, 2014, Ohio EPA observed in an internal e-mail that Defendant Closed Loop had not "completely recycled the glass onsite nor have they sent any glass to another site for further recycling." Put differently, much of the processed CRT glass stored at the Properties since operations began in 2012 had already triggered speculative accumulation rules given Defendant Closed Loop's failure to recycle, or to transfer offsite for recycling, 75% of the previously processed CRT glass in inventory as of January 1, 2013, by December 31, 2013.

89. From on or about December 22, 2014 through on or about December 26, 2014, the Closed Loop Defendants arranged for the transport of an additional 59 truckloads of processed CRT glass from the Properties to 2200 Fairwood Avenue in yet another misguided effort to shield itself from liability for failing to meet speculative accumulation requirements, as evidenced by 59 bills of lading reflecting shipments from 1675 Watkins Road to 2200 Fairwood Avenue.

90. On or about March 5, 2015, Ohio EPA conducted an inspection of 1675 Watkins Road, during which Ohio EPA discovered for the first time that Defendant Closed Loop had also been accumulating CRTs in 1655 Watkins Road since October or November of 2013. According to the Ohio EPA inspector:

> "At that time Mr. O'hara informed me that Closed Loop had been leasing and storing CRTs (unknown to Ohio EPA) at 1655 Watkins Rd since Oct.-Nov. of 2013. Upon arrival I met with the plant manager (Patrick O'hara) who proceeded to walk me over to the 1655 Watkins Rd. storage facility. The facility is half full of CRTs and old televisions, Patrick said that it is currently being downsized due to costs and three bays of CRTs were recently moved to Fairwood Avenue. I asked how this was being tracked and Patrick informed me that it wasn't."

91.     Ohio EPA's inspection revealed that Defendant Closed Loop had not only hidden a staging area for its e-waste recycling operations from Ohio EPA in violation of federal and state hazardous waste law, but also that Defendant Closed Loop had not been reporting internal movements of CRTs in a further effort to mislead Ohio EPA.

> **(iii)** **Closed Loop Acknowledges Concerns with Speculative Accumulation, Yet Continues to Accept Inbound CRTs for Profit.**

92.     On or about November 6, 2014, E-Scrap News reported that Defendant Benham admitted that "Closed Loop has been amassing leaded glass instead of sending it downstream for recycling elsewhere because the company is trying to collect sufficient feedstock for its furnace." *See* E-Scrap News, *CRT player Closed Loop receives notice of violation* (Nov. 6, 2014).

93.     On or about December 9, 2014, Defendant Closed Loop acknowledged to Ohio EPA in a letter that it "did not give greater attention to speculative accumulation prior to October 2014," effectively admitting that it failed to comply the speculative accumulation requirement in the CRT conditional exclusion – the very exclusion upon which Defendant Closed Loop's entire e-waste recycling business model was predicated.

94.     On or about October 14, 2015, Garrison e-mailed Defendant Benham to follow up on Ohio EPA's concerns with speculative accumulation at the Properties: "As I understand it, you are still being paid to take CRTs into 1675 on a daily/weekly basis and with that new inventory comes components that are accumulating for disposal that are a liability."

95.     On or about October 20, 2015, Defendant Benham responded to Garrison's e-mail by explaining that any "product liability" would not be a cause for concern because

Defendant Closed Loop has "room under the insurance . . . to allow for more material on the site."

96.     Defendant Benham attached a "Site Closure Plan" to his October 20, 2015 e-mail, purportedly to "give [Garrison] an understanding of cleanup" to be covered by the insurance.

    a.     The Site Closure Plan indicated that the maximum inventory of material expected at the Properties would be 45,000 tons.

    b.     That estimate was false, however, because it is currently estimated that the Closed Loop Defendants ultimately accumulated and abandoned 64,000 tons (128 million pounds) of CRTs and other e-waste.

97.     On or about October 23, 2015, Defendant Closed Loop admitted to Ohio EPA in a phone call that it was "unsure of what they can or cannot do with the material next year to meet the [speculative accumulation] standard."

98.     The Closed Loop Defendants nevertheless continued to accept inbound CRTs and other e-waste until in or about March 2016, in a self-serving effort to continue profiting from its scheme.

99.     On or about March 17, 2016, Defendant Closed Loop admitted to Garrison in an e-mail that it has "liability [for] the CRTs and leaded glass that has accumulated on the property over the last 4 years through the operations of CLRR's facility."

### b.     Feasible Means of Being Recycled

100.     As noted above, the qualifying criteria for the CRT conditional exclusion includes, *inter alia*, a prohibition on "speculative accumulation," which includes two components. 40 C.F.R. § 261.39(a)(4) & (c). The second component of the CRT

26

conditional exclusion requires a demonstration that "the material is potentially recyclable and has a feasible means of being recycled."

101. From 2012 through 2016, Defendant Closed Loop repeatedly misrepresented to Ohio EPA that it qualified for the CRT conditional exclusion through statements to Ohio EPA that it would fund, install, and operate a glass furnace to extract lead from the processed CRT glass accumulating at the Properties.

102. The Closed Loop Defendants' business model was to pursue air quality permits-to-install from Ohio EPA in an effort to mislead Ohio EPA into finding that a "feasible means of being recycled" existed, so that it could continue to accept inbound CRTs and other e-waste while never having any intention of actually constructing a furnace.

### (i)  1635 Watkins Road

103. Defendant Closed Loop first applied for and received an "initial installation" air quality permit-to-install a glass furnace at 1635 Watkins Road, Columbus, Ohio 43207 ("1635 Watkins Road"), which issued October 17, 2013 (and was administratively-modified November 15, 2013).

104. Defendant Closed Loop never had any property rights with respect to 1635 Watkins Road. Garrison owns 1635 Watkins Road and never extended a lease option to Defendant Closed Loop at this property.

105. The U.S. EPA has taken the position that demonstration of a feasible means of recycling "ordinarily will require identification of actual recyclers and recycling technology, *location of the recycler*, and relative costs associated with recycling." (Emphasis added.)

106.    Thus, as Defendant Closed Loop lacked the right to occupy 1635 Watkins Road, it could not use the 1635 Watkins Road permit-to-install to demonstrate that it had  a feasible means of recycling the CRTs accumulating in 1655 Watkins Road and 1675 Watkins Road.

107.    On or about December 9, 2014, Defendant Closed Loop represented to Ohio EPA in a letter that CLGS "has obtained 100,000 square foot facility at 1635 Watkins Road in Columbus, Ohio" and that construction of the glass furnace at 1635 Watkins Road would begin in the summer of 2015, with an estimated operational date of November 2015.

108.    Defendant Closed Loop's representation was false and misleading because it never had the right to occupy 1635 Watkins Road.

109.    On or about December 16, 2014, Ohio EPA conducted an inspection of 1635 Watkins Road to "monitor the progress of the build-out for operations of CLGS," where Defendant Closed Loop would "eventually install a furnace."

a.    The scope of the inspection included a schedule that had been submitted "as part of the demonstration that CLGS feasibly recycle the processed CRT glass currently being accumulated" at the Properties.

b.    Ohio EPA found that "no work had commenced on the vacant half of the warehouse where CLGS is supposed to conduct operations."

c.    Ohio EPA found that discussions with the existing tenant "indicated they had no information that CLGS had obtained a lease agreement."

d.    In a follow up call, Robert Cruz, the Defendant Closed Loop plant manager, again falsely advised Ohio EPA that a "lease had been obtained."

110.    On or about January 5, 2015, Defendant Closed Loop finally admitted in a letter to Ohio EPA that it was "unable to exercise the lease option" at 1635 Watkins Road.

28

111.   The terms of the 1635 Watkins Road permit-to-install provided that the permit would automatically terminate within 18 months of the effective date if the "operator has not undertaken a continuing program of installation or has not entered into a binding contractual obligation to undertake and complete within a reasonable time a continuing program of installation."

112.   Defendant Closed Loop did not undertake a continuing program of installation, nor did it enter into a binding contractual obligation to build the furnace, indicating further that it had no intention of actually constructing a furnace at 1635 Watkins Road.

113.   On or about March 6, 2015, Defendant Closed Loop nevertheless applied for an extension of the 1635 Watkins Road permit-to-install, three months after admitting that it lacked a lease option, because "we are now negotiating with our landlord at 1635 Watkins Road as it is time to renew our lease soon."

   a.   The referenced lease, however, is the Lease Agreement for 1675 Watkins Road.

   b.   There was never an agreement with Garrison to lease 1635 Watkins Road.

   c.   Further, any discussions with Garrison regarding a lease option at 1635 Watkins Road had long since terminated.

114.   On or about April 28, 2015, Defendant Closed Loop entered into a Consent Order with the Arizona Department of Environmental Quality ("ADEQ") for speculative accumulation at Defendant Closed Loop's Arizona facility that was predicated on shipments of processed CRT glass from that facility to a glass furnace at 1635 Watkins Road.

a. Defendant Closed Loop executed this agreement four months after advising Ohio EPA that it did not have a lease option at 1635 Watkins Road.

b. Defendants Benham, Cauchi, and LaPoint each signed the Consent Order, thereby making false statements to a state environmental agency as part of an e-waste recycling scheme that extended across the county.

115.    For all of the reasons set forth above, Defendant Closed Loop secured the 1635 Watkins Road permit-to-install solely as part of a continuing effort to mislead Garrison and Ohio EPA into finding that there was a feasible means of recycling, when in fact no feasible means of recycling had been put into place.

### (ii)    1659 E. Front Street

116.    Defendant Closed Loop applied for and received a second "initial installation" air quality permit-to-install for 1659 E. Front Street, Logan, Ohio 43138 ("1659 E. Front Street"), which issued December 23, 2015.

117.    The "planned" furnace at 1659 E. Front Street would not have had sufficient recycling capacity to avoid speculative accumulation prohibitions.

118.    The permit had an 18,000 ton-per-year ("tpy") limit, similar to its predecessor permit-to-install at 1635 Watkins Road.

119.    Even under the best case scenario – which would account for obtaining funding to construct the furnace, one year of construction, no additional inbound CRTs, and a Clean Air Act Title V permit-to-operate – there would be over four more years of speculative accumulation, as it would take approximately 3.5 years to process the 64,000 tons (128 million pounds) of e-waste that are currently stored at the Properties.

120.    BAN had long before warned of the prospects of a small furnace in public comments provided in response to a draft of Defendant Closed Loop's first "initial installation" air quality permit-to-install:

> "We are very concerned that a small furnace with slow throughput is being envisaged, which may provide appearances to observers that an effort is being made to avoid speculative accumulation and perhaps raise false hopes such that that [sic] variances to the speculative accumulation rules will be granted, when in fact there is no possibility of catching up to the volumes via the proposed process."

121.    As predicted in BAN's public comments, the limits in both permits-to-install provide the best evidence that the Closed Loop Defendants could not possibly have intended to conduct a legitimate e-waste recycling operation because they could not possibly have caught up to the volumes of CRTs that were being accumulated without running afoul of speculative accumulation restrictions.

122.    For all of the reasons set forth above, Defendant Closed Loop secured the second permit-to-install solely as part of a continuing effort to mislead Garrison and Ohio EPA into finding that there was a feasible means of recycling.

### (iii)    2200 Fairwood Avenue

123.    When Defendant Closed Loop began having difficulties in demonstrating the viability of a glass furnace, it proposed a new step in the CRT processing as part of a scheme to mislead Ohio EPA into finding that an alternative "feasible means of recycling" existed, thereby artificially extending the speculative accumulation period for the processed CRT glass at the Properties.

124.    On or about November 19, 2014, Defendant Closed Loop met with Ohio EPA to advise that it would no longer be purchasing 1659 E. Front Street to install a furnace and had instead intended to introduce a new "funnel glass cleaning (reclamation) process" that would ostensibly remove a coating to meet the product specifications of a

glass furnace in India – purportedly to demonstrate that it still had a "feasible means of recycling" the vast amounts of CRTs that had been accumulating.

125.    On or about December 9, 2014, Defendant Closed Loop sent Ohio EPA a letter indicating that the new process would be installed by December 15, 2014, at 1635 Watkins Road, where Defendant Closed Loop had "acquired space."

126.    Defendant Closed Loop, however, refused to provide Ohio EPA with information regarding the new process in the December 9, 2014 letter, asserting that it was "highly proprietary," despite the availability of long-standing information protections that would have prevented Ohio EPA from disclosing the information publicly.

127.    Defendant Closed Loop's December 9, 2014 letter advised Ohio EPA that the new process was based, in part, on Defendant Closed Loop's Arizona operations, which it considered a "useful model in evaluating . . . the constraints for speculative accumulation."

128.    ADEQ, however, had previously found that Defendant Closed Loop's Arizona facility was itself in violation of its speculative accumulation requirements for at least a full year prior to December 9, 2014, *i.e.* at the very same time Defendant Closed Loop was making the above misrepresentations to Ohio EPA.

129.    Defendant Closed Loop would eventually abandon approximately 25,000 tons (50 million pounds) of CRTs at its Arizona facility, in addition to the approximately 64,000 tons (128 million pounds) of CRTs and other e-waste at the Properties.

130.    On or about January 5, 2015, and as noted above in Paragraph 110, Defendant Closed Loop finally admitted in a letter to Ohio EPA that it was "unable to exercise the lease option" at 1635 Watkins Road and had instead "obtained new space at 2200 Fairwood Avenue" for the new "glass cleaning facility."

131.    On or about March 19, 2015, Ohio EPA advised Defendant Closed Loop in a letter that the Ohio EPA Division of Air Pollution Control "has recently become aware of a CRT glass acid washing operation located at 2200 Fairwood Avenue that is run by Closed Loop" and that the process "may require a permit-to-install and operate."

132.    On or about March 4, 2016, according to an Ohio EPA Field Activity Report, Defendant Closed Loop Plant Manager Robert Cruz and Defendant Closed Loop Manager Matt Strangle advised Ohio EPA that the "tumbler (which aids in the washing) at Fairwood broke in the summer of 2015 and had not been repaired yet…."

133.    Defendant Closed Loop had waited 6-8 months to disclose to Ohio EPA that its purportedly "alternative" feasible means of recycling had not been operational, while generating millions of dollars in additional revenue from inbound CRTs and other e-waste during the same time period.

134.    For all of the reasons set forth above, the Closed Loop Defendants purported to operate a new "funnel glass cleaning (reclamation) process" solely as part of a continuing effort to mislead Garrison and Ohio EPA into finding that there was a feasible means of recycling when, in fact, no such feasible means of recycling existed.

### (iv)    Funding

135.    In or around October and November 2015, Ohio EPA advised Defendant Closed Loop in multiple communications that, to demonstrate a "feasible means of recycling," Defendant Closed Loop would need to provide:

a.    "documentation showing that they have a contract for the furnace, financing arrangements (e.g., letters from investors), a schedule for construction, etc." (Oct. 23, 2015 phone call between Ohio EPA and Defendant Closed Loop);

b.      "bona fide letters of intent from investors to provide capital funds for the construction of the furnace" (Nov. 20, 2015 letter from Ohio EPA to Defendant Closed Loop); and

c.      "[o]ther information may include written construction schedules, construction contracts and construction permits." (Nov. 20, 2015 letter from Ohio EPA to Defendant Closed Loop).

136.    The Closed Loop Defendants never made this demonstration and, accordingly, never had a feasible means of recycling, or the ability to fund such recycling.

137.    The Closed Loop Defendants knew or should have known that they could never have secured sufficient funding to install and operate a furnace that could recycle the high volumes of processed CRT glass that were accumulating at the Properties.

138.    The Closed Loop Defendants admitted on at least three occasions that it lacked the financial wherewithal to secure commitments to this level of funding, including as follows:

a.      On or about August 5, 2015, Defendant Benham admitted to Garrison in an e-mail requesting another lease restructuring that "CLRR has been under capitalized for the past five years of business."

b.      On or about October 26, 2015, Defendant Closed Loop admitted to Ohio EPA in a letter attempting to explain why it had a "feasible means of recycling," that financing had never been "committed to the project," thus admitting that there had never been a feasible means of recycling.

c.      On or about March 17, 2016, Defendant Benham admitted to Garrison in an e-mail regarding liability for the accumulated e-waste that:

34

"Our efforts to secure venture financing have been unsuccessful at this time. Speaking with potential strategic industry players has evoked even more negative responses – citing the huge amount of CRTs and leaded glass amassed on the property – there is no logic to take on this liability plus the cost to remove it will outweigh any potential revenues to be had from metal sales."

139.  The Closed Loop Defendants nevertheless repeatedly represented to Ohio EPA and to Garrison that they had either secured funding or were on the cusp of securing funding, as part of a delay tactic to stave off environmental enforcement such that it could continue to accept inbound CRTs and other e-waste, including as follows:

a.  On or about March 6, 2015, Defendant LaPoint misrepresented to Ohio EPA in a letter that "we have funding identified" for the furnace.

b.  On or about September 27, 2015, Defendant Benham advised Garrison in an e-mail that Defendant Closed Loop had "executed a term sheet with a private fund"; that it was "deep in due diligence with closing anticipated in late November or early December 2015"; and that the fund will "provide a $9.5 million term loan credit facility providing additional equipment into the Company's current operations in Arizona and Ohio, the buildout of the glass furnace operation in Ohio, and much needed working capital."

c.  On or about October 22, 2015, Defendant Benham advised ADEQ that Defendant Closed Loop was "very close to obtaining financing for building a furnace in Ohio."

140.  Upon information and belief, the costs of constructing an 18,000 tpy glass furnace would likely have run approximately $10-20 million, and the costs of operating it would likely have run approximately $1 million a year.

35

141. No reasonable investor would have provided the necessary level of funding for Defendant Closed Loop to build a furnace under the prevailing market conditions and given the volumes of processed CRT glass at issue.

142. Ohio EPA and BAN both expressed concerns with the ability of Defendant Closed Loop to secure or allocate the requisite funding, which suggested that it was widely understood that Defendant Closed Loop lacked the financial wherewithal or willingness to conduct a legitimate recycling operation, including as follows:

a. On or about June 25, 2014, Ohio EPA expressed its concern to Defendant Benham in a phone call "with the potential for them to abandon large amounts of hazardous waste glass if they are unsuccessful in securing investments to build the furnace."

b. On or about October 30, 2014, BAN advised U.S. EPA and Ohio EPA in a letter that:

"[Closed Loop] continues to bring in large sums of cash for receiving glass from a variety of sources, and yet the money is not in Escrow to be applied to the recycling of the glass. This funding is surely a source of funding that could easily be spent on building a furnace. But this has not happened. One must wonder why."

c. On or about November 5, 2014, Ohio EPA observed following a meeting with Defendant Closed Loop that:

"To date, we have not seen any contracts, agreements or letters of intent for investors in the furnace. As such we asked Closed Loop to provide this information before we can recommend taking an action on a variance request. In addition, we are asking Closed Loop to provide an estimate of the cost to properly dispose of all accumulated hazardous processed CRT glass and unprocessed CRTs, as well as evidence of financial assurance for a third party cleanup. Financial assurance seemed to be an issue for the company."

143.    Upon information and belief, and as explained more fully below, the Arranger/Transporter Defendants had the requisite sophistication and experience in the e-waste industry such that they, too, were aware or should have been aware that Defendant Closed Loop lacked the financial wherewithal or willingness to conduct a legitimate recycling operation.

144.    On or about May 6, 2016, Defendant Closed Loop advised Ohio EPA in a letter that Defendant Closed Loop would cease its operations in Columbus, Ohio "due to changing market conditions and financial considerations."

145.    For all of the reasons set forth above, and at all times relevant, the Closed Loop Defendants lacked the financial wherewithal and willingness to commit funding to build a furnace that could be used to demonstrate that Defendant Closed Loop had a feasible means of recycling.

### c.    Use in a Manner Constituting Disposal

146.    The qualifying criteria for the CRT conditional exclusion also includes, *inter alia*, a prohibition on using the CRTs "in a manner constituting disposal." 40 C.F.R. § 261.39(a)(4).

147.    U.S. EPA has looked to a variety of factors in determining whether a material is a legitimate product as opposed to a waste and whether the recycling process is legitimate as opposed to sham recycling, or "disposal."

148.    These factors include whether a legitimate market exists for the material, whether the material provides revenues, and whether the material is managed to prevent release (*i.e.*, managed as a valuable commodity). *See, e.g.,* 40 C.F.R. § 260.43 (setting forth required criteria to demonstrate legitimate recycling), *id*. § 261.2(e)(1) (describing materials that are not solid wastes when recycled), *id*. § 261.2(g) (prohibiting sham

37

recycling), EPA Faxback 13691 (May 19, 1994), EPA Faxback 11750 (June 2, 1993), and EPA Faxback 11936 (Jan. 31, 1995).

149. The Closed Loop Defendants violated the prohibition on using CRTs in a manner constituting disposal by failing to demonstrate that:

    a.    a legitimate market existed for the processed CRT glass they were generating;

    b.    the CRTs that were accumulating on the Properties were being managed as valuable commodities; and

    c.    the CRTs that were accumulating on the Properties were being managed so as to prevent a release.

150. No legitimate market existed for the processed CRT glass that the Closed Loop Defendants were generating given the manner in which they generated it, including as follows:

    a.    It is standard industry practice to segregate leaded funnel glass from panel glass during CRT processing to meet the product specifications of downstream lead smelters.

    b.    It is not economically viable for lead smelters to accept commingled glass from e-waste recyclers, given the need to run over twice as much feedstock (glass) to extract the same amount of lead.

    c.    The Closed Loop Defendants failed to segregate leaded funnel glass from panel glass, as evidenced by the nearly 30,000 Gaylords of used, broken, and commingled CRT glass that were abandoned at the Properties.

    d.    On or about November 19, 2014, Defendant Closed Loop misrepresented to Ohio EPA in a meeting that it had instead been processing CRTs to separate

the nonhazardous front (panel) glass from the hazardous funnel glass, as reflected in an internal Ohio EPA communication.

e.     On or about May 22, 2015, Defendant Closed Loop again misrepresented to Ohio EPA in response to an information request that "[w]hen CRTs are processed they are separated into Panel Cullet, Funnel Glass, Metals, Plastics and glass fines."

f.     On or about October 20, 2015, Defendant Benham provided Garrison with a Site Closure Plan," which provided yet another misrepresentation: "The CRTs are processed to separate the leaded glass from the unleaded glass, with the leaded glass further processed in a lead recovery line and the unleaded glass further processed to separate different sized particles in a glass-to-glass recovery line."

151.     Nor did the Closed Loop Defendants manage the processed CRT glass at the Properties in an environmentally responsible manner with a concern for product integrity, as is confirmed by the following:

a.     It is standard industry practice to use new octagon Gaylord boxes to provide appropriate containment for processed CRT glass, which averages 2 tons per Gaylord.

b.     The Closed Loop Defendants repurposed many of the same four-sided Gaylord boxes that had previously been used to transport used, intact CRTs to the Properties.

c.     These boxes had, in turn, been repurposed from their initial use to package non-hazardous consumer products, which do not require the same standard of durability.

39

d.     As a result, much of the processed CRT glass has spilled to the floor.

e.     On or about October 17, 2013, Ohio EPA issued a Notice of Violation ("NOV") to Defendant Closed Loop, alleging that Defendant Closed Loop failed to qualify for CRT conditional exclusion and finding, *inter alia*:

"At the time of the inspection, Closed Loop was storing approximately 300 pallets of broken CRTs outside in cardboard gaylords. (See pics 1-3). The containers had deteriorated to the point that they could no longer hold the CRTs, and CRT glass and parts were strewn throughout the storage area. In addition, the facility was storing approximately 450 pallets of televisions outside; due to storage conditions, some of these CRTS had broken as well. . . .

During the inspection the gaylords being stored outside and the gaylords inside storing the processed television [sic] were not properly labeled.

Closed Loop violated the condition of the exclusion for CRTs thus creating an illegal storage and disposal facility."

152.     U.S. EPA has observed that "storing broken CRTs outdoors prior to processing is inconsistent with the premise that these materials are commodity-like." 71 Fed. Reg. at 42,933.

153.     For all of the reasons set forth above, the manner in which the Closed Loop Defendants processed CRT glass and otherwise managed inbound CRTs evidenced the fact that the Closed Loop Defendants had no intention of actually recycling these materials as though they were valuable commodities with a legitimate downstream market to receive them. Thus, the Closed Loop Defendants failed to satisfy the "non-disposal" requirement of the CRT conditional exclusion.

**d.     State of Ohio Environmental Enforcement**

154.     The Ohio EPA issued an NOV to Defendant Closed Loop on April 11, 2016, alleging that Defendant Closed Loop failed to qualify for the CRT conditional exclusion at the Properties.

40

155. The April 11, 2016 NOV was at least the fourth NOV Defendant Closed Loop had received for violations of Ohio hazardous waste and air quality laws during its operations at the Properties. The prior NOVs are as follows:

a. On or about October 17, 2013, Ohio EPA issued an NOV that similarly alleged that Defendant Closed Loop failed to qualify for the CRT conditional exclusion at 1675 Watkins Road.

b. On or about January 30, 2015, Ohio EPA issued an NOV that alleged that Defendant Closed Loop failed to post the appropriate emergency notification information at 1675 Watkins Road and for failing to provide Ohio EPA with land disposal restriction notifications.

c. On or about April 2, 2015, Ohio EPA issued an NOV that alleged that Defendant Closed Loop operated air contaminant sources without a permit at 1675 Watkins Road.

d. These NOVs are in addition to a series of OSHA citations relating to respiratory protection, lead, cadmium, and air contaminants issued on August 14, 2015 (15 "serious" citations); November 9, 2015 (1 "serious" citation); and December 24, 2015 (1 "other" citation).

156. The April 11, 2016 NOV alleged, *inter alia*, that Defendant Closed Loop: (a) failed to demonstrate that it was not speculatively accumulating CRTs or processed CRTs; (b) was not operating a "legitimate recycling facility"; (c) "did not have a feasible means of recycling"; and (d) "illegally transported a hazardous waste under Ohio's hazardous waste laws to an unpermitted facility."

157. Ohio EPA further indicated in the April 11, 2016 NOV that it was referring the matter to Ohio EPA's Division of Materials and Waste Management's hazardous waste enforcement coordinator for enforcement consideration.

158. Garrison was copied on the April 11, 2016 NOV issued by Ohio EPA to Defendant Closed Loop.

159. On or about August 31, 2016, Ohio EPA confirmed to Garrison's counsel in a telephone call that Ohio EPA views Garrison liable as owner of a hazardous waste facility and that Ohio EPA intends to pursue Garrison for clean-up costs.

160. On or about September 9, 2016, Ohio EPA sent a letter requesting the Attorney General of Ohio ("Ohio AG") to initiate "all necessary legal and/or equitable civil actions as may be deemed necessary and seek appropriate penalties against [Defendant Closed Loop] *and other appropriate persons* for the violations of ORC Chapter 3734 and the rules adopted thereunder." (Emphasis added.)

161. No enforcement action has been filed, however, and Garrison has not settled any actual alleged liability it may have regarding the Properties.

162. Garrison has been cooperating with the Ohio AG and Ohio EPA investigation. Garrison has undertaken efforts at its sole expense to investigate the nature and quantity of the abandoned CRTs and other e-waste at the Properties and to protect public health and safety. All costs incurred to date are consistent with the U.S. EPA National Contingency Plan ("NCP") at 40 C.F.R. Part 300, in keeping with 42 U.S.C. § 9607(b). These efforts have included, but are not limited to:

a.      arranging for the retention of an environmental consultant, Atwell, LLC, which performed site inspections and records reviews to characterize the

nature and extent of the abandoned CRTs and other e-waste at the Properties;

b.  directing Atwell, LLC to identify potential options and locations for the recycling or, if necessary, disposal of the abandoned CRTs and other e-waste in accordance with applicable federal and state laws;

c.  directing Atwell, LLC to obtain cost estimates from potential hazardous and electronic waste vendors for the recycling and/or disposal of the abandoned CRTs and other e-waste and for the abatement and remediation of the Properties;

d.  coordinating with Garrison's property management company, Jones Lang LaSalle, to secure the Properties to prevent unauthorized entry; and

e.  directing Atwell, LLC to prepare a health and safety plan to inform personnel participating in on-site activities at the Properties, including contractors performing removal or abatement activity, of the known or reasonably anticipated potential hazards and safety concerns.

### 2.  The Arranger/Transporter Defendants

163.  The Arranger/Transporter Defendants participated in and profited from the Closed Loop Defendants' e-waste recycling scheme.

164.  The Arranger/Transporter Defendants selected Defendant Closed Loop as the cheapest possible option on the market to receive and ostensibly "recycle" CRTs and other e-waste.

165.  The Arranger/Transporter Defendants either knew or should have known that the Closed Loop Defendants lacked the capacity to qualify for the CRT conditional exclusion at the time the arrangements were made to transport the CRTs and other e-waste

to the Properties and at the time the CRTs and other e-waste were accepted for transport to the Properties.

166.  The Arranger/Transporter Defendants benefited from the delay tactics that the Closed Loop Defendants implemented to hold Ohio EPA and Garrison at bay.

167.  With the requisite experience and sophistication in the tightknit e-waste industry, the Arranger/Transporter Defendants knew or should have known that the Closed Loop Defendants did not qualify for the CRT conditional exclusion, because the Arranger/Transporter Defendants knew or should have known that the Closed Loop Defendants were speculatively accumulating CRTs, had no feasible means of recycling them, and were using them in a manner constituting disposal.

168.  There is widespread and long-standing recognition in the e-waste recycling industry regarding concerns with e-waste abandonment, including concerns that were known or should have by known by the Arranger/Transporter Defendants, including as follows:

a.  The U.S. EPA web page on CRTs warns: "Because of rising costs, negative economic incentives and shifts in CRT glass markets, some CRT processors and recyclers are choosing to store the glass indefinitely rather than send it for recycling or disposal, which increases the risk of mismanagement and/or abandonment of CRTs." *See* https://www.epa.gov/hw/cathode-ray-tubes-crts-0.

b.  A U.S. EPA official recently observed at an e-waste conference called "E-Scrap 2016" that: "Basically, we've been seeing a pattern consistently across the nation of stockpiles, illegal disposal, mismanagement of

44

CRTs…. In some cases, it's just warehouses full." *See* E-Scrap News, U.*S. EPA Offers Information on CRT Regulations* (Oct. 6, 2016).

c.   Ohio EPA has issued guidance that provides: "In addition to being familiar with the manner in which electronics will be recycled, it is important to research the recycling facility to determine if it has any compliance problems. . . . If electronic equipment is not recycled properly, and it is a hazardous waste, both your company and the recycling facility will be liable for clean-up costs associated with improper disposal of hazardous components."                                         *See* http://epa.ohio.gov/portals/32/pdf/Electronic_Equipment_Guidance.pdf.

d.   BAN routinely warns against the dangers to public and health and the environment of e-waste abandonment. *See* http://www.ban.org/news/.

169.   Several recent e-waste abandonments and related environmental enforcement actions have been widely reported in the media, and any participant in the e-waste recycling market would have been well aware of the trend, including the Arranger/Transporter Defendants, briefly summarized as follows:

a.   A small sampling of recent enforcement actions includes several matters with ties to the Closed Loop Defendants: Eco International, LLC / Amandi Services / Envirocycle (U.S. EPA Region 2 Consent Agreement and Final Order dated Sept. 30, 2015 arising out of speculative accumulation violations and associated e-waste abandonment of approximately 13,000 tons of CRTs and other e-waste; Defendant Cauchi was a principal in a predecessor entity); E-World Recyclers, LLC (U.S. District Court for the Southern District of California indictment arising out of fraudulent e-waste

recycling services, dated Dec. 18, 2014; E-World Recyclers, LLC arranged for the transport of at least 12.1 million pounds of CRTs and other e-waste to Defendant Closed Loop); and 2TRG / E-Waste Systems (Ohio EPA NOV dated July 24, 2014 involving e-waste abandonment in Cincinnati, Ohio, much of which was later shipped to the Properties).

b.    At least one of the 25 states with e-waste recycling laws denied recycling credit to original equipment manufacturers for processed CRT glass sent to the Closed Loop Defendants.

    (i)    In or about December 2014, the Wisconsin Department of Natural Resources ("Wisconsin DNR") issued a statewide warning to e-waste recyclers that Defendant Closed Loop lacked the capacity to process CRTs and that any CRTs sent to Defendant Closed Loop would accordingly not be counted toward manufacturer credit under the E-Cycle Wisconsin Program.

    (ii)    The warning provided: "Until the furnace is up and running and processing CRT glass, the weight of any glass sent to Closed Loop and stored at any of its facilities may not be counted for manufacturer credit under E-Cycle Wisconsin."

170.    The fact that the Closed Loop Defendants were stockpiling CRTs at the Properties in violation of speculative accumulation requirements was widely known in the e-waste industry for several years prior to 2016 and was known or should have been known by the Arranger/Transporter Defendants. For example:

a.  Resource Recycling, Inc., an e-waste trade publication, not only tracks e-waste abandonment, but has reported specifically on the Closed Loop Defendants since at least 2014.

b.  A sampling of relevant Resource Recycling, Inc. articles includes: E-Scrap News, *CRT Player Closed Loop Receives Notice of Violation* (Nov. 6, 2014); E-Scrap News, *Under Regulatory Pressure, Closed Loop Explores Options* (Nov. 21, 2014); E-Scrap News, *Stored CRT Glass in Arizona is Set to Move* (June 18, 2015); E-Scrap News, *Auditor Voices Concerns about CRT Processor* (Feb. 25, 2016); E-Scrap News, *CRT Closed Loop Nears Collapse* (Apr. 14, 2016); E-Scrap News, *Closed Loop Leaves Ohio Facility* (May 5, 2016); E-Scrap News, *From Promises to Piles* (June 2016); E-Scrap News, U.*S. EPA Offers Information on CRT Regulations* (Oct. 6, 2016) (citing a U.S. EPA official's discussion of Defendant Closed Loop as one of the recent high-profile CRT issues in the U.S.).

171.  The fact that the Closed Loop Defendants were otherwise not operating in compliance with federal and state hazardous waste laws was widely known in the e-waste industry for several years and was known or should have been known by the Arranger/Transporter Defendants because, among other reasons:

a.  The Consent Order with ADEQ entered into on April 28, 2015 made national news. *See* E-Scrap News, *Stored CRT glass in Arizona is set to move* (June 18, 2015).

b.  Anyone conducting the most basic environmental due diligence on downstream recipients of CRTs would have or should have consulted the U.S. EPA's ECHO (Enforcement and Compliance History Online)

database, which provides a detailed history on noncompliance with hazardous waste and air quality laws at the Properties.

172.   The fact that the Closed Loop Defendants did not have a glass furnace was widely known in the e-waste industry for several years and was known or should have been known by the Arranger/Transporter Defendants.

173.   There are only a small number of glass furnaces that can currently extract lead from processed CRT glass in North America, and the existence of an additional option would have attracted widespread industry attention.

174.   The fact that the Closed Loop Defendants lacked other downstream markets to manage processed CRT glass was widely known in the e-waste industry for several years because it directly impacted the revenue streams of nearly every entity involved in the CRT recycling chain, including the Arranger/Transporter Defendants.

175.   At all times relevant, the Arranger/Transporter Defendants knew or should have known, and had an objectively reasonable basis to believe, that the processed CRT glass at the Properties would not be recycled in accordance with the CRT conditional exclusion, including its speculative accumulation requirement.

176.   Thus, for all of the reasons noted above, the Arranger/Transporter Defendants transported and/or arranged for the transport of CRTs and other e-waste to the Properties, despite the fact that they knew or should have known that the Closed Loop Defendants lacked the capacity to qualify for the CRT conditional exclusion.

### a.     Federal Prison Industries, Inc. d/b/a UNICOR

177.   Records produced by the Closed Loop Defendants indicate that Defendant UNICOR arranged for the transport of more than 4.6 million pounds of CRTs and other e-waste to the Properties starting in 2012 and extending into 2015.

178.    Records produced by the Closed Loop Defendants indicate that Defendant UNICOR arranged for the transport of these CRTs and other e-waste to the Properties from at least four different locations:  (a) Marianna Federal Prison Industries, UNICOR Recycling, Marianna, Florida; (b) Fort Dix Federal Prison Industries, UNICOR Recycling, Fort Dix, New Jersey; (c) Lewisburg Federal Prison Industries, UNICOR Recycling, Lewisburg, Pennsylvania; and (d) Tucson Federal Prison Industries, UNICOR Recycling, Tucson, Arizona.

179.    Defendant UNICOR and the Closed Loop Defendants executed a series of "Commodity Purchase Agreements," which included a unit price quote of as low as $0.0800 per pound for "Whole CRT Tubes."

180.    Defendant UNICOR knew or should have known that the artificially low prices being charged by Defendant Closed Loop substantially undercut the prevailing market with a price point that no reasonable industry participant could have believed to be sufficient to cover the costs of a legitimate recycling operation.  Thus, Defendant UNICOR knew or should have known that Defendant Closed Loop was running a sham recycling scheme, but chose to do business with it anyway in an attempt to benefit from its misconduct.

181.    In or about June 2016, E-Scrap News reported that Defendant UNICOR paid the Closed Loop Defendants nearly $2.5 million in e-waste recycling services from August 2011 through January 2015. *See* E-Scrap News, *From promises to piles* (June 2015).

182.    Defendant UNICOR has a long history of noncompliance with federal and state hazardous waste laws, including with the CRT conditional exclusion.

183.    In or about October 2010, the U.S. Department of Justice Office of the Inspector General ("DOJ OIG") released a 433-page report entitled "A Review of Federal Prison Industries' Electronic-Waste Recycling Program."

a.    The report concluded that "management of the e-waste recycling program resulted in numerous violations of health, safety, and environmental laws, regulations, and BOP [Bureau of Prisons] policies."

b.    With respect to CRTs, the report noted:

"According to staff, inmates, and UNICOR customers, open gaylord boxes and dumpster containers containing broken CRTs were routinely left outdoors at the UNICOR warehouse at FCI Elkton, some for months at a time, allowing for the release of dust and glass debris to the air, soil, and storm drains through wind or rainwater runoff. Staff at USP Atwater also stated that boxes of broken monitor glass were stored outdoors uncovered. After conferring with the EPA, we concluded that the activities described above constitute unlawful disposals and storage of hazardous waste."

184.    Particularly in light of the extensive scrutiny from DOJ OIG, Defendant UNICOR had the sophistication and experience in the e-waste industry necessary to ascertain the true nature of the Closed Loop Defendants' sham recycling operations.

185.    Defendant UNICOR, however, failed to exercise reasonable care to determine whether Defendant Closed Loop was operating in compliance with applicable law, including whether Defendant Closed Loop qualified for the CRT conditional exclusion.

186.    On or about November 19, 2014, a competitor of the Closed Loop Defendants e-mailed Defendant UNICOR, advising them that Defendant Closed Loop "does not recycle the funnel glass" and was not running a legitimate end-use e-waste recycling operation.

187.    Nevertheless, Defendant UNICOR continued to ship vast quantities of CRTs and other e-waste to the Properties to take advantage of the Closed Loop Defendants' artificially low prices.

188.    Records produced by the Closed Loop Defendants indicate that the drivers for Defendant UNICOR made at least 125 different deliveries to the Properties.

189.    Upon information and belief, these drivers observed firsthand that the Closed Loop Defendants' e-waste recycling operation was not a legitimate enterprise and amounted to sham recycling.

190.    These drivers would have witnessed the fact that Defendant Closed Loop was stockpiling CRTs and other e-waste in such immense quantities that they could not possibly be recycled in the course of a single calendar year or otherwise as part of a legitimate and economically viable recycling operation.

191.    These drivers would have witnessed how the Closed Loop Defendants used CRTs in a manner constituting disposal, including the hundreds of pallets of deteriorating Gaylords and broken CRTs stored outside that led to the October 17, 2013 NOV described in Paragraph 151; the deteriorating Gaylords stacked 15-20 feet high inside the Properties without sufficient aisle space in which to manage them, which led to the April 11, 2016 NOV described in Paragraph 156; and the hazardous leaded dust dispersed throughout the Properties given the lack of appropriate dust containment that contributed to the OSHA violations described in Paragraph 155.

192.    Thus, at all times relevant, Defendant UNICOR knew or should have known that the Closed Loop Defendants did not qualify for the CRT conditional exclusion, because Defendant UNICOR knew or should have known that the Closed Loop

51

Defendants were speculatively accumulating CRTs, had no feasible means of recycling them, and/or were using them in a manner constituting disposal.

193. Nevertheless, enticed by the artificially low prices offered by a sham recycling operation, Defendant UNICOR selected Defendant Closed Loop as its downstream e-waste "recycler," arranging for the transport of more than 4.6 million pounds of CRTs and other e-waste to the Properties over approximately a three-and-a-half year period, from 2013 through 2016.

### b. The Kuusakoski Defendants

194. Records produced by the Closed Loop Defendants indicate that Kuusakoski Defendants, including, but possibly not limited to, Defendants Kuusakoski Recycling, Kuusakoski US LLC (via VTKK, LLC), and Vintage Tech, arranged for the transport of more than 48.6 million pounds of CRTs and other e-waste to the Properties, representing more than 35% of the total amount of e-waste abandoned at the Properties, starting in 2012 and extending into 2016.

195. Kuusakoski Defendants, including, but possibly not limited to, Defendants Kuusakoski Recycling, Kuusakoski US LLC (via VTKK, LLC), and Vintage Tech, and the Closed Loop Defendants executed a series of "Commodity Purchase Agreements" to arrange for the transport of CRTs and other e-waste to the Properties.

196. The Commodity Purchase Agreements included a unit price quote of as low as $0.0750 per pound for "Whole CRT Tubes."

197. Kuusakoski Defendants, including, but possibly not limited to, Defendants Kuusakoski Recycling, Kuusakoski US LLC (via VTKK, LLC), and Vintage Tech, knew or should have known that the artificially low prices being charged by Defendant Closed Loop substantially undercut the prevailing market with a price point that no reasonable

industry participant could have believed to be sufficient to cover the costs of a legitimate recycling operation.  Thus, Kuusakoski Defendants, including, but possibly not limited to, Defendants Kuusakoski Recycling, Kuusakoski US LLC (via VTKK, LLC), and Vintage Tech, knew or should have known that Defendant Closed Loop was running a sham recycling scheme, but chose to do business with it anyway in an attempt to benefit from its misconduct.

198.    Kuusakoski Defendants, including, but possibly not limited to, Defendants Kuusakoski Recycling, Kuusakoski US LLC (via VTKK, LLC), and Vintage Tech, were the highest volume shippers to the Closed Loop Defendants from 2012 through 2016, despite issuing several guarantees on their website that they do not contribute to stockpiling CRTs:

a.    "We guarantee that CRT electronics and material sent to us is not stockpiled or shipped internationally."

   *See* http://www.kuusakoski.us/our-services/e-scrap-processing/.

b.    "We absolutely, positively do not stockpile CRT devices or CRT glass. You never have to worry that your hazardous, lead-containing CRT glass is sitting in a warehouse or empty lot for years."

   *See* http://www.kuusakoski.us/what-we-recycle/crts-crt-recycling/.

c.    "[W]e ensure our customers that their materials are properly handled, processed, and recycled."

   *See* http://www.kuusakoski.us/what-we-recycle/.

d.    "We work only with certified, audited downstream vendors that process and handle materials in safe, legal, and planet-friendly ways."

   *See*  http://www.kuusakoski.us/our-services/e-scrap-processing/.

199.  The Kuusakoski Defendants had the sophistication and experience in the e-waste industry necessary to ascertain the true nature of the Closed Loop Defendants' sham recycling operations.

200.  The Kuusakoski Defendants assert that they have "deep industry expertise," that they have "streamlined [their] processes to be among the best in the world," and that they "cover 48 states in the U.S., with processing facilities on the East Coast and centrally in the mid-West." *See* http://www.kuusakoski.us/our-services/e-scrap-processing/.

201.  Nevertheless, the Kuusakoski Defendants failed to exercise reasonable care to determine whether Defendant Closed Loop was operating in compliance with applicable law, including whether Defendant Closed Loop qualified for the CRT conditional exclusion.

202.  On or around January 5, 2013, the Closed Loop Defendants provided Kuusakoski Defendants, including, but possibly not limited to, Defendant Vintage Tech, with a proposal entitled "Strategic Partnership for Vintage Tech Recyclers & Closed Loop Refining & Recovery, Inc.," in which Kuusakoski Defendants, including, but possibly not limited to, Defendant Vintage Tech, would "provide funding to [the Closed Loop Defendants] for the first CRT commercial (Pb) lead recovery and glass furnace in the North America."

203.  The proposal, which was never accepted, evidences the fact that Kuusakoski Defendants including, but possibly not limited to, Defendant Vintage Tech, knew that the Closed Loop Defendants not only lacked the funding to build their own furnace, but that there were no other furnaces in all of North America to handle the vast amounts of CRTs that Kuusakoski Defendants, including, but possibly not limited to, Defendants Kuusakoski Recycling, Kuusakoski US LLC (via VTKK, LLC), and Vintage

54

Tech, had already shipped to the Properties and would continue to ship to the Properties for an additional three years.

204.     In or around August 2013, Kuusakoski Defendants, including, but possibly not limited to, Defendant Kuusakoski Recycling, issued a white paper entitled "An Analysis of the Demand for CRT Glass Processing in the U.S."  As pertinent, the white paper:

    a.     concludes that there is insufficient capacity to manage the quantity of CRTs reaching end-of-life and that "[t]here [were] only four end-use markets processing CRT glass in North America" and that "[o]f these, only one is located in the U.S." (citing Doe Run (Missouri), Teck Resources (British Columbia, Canada), Xstrata Zinc (New Brunswick, Canada), and Cali Resources/TDM (Baja California, Mexico));

    b.     provides an extensive accounting of recent e-waste abandonments, citing to Resource Recycling, Inc., among other publications, and noting: "Various reports within the past year have indicated some processors are stockpiling CRTs due to a lack of market capacity or affordable access to market capacity";

    c.     cites to a CRT stockpiling study, which concluded: "Recyclers 'setting aside' the cost of managing CRT glass while enjoying revenue from commodities is the single largest contributor to stockpiling CRT glass";

    d.     explains that market conditions are "further compounded because recyclers are reportedly eager to secure contracts from the OEMs [original equipment manufacturers], and they may therefore bid contracts with aggressively low pricing"; and

     e.     tracks the Closed Loop Defendants, citing to a "personal communication," for the premise that the Closed Loop Defendants were offering the lowest price point in the U.S. for inbound CRTs.

205.    In or around October 2014, Kuusakoski Defendants, including, but possibly not limited to, Defendant Kuusakoski Recycling, issued a second white paper entitled "CRT Glass Processing Update:  Industry and Regulatory Developments."  The white paper:

     a.     concludes that the overall conclusions of the first white paper "remain unchanged," *i.e.*, CRT glass continues to be stockpiled; that existing end-use markets fall far short of current demand; and that proposed future capacity is "at best, only available at some unknown point in the future (when the strongest demand exists today) or, at worst, speculative in nature";

     b.     reiterates many of the concerns regarding e-waste abandonment, noting that the "continued reporting of abandoned CRT stockpiles is empirical evidence that there is a lack of viable processing capacity";

     c.     tracks the lack of progress with the Closed Loop Defendants' proposed glass furnaces in Arizona and Ohio;

     d.     notes: "Given the extended periods of time that proposed facilities are taking to be developed, it is apparent that proposed facilities cannot be relied upon to provide real capacity until they are operating and demonstrate the ability to meet their design capacity"; and

     e.     quotes Defendant Cauchi, who admitted that Defendant Closed Loop had no feasible means of recycling and could not meet the speculative

accumulation requirements: "The fact of the matter is the amount of glass that's being generated cannot be consumed by the glass furnaces today, even if [all prospective operations] go on-line . . . . There's a five-year backlog on the ground."

206. In or around September 2016, Kuusakoski Defendants, including, but possibly not limited to, Defendant Kuusakoski Recycling, issued a third white paper entitled "CRT Glass Processing Capacity and Latest Enhancement to the Kuusakoski / PDC CRT Glass Solution (Third Update)."

    a.    The white paper devoted a significant amount of attention to the demise of Defendant Closed Loop, which prior white papers had been tracking.

    b.    Kuusakoski Defendants including, but possibly not limited to, Defendant Kuusakoski Recycling, quoted Defendant Benham's efforts to blame everyone: "[T]he customers and the OEMs that allowed shipment to our site [were well aware] of what we were doing. . . . No one was hiding the pickle."

    c.    Defendant Benham's suggestion that the customers and OEMs were aware of the Closed Loop Defendants' business practices confirms that they, too, were beneficiaries and willing participants in the Closed Loop Defendants' scheme to defraud Garrison.

    d.    Further, citing the Closed Loop Defendants' furnaces that were never built, Kuusakoski Defendants, including, but possibly not limited to, Defendant Kuusakoski Recycling, admitted that a reasonable duty of care in the industry would involve some modicum of due diligence by OEMs, customers, and others upstream in the chain:

"[C]aution and prudence must be exercised with end-use markets that are accumulating inventories of CRT glass in advance of a facility actually commencing processing operations . . . . (as in the case of Closed Loop) . . . . [A]dditional due diligence of end-use processors may be required by upstream processors and OEMs beyond the reported capacity of the end-use processor. The fact that an end-use market may be allowed by one of the certification organizations (Sustainable Electronics Recycling International, formerly R2 Solutions, and e-Stewards) has never been a guarantee that material is being properly handled. GES was R2 certified, and although an audit of the facility identified serious nonconformities, the burying of CRTs was discovered by a news channel. A demonstrated, long-term track record in handling CRT glass would be an important due diligence criterion."

207. Thus, by their own admission, the highest volume shippers to Defendant Closed Loop knew or should have known that the Closed Loop Defendants did not qualify for the CRT conditional exclusion and yet transported and/or arranged for the transport of more than 48.6 million pounds of CRTs and other e-waste to them anyway.

208. The white papers authored by Kuusakoski Defendants, including, but possibly not limited to, Defendant Kuusakoski Recycling, also established that they had their own capacity to process CRTs as an end-use market:

a. The 2013 white paper promotes a new CRT recycling facility under development by Kuusakoski Defendants, including, but possibly not limited to, Defendant Kuusakoski Recycling, in Peoria, Illinois that would ostensibly "treat" crushed CRT glass and use the treated material as "alternative daily cover" for municipal landfills through a process called "KleanKover."

b. The 2014 white paper indicates that Kuusakoski Defendants, including, but possibly not limited to, Defendant Kuusakoski Recycling, have "processed millions of pounds of CRT material" through the "KleanKover Recycling Solution," which has "been successfully operating since November 2013."

58

c.    The 2014 white paper also promotes yet another new method of handling CRT glass under development by Kuusakoski Defendants, including, but possibly not limited to, Defendant Kuusakoski Recycling, in which "treated CRT glass will be stored in a dedicated [landfill] cell that will permit future mining of the material if future end-use markets for leaded glass are developed."

d.    The 2016 white paper indicates that the new method of retrievable landfill storage cells has been operational since July 2015 and that Kuusakoski Defendants, including, but possibly not limited to, Defendant Kuusakoski Recycling, had been providing a "guaranteed, defined market for 50,000 tons per year of CRT glass."

209.    Nevertheless, Kuusakoski Defendants, including, but possibly not limited to, Defendants Kuusakoski Recycling, Kuusakoski US LLC (via VTKK, LLC), and Vintage Tech, continued to ship vast quantities of CRTs and other e-waste to the Properties to take advantage of the Closed Loop Defendants' artificially low prices.

210.    In or around September 23-24, 2014, Anssi Takala, on behalf of at least one of the Kuusakoski Defendants, and Defendant Benham participated in the "Sustainable Materials Management (SMM) Electronics Recycling Forum" ("SSM Forum") in Arlington, Virginia, which was hosted by U.S. EPA as part of an effort "to address the challenges of Cathode Ray Tube (CRT) stockpiling."

211.    The SSM Forum began with the following "CRT Problem Statement":

"CRTs and CRT glass were once easily recycled into new CRTs; however, the demand for new CRTs has collapsed in favor of new flat panel technologies. Because of rising costs, negative economic incentives, and shifts in CRT glass markets, some CRT processors and recyclers are choosing to store the glass indefinitely rather than send it for recycling (or

disposal), which increases the risk of mismanagement and/or abandonment of the CRTs."

212.    U.S. EPA summarized the "Factors Leading to the Problem" in a subsequent publication about the SSM Forum; these factors included, among other things:

a.    "There is a financial incentive for entities to get paid to collect CRTs and CRT glass and then not pay to recycle (or dispose)."

b.    "'Cherry-picking' high-value parts lowers value down the chain."

c.    "Shipments out of state can't be regulated by original jurisdiction."

d.    "Barriers to [market] entry are low."

e.    "Recyclers aren't charging enough to cover costs for recycling."

f.    "Thin operating margins, insufficient funds held."

213.    Records produced by the Closed Loop Defendants indicate that the drivers for Kuusakoski Defendants, including, but possibly not limited to, Defendants Kuusakoski Recycling, Kuusakoski US LLC (via VTKK, LLC), and Vintage Tech, nevertheless made at least 1300 different deliveries to the Properties.

214.    Upon information and belief, these drivers observed firsthand that the Closed Loop Defendants' e-waste recycling operation was not a legitimate enterprise and amounted to sham recycling.

215.    These drivers would have witnessed the fact that Defendant Closed Loop was stockpiling CRTs and other e-waste in such immense quantities that they could not possibly be recycled in the course of a single calendar year or otherwise as part of a legitimate and economically viable recycling operation.

216.    These drivers would have witnessed firsthand how the Closed Loop Defendants used CRTs in a manner constituting disposal, including the hundreds of pallets of deteriorating Gaylords and broken CRTs stored outside that led to the October 17, 2013

NOV described in Paragraph 151; the deteriorating Gaylords stacked 15-20 feet high inside the Properties without sufficient aisle space in which to manage them, which led to the April 11, 2016 NOV described in Paragraph 156; and the hazardous leaded dust dispersed throughout the Properties given the lack of appropriate dust containment that contributed to the OSHA violations described in Paragraph 155.

217.    Upon information and belief, the Kuusakoski Defendants' business model appears to be based on generating revenue from sham recycling operations, then profiting again off the cleanup.  *See* http://www.kuusakoski.us/our-services/crt-glass-clean-ups/.

218.    Upon information and belief, the Kuusaksoski Defendants arranged for the disposal of CRTs and other e-waste at the Properties, generating millions of dollars in profit, knowing that they would have an additional opportunity to profit off the cleanup of the Properties after the Closed Loop Defendants abandoned them.

219.    On or about April 28, 2016, Kuusakoski Defendants, including, but possibly not limited to, Defendant Kuusakoski Recycling, without acknowledging they were the top CRT shipper to the Properties, brazenly submitted a bid to Garrison to clean up the e-waste that the Closed Loop Defendants had abandoned, which included the millions of pounds of e-waste that Kuusakoski Defendants themselves had shipped or arranged to be shipped previously.

220.    Their bids ranged from $16.5 million to $20.9 million, in what would likely have been one of the most lucrative contracts for e-waste remediation in U.S. history.

221.    On or about June 7, 2017, counsel for Defendant Kuusakoski Recycling sent a letter to Plaintiff's counsel providing a revised (and unsolicited) second bid, explaining that it should not be disqualified from the bidding process because it did not ship e-waste to the Properties;  the letter went on to blame Defendant Vintage Tech, which

was described as a "sister entity" of Defendant Kuusakoski Recycling, for contributing to the abandonment at the Properties.

222.    On or about July 10, 2017, a "Sam" from Defendant Vintage Tech left Plaintiff's counsel a voice mail requesting an opportunity to submit a bid of its own to remediate the Properties.

223.    Kuusakoski Defendants including, but possibly not limited to, Defendant Kuusakoski Recycling and Defendant Vintage Tech, thus sought to bootstrap the revenues they had generated from the Closed Loop Defendants' artificially low prices by offering to clean up the very same mess they had knowingly created.

224.    Thus, at all times relevant, the Kuusakoski Defendants knew or should have known that the Closed Loop Defendants did not qualify for the CRT conditional exclusion, because the Kuusakoski Defendants knew or should have known that the Closed Loop Defendants were speculatively accumulating CRTs, had no feasible means of recycling them, and/or were using them in a manner constituting disposal.

225.    Nevertheless, enticed by the artificially low prices offered by a sham recycling operation, Kuusakoski Defendants, including, but possibly not limited to, Defendants Kuusakoski Recycling, Kuusakoski US LLC (via VTKK, LLC), and Vintage Tech, selected the Closed Loop Defendants as their downstream e-waste "recycler," arranging for the transport of more than 48.6 million pounds of CRTs and other e-waste to the Properties over a four-year period, from 2012 through 2016.

## FIRST CAUSE OF ACTION

### (Declaratory Judgment)

226.    Plaintiff repeats and realleges the allegations in Paragraphs 1 through 225 of this Complaint as if fully set forth herein.

227. This claim arises under the provisions of the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, which authorizes this Court to render declaratory judgment as to the allocation of liability for response costs and damages.

228. An actual, substantial, and justiciable controversy exists between Garrison and all Defendants regarding their respective rights and obligations for the response costs and/or damages that have been and will be incurred in connection with the release and/or threatened release of hazardous substances at the Properties.

229. Declaratory relief is necessary because, without a ruling on the parties' allocation of liability for response costs and damages, Garrison would be forced to bring subsequent lawsuits to obtain contribution for future response costs.

230. Garrison seeks a declaratory judgment against Defendants under 28 U.S.C. §§ 2201-2202, holding all Defendants strictly liable for all of response costs incurred and to be incurred at the Properties that will bind the parties in any subsequent action to recover further response costs or damages.

## SECOND CAUSE OF ACTION

### (CERCLA Cost Recovery)

231. Garrison repeats and realleges the allegations in Paragraphs 1 through 230 of this Complaint as if fully set forth herein.

232. Each Defendant is a "person" as defined by 42 U.S.C. § 9601(21).

233. The Properties constitute a "facility" within the meaning of 42 U.S.C. § 9601(9).

234. Hazardous substances, within the meaning of 42 U.S.C. § 9601(14), including, but not limited, to lead, were disposed of at the Properties during the period in which Defendant Closed Loop leased and operated the facility at the Properties and during

the period in which the Arranger/Transporter Defendants transported or arranged to be transported CRTs and other e-waste to the Properties.

235.    There have been and continue to be "releases" or "threatened releases" of hazardous substances at, on to and from the Properties, within the meaning of 42 U.S.C. §§ 9601(22) and 9607(a).

236.    CERCLA defines release as including "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant)." 42 U.S.C. § 9601(22).

237.    The vast majority of the e-waste in 1655 and 1675 Watkins Road consists of used, broken CRT glass, much or all of which was not maintained in appropriate containers and much of which was released from this initial confinement, spilling to the floor as a result.

238.    CRT processing, which involves breaking leaded glass, releases hazardous leaded dust, which has dispersed throughout 1655 and 1675 Watkins Road; has become embedded in the CRT processing equipment and surrounding structures; has collected on the floor; and was tracked by workers throughout the warehouses.

239.    A "release" occurred at 1655 and 1675 Watkins Road, regardless of whether the leaded glass or leaded dust escaped from initial confinement, given that Congress expressly defined the term "release" in CERCLA as "including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant."

240. As a result of the releases or threatened releases of hazardous substances, Garrison has incurred and continues to incur response costs within the meaning of 42 U.S.C. §§ 9601(23) and (25) as described in Paragraph 162 hereof.

241. All of Garrison's costs were and are being incurred consistent with CERCLA's NCP, 42 U.S.C. § 9605(a) and 40 C.F.R. Part 300.

242. To date, Garrison has incurred in excess of $112,000 in such costs. Garrison will continue to incur response costs in the future.

243. Defendants Benham, Cauchi and LaPoint each had the authority to direct, manage and control, and each of them did direct, manage and control, the acceptance, intake, handling, disposition, treatment, storage and disposal of the CRTs and other e-waste at the Properties.

244. CERCLA § 107(a)(2), 42 U.S.C. § 9607(a)(2) provides, in pertinent part, that any person who at the time of disposal of any hazardous substance operated a facility at which such hazardous substances were disposed of is liable to "any person" who, as a result of a release or threatened release of hazardous substances from the facility, incurs response costs consistent with the NCP. As such, the Closed Loop Defendants are each liable under CERCLA to Garrison for all of Garrison's response costs for the Properties.

245. Each of the other Defendants and their predecessors were persons, including entities and individuals, who: (a) are liable under CERCLA § 107(a)(3), 42 U.S.C. § 9607(a)(3), as persons who arranged with a third party for the disposal or treatment at the Closed Loop Defendants' facility of CRTs owned or possessed by them; or (b) are liable under CERCLA § 107(a)(4), 42 U.S.C. § 9607(a)(4), as persons who accepted CRTs for transport to the Closed Loop Defendants' facility selected by such person. As

such, the other Defendants and their predecessors are each liable under CERCLA for the environmental response costs for the Properties.

246. Plaintiffs are also entitled to statutory interest pursuant to 42 U.S.C. § 9607(a)(4).

### THIRD CAUSE OF ACTION

### (Common Law Negligence)

247. Garrison repeats and realleges the allegations in Paragraphs 1 through 246 of this Complaint as if fully set forth herein.

248. Each of the Defendants owed a duty to Garrison, the owner of the Properties, to use reasonable care to avoid causing reasonably foreseeable damage to the Properties.

249. A reasonable and prudent person engaged in the transport of, or arranging for the transport of, CRTs and other e-waste exercises due diligence on downstream recipients to avoid causing injury to public health, property, or the environment, as discussed in Paragraph 206(d).

250. At all times relevant, Garrison detrimentally relied on the Closed Loop Defendants' representations that they had a feasible means of recycling the CRTs that were accumulated at the Properties.

251. At all times relevant, Garrison detrimentally relied on the Arranger/Transporter Defendants' due diligence on Defendant Closed Loop and failure to perform their contractual obligations to Defendant Closed Loop in compliance with applicable federal and state hazardous waste law, which required a feasible means of recycling the CRTs and other e-waste disposed of at the Properties.

252.    The Arranger/Transporter Defendants created the condition that caused damage to Garrison by transporting and arranging for the transport for CRTs and other e-waste to the Properties, despite the fact that there was no feasible means of recycling them, whereas such acts and omissions advanced to a point so as to have launched a force or instrument of harm against Garrison, as the owner of the Properties.

253.    By the acts and omissions of Defendants, Defendants were negligent and breached their duties to Garrison, thereby causing reasonably foreseeable damage to Garrison, as the owner of the Properties.

254.    As a direct and proximate result of the acts and omissions of Defendants, Garrison cannot rent or sell the Properties in their present condition and has suffered and continues to suffer physical harm to the Properties as well as economic harm, including, but not limited to, loss of rent, loss of business opportunity, and costs of environmental cleanup.

255.    The Defendants' sham recycling scheme was designed to shift the costs of disposing of the CRTs and other e-waste in the Properties directly to Garrison, the owner of the Properties.

256.    The Defendants knew or should have known that their actions created strict liability under CERCLA and RCRA for owners of properties at which there are releases of hazardous substances or wastes, even when those properties are contaminated by third parties.

257.    Furthermore, Defendants acted with conscious disregard for the hazards associated with the hazardous substances they handled at the Properties, and through their reckless acts and omissions caused the release or threatened release of hazardous

substances and wastes at the Properties for which the owner of the Properties may be held liable under federal and state hazardous waste law.

**<u>REQUEST FOR RELIEF</u>**

WHEREFORE, Plaintiff Garrison Southfield Park LLC respectfully requests entry of judgment in its favor:

A.     With respect to the First Cause of Action, declaring that Garrison is entitled to cost recovery for the removal of the CRTs and other e-waste and associated abatement costs;

B.     With respect to the Second Cause of Action, awarding Garrison damages in the amount of at least $14,181,553.74;

C.     With respect to the Third Cause of Action, awarding Garrison damages in the amount of at least $14,181,553.74; and

D.     Granting such other and further relief in law or equity as the Court may deem proper.

Dated: September 5, 2017

Respectfully submitted,

*Trial Attorney*:

 /s/ Jack A. Van Kley
By: Jack A. Van Kley  (#0016961)
VAN KLEY & WALKER, LLC
132 Northwoods Blvd., Suite C-1
Columbus, Ohio 43235
Telephone: (614) 431-8900
Facsimile: (614) 431-8905
Email:  jvankley@vankleywalker.com

*Of Counsel*:

Karl R. Heisler
(*Pro Hac Vice* admission pending)
KATTEN MUCHIN ROSENMAN LLP
2900 K Street, NW
North Tower – Suite 200
Washington, DC 20007-5118
Telephone: (202) 625-3530
Facsimile: (202) 298-7570
Email: karl.heisler@kattenlaw.com

Matthew Parrott
(*Pro Hac Vice* admission pending)
FRIED, FRANK, HARRIS, SHRIVER &
JACOBSON LLP
One New York Plaza
New York, NY 10004
Telephone: (212) 859-8996
Facsimile: (212) 859-4000
Email: M.Parrott@friedfrank.com

*Attorneys for Plaintiff Garrison Southfield Park
LLC*

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable in this case.

/s/ Jack A. Van Kley

*Attorneys for Plaintiff Garrison Southfield
Park LLC*