**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

GARRISON SOUTHFIELD PARK LLC,     )
)
       Plaintiff,     )
)
v.     )
)
CLOSED LOOP REFINING AND RECOVERY, )
INC.; FEDERAL PRISON INDUSTRIES, INC. )
D/B/A UNICOR; KUUSAKOSKI INC.;     )   Case No.2:17-cv-00783-GCS-CMV
KUUSAKOSKI US LLC; KUUSAKOSKI )
GLASS RECYCLING LLC; VINTAGE TECH, )
LLC A.K.A. VINTAGE TECH RECYCLERS,  )   Judge George C. Smith
INC. and VINTAGE TECH RECYCLING;    )   Mag. Judge Chelsey M. Vascura
ACCURATE IT SERVICES LTD.; B&K )
TECHNOLOGY SOLUTIONS INC. D/B/A )
ADVANCED TECHNOLOGY RECYCLING; )
AIM ECYCLING, LLC; AMERICAN )
RETROWORKS, INC.; ARROW RECOVERY )
GROUP, INC.; CIE INTERNATIONAL L.L.C. )
D/B/A C2 MANAGEMENT; COHEN )
ELECTRONICS, INC.; COMPLETE )
RECYCLING SOLUTIONS, LLC; )
COMPRENEW; COMPUPOINT USA LLC; )
COMPUTER RECYCLING OF VIRGINIA, )
INC.; DYNAMIC LIFESTYLE INNOVATIONS )
INC. A/KA DYNAMIC RECYCLING, INC. )
A.K.A. DYNAMIC 1 TO 1 CONTRACT )
LOADS; ECYCLESECURE, LLC; E-LOT )
ELECTRONICS RECYCLING, INC.; )
ENVIRONMENTAL COORDINATION )
SERVICES AND RECYCLING, INC.; )
EREVIVAL LLC; ROBERT A. ERIE; EWASTE )
RECYCLING SOLUTIONS, LLC; EWORKS )
ELECTRONICS SERVICES, INC.; E-WORLD )
RECYCLERS, LLC A.K.A. E-WORLD )
ONLINE, LLC; GEEP HOLDINGS INC.; GEEP )
USA INC.; GREAT LAKES ELECTRONICS )
CORPORATION; GREEN CHIP, INC.; GREEN )
TECH RECYCLING, LLC; GREEN WAVE )
COMPUTER RECYCLING, LLC; IMS )
ELECTRONICS RECYCLING, INC.; INTERCO )
TRADING, INC.; JD BEAVERS CO. LLC; )
MRC I, LLC D/B/A MRC RECYCLING; ABC )
CORP HOLDINGS LLC D/B/A OHIO DROP )

1

OFF, LLC; POTOMAC ECYCLE, LLC; F&F )
ENVIRONMENTAL, INC. D/B/A )
QUICKSILVER RECYCLING SERVICES; )
RMG ENTERPRISE, LLC; ROCHESTER )
COMPUTER RECYCLING & RECOVERY, )
LLC A.K.A. EWASTE+; SIAM RECLAIM )
TECHNOLOGIES, INC.; MOSHE SILAGI; )
STRICKLAND ELECTRONIC RECYCLING, )
LLC; SUNNKING, INC.; TK6, INC.; USB )
RECYCLING.COM, LLC; WASTE )
COMMISSION OF SCOTT COUNTY, IOWA; )
and FORMALLY BARDWILLS, LLC D/B/A )
WE ELECTRONICS. )
)
　　　　　　　　　Defendants. )

## FIRST AMENDED COMPLAINT

Plaintiff Garrison Southfield Park LLC ("Garrison" or "Plaintiff"), by the undersigned counsel, as and for its First Amended Complaint (hereinafter referred to as the "Complaint"), alleges as follows against Closed Loop Refining and Recovery, Inc. ("Closed Loop"), Moshe Silagi, and the "Arranger/Transporter Defendants," which include, respectively and together, Federal Prison Industries, Inc. d/b/a UNICOR ("UNICOR"); Kuusakoski Inc., Kuusakoski US LLC, Kuusakoski Glass Recycling LLC ("Kuusakoski Recycling"), and Vintage Tech, LLC a.k.a. Vintage Tech Recyclers, Inc. and Vintage Tech Recycling ("Vintage Tech") (with Defendants Kuusakoski Inc., Kuusakoski US LLC, Kuusakoski Recycling, and Vintage Tech, respectively and together, the "Kuusakoski Defendants"); Accurate IT Services Ltd. ("Accurate IT"); B&K Technology Solutions Inc. d/b/a Advanced Technology Recycling ("ATR"); AIM Ecycling, LLC ("AIM"); American Retroworks, Inc. ("ARI"); Arrow Recovery Group, Inc. ("ARG"); CIE International L.L.C. d/b/a C2 Management ("C2"); Cohen Electronics, Inc. ("Cohen"); Complete Recycling Solutions, LLC ("CRS"); Comprenew; CompuPoint USA LLC ("CompuPoint"); Computer Recycling of Virginia, Inc. ("CRV"); Dynamic Lifestyle

Innovations Inc. a.k.a. Dynamic Recycling, Inc. a.k.a. Dynamic 1 to 1 Contract Loads ("Dynamic"); eCycleSecure, LLC ("eCycle"); e-Lot Electronics Recycling, Inc. ("E-Lot"); Environmental Coordination Services and Recycling, Inc. ("ECSR"); eRevival LLC ("eRevival"); Robert A. Erie, individually; eWaste Recycling Solutions, LLC ("eWaste Recycling"); eWorks Electronics Services, Inc. ("eWorks"); E-World Recyclers, LLC a.k.a. E-World Online, LLC ("E-World Online"); GEEP Holdings Inc. ("GEEP"); GEEP USA Inc. ("GEEP USA"); Great Lakes Electronics Corporation ("Great Lakes"); Green Chip, Inc. ("Green Chip"); Green Tech Recycling LLC ("Green Tech"); Green Wave Computer Recycling, LLC ("Green Wave"); Interco Trading, Inc. ("Interco"); IMS Electronics Recycling, Inc. ("IMS"); JD Beavers Co. LLC ("JD Beavers"); MRC I, LLC d/b/a MRC Recycling ("MRC"); ABC Corp Holdings LLC d/b/a Ohio Drop Off, LLC ("Ohio Drop Off"); Potomac eCycle, LLC ("Potomac"); F&F Environmental, Inc. d/b/a Quicksilver Recycling Services ("Quicksilver"); RMG Enterprise, LLC ("RMG"); Rochester Computer Recycling & Recovery, LLC a.k.a. EWASTE+ ("RCRR"); Siam Reclaim Technologies, Inc. ("Siam"); Strickland Electronic Recycling, LLC ("Strickland"); Sunnking, Inc. ("Sunnking"); TK6, Inc. ("TK6"); USB Recycling.com, LLC ("USB"); Waste Commission of Scott County, Iowa ("Waste Commission"); and Formally Bardwills, LLC d/b/a We Electronics ("We").

## I.     NATURE OF THE ACTION

1.     This action seeks declaratory relief, cost recovery, and common law damages resulting from environmental contamination caused by Defendant Closed Loop, Defendant Silagi, and the Arranger/Transporter Defendants at two contiguous warehouses owned by Garrison and located at 1655 and 1675 Watkins Road, Columbus, Ohio 43207 (together, the "Properties"). Plaintiff's claims for relief arise under (i) the Declaratory

Judgment Act, 28 U.S.C. §§ 2201-2202; (ii) the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended ("CERCLA"), 42 U.S.C. §§ 9601-9675; and (iii) principles of common law.

2.     As more fully demonstrated below, Defendant Closed Loop and the Arranger/Transporter Defendants collaborated in an elaborate sham recycling scheme that extended across the country to profit from the stockpiling and subsequent abandonment of more than 64,000 tons (128 million pounds) of hazardous electronic waste ("e-waste") at the Properties. Defendant Closed Loop collected millions of dollars in illegal revenue over a four-year period, while the Arranger/Transporter Defendants saved millions of dollars in waste disposal fees, leaving Garrison with the costs of removing and/or remediating nearly 10 acres of hazardous e-waste at the Properties, at a cost that will exceed $14.2 million.

3.     Defendant Closed Loop launched the scheme by leasing the Properties from Garrison, claiming to be a bona fide recycler of cathode ray tubes, which are the glass vacuum tubes that constitute the video display component of televisions, computer monitors, and other electronic devices. It then charged artificially low prices to undercut the national e-waste recycling market and to accept as many CRT-containing electronic devices ("CRTs") as possible, including CRTs from the Arranger/Transporter Defendants, to maximize profits. In certain instances, it cherry-picked what limited valuable commodities it could (such as wire, plastics, aluminum, and steel) from the inbound CRTs, then sold those commodities for additional profit. It cross-contaminated the remaining CRT glass by feeding both the leaded funnel glass and the panel glass together into a mechanical crusher, creating a worthless stream of commingled leaded and nonleaded glass. This ostensibly "processed" CRT glass was stockpiled in the Properties indefinitely, without any feasible means to recycle it. Contrary to its assertions, Defendant Closed Loop never

4

had the capacity to install and operate a furnace to recycle this glass, nor did it ever have sufficient downstream markets willing to accept and recycle it.

4. The Arranger/Transporter Defendants aided and abetted the scheme by transporting and/or arranging for the transport of CRTs and other e-waste to the Properties, despite the fact that they knew or should have known that Defendant Closed Loop was a sham recycler. The Arranger/Transporter Defendants had the sophistication and the experience in the e-waste industry to ascertain the true nature of Defendant Closed Loop's sham recycling operation, yet continued to cause truckload after truckload of CRTs and other e-waste to be deposited at the Properties to take advantage of Defendant Closed Loop's artificially low prices. The Arranger/Transporter Defendants fully recognized at the time the arrangements were made, and at the time the CRTs and other e-waste were accepted for transport, that Defendant Closed Loop lacked any feasible means to recycle them. They thus provided material support to the sham recycling scheme and should likewise be held accountable for the environmental contamination that resulted.

5. Through four years of misrepresentations, acts, and omissions, Defendant Closed Loop misled Garrison and the Ohio Environmental Protection Agency ("Ohio EPA") with respect to whether Defendant Closed Loop qualified for a limited regulatory exclusion from federal and state hazardous waste regulations that applies only to legitimate CRT recycling operations ("CRT conditional exclusion"). Defendant Closed Loop pursued a series of delay tactics designed to mislead Garrison and the Ohio EPA into believing that recycling operations at the Properties qualified for the CRT conditional exclusion and that there was a feasible means of recycling the CRTs and other e-waste that had been accumulating. Throughout all or part of this four-year period, the Arranger/Transporter Defendants knew or should have known that Defendant Closed Loop could not have

possibly met all of the elements of the CRT conditional exclusion given the extraordinary volume of e-waste at issue and Defendant Closed Loop's inability to demonstrate that there was any feasible means of recycling all of it. The Arranger/Transporter Defendants accordingly knew or should have known that the CRTs and other e-waste they were shipping was classified as hazardous waste that was being sent for disposal or treatment. Nevertheless, scores of shippers, including the Arranger/Transporter Defendants herein, arranged for the transport of these materials to the Properties as if they were being sent for recycling, benefitting from the scheme through willful blindness or outright conspiracy, in an effort to profit off Defendant Closed Loop's price point – an offer no legitimate CRT recycler could possibly beat.

6.     Soon after the Ohio EPA discovered the scheme, Defendant Closed Loop abandoned the Properties, leaving behind towers of whole CRTs and "processed" CRT glass that had been packed into the warehouses 15-20 feet high. Significant portions of the Properties remain inaccessible given the manner in which Defendant Closed Loop blocked aisles to make room for more inbound shipments from the Arranger/Transporter Defendants. CRT disassembly lines were halted mid-stream as part of Defendant Closed Loop's rushed exit. Employee overalls, boots, and gloves contaminated with hazardous leaded dust were left in piles on the floor. Office furniture and file cabinets were abandoned as well, although Defendant Closed Loop took the time to remove nearly all of the business records from the Properties, except for those contained in a single file drawer, which was jammed shut.

7.     The Court of Common Pleas in Franklin County, Ohio ("Franklin County Court") conducted a bench trial in connection with related state litigation filed by Garrison

against Defendant Closed Loop arising out of the lease agreements for the Properties. On or about August 7, 2017, the Court found for Garrison, ruling that:

> ". . . Closed Loop was not engaged in legitimate CRT recycling operations at the Properties, but was instead engaged in the speculative accumulation and subsequent abandonment and disposal of the CRT Waste at the Properties without any feasible means of recycling it. The testimony established that [Closed Loop] . . . also failed to segregate leaded funnel glass from panel glass during its CRT recycling operation, resulting in the abandonment of over 113 million pounds of crushed, commingled leaded and unleaded glass at the Properties in addition to approximately 15 million pounds of other electronic waste. . . . [A] legitimate CRT recycling operation at the Properties would not have commingled the CRT glass because the cross-contamination of leaded and unleaded glass would have rendered any available downstream recycling option unprofitable, *i.e.*, no legitimate market existed for this commingled glass as a feedstock for lead smelters or otherwise."

Despite Garrison's best efforts, however, it has been unable to recover the judgment from Defendant Closed Loop through the Franklin County litigation and discussions leading up to it.

8.    Garrison now brings this action to require Defendant Closed Loop, Defendant Silagi, and the Arranger/Transporter Defendants to clean up and/or pay for the cleanup of more than 64,000 tons (128 million pounds) of e-waste that currently remains at the Properties.

## II.    PARTIES

### A.    Plaintiff Garrison

9.    Plaintiff is a limited liability corporation duly organized and existing under the laws of the State of Delaware, with its principal office and place of business in New York, New York. Plaintiff owns the Properties.

### B.    Defendant Closed Loop

10.    Defendant Closed Loop is a corporation organized under the laws of the state of Arizona, with a principal place of business in Phoenix, Arizona. Starting in 2012 and extending into 2016, Defendant Closed Loop was a tenant occupying the Properties.

### C.     Defendant Silagi

11.     Defendant Silagi is an individual with a principal place of business at 101 Hodencamp Road, Suite 200, Thousand Oaks, California 91360.  Defendant Silagi was the sole member and the managing member of MS-South LLC, which owned 1675 Watkins Road, Columbus, Ohio 43207 ("1675 Watkins Road") from prior to April 6, 2012 through on or about April 29, 2013, and which leased 1675 Watkins Road to Defendant Closed Loop during this time period.

### D.     Defendant UNICOR

12.     Defendant UNICOR is a wholly-owned government corporation pursuant to 31 U.S.C. § 9101(3)(E), with a principal place of business in Washington, DC. Pursuant to 42 U.S.C. § 9620(a)(1), the federal government waived sovereign immunity for purposes of cases arising under 42 U.S.C. § 9607. Starting in 2012 and extending into 2015, Defendant UNICOR arranged for the transport of over 4.6 million pounds of CRTs and other e-waste to the Properties.

### E.     The Kuusakoski Defendants

13.     Defendant Kuusakoski Inc. is a corporation organized under the laws of the state of Delaware, with a principal place of business in Philadelphia, Pennsylvania. Defendant Kuusakoski Inc. holds itself out as operating as a parent of Defendants Kuusakoski US LLC, Kuusakoski Recycling, and Vintage Tech. Kuusakoski Inc.'s 2015 financial statements, however, provide that "[t]he operations of Vintage Tech, which was acquired at the end of 2014, were *integrated* with those of Kuusakoski" (emphasis added); thus, the Defendant Vintage Tech acquisition appears to have been more of a consolidation or merger, and Kuusakoski Inc. appears to have otherwise managed, directed, or conducted the operations of Defendant Vintage Tech. Starting in 2012 and extending into 2016,

Defendant Kuusakoski Inc. and/or one or more of its related entities, Defendants Kuusakoski US LLC, Kuusakoski Recycling, and Vintage Tech, arranged for the transport of over 46 million pounds of CRTs and other e-waste to the Properties, representing more than 35% of the total amount of e-waste abandoned by Defendant Closed Loop at the Properties. Defendants Kuusakoski Inc., Kuusakoski US LLC, Kuusakoski Recycling, and/or one of their related entities acquired Defendant Vintage Tech in 2014.

14.     Defendant Kuusakoski US LLC is a limited liability company organized under the laws of the state of Delaware, with a principal place of business in Plainfield, Illinois. Defendant Kuusakoski US LLC holds itself out as operating as a subsidiary of Kuusakoski Inc. Starting in 2012 and extending into 2016, Defendant Kuusakoski US LLC and/or one or more of its related entities, Defendants Kuusakoski Inc., Kuusakoski Recycling, and Vintage Tech, arranged for the transport of over 46 million pounds of CRTs and other e-waste to the Properties, representing more than 35% of the total amount of e-waste abandoned by Defendant Closed Loop at the Properties, in part, through an entity known as "VTKK LLC." VTKK LLC had previously operated as a joint venture between Defendant Kuusakoski US LLC and Defendant Vintage Tech and/or one or more related entities before it merged into Defendant Kuusakoski US LLC in 2015. Defendants Kuusakoski US LLC, Kuusakoski Inc., Kuusakoski Recycling, and/or one of their related entities acquired Defendant Vintage Tech in 2014.

15.     Defendant Kuusakoski Recycling is a limited liability company organized under the laws of the state of Illinois, with a principal place of business in Plainfield, Illinois. Defendant Kuusakoski Recycling holds itself out as operating as a subsidiary of Defendant Kuusakoski Inc. Starting in 2012 and extending into 2016, Defendant Kuusakoski Recycling and/or one or more of its related entities, Defendants Kuusakoski

Inc., Kuusakoski US LLC, and Vintage Tech, arranged for the transport of over 46 million pounds of CRTs and other e-waste to the Properties, representing more than 35% of the total amount of e-waste abandoned by Defendant Closed Loop at the Properties. Defendants Kuusakoski Recycling, Kuusakoski Inc., Kuusakoski US LLC, and/or one of their related entities acquired Defendant Vintage Tech in 2014.

16.     Defendant Vintage Tech is a limited liability company organized under the laws of the state of Illinois, with a principal place of business in Plainfield, Illinois. Vintage Tech holds itself out as operating as a subsidiary of Kuusukoski Inc. Records generated by the Kuusakoski Defendants refer to Vintage Tech, LLC, Vintage Tech Recyclers, Inc. and Vintage Tech Recycling interchangeably, including shipping documentation and Kuusakoski Inc.'s 2014 financial statements. Starting in 2012 and extending into 2016, Defendant Vintage Tech arranged for the transport of over 35.9 million pounds of CRTs and other e-waste to the Properties. Defendant Vintage Tech was acquired by Defendants Kuusakoski Inc., Kuusakoski US LLC, Kuusakoski Recycling, and/or one of their related entities in 2014.

### F.     Other Arranger/Transporter Defendants

17.     Defendant Accurate IT is a limited liability company organized under the laws of the state of Ohio, with a principal place of business in Columbus, Ohio. Starting in or around December 2012 and extending into or around September 2014, Defendant Accurate IT arranged for the transport of at least 135,110 pounds of CRTs and other e-waste to the Properties.

18.     Defendant ATR is a corporation organized under the laws of the state of Illinois, with a principal place of business in Pontiac, Illinois. Starting in or around June

2015 and extending into or around February 2016, Defendant ATR arranged for the transport of at least 91,750 pounds of CRTs and other e-waste to the Properties.

19. Defendant AIM is a limited liability company organized under the laws of the state of Ohio, with a principal place of business in Toledo, Ohio. Starting in or around June 2013 and extending into or around November 2014, Defendant AIM arranged for the transport of at least 114,303 pounds of CRTs and other e-waste to the Properties.

20. Defendant ARI is a corporation organized under the laws of the state of Delaware, with a principal place of business in Middlebury, Vermont. Starting in or around May 2012 and extending into or around January 2014, Defendant ARI arranged for the transport of at least 2,528,422 pounds of CRTs and other e-waste to the Properties.

21. Defendant ARG is a corporation organized under the laws of the state of California, with a principal place of business at Fremont, California. Starting in or around April 2012 and extending into or around November 2012, Defendant ARG arranged for the transport of at least 324,626 pounds of CRTs and other e-waste to the Properties.

22. Defendant C2 is a limited liability company organized under the laws of the state of Virginia, with a principal place of business in Berryville, Virginia. Starting in or around May 2014 and extending into or around February 2016, Defendant C2 arranged for the transport of at least 1,178,106 pounds of CRTs and other e-waste to the Properties.

23. Defendant Cohen is a corporation organized under the laws of the state of Ohio, with a principal place of business in Middletown, Ohio. Starting in or around August 2013 and extending into or around June 2015, Defendant Cohen arranged for the transport of at least 909,106 pounds of CRTs and other e-waste to the Properties.

24. Defendant CRS is a limited liability company organized under the laws of the state of Delaware, with a principal place of business in Fall River, Massachusetts.

Starting in or around April 2015 and extending into or around December 2015, Defendant CRS arranged for the transport of at least 525,738 pounds of CRTs and other e-waste to the Properties.

26. Defendant Comprenew is a nonprofit corporation organized under the laws of the state of Michigan, with a principal place of business in Grand Rapids, Michigan. Starting in or around July 2015 and extending into or around February 2016, Defendant Comprenew arranged for the transport of at least 332,826 pounds of CRTs and other e-waste to the Properties.

26. Defendant CompuPoint is a limited liability company organized under the laws of the state of Georgia, with a principal place of business in Norcross, Georgia. Starting in or around August 2012 and extending into or around January 2016, Defendant CompuPoint arranged for the transport of at least 2,926,499 pounds of CRTs and other e-waste to the Properties.

27. Defendant CRV is corporation organized under the laws of the state of Virginia, with a principal place of business in Tappahannock, Virginia. Starting in or around July 2015 and extending into or around February 2016, Defendant CRV arranged for the transport of at least 153,253 pounds of CRTs and other e-waste to the Properties.

28. Defendant Dynamic is a limited liability company organized under the laws of the state of Wisconsin, with a principal place of business in Onalaska, Wisconsin. Starting in or around January 2013 and extending into or around March 2016, Defendant Dynamic arranged for the transport of at least 5,273,233 pounds of CRTs and other e-waste to the Properties. According to the Wisconsin Department of Financial Institutions, Dynamic Recycling, Inc. changed its name to Dynamic Lifestyle Innovations Inc. in or around July 2018.

29.     Defendant eCycle is a limited liability company organized under the laws of the state of North Carolina, with a principal place of business in Charlotte, North Carolina. Starting in or around June 2012 and extending into or around September 2015, Defendant eCycle arranged for the transport of at least 7,054,560 pounds of CRTs and other e-waste to the Properties.

30.     Defendant eLot is a corporation organized under the laws of the state of New York, with a principal place of business in Glenmont, New York. In or around April 2015, Defendant eLot arranged for the transport of at least 204,828 pounds of CRTs and other e-waste to the Properties.

31.     Defendant ECSR is a corporation organized under the laws of the state of Pennsylvania, with a principal place of business in Cochranton, Pennsylvania. Starting in or around June 2012 and extending into or around July 2014, Defendant ECSR arranged for the transport of at least 320,834 pounds of CRTs and other e-waste to the Properties.

32.     Defendant eRevival is a limited liability company organized under the laws of the state of New Jersey, with a principal place of business in Garfield, New Jersey. Starting in or around July 2014 and extending into or around October 2015, Defendant eRevival arranged for the transport of at least 593,767 pounds of CRTs and other e-waste to the Properties.

33.     Defendant Robert A. Erie, upon information and belief, is an individual with a principal place of residence in a residential reentry center in San Diego, California, which is managed by Correctional Alternatives Incorporated. Defendant Erie served at all times relevant to the allegations herein as the Chief Executive Officer of Defendant E-World, which arranged for the transport of at least 11,583,163 pounds of CRTs and other e-waste

to the Properties, starting in or around June 2012 and extending into or around November 2014.

34.     Defendant eWaste Recycling is a limited liability company organized under the laws of the state of Maine, with a principal place of business in Auburn, Maine. Starting in or around August 2012 and extending into or around March 2013, Defendant eWaste Recycling arranged for the transport of at least 1,670,776 pounds of CRTs and other e-waste to the Properties.

35.     Defendant eWorks is a corporation organized under the laws of the state of New York, with a principal place of business in Freeport, New York. Starting in or around January 2016 and extending into or around February 2016, Defendant eWorks arranged for the transport of at least 370,205 pounds of CRTs or other e-waste to the Properties.

36.     Defendant E-World is or was a limited liability company organized under the laws of the state of California, with a principal place of business in Vista, California. Starting in or around June 2012 and extending into or around November 2014, Defendant E-World arranged for the transport of at least 11,583,163 pounds of CRTs and other e-waste to the Properties.

37.     Defendant GEEP is a corporation organized under the laws of Canada, with a principal place of business in Barre, Ontario. Starting in or around September 2012 and extending into or around June 2013, Defendant GEEP arranged for the transport of at least 2,676,207 pounds of CRTs and other e-waste to the Properties.

38.     Defendant GEEP USA is a corporation organized under the laws of the state of North Carolina, with a principal place of business in Durham, North Carolina. Starting in or around September 2012 and extending into or around May 2015, Defendant GEEP

USA arranged for the transport of at least 1,214,443 pounds of CRTs and other e-waste to the Properties.

39.     Defendant Great Lakes is a corporation organized under the laws of the state of Michigan, with a principal place of business in Warren, Michigan. Starting in or around September 2015 and extending into or around February 2016, Defendant Great Lakes arranged for the transport of at least 311,454 pounds of CRTs and other e-waste to the Properties.

40.     Defendant Green Chip is a corporation organized under the laws of the state of New York, with a principal place of business in Brooklyn, New York. Starting in or around August 2013 and extending into or around April 2014, Defendant Green Chip arranged for the transport of at least 156,416 pounds of CRTs and other e-waste to the Properties.

41.     Defendant Green Tech is a limited liability company organized under the laws of the state of Minnesota, with a principal place of business in Mankato, Minnesota. Starting in or around June 2015 and extending into or around September 2015, Defendant Green Tech arranged for the transport of at least 152,257 pounds of CRTs and other e-waste to the Properties.

42.     Defendant Green Wave is a limited liability company organized under the laws of the state of Indiana, with a principal place of business in Indianapolis, Indiana. Starting in or around May 2015 and extending into or around December 2015, Defendant Green Wave arranged for the transport of at least 656,154 pounds of CRTs and other e-waste to the Properties.

43.     Defendant IMS is a corporation organized under the laws of the state of California, with a principal place of business in Poway, California. Starting in or around

February 2014 and extending into or around February 2016, Defendant IMS arranged for the transport of at least 5,598,819 pounds of CRTs and other e-waste to the Properties. Defendant IMS arranged for the transport of at least 3,481,959 of these 5,598,819 pounds to the Properties from another property owned by Plaintiff at 1635 Watkins Road, Columbus, Ohio 43207 ("1635 Watkins Road").

44. Defendant Interco is a corporation organized under the laws of the state of Missouri, with a principal place of business in Madison, Illinois. Starting in or around October 2015 and extending into or around January 2016, Defendant Interco arranged for the transport of at least 52,604 pounds of CRTs and other e-waste to the Properties.

45. Defendant JD Beavers is a limited liability company organized under the laws of the state of Michigan, with a principal place of business in Brighton, Michigan. Starting in or around November 2013 and extending into or around February 2015, Defendant JD Beavers arranged for the transport of at least 75,591 pounds of CRTs and other e-waste to the Properties.

46. Defendant MRC is a limited liability company organized under the laws of the state of Missouri, with a principal place of business in Imperial, Missouri. Starting in or around October 2015 and extending into or around February 2016, Defendant MRC arranged for the transport of at least 288,348 pounds of CRTs and other e-waste to the Properties.

47. Defendant Ohio Drop Off is a limited liability company organized under the laws of the state of Ohio, with a principal place of business in Columbus, Ohio. Starting in or around July 2015 and extending into or around March 2016, Defendant Drop Off arranged for the transport of at least 175,847 pounds of CRTs and other e-waste to the Properties.

48.     Defendant Potomac is a limited liability company organized under the laws of the state of Virginia, with a principal place of business in Sterling, Virginia. Starting in or around June 2015 and extending into or around October 2015, Defendant Potomac arranged for the transport of at least 76,791 pounds of CRTs and other e-waste to the Properties.

49.     Defendant Quicksilver is a corporation organized under the laws of the state of Florida, with a principal place of business in Tampa, Florida. Starting in or around January 2013 and extending into or around May 2015, Defendant Quicksilver arranged for the transport of at least 237,703 pounds of CRTs and other e-waste to the Properties.

50.     Defendant RMG is a limited liability company organized under the laws of the state of New Hampshire, with a principal place of business in Derry, New Hampshire. Starting in or around November 2012 and extending into or around February 2014, Defendant RMG arranged for the transport of at least 1,486,580 pounds of CRTs and other e-waste to the Properties.

51.     Defendant RCRR is a limited liability company organized under the laws of the state of New York, with a principal place of business in Victor, New York. Starting in or around June 2012 and extending into or around March 2016, Defendant RCRR arranged for the transport of at least 16,417,553 pounds of CRTs and other e-waste to the Properties.

52.     Defendant Siam is a corporation organized under the laws of the state of Ohio, with a principal place of business in Columbus, Ohio. In or around February 2013, Defendant Siam arranged for the transport of at least 85,896 pounds of CRTs and other e-waste to the Properties.

53.     Defendant Strickland is a limited liability company organized under the laws of the state of South Carolina, with a principal place of business in North, South Carolina. Starting in or around October 2014 and extending into or around February 2016, Defendant Strickland arranged for the transport of at least 230,665 pounds of CRTs and other e-waste to the Properties.

54.     Defendant Sunnking is a corporation organized under the laws of the state of New York, with a principal place of business in Brockport, New York. Starting in or around October 2014 and extending into or around December 2014, Defendant Sunnking arranged for the transport of at least 636,367 pounds of CRTs and other e-waste to the Properties.

55.     Defendant TK6 is a corporation organized under the laws of the state of Florida, with a principal place of business in Tampa, Florida. Starting in or around April 2015 and extending into or around February 2016, Defendant TK6 arranged for the transport of at least 384,336 pounds of CRTs and other e-waste to the Properties.

56.     Defendant USB is a limited liability company organized under the laws of the state of North Carolina with a principal place of business in Monroe, North Carolina. Starting in or around June 2015 and extending into or around February 2016, Defendant USB arranged for the transport of at least 178,054 pounds of CRTs and other e-waste to the Properties.

57.     Defendant Waste Commission is an inter-governmental agency with a principal place of business in Davenport, Iowa. Starting in or around September 2014 and extending into or around February 2016, Defendant Waste Commission arranged for the transport of at least 1,469,881 pounds of CRTs and other e-waste to the Properties.

58. Defendant We is a limited liability company organized under the laws of the state of Ohio, with a principal place of business in Bellaire, Ohio. Starting in or around May 2015 and extending into or around August 2015, Defendant We arranged for the transport of at least 126,420 pounds of CRTs and other e-waste to the Properties.

### III. JURISDICTION AND VENUE

59. This Court has original jurisdiction over this civil action pursuant to 42 U.S.C. § 9613(b) and 28 U.S.C. § 2201.

60. This Court has supplemental jurisdiction over Garrison's state law claims pursuant to 28 U.S.C. § 1367, because the state law claims are so related to Garrison's federal claims that they form part of the same case or controversy.

61. Venue is proper under 42 U.S.C. § 9613(b) and 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to this lawsuit occurred within this District, including the damages and the release and/or threatened release of hazardous substances, and because the Properties that are the subject of this action are located in this District.

### IV. STATEMENT OF FACTS

**A. The Properties: Ownership and Operational History**

**1. 1675 Watkins Road**

62. On or about April 6, 2012, Garrison's predecessor-in-interest, MS-South LLC, as landlord, entered into a Lease Agreement with Defendant Closed Loop, as Tenant, to lease the warehouse premises located at 1675 Watkins Road.

a. The Lease Agreement leased the premises to Defendant Closed Loop and listed "[w]arehousing, distribution, electronic recycling and de-manufacturing of cathode ray tubes" as the "Permitted Use."

19

b. Upon information and belief, MS-South LLC tendered possession of the premises to Defendant Closed Loop in broom-clean condition.

c. The Lease Agreement required Defendant Closed Loop:

(i) to comply with federal and state hazardous waste laws;

(ii) to make monthly base rent payments starting at $59,131.57 per month and increasing to $64,924.05 per month;

(iii) to make accelerated rent payments through March 31, 2020, if in default and so demanded by the landlord;

(iv) to make late fee payments for any payment received more than ten (10) days after the due date thereof;

(v) to pay for utilities and services; and

(vi) to surrender 1675 Watkins Road "broom clean in as good condition as when received by Tenant."

d. The Lease Agreement also provided Defendant Closed Loop with an option to lease approximately 100,000 square feet at the contiguous premises located at 1655 Watkins Road, Columbus, Ohio 43207.

63. Defendant Silagi was the sole member and the managing member of MS-South LLC, which owned all right, title and interest in 1675 Watkins Road from prior to April 6, 2012, through on or about April 29, 2013.

64. On or about April 29, 2013, Garrison acquired 1675 Watkins Road from MS-South LLC in exchange for good and valuable consideration and thereafter assumed all right, title and interest in that property, which included an assignment of all rights and obligations as landlord under the Lease Agreement.

20

65.    On or about April 15, 2014, following a rent payment default by Defendant Closed Loop, Garrison entered into a First Amendment of Lease with Defendant Closed Loop for 1675 Watkins Road.

a.    The purpose of the First Amendment of Lease was to allow Defendant Closed Loop to restructure its payment schedule following Defendant Closed Loop's failure to pay rent in exchange for the execution and delivery of guaranties by Brent Benham, the President and Chief Financial Officer of Defendant Closed Loop, David Cauchi, the Chief Executive Officer of Defendant Closed Loop, and Brian LaPoint, the Chief Technology Officer of Defendant Closed Loop.

b.    The guaranties provided that Messrs. Benham, Cauchi, and LaPoint "absolutely, irrevocably and unconditionally" guaranteed to Garrison all of Defendant Closed Loop's obligations under the Lease Agreement.

66.    Garrison terminated the Lease Agreement on or about February 26, 2016, after Defendant Closed Loop once again failed to pay rent, declaring that all installments of rent for the remainder of the term of the Lease Agreement were immediately payable and due, pursuant to Section 19(b)(i) of the Lease Agreement.

67.    On or about March 4, 2016, Garrison filed a Complaint for Eviction (Forcible Entry and Detainer), Injunction, and Damages Under Lease Agreement and for Damages Under Guaranties of Lease against Defendant Closed Loop in the Franklin County Court. Garrison sought, among other relief, a preliminary injunction and a permanent injunction ordering Defendant Closed Loop to perform an environmental cleanup at 1675 Watkins Road.

68.　On or about March 7, 2017, the Franklin County Court granted Garrison's Motion for Default Judgment as to Defendant Closed Loop's liability for breach of contract and resulting damages, leaving the question of damages to be determined later.

69.　On or about May 8, 2017, the Franklin County Court held a hearing during which Garrison presented testimony and evidence establishing the damages incurred as a result of Defendant Closed Loop's breach of the Lease Agreement.

70.　On or about August 2, 2017, the Franklin County Court held a second hearing during which Garrison presented testimony and evidence establishing the damages incurred as a result of the breach of the Lease Agreement by Messrs. Benham, Cauchi, and LaPoint.

71.　On or about August 7, 2017, the Franklin County Court issued a Final Judgment Entry, in which the Court, among other things:

a.　found that "Closed Loop was not engaged in legitimate CRT recycling operations at the Properties";

b.　found that Defendant Closed Loop "was instead engaged in the speculative accumulation and subsequent abandonment and disposal of the CRT Waste at the Properties without any feasible means of recycling it";

c.　found that Defendant Closed Loop "failed to segregate leaded funnel glass from panel glass during its CRT recycling operation," which "rendered any available downstream recycling option unprofitable, *i.e.* no legitimate market existed for this commingled glass as a feedstock for lead smelters or otherwise"; and

d.　ordered, adjudged, and decreed that "[j]udgment is entered in favor of Garrison and against Closed Loop, Brent Benham, David Cauchi, and Brian

LaPoint, jointly and severally, in the amount of $14,181,533.74 for costs to clean-up the CRT Waste" at the Properties. (Emphasis in original.)

### 2.    1655 Watkins Road

72.    On or about April 29, 2013, Garrison acquired 1655 Watkins Road from MS-South LLC in exchange for good and valuable consideration and thereafter assumed all right, title and interest in that property.

73.    On or about March 24, 2014, Garrison, as Licensor, entered into a Temporary Occupancy Agreement with Defendant Closed Loop, as Licensee, retroactive to December 1, 2013, for the occupancy and use of additional square footage in the contiguous premises located at 1655 Watkins Road, Columbus, Ohio 43207 ("1655 Watkins Road").

     a.    The Temporary Occupancy Agreement provided Defendant Closed Loop with a license to occupy a portion of the property "solely for warehousing and storage purposes," which could include the storage of "commercially reasonable" quantities of hazardous materials.

     b.    The purpose of the Temporary Occupancy Agreement was to provide a staging area for Defendant Closed Loop to store inbound CRTs at 1655 Watkins Road for the downstream processing operations at 1675 Watkins Road.

     c.    Garrison tendered possession of the premises to Defendant Closed Loop in good condition and repair and free of trash and debris.

     d.    The Temporary Occupancy Agreement required Defendant Closed Loop:

          (i)    to comply with federal and state hazardous waste laws;

          (ii)    to pay Garrison a monthly use and occupancy fee of $10,518.67;

23

        (iii)     to pay its pro rata share of utility costs; and

        (iv)     to surrender the premises "in good condition and repair, ordinary wear and tear accepted, and free of trash and debris."

74. Starting in or around January 2015, Defendant Closed Loop failed to pay use and occupancy fees and utility costs in accordance with the Temporary Occupancy Agreement.

75. Garrison terminated the Temporary Occupancy Agreement as of June 12, 2015, for failure to pay use and occupancy fees.

76. On or about August 3, 2015, Garrison filed a Complaint for Eviction (Forcible Entry and Detainer, Injunction, and Damages) against Defendant Closed Loop in the Common Pleas Court of Franklin County, Ohio, Civil Division ("Franklin County Court"). Garrison sought, among other relief, a preliminary injunction and a permanent injunction ordering Defendant Closed Loop to remove all of its personal property from 1655 Watkins Road.

77. On or about August 24, 2015, Defendant Closed Loop and Garrison entered into an Agreed Order requiring Defendant Closed Loop to "remove all personal property, debris, and trash . . . at its cost" from 1655 Watkins Road by October 31, 2015.

78. Defendant Closed Loop failed to comply with the August 24, 2015 Agreed Order.

79. On or about May 24, 2016, the Franklin County Court granted Garrison's Motion for Default Judgment as to Defendant Closed Loop's liability for breach of contract and resulting damages, leaving the question of damages to be determined later.

80.     On or about May 8, 2017, the Franklin County Court held a hearing during which Garrison presented testimony and evidence establishing the damages incurred as a result of Defendant Closed Loop's breach of the Temporary Occupancy Agreement.

81.     On or about August 7, 2017, the Franklin County Court issued a Final Judgment Entry, in which the Court, among other things:

a.      found that "[Defendant] Closed Loop was not engaged in legitimate CRT recycling operations at the Properties";

b.      found that Defendant Closed Loop "was instead engaged in the speculative accumulation and subsequent abandonment and disposal of the CRT Waste at the Properties without any feasible means of recycling it";

c.      found that Defendant Closed Loop "failed to segregate leaded funnel glass from panel glass during its CRT recycling operation," which "rendered any available downstream recycling option unprofitable, *i.e.* no legitimate market existed for this commingled glass as a feedstock for lead smelters or otherwise"; and

d.      ordered, adjudged, and decreed that "[j]udgment is entered in favor of Garrison and against Closed Loop, Brent Benham, David Cauchi, and Brian LaPoint, jointly and severally, in the amount of $14,181,533.74 for costs to clean-up the CRT Waste" at the Properties. (Emphasis in original).

**3.      Defendant Closed Loop's Abandonment of Hazardous Substances at the Properties**

82.     Defendant Closed Loop vacated the Properties in or around late March 2016.

25

83.     Defendant Closed Loop abandoned more than 64,000 tons (128 million pounds) of CRTs and other e-waste upon vacating the Properties.

84.     CRTs contain lead, a toxic substance that can cause delayed neurological development in children and other adverse health effects in adults.

85.     The Resource Conservation and Recovery Act ("RCRA") established a cradle-to-grave program that regulates the generation, transportation, treatment, storage, and disposal of hazardous wastes and provides for a conditional exclusion for legitimate CRT recycling operations – but only if certain criteria are met. *See* 40 C.F.R. §§ 261.4(a)(22) & 261.39 and Ohio Admin. Code 3745-51-04(A)(22) & 3745-51-39.

86.     Defendant Closed Loop failed to manage the used CRTs and crushed CRT glass in compliance with the CRT conditional exclusion because it speculatively accumulated these materials at the Properties in violation of that exclusion.   *See* 40 C.F.R. §§ 261.39 & 261.1(c)(8) and Ohio Admin. Code 3745-51-39 & 3745-51-01(C)(8).

   a.     For the reasons more fully described below, Defendant Closed Loop could not show that "during the calendar year commencing January first, the amount of material that is recycled, or transferred to a different site for recycling, equals at least seventy-five per cent by weight or volume of the amount of that material accumulated at the beginning of the calendar year," which is the first of the two components of the speculative accumulation prohibition in 40 C.F.R. §§ 261.39 & 261.1(c)(8) and Ohio Admin. Code 3745-51-39 & 3745-51-01(C)(8).

   b.     For the reasons more fully described below, Defendant Closed Loop could not show that the materials had a "feasible means of being recycled," which

is the second of the two components of the speculative accumulation prohibition in 40 C.F.R. §§ 261.39 & 261.1(c)(8) and Ohio Admin. Code 3745-51-39 & 3745-51-01(C)(8).

87.    Used CRTs and crushed CRT glass containing lead at concentrations equal to or greater than 5.0 mg/L using the Toxicity Characteristic Leaching Procedure ("TCLP"), if not managed under the CRT conditional exclusion, are regulated as hazardous waste under RCRA and Ohio Rev. Code Chapter 3734.

88.    Total lead content from samples collected from the Properties far exceeded the 5.0 mg/L regulatory limits using TCLP.

89.    The U.S. Environmental Protection Agency ("U.S. EPA") has observed that "according to recent studies performed at the University of Florida, most color CRTs leach lead in the TCLP test at concentrations above the TC regulatory level of 5 milligrams per liter." *Hazardous Waste Management System; Modification of the Hazardous Waste Program; Cathode Ray Tubes; Final Rule*, 71 Fed. Reg. 42,928, 42,930 (July 28, 2006).

90.    CERCLA defines "hazardous substances" to include any substance regulated as a hazardous waste under RCRA. *See* 42 U.S.C. § 9601(14)(C).

91.    CERCLA also defines "hazardous substances" to include any substance separately listed under 42 U.S.C. § 9602, and its underlying regulation, 40 C.F.R. § 302.4; lead is separately listed as a hazardous substance in 40 C.F.R. § 302.4, and therefore constitutes a hazardous substance pursuant to 42 U.S.C. § 9601(14)(B), whether or not it is also classified as a hazardous waste under RCRA.

92.    Thus, the CRTs and processed CRT glass, lead-impacted e-waste, and lead at the Properties are both RCRA hazardous wastes and CERCLA hazardous substances.

27

93.     Garrison currently estimates the costs of environmental cleanup for the Properties at more than $14.2 million, although cleanup costs may vary based on, among other things, the quantity of material, the availability of previously-identified disposal/recycling outlets, fuel costs, the extent of Ohio EPA's oversight over removal and/or remedial actions at the Properties, and other contingencies.

### B.     The Sham Recycling Scheme

#### 1.     Defendant Closed Loop

94.     From 2012 and continuing to the present, Defendant Closed Loop orchestrated an extensive scheme to mislead Garrison and Ohio EPA with respect to whether Defendant Closed Loop qualified for the CRT conditional exclusion and to defraud Garrison and Ohio EPA through the sham recycling operation at the Properties, thereby generating millions of dollars in illegal revenue and imposing upon Garrison potential liability for millions of dollars in environmental cleanup costs.

95.     Defendant Closed Loop selected Ohio as the state to launch its scheme given that Ohio lacks e-waste legislation requiring original equipment manufacturers to certify that CRTs are recycled in accordance with federal and state law and that Ohio does not have a CRT landfill disposal ban.

96.     Surrounding and nearby states Michigan, Illinois, Indiana, West Virginia, Pennsylvania, New Jersey, New York, and Virginia among others, each had e-waste legislation and CRT landfill disposal bans, which incentivized the e-waste industry to arrange for e-waste to be transported to Ohio in a nationwide "race to the bottom."

97.     Defendant Closed Loop also selected Ohio in purview of a tax credit provided in 2012 by the Ohio Tax Credit Authority to bring jobs to Columbus.

98.     Defendant Closed Loop secured the Lease Agreement and Temporary Occupancy Agreement from Garrison based on false representations that Defendant Closed Loop would actually pay the rent; would be providing legitimate e-waste recycling services; and would otherwise be operating in compliance with federal and state hazardous waste laws.

99.     Defendant Closed Loop entered the Ohio e-waste recycling market in 2012, with an offer to accept inbound CRTs at prices as low as $0.0700 per pound, which undercut the then-prevailing U.S. market rates of $0.11-0.12 per pound.

100.    No other U.S. e-waste recycler could compete with Defendant Closed Loop's rate, as no e-waste recycler with a similar business model and low profit margin could have met all of the elements of, and thus, qualified for, the CRT conditional exclusion from RCRA hazardous waste regulation.

101.    Over the next four years, Defendant Closed Loop implemented a series of delay tactics designed to mislead Garrison and the Ohio EPA into believing that recycling operations at the Properties were lawful and that there was a feasible means of recycling the CRTs and other e-waste that had been accumulating at the Properties.

102.    These delay tactics enabled Defendant Closed Loop to continue to collect revenue for inbound CRTs and other e-waste, without ever having to incur the costs of actually recycling them.

103.    During this four year period, Defendant Closed Loop speculatively accumulated tens of millions of pounds of CRTs and other e-waste, generating well over $20 million in revenue for recycling services that were never performed.

     a.     Defendant Closed Loop received more than $11 million in revenue from inbound shipments of used CRTs and other e-waste from 2012 through 2016, based on records produced by Defendant Closed Loop.

     b.     Defendant Closed Loop likely received an equivalent revenue stream from outbound shipments of commodities extracted from these CRTs, including yokes, copper wire, aluminum, steel, plastic, and circuit boards, based on the revenue streams of similarly situated entities in the e-waste industry.

     c.     Defendant Closed Loop had minimal overhead expenses given its failure to pay rent, lower labor costs associated with the use of prison labor, lower labor costs associated with its failure to segregate leaded funnel glass from panel glass, and its failure to meet applicable Ohio EPA and Occupational Safety and Health Administration ("OSHA") regulatory requirements.

104.    Defendant Closed Loop was able to continue to accept inbound shipments of used CRTs and other e-waste (and the accompanying revenue streams) for four years, based on a series of misrepresentations, acts and omissions designed to mislead Garrison and Ohio EPA with respect to Defendant Closed Loop's compliance with: (a) the 75% recycling component of the CRT conditional exclusion; (b) the "feasible means of being recycled" component of the CRT conditional exclusion; and (c) RCRA's prohibition against sham recycling. *See* 40 C.F.R. §§ 260.43, 261.1(c)(8), 261.2(g), 261.4(a)(22), 261.39 and Ohio Admin. Code 3745-51-01(C)(8), 3745-51-04(A)(22), & 3745-51-39.

105.    In or around late March 2016, when its scheme was discovered, Defendant Closed Loop abandoned the Properties, leaving Garrison, as the landlord, to incur more than $14.2 million in environmental cleanup costs.

**a.    CRT Conditional Exclusion: 75% Recycling Component**

106.    The qualifying criteria for the CRT conditional exclusion include, *inter alia*, a prohibition against "speculative accumulation," which is comprised of two components. 40 C.F.R. §§ 261.39 & 261.1(c)(8) and Ohio Admin. Code 3745-51-39 & 3745-51-01(C)(8).

107.    The first component of the CRT conditional exclusion requires a demonstration that: "during the calendar year commencing January first, the amount of material that is recycled, or transferred to a different site for recycling, equals at least seventy-five per cent by weight or volume of the amount of that material accumulated at the beginning of the calendar year."

108.    From 2012 through 2016, Defendant Closed Loop repeatedly misrepresented that it qualified for the CRT conditional exclusion through statements to Ohio EPA that the weight of the crushed CRT glass that was recycled at the Properties, or was transferred to a different site for recycling, equaled at least 75% of the weight of the crushed CRT glass that had accumulated at the beginning of each calendar year.

109.    Defendant Closed Loop's business model was to process inbound CRTs through disassembly and glass breaking within the calendar year during which they were received, but then to store indefinitely the vast majority of the crushed CRT glass in the center of the warehouse at 1675 Watkins Road, where it would be obstructed from the view of Ohio EPA inspectors and in violation of 40 C.F.R. § 261.39 and Ohio Admin. Code 3745-51-39 (regarding speculative accumulation).

110.    Defendant Closed Loop's business model also included accepting pre-processed CRT glass at a higher price-per-pound to help fund the enterprise, despite the

fact that it had no capacity to recycle this stream any further, within the calendar year or otherwise.

111.    Garrison currently estimates that there are nearly 30,000 Gaylords (*i.e.*, pallet-sized, cardboard containers) of crushed CRT glass that were speculatively accumulated and abandoned at the Properties.

112.    Garrison currently estimates that there are more than 14,500 Gaylords or wooden pallets of used, intact CRTs that were speculatively accumulated and abandoned at the Properties.

## 1.    BAN Warns the Arranger/Transporter Defendants that Closed Loop Lacked a Clear Pathway to Compliance.

113.    The Basel Action Network ("BAN") is an environmental non-profit group that describes itself as an investigative watchdog for sham electronic waste recyclers.

114.    On or about January 22, 2013, Closed Loop Glass Solutions, LLC ("CLGS"), an affiliate or subsidiary of Defendant Closed Loop controlled by the same individuals that controlled Defendant Closed Loop, applied for an air quality permit-to-install a glass furnace to recycle crushed CRT glass in connection with its operations at the Properties.

115.    On or about September 26, 2013, BAN provided public comments in response to Defendant Closed Loop's permit application in which it expressed concerns with the risk of speculative accumulation and sham recycling that would arise from Defendant Closed Loop's conduct:

> "This is an important matter because an influx of cash comes into a business of this kind upon receipt of CRT glass and the actual subsequent processing of the CRTs is a very large subsequent expense. The economic temptation to avoid latter [sic] costs, in the face of large influxes of cash is real and thus holding to Speculative

32

Accumulation rules is vital unless there is a clear pathway for meeting the processing goals, and avoiding accumulation is seen as a reality in the near-term. Already numerous CRT storage-for-later processing sites around the nation have been found abandoned with massive amounts of glass still on site due to this factor (see Luminous Recycling, Denver, Dow Management, Yuma)."

116.    BAN's public statements regarding the Defendant Closed Loop situation were widely disseminated and, upon information and belief, were known to participants in the industry, including the Arranger/Transporter Defendants.

117.    The Arranger/Transporter Defendants had the requisite sophistication and experience in the e-waste industry such that they were aware or should have been aware of BAN's public warning regarding the "economic temptation" for Defendant Closed Loop to circumvent the speculative accumulation requirements in exchange for "large influxes of cash."

118.    For the next three years, the Arranger/Transporter Defendants nevertheless knowingly transported and/or arranged for the transport of tens of millions of pounds of CRTs and other e-waste to the Properties for disposal or treatment.

**2.    Closed Loop Seeks to Protect Its Scheme When Ohio EPA Begins to Express Concerns Regarding Speculative Activity.**

119.    In or around 2014, Ohio EPA began expressing concerns with Defendant Closed Loop's ability to meet speculative accumulation requirements, which coincided with evasive actions by Defendant Closed Loop to prevent its sham recycling scheme from being discovered.

120.    On or about June 19, 2014, in assessing how to respond to a media inquiry regarding Defendant Closed Loop, Ohio EPA expressed concern in an internal e-mail

regarding operations at the Properties that "we don't really have a break down of how much material went where."

    a.    Ohio EPA's June 19, 2014 e-mail indicated that Defendant Closed Loop provided insufficient information for Ohio EPA to determine compliance with speculative accumulation requirements.

    b.    Upon information and belief, Defendant Closed Loop was withholding information regarding speculative accumulation from Ohio EPA to conceal its sham recycling scheme.

121.    On or about June 25, 2014, in discussing a request by Defendant Closed Loop for a variance from speculative accumulation requirements, Ohio EPA warned Defendant Closed Loop in a phone call of its potential to abandon large amounts of hazardous waste at the Properties in violation of the speculative accumulation provision.

122.    On or about June 26, 2014, Ohio EPA observed in an internal e-mail that Defendant Closed Loop was "storing millions of pounds of CRTs and processed glass"; that it wants to "continue to store the lead glass as a feedstock . . ."; and that it "will likely trigger our speculative accumulation rules and the hazardous CRT glass will be a regulated hazardous waste at that point."

123.    On or about October 21, 2014, a concerned citizen advised Ohio EPA in an e-mail that Defendant Closed Loop transported 200 truckloads of crushed CRT glass from the Properties to a new property leased by Defendant Closed Loop or a Closed Loop affiliate located at 2200 Fairwood Avenue, Columbus, Ohio 43207 ("2200 Fairwood Avenue"), in an effort to mislead Ohio EPA into believing that the glass was being recycled so that it would find Defendant Closed Loop to be in compliance with speculative accumulation requirements.

124.    On or about October 21, 2014, and in reaction to the concerned citizen's report, Ohio EPA commented in an internal e-mail: "This will not get them out of speculative accumulation. We should be looking into this."

125.    On or about January 5, 2015, an internal Ohio EPA e-mail characterized these shipments as follows: "Seems a little convenient that the new facility is located where they were already rumored to be 'hiding' shipments of glass…."

126.    On or about October 27, 2014, Defendant Closed Loop applied for a variance from the speculative accumulation requirements based on the "limitations of the primary and secondary lead smelters['] ability to absorb the volume generated within the USA," which led to the "current stock pile of clean panel cullet and funnel cullet in North America."

127.    The only reason Defendant Closed Loop would have applied for the variance was because it could not comply with the speculative accumulation requirements.

128.    Defendant Closed Loop never received the variance.

129.    Defendant Closed Loop nevertheless continued to accept inbound CRTs and other e-waste at the Properties for the next 15-17 months, despite these market conditions and despite knowing that Defendant Closed Loop would be out of compliance with speculative accumulation requirements without a variance.

130.    On or about November 21, 2014, Ohio EPA observed in an internal e-mail that Defendant Closed Loop had not "completely recycled the glass onsite nor have they sent any glass to another site for further recycling." Put differently, the crushed CRT glass stored at the Properties since operations began in 2012 had already triggered the 75% recycling component of the speculative accumulation rules given Defendant Closed Loop's

failure to recycle, or to transfer offsite for recycling, 75% of the previously crushed CRT glass in inventory as of January 1, 2013, by December 31, 2013.

131. From on or about December 22, 2014 through on or about December 26, 2014, Defendant Closed Loop arranged for the transport of an additional 59 truckloads of crushed CRT glass from the Properties to 2200 Fairwood Avenue in yet another deceptive effort to shield itself from liability for failing to meet speculative accumulation requirements, as evidenced by 59 bills of lading reflecting shipments from 1675 Watkins Road to 2200 Fairwood Avenue.

132. On or about March 5, 2015, Ohio EPA conducted an inspection of 1675 Watkins Road, during which Ohio EPA discovered for the first time that Defendant Closed Loop had also been accumulating CRTs in 1655 Watkins Road since October or November of 2013. According to the Ohio EPA inspector:

> "At that time Mr. O'hara informed me that Closed Loop had been leasing and storing CRTs (unknown to Ohio EPA) at 1655 Watkins Rd since Oct.-Nov. of 2013. Upon arrival I met with the plant manager (Patrick O'hara) who proceeded to walk me over to the 1655 Watkins Rd. storage facility. The facility is half full of CRTs and old televisions, Patrick said that it is currently being downsized due to costs and three bays of CRTs were recently moved to Fairwood Avenue. I asked how this was being tracked and Patrick informed me that it wasn't."

133. Ohio EPA's inspection revealed that Defendant Closed Loop had not only hidden a staging area for its e-waste storage from Ohio EPA in violation of federal and state hazardous waste law, but also that Defendant Closed Loop had not been reporting internal movements of CRTs in a further effort to mislead Ohio EPA.

### 3. Closed Loop Acknowledges Concerns with Speculative Accumulation, Yet Continues to Accept Inbound CRTs for Profit.

134. On or about November 6, 2014, E-Scrap News reported that Mr. Benham admitted that "Closed Loop has been amassing leaded glass instead of sending it downstream for recycling elsewhere because the company is trying to collect sufficient feedstock for its furnace." *See* E-Scrap News, *CRT player Closed Loop receives notice of violation* (Nov. 6, 2014).

135. On or about December 9, 2014, Defendant Closed Loop acknowledged to Ohio EPA in a letter that it "did not give greater attention to speculative accumulation prior to October 2014," effectively admitting that it failed to comply with the speculative accumulation requirement in the CRT conditional exclusion — the very exclusion upon which Defendant Closed Loop's entire e-waste recycling business model was predicated.

136. On or about October 14, 2015, Garrison e-mailed Mr. Benham to follow up on Ohio EPA's concerns with speculative accumulation at the Properties: "As I understand it, you are still being paid to take CRTs into 1675 on a daily/weekly basis and with that new inventory comes components that are accumulating for disposal that are a liability."

137. On or about October 20, 2015, Mr. Benham responded to Garrison's e-mail by explaining that any "product liability" would not be a cause for concern because Defendant Closed Loop has "room under the insurance . . . to allow for more material on the site."

138. Mr. Benham attached a "Site Closure Plan" to his October 20, 2015 e-mail, purportedly to "give [Garrison] an understanding of cleanup" to be covered by the insurance.

a. The Site Closure Plan indicated that the maximum inventory of material expected at the Properties would be 45,000 tons.

b. That estimate was false, however, because it is currently estimated that Defendant Closed Loop ultimately accumulated and abandoned more than 64,000 tons (128 million pounds) of CRTs and other e-waste.

139. On or about October 23, 2015, Defendant Closed Loop admitted to Ohio EPA in a phone call that it was "unsure of what they can or cannot do with the material next year to meet the [speculative accumulation] standard."

140. As Mr. Benham admitted in his Answer, Paragraph ("para.") 129, Defendant Closed Loop advised the Arizona Department of Environmental Quality ("ADEQ") in January 2016, that "it had no viable means of potentially recycling its Arizona materials."

141. Defendant Closed Loop nevertheless continued to accept inbound CRTs and other e-waste at the Properties until in or around March 2016, in a self-serving effort to continue profiting from its scheme.

142. On or about March 17, 2016, Defendant Closed Loop admitted to Garrison in an e-mail that it has "liability [for] the CRTs and leaded glass that has accumulated on the property over the last 4 years through the operations of CLRR's facility."

**b. CRT Conditional Exclusion: "Feasible Means of Being Recycled" Component**

143. As noted above, the qualifying criteria for the CRT conditional exclusion include, *inter alia*, a prohibition against "speculative accumulation," which includes two components. 40 C.F.R. § 261.39 and Ohio Admin. Code 3745-51-39. The first component is discussed above in Paragraphs 107 through 142.

38

144.    The second component of the CRT conditional exclusion requires a demonstration that "the material is potentially recyclable and has a feasible means of being recycled."

145.    From 2012 through 2016, Defendant Closed Loop repeatedly misrepresented to Ohio EPA that it qualified for the CRT conditional exclusion through statements to Ohio EPA that it would fund, install, and operate a glass furnace to extract lead from the crushed CRT glass accumulating at the Properties.

146.    Defendant Closed Loop's business model was to pursue air quality permits-to-install from Ohio EPA in an effort to mislead Ohio EPA into finding that a "feasible means of being recycled" existed, so that it could continue to accept inbound CRTs and other e-waste while never having any intention of actually constructing a furnace.

**1.      1635 Watkins Road**

147.    Defendant Closed Loop first applied for and received an air quality permit-to-install a glass furnace at 1635 Watkins Road, which was issued on October 17, 2013 (and was administratively-modified on November 15, 2013).

148.    Defendant Closed Loop never owned any lease interests or other property rights with respect to 1635 Watkins Road. Garrison owns 1635 Watkins Road.

149.    The U.S. EPA has taken the position that demonstration of a feasible means of recycling "ordinarily will require identification of actual recyclers and recycling technology, *location of the recycler*, and relative costs associated with recycling." (Emphasis added.)

150.    Thus, as Defendant Closed Loop lacked the right to occupy 1635 Watkins Road, it could not use the 1635 Watkins Road permit-to-install to demonstrate that it had a feasible means of recycling the CRTs accumulating in the Properties.

39

151.    On or about December 9, 2014, Defendant Closed Loop represented to Ohio EPA in a letter that CLGS "has obtained 100,000 square foot facility at 1635 Watkins Road in Columbus, Ohio" and that construction of the glass furnace at 1635 Watkins Road would begin in the summer of 2015, with an estimated operational date of November 2015.

152.    Defendant Closed Loop's representation was false and misleading because it never had the right to occupy 1635 Watkins Road.

153.    On or about December 16, 2014, Ohio EPA conducted an inspection of 1635 Watkins Road to "monitor the progress of the build-out for operations of CLGS," where Defendant Closed Loop would "eventually install a furnace."

    a.    The scope of the inspection included a schedule that had been submitted "as part of the demonstration that CLGS feasibly recycle the processed CRT glass currently being accumulated" at the Properties.

    b.    Ohio EPA found that "no work had commenced on the vacant half of the warehouse where CLGS is supposed to conduct operations."

    c.    Ohio EPA found that discussions with the existing tenant "indicated they had no information that CLGS had obtained a lease agreement."

    d.    In a follow up call, Robert Cruz, the Defendant Closed Loop plant manager, again falsely advised Ohio EPA that a "lease had been obtained."

154.    On or about January 5, 2015, Defendant Closed Loop finally admitted in a letter to Ohio EPA that it was "unable to exercise the lease option" at 1635 Watkins Road.

155.    The terms of the 1635 Watkins Road permit-to-install provided that the permit would automatically terminate within 18 months of the effective date if the "operator has not undertaken a continuing program of installation or has not entered into a

binding contractual obligation to undertake and complete within a reasonable time a continuing program of installation."

156.    Defendant Closed Loop did not undertake a continuing program of installation, nor did it enter into a binding contractual obligation to build the furnace, indicating further that it had no intention of actually constructing a furnace at 1635 Watkins Road.

157.    On or about March 6, 2015, Defendant Closed Loop nevertheless applied for an extension of the 1635 Watkins Road permit-to-install, three months after admitting that it lacked a lease option, because "we are now negotiating with our landlord at 1635 Watkins Road as it is time to renew our lease soon."

   a.    The referenced lease, however, is the Lease Agreement for 1675 Watkins Road.

   b.    There was never an agreement with Garrison to lease 1635 Watkins Road.

158.    On or about April 28, 2015, Defendant Closed Loop entered into a Consent Order with ADEQ to address speculative accumulation at Defendant Closed Loop's Arizona facility that was predicated on shipments of crushed CRT glass from that facility to a glass furnace at 1635 Watkins Road.

   a.    Defendant Closed Loop executed this agreement four months after advising Ohio EPA that it did not have a lease option at 1635 Watkins Road.

   b.    Messrs. Benham, Cauchi, and LaPoint each signed the Consent Order, thereby making false statements to a state environmental agency as part of an e-waste recycling scheme that extended across the county.

159.     For all of the reasons set forth above, Defendant Closed Loop secured the 1635 Watkins Road permit-to-install solely as part of a continuing effort to mislead

Garrison and Ohio EPA into finding that there was a feasible means of recycling, when in fact no feasible means of recycling had been put into place.

## 2.    1659 E. Front Street

160.    Defendant Closed Loop applied for and received a second "initial installation" air quality permit-to-install for 1659 E. Front Street, Logan, Ohio 43138 ("1659 E. Front Street"), which issued December 23, 2015.

161.    Upon information and belief, Defendant Closed Loop never owned any lease interests or other property rights with respect to 1659 E. Front Street.

162.    Thus, as Defendant Closed Loop lacked the right to occupy 1659 E. Front Street, it could not use the 1659 E. Front Street permit-to-install to demonstrate that it had a feasible means of recycling the CRTs accumulating in the Properties.

163.    On or about December 18, 2015, representatives from Defendant Closed Loop advised an entity that arranged for the transport of CRTs and other e-waste that Defendant Closed Loop wanted to move to 1659 E. Front Street, that the furnace would be located at that site, but that no move date was established.

164.    The "planned" furnace at 1659 E. Front Street would not have had sufficient recycling capacity to avoid speculative accumulation prohibitions.

165.    The permit had an 18,000 ton-per-year ("tpy") limit, similar to its predecessor permit-to-install at 1635 Watkins Road.

166.    Even under the best case scenario – which would be premised on obtaining funding to construct the furnace, one year of construction, no additional inbound CRTs, and a Clean Air Act permit-to-operate – there would be over four more years of speculative accumulation, as it would take approximately 3.5 years to process the 64,000 tons (128 million pounds) of e-waste that are currently stored at the Properties.

167. BAN had long before warned of the prospects of a small furnace in public comments provided in response to a draft of Defendant Closed Loop's first "initial installation" air quality permit-to-install:

> "We are very concerned that a small furnace with slow throughput is being envisaged, which may provide appearances to observers that an effort is being made to avoid speculative accumulation and perhaps raise false hopes such that that [sic] variances to the speculative accumulation rules will be granted, when in fact there is no possibility of catching up to the volumes via the proposed process."

168. As predicted in BAN's public comments, the limits in both permits-to-install provide the best evidence that Defendant Closed Loop could not possibly have intended to conduct a legitimate e-waste recycling operation because it could not possibly have caught up to the volumes of CRTs that were being accumulated without running afoul of speculative accumulation restrictions.

169. For all of the reasons set forth above, Defendant Closed Loop secured the second permit-to-install solely as part of a continuing effort to mislead Garrison and Ohio EPA into finding that there was a feasible means of recycling.

### 3. 2200 Fairwood Avenue

170. When Defendant Closed Loop began having difficulties in demonstrating the viability of a glass furnace, it proposed a new step in the CRT processing as part of a scheme to mislead Ohio EPA into finding that an alternative "feasible means of recycling" existed, thereby artificially extending the speculative accumulation period for the crushed CRT glass at the Properties.

171. On or about November 19, 2014, Defendant Closed Loop met with Ohio EPA to advise that it would no longer be purchasing 1659 E. Front Street to install a furnace and had instead intended to introduce a new "funnel glass cleaning (reclamation) process" that would ostensibly remove a coating to meet the product specifications of a glass furnace

43

in India – purportedly to demonstrate that it still had a "feasible means of recycling" the vast amounts of CRTs that had been accumulating.

172. On or about December 9, 2014, Defendant Closed Loop sent Ohio EPA a letter indicating that the new process would be installed by December 15, 2014, at 1635 Watkins Road, where Defendant Closed Loop had "acquired space."

173. Defendant Closed Loop, however, refused to provide Ohio EPA with information regarding the new process in the December 9, 2014 letter, asserting that it was "highly proprietary," despite the availability of long-standing information protections that would have prevented Ohio EPA from disclosing the information publicly.

174. Defendant Closed Loop's December 9, 2014 letter advised Ohio EPA that the new process was based, in part, on Defendant Closed Loop's Arizona operations, which it considered a "useful model in evaluating . . . the constraints for speculative accumulation."

175. ADEQ, however, had previously found that Defendant Closed Loop's Arizona facility was itself in violation of its speculative accumulation requirements for at least a full year prior to December 9, 2014, *i.e.*, at the very same time Defendant Closed Loop was making the above misrepresentations to Ohio EPA.

176. Defendant Closed Loop would eventually abandon over 25,000 tons (50 million pounds) of CRTs at its Arizona facilities, in addition to the more than 64,000 tons (128 million pounds) of CRTs and other e-waste at the Properties.

177. On or about January 5, 2015, Defendant Closed Loop finally admitted in a letter to Ohio EPA that it was "unable to exercise the lease option" at 1635 Watkins Road and had instead "obtained new space at 2200 Fairwood Avenue" for the new "glass cleaning facility."

178.    On or about March 19, 2015, Ohio EPA advised Defendant Closed Loop in a letter that the Ohio EPA Division of Air Pollution Control "has recently become aware of a CRT glass acid washing operation located at 2200 Fairwood Avenue that is run by Closed Loop" and that the process "may require a permit-to-install and operate."

179.    On or about March 4, 2016, according to an Ohio EPA Field Activity Report, Defendant Closed Loop Plant Manager Robert Cruz and Defendant Closed Loop Manager Matt Strangle advised Ohio EPA that the "tumbler (which aids in the washing) at Fairwood broke in the summer of 2015 and had not been repaired yet…."

180.    Defendant Closed Loop had waited 6-8 months to disclose to Ohio EPA that its purportedly "alternative" feasible means of recycling had not been operational, while generating millions of dollars in additional revenue from inbound CRTs and other e-waste during the same time period.

181.    For all of the reasons set forth above, Defendant Closed Loop purported to operate a new "funnel glass cleaning (reclamation) process" solely as part of a continuing effort to mislead Garrison and Ohio EPA into finding that there was a feasible means of recycling when, in fact, no such feasible means of recycling existed.

### 4.    Funding

182.    In or around October and November 2015, Ohio EPA advised Defendant Closed Loop in multiple communications that, to demonstrate a "feasible means of recycling," Defendant Closed Loop would need to provide:

a.    "documentation showing that they have a contract for the furnace, financing arrangements (e.g., letters from investors), a schedule for construction, etc." (Oct. 23, 2015 phone call between Ohio EPA and Defendant Closed Loop);

b.      "bona fide letters of intent from investors to provide capital funds for the construction of the furnace" (Nov. 20, 2015 letter from Ohio EPA to Defendant Closed Loop); and

c.      "[o]ther information may include written construction schedules, construction contracts and construction permits." (Nov. 20, 2015 letter from Ohio EPA to Defendant Closed Loop).

183.    Defendant Closed Loop never made this demonstration and, accordingly, never had a feasible means of recycling, or the ability to fund such recycling.

184.    Defendant Closed Loop knew or should have known that it could never have secured sufficient funding to install and operate a furnace that could recycle the high volumes of crushed CRT glass accumulating at the Properties.

185.    Defendant Closed Loop admitted on at least three occasions that it lacked the financial wherewithal to secure commitments to this level of funding, including as follows:

a.      On or about August 5, 2015, Mr. Benham admitted to Garrison in an e-mail requesting another lease restructuring that "CLRR has been under capitalized for the past five years of business."

b.      On or about October 26, 2015, Defendant Closed Loop admitted to Ohio EPA in a letter attempting to explain why it had a "feasible means of recycling," that financing had never been "committed to the project," thus admitting that there had never been a feasible means of recycling.

c.      On or about March 17, 2016, Mr. Benham admitted to Garrison in an e-mail regarding liability for the accumulated e-waste that:

"Our efforts to secure venture financing have been unsuccessful at this time. Speaking with potential strategic industry players has evoked even more

46

negative responses – citing the huge amount of CRTs and leaded glass amassed on the property – there is no logic to take on this liability plus the cost to remove it will outweigh any potential revenues to be had from metal sales."

186. The Closed Loop Defendants nevertheless repeatedly represented to Ohio EPA and to Garrison that they had either secured funding or were on the cusp of securing funding, as part of a delay tactic to stave off environmental enforcement such that it could continue to accept inbound CRTs and other e-waste, including as follows:

a. On or about March 6, 2015, Mr. LaPoint misrepresented to Ohio EPA in a letter that "we have funding identified" for the furnace.

b. On or about September 27, 2015, Mr. Benham advised Garrison in an e-mail that Defendant Closed Loop had "executed a term sheet with a private fund"; that it was "deep in due diligence with closing anticipated in late November or early December 2015"; and that the fund will "provide a $9.5 million term loan credit facility providing additional equipment into the Company's current operations in Arizona and Ohio, the buildout of the glass furnace operation in Ohio, and much needed working capital."

c. On or about October 22, 2015, Mr. Benham advised ADEQ that Defendant Closed Loop was "very close to obtaining financing for building a furnace in Ohio."

187. Upon information and belief, the costs of constructing an 18,000 tpy glass furnace would likely have run approximately $10-20 million, and the costs of operating it would likely have run approximately $1 million a year.

188. No reasonable investor would have provided the necessary level of funding for Defendant Closed Loop to build a furnace under the prevailing market conditions and

given the credit worthiness of Defendant Closed Loop and its three principals, all of whom have since declared bankruptcy.

189.     Ohio EPA and BAN both expressed concerns with the ability of Defendant Closed Loop to secure or allocate the requisite funding, which suggested that it was widely understood that Defendant Closed Loop lacked the financial wherewithal or willingness to conduct a legitimate recycling operation, including as follows:

a.     On or about June 25, 2014, Ohio EPA expressed its concern to Mr. Benham in a phone call "with the potential for them to abandon large amounts of hazardous waste glass if they are unsuccessful in securing investments to build the furnace."

b.     On or about October 30, 2014, BAN advised U.S. EPA and Ohio EPA in a letter that:

"[Closed Loop] continues to bring in large sums of cash for receiving glass from a variety of sources, and yet the money is not in Escrow to be applied to the recycling of the glass. This funding is surely a source of funding that could easily be spent on building a furnace. But this has not happened. One must wonder why."

c.     On or about November 5, 2014, Ohio EPA observed following a meeting with Defendant Closed Loop that:

"To date, we have not seen any contracts, agreements or letters of intent for investors in the furnace. As such we asked Closed Loop to provide this information before we can recommend taking an action on a variance request. In addition, we are asking Closed Loop to provide an estimate of the cost to properly dispose of all accumulated hazardous processed CRT glass and unprocessed CRTs, as well as evidence of financial assurance for a third party cleanup. Financial assurance seemed to be an issue for the company."

190.     Upon information and belief, and as explained more fully below, the Arranger/Transporter Defendants had the requisite sophistication and experience in the e-waste industry such that they, too, were aware or should have been aware that Defendant

Closed Loop lacked the financial wherewithal or willingness to conduct a legitimate recycling operation.

191.    On or about May 6, 2016, Defendant Closed Loop advised Ohio EPA in a letter that Defendant Closed Loop had ceased its operations in Columbus, Ohio "due to changing market conditions and financial considerations."

192.    For all of the reasons set forth above, and at all times relevant, Defendant Closed Loop lacked the financial wherewithal and willingness to commit funding to build a furnace that could be used to demonstrate a feasible means of recycling.

### c.    Sham Recycling / Disposal

193.    CRTs and other e-waste that are sham recycled or disposed of are regulated hazardous wastes under RCRA and Ohio Rev. Code Chapter 3734. *See* 40 C.F.R. § 261.4(a)(22)(i) (subjecting used, intact CRTs to regulation if they are "disposed"); Ohio Admin. Code 3745-51-04(A)(22)(a) (same); 40 C.F.R. § 261.39(a) & (c) (exempting used, broken CRTs from regulation only if they are "destined for recycling"); Ohio Admin. Code 3745-51-39(A) and (C) (same); 40 C.F.R. § 261.2 (subjecting "discarded" materials to regulation, including materials that are disposed, abandoned, accumulated, or reclaimed); and Ohio Admin. Code 3745-51-02 (same).

194.    RCRA requires that the recycling of hazardous secondary materials for purposes of complying with the CRT conditional exclusion be "legitimate," or else the materials be deemed hazardous wastes, and that "[s]ham recycling is recycling that is not legitimate recycling." *See* 40 C.F.R. §§ 260.43 & 261.2(g).

195.    The leaded funnel glass and panel glass removed from CRTs and otherwise generated in CRT processing constitute "hazardous secondary materials," within the meaning of 40 C.F.R § 260.43.

196.     Defendant Closed Loop disposed of the CRT glass fed into the mechanical crusher by placing it in the Properties indefinitely with the intent to abandon it, which Defendant Closed Loop ultimately did in or around late March 2016.

197.     U.S. EPA has looked to a variety of factors in determining whether a material is a legitimate product as opposed to a waste and whether the recycling process is legitimate as opposed to sham recycling or disposal.

198.     These factors include whether a legitimate market exists for the material, whether the material provides revenues, and whether the material is managed to prevent release (*i.e.*, managed as a valuable commodity). *See, e.g.,* 40 C.F.R. § 260.43 (setting forth required criteria to demonstrate legitimate recycling), *id*. § 261.2(e)(1) (describing materials that are not solid wastes when recycled), *id*. § 261.2(g) (prohibiting sham recycling), EPA Faxback 13691 (May 19, 1994), EPA Faxback 11750 (June 2, 1993), and EPA Faxback 11936 (Jan. 31, 1995). *See* also Ohio Admin. Code 3745-51-06 (setting forth requirements for recyclable materials)

199.     Defendant Closed Loop violated the prohibition against sham recycling by failing to demonstrate that:

a.       the crushing of commingled leaded funnel glass and panel glass provided a useful contribution to the recycling process;

b.       the crushed commingled leaded funnel glass and panel glass was a valuable product or intermediate;

c.       a legitimate market existed for the crushed CRT glass that was being generated;

d.       the CRTs and crushed CRT glass that were accumulating on the Properties were being managed as valuable commodities; and

e.    the CRTs and crushed CRT glass that were accumulating on the Properties were being managed so as to prevent a release.

200.    No legitimate market existed for the crushed CRT glass that Defendant Closed Loop was generating given the manner in which it was generated:

a.    It is standard industry practice to segregate leaded funnel glass from panel glass during CRT processing to meet the product specifications of downstream lead smelters.

b.    It is not economically viable for lead smelters to accept commingled glass from e-waste recyclers, given the need to run over twice as much feedstock (glass) to extract the same amount of lead.

c.    Nor did commingled glass meet the product specifications for other downstream recyclers, including Camacho Recycling, as evidenced by a May 7, 2015 letter from Comacho Recycling to Mr. Cauchi.

d.    Defendant Closed Loop failed to segregate leaded funnel glass from panel glass, as evidenced by the nearly 30,000 Gaylords of used, broken, and commingled CRT glass that were abandoned at the Properties.

e.    On or about November 19, 2014, Defendant Closed Loop misrepresented to Ohio EPA in a meeting that it had been processing CRTs to separate the nonhazardous front (panel) glass from the hazardous funnel glass, as reflected in an internal Ohio EPA communication.

f.    On or about May 22, 2015, Defendant Closed Loop again misrepresented to Ohio EPA in response to an information request that "[w]hen CRTs are processed they are separated into Panel Cullet, Funnel Glass, Metals, Plastics and glass fines."

g.   On or about October 20, 2015, Mr. Benham provided Garrison with a Site Closure Plan," which provided yet another misrepresentation: "The CRTs are processed to separate the leaded glass from the unleaded glass, with the leaded glass further processed in a lead recovery line and the unleaded glass further processed to separate different sized particles in a glass-to-glass recovery line."

201.   No legitimate market existed for the pre-processed CRT glass that Defendant Closed Loop received from the Arranger/Transporter Defendants given that the CRT glass alone has a "negative net value," as described in Mr. Benham's Answer, para. 2. As Mr. Benham explained, "CRT glass is an expense," whereas "the circuit board, cone, and copper cables of the CRT can have some positive scrap value . . . . depend[ing] on metal prices."

202.   Nor did Defendant Closed Loop manage the crushed CRT glass at the Properties in an environmentally responsible manner with a concern for product integrity, as confirmed by the following:

a.   It is standard industry practice to use new octagon Gaylord boxes to provide appropriate containment for processed CRT glass, which averages 2 tons per Gaylord.

b.   Defendant Closed Loop repurposed many of the same four-sided Gaylord boxes that had previously been used to transport used, intact CRTs to the Properties.

c.   These boxes had, in turn, been repurposed from their initial use to package non-hazardous consumer products, which do not require the same standard of durability.

d.    As a result, much of the crushed CRT glass has spilled to the floor.

e.    On or about October 17, 2013, Ohio EPA issued a Notice of Violation ("NOV") to Defendant Closed Loop, alleging that Defendant Closed Loop failed to qualify for CRT conditional exclusion and finding, *inter alia*:

> "At the time of the inspection, Closed Loop was storing approximately 300 pallets of broken CRTs outside in cardboard gaylords. (See pics 1-3). The containers had deteriorated to the point that they could no longer hold the CRTs, and CRT glass and parts were strewn throughout the storage area. In addition, the facility was storing approximately 450 pallets of televisions outside; due to storage conditions, some of these CRTS had broken as well. . . .
>
> During the inspection the gaylords being stored outside and the gaylords inside storing the processed television [sic] were not properly labeled.
>
> Closed Loop violated the condition of the exclusion for CRTs thus creating an illegal storage and disposal facility."

f.    Defendant Closed Loop was required to install a silt screen to cover storm drains within the outdoor CRT storage area as a result of Ohio EPA's inspection, as referenced in the October 17, 2013 NOV.

g.    On or about June 10, 2014, Ohio EPA and Closed Loop entered into an "Expedited Settlement Agreement and Director's Order" to resolve the October 17, 2013 NOV, in which Ohio EPA found that "the containers . . . had deteriorated such that the CRTs had been released to the parking lot and the ground."

203.    U.S. EPA has observed that "storing broken CRTs outdoors prior to processing is inconsistent with the premise that these materials are commodity-like." 71 Fed. Reg. 42,928, 42,933 (July 28, 2006).

204.    For all of the reasons set forth above, the manner in which Defendant Closed Loop processed CRT glass and otherwise managed inbound CRTs evidenced the fact that

it had no intention of actually recycling these materials as though they were valuable commodities with a legitimate downstream market to receive them. Thus, Defendant Closed Loop violated the sham recycling prohibition in 40 C.F.R. § 260.43.

### d. State of Ohio Environmental Enforcement

205. The Ohio EPA issued an NOV to Defendant Closed Loop on April 11, 2016, alleging that Defendant Closed Loop failed to qualify for the CRT conditional exclusion at the Properties.

206. The April 11, 2016 NOV was at least the fourth NOV Defendant Closed Loop had received for violations of Ohio hazardous waste and air quality laws during its operations at the Properties. The prior NOVs are as follows:

    a. On or about October 17, 2013, Ohio EPA issued an NOV that similarly alleged that Defendant Closed Loop failed to qualify for the CRT conditional exclusion at 1675 Watkins Road.

    b. On or about January 30, 2015, Ohio EPA issued an NOV that alleged that Defendant Closed Loop failed to post the appropriate emergency notification information at 1675 Watkins Road and for failing to provide Ohio EPA with land disposal restriction notifications.

    c. On or about April 2, 2015, Ohio EPA issued an NOV that alleged that Defendant Closed Loop operated air contaminant sources without a permit at 1675 Watkins Road; the NOV specifically alleged that "[p]ollutants that are outside the breaker room are free to vent outside the building or through open loading doors or the buildings ventilation."

    d. These NOVs are in addition to a series of OSHA citations relating to respiratory protection, lead, cadmium, and air contaminants issued on

August 14, 2015 (15 "serious" citations); November 9, 2015 (1 "serious" citation); and December 24, 2015 (1 "other" citation).

207.    The April 11, 2016 NOV alleged, *inter alia*, that Defendant Closed Loop: (a) failed to demonstrate that it was not speculatively accumulating CRTs or processed CRTs; (b) was not operating a "legitimate recycling facility"; (c) "did not have a feasible means of recycling"; and (d) "illegally transported a hazardous waste under Ohio's hazardous waste laws to an unpermitted facility."

208.    Ohio EPA further indicated in the April 11, 2016 NOV that it was referring the matter to Ohio EPA's Division of Materials and Waste Management's hazardous waste enforcement coordinator for enforcement consideration.

209.    Garrison was copied on the April 11, 2016 NOV issued by Ohio EPA to Defendant Closed Loop.

210.    On or about August 31, 2016, Ohio EPA confirmed in a telephone call that Ohio EPA views Garrison liable as owner of a hazardous waste facility and that Ohio EPA intends to pursue Garrison for clean-up costs.

211.    On or about September 9, 2016, Ohio EPA sent a letter requesting the Attorney General of Ohio ("Ohio AG") to initiate "all necessary legal and/or equitable civil actions as may be deemed necessary and seek appropriate penalties against [Defendant Closed Loop] *and other appropriate persons* for the violations of ORC Chapter 3734 and the rules adopted thereunder." (Emphasis added.)

212.    On or about May 17, 2017, the Ohio AG sent a letter inviting Plaintiff to negotiate the resolution of potential claims arising out of alleged violations of Ohio hazardous waste laws and rules at the Properties. No enforcement action has been filed,

however, and Garrison has not settled any actual alleged liability with Ohio that it may have regarding the Properties.

213.    Garrison has been cooperating with the Ohio AG and Ohio EPA investigation. Garrison has undertaken efforts at its sole expense to investigate the nature and quantity of the abandoned CRTs and other e-waste at the Properties; to protect public health and safety; and to address releases and threatened releases. All costs incurred to date, for which CERCLA cost recovery is sought herein, are consistent with the U.S. EPA National Contingency Plan ("NCP") at 40 C.F.R. Part 300, in keeping with 42 U.S.C. § 9607. These efforts have included, but are not limited to:

    a.    arranging for the retention of an environmental consultant, which performed a removal preliminary assessment, removal site inspections, and records reviews in accordance with 40 C.F.R. § 300.410, *inter alia*, (i) to characterize the nature and extent of the abandoned CRTs and other e-waste at the Properties, (ii) to identify sources and the nature of releases and threatened releases, (iii) to evaluate the magnitude of the threat, and (iv) to evaluate the factors necessary to determine whether a removal is necessary;

    b.    identifying potential options and locations for the recycling or, if necessary, disposal of the abandoned CRTs and other e-waste in furtherance of 40 C.F.R. § 300.415(b)(4)(i) and in accordance with other applicable federal and state laws;

    c.    obtaining cost estimates from potential hazardous and electronic waste vendors for the recycling and/or disposal of the abandoned CRTs and other e-waste and for the removal and/or remedial action at the Properties in

furtherance of 40 C.F.R. § 300.415(b)(4)(i) and in accordance with other applicable federal and state laws;

d.      securing the Properties to prevent unauthorized entry in accordance with 40 C.F.R. § 300.415(b)(1)-(3) and (e)(1);

e.      repairing and replacing bay doors that were damaged by collapsing Gaylord towers in an effort to mitigate the exigent threat of releases through open air conduits beyond the warehouse perimeter in accordance with 40 C.F.R. § 300.415(b)(1)-(3) and (e)(1);

f.      directing an environmental consultant to prepare a health and safety plan in accordance with 40 C.F.R. § 300.150 to inform personnel participating in on-site activities at the Properties, including contractors performing removal and/or remediation, of the known or reasonably anticipated potential hazards and safety concerns;

g.      preparing documentation in accordance with 40 C.F.R. § 300.160(a)(1), *inter alia*, (i) to identify responsible parties, (ii) to describe the source and circumstances of the releases, and (iii) to provide for an accounting of response costs; and

h.      arranging for the retention of an environmental consultant to prepare an Engineering Evaluation/Cost Analysis pursuant to 40 C.F.R. § 300.415 to analyze removal alternatives for the Properties.

**2.      Defendant Silagi**

214.    Defendant Silagi exercised exclusive control over MS-South LLC as the property owner of 1675 Watkins Road from prior to April 6, 2012, through on or about April 29, 2013.

215. According to the State of California Secretary of State filings, Defendant Silagi exercised extensive and exclusive control over MS-South LLC, serving as its managing member, its sole member, and its registered agent for service of process.

216. Defendant Silagi's current principal place of business for Silagi Development and Management Inc. is the same address listed on the Lease Agreement entered into by and between MS-South LLC and Defendant Closed Loop on or about April 6, 2012 for 1675 Watkins Road.

217. Upon information and belief, Defendant Silagi managed, directed, and conducted the operations of MS-South LLC as they related to tenant disposal of hazardous waste and/or tenant compliance with environmental regulations.

218. Upon information and belief, Defendant Silagi and MS-South LLC are legally indistinct for purposes of CERCLA, and Defendant Silagi should accordingly be held accountable for the obligations of MS-South LLC under CERCLA.

219. Defendant Silagi signed the Lease Agreement with Defendant Closed Loop for 1675 Watkins Road in the presence of a notary public on or about April 9, 2012; the Lease Agreement expressly permitted the "electronic recycling . . . of cathode ray tubes," which contain lead.

220. Defendant Silagi thereafter misrepresented to Garrison in a Purchase and Sale Agreement ("PSA") dated April 29, 2013, that "[t]o Seller's knowledge, except as set forth on Schedule 3.1.10 . . . during Seller's term of ownership, the Property [which included 1675 Watkins Road] has not been used for industrial purposes or for the storage, treatment or disposal of Hazardous Substances (as hereinafter defined), other than products customarily used or stored incidental to the operation and/or maintenance of the Property, all of which are stored and used in accordance with all applicable Environmental Laws."

a.  The PSA, Schedule 3.1.10, listed no scheduled exceptions.

b.  The PSA defined "Hazardous Substances" to include "lead."

c.  The PSA defined "to Seller's Knowledge" as "the actual current knowledge of Guarantor, after due inquiry of (i) the individuals in Seller's organization who have knowledge of the matters contained herein and (ii) Kevin McLewee, the general manager of the Property, and an employee of Cassidy Turley."

d.  The PSA defined "Guarantor" as Defendant Silagi.

221.  Defendant Silagi provided a guaranty in the PSA which "unconditionally guaranties to [Garrison] the full and faithful payment and performance by [Defendant MS-South LLC] of all of its obligations to [Garrison]," which obligations are "absolute, primary, unconditional and irrevocable."

222.  MS-South LLC was dissolved on or about October 3, 2017, *i.e.*, less than one month after Garrison filed the original Complaint in this matter.

223.  Upon information and belief, Defendant Silagi dissolved MS-South LLC in an effort to avoid liability in connection with the CRTs and other e-waste that were stockpiled and speculatively accumulated at 1675 Watkins Road during MS-South LLC's period of ownership from April 6, 2012 through April 29, 2013.

### 3.  The Arranger/Transporter Defendants

224.  From 2012 and continuing to the present, the Arranger/Transporter Defendants participated in and profited from Defendant Closed Loop's extensive scheme to mislead Garrison and Ohio EPA with respect to whether Defendant Closed Loop qualified for the CRT conditional exclusion and otherwise to defraud Garrison and Ohio EPA through the sham recycling operation at the Properties, thereby saving millions of

59

dollars in waste disposal costs and imposing upon Garrison potential liability for millions of dollars in environmental cleanup costs.

225.    The Arranger/Transporter Defendants selected Defendant Closed Loop as the cheapest possible option on the market to receive and ostensibly "recycle" CRTs and other e-waste.

226.    The Arranger/Transporter Defendants either knew or should have known that Defendant Closed Loop did not qualify for the CRT conditional exclusion and lacked the capacity to qualify for this exclusion at the time the arrangements were made to transport the CRTs and other e-waste to the Properties and at the time the CRTs and other e-waste were accepted for transport to the Properties.

227.    The Arranger/Transporter Defendants benefited from the delay tactics that Defendant Closed Loop implemented to hold Ohio EPA and Garrison at bay.

228.    With the requisite experience and sophistication in the tightknit e-waste industry, the Arranger/Transporter Defendants knew or should have known that Defendant Closed Loop did not qualify for the CRT conditional exclusion, because the Arranger/Transporter Defendants knew or should have known that Defendant Closed Loop was speculatively accumulating CRTs, had no feasible means of recycling them, was disposing of them, and was otherwise not engaged in legitimate recycling.

229.    There is widespread and long-standing recognition in the e-waste recycling industry regarding concerns with e-waste abandonment, including concerns that were known or should have by known by the Arranger/Transporter Defendants, including as follows:

      a.    The U.S. EPA web page on CRTs warns: "Because of rising costs, negative economic incentives and shifts in CRT glass markets, some CRT processors

and recyclers are choosing to store the glass indefinitely rather than send it for recycling or disposal, which increases the risk of mismanagement and/or abandonment of CRTs." *See* https://www.epa.gov/hw/cathode-ray-tubes-crts-0.

b. A U.S. EPA official observed at an e-waste conference called "E-Scrap 2016" that: "Basically, we've been seeing a pattern consistently across the nation of stockpiles, illegal disposal, mismanagement of CRTs…. In some cases, it's just warehouses full." *See* E-Scrap News, *U.S. EPA Offers Information on CRT Regulations* (Oct. 6, 2016).

c. Ohio EPA has issued guidance that provides: "In addition to being familiar with the way electronics will be recycled, it is important to research the recycling facility to determine if it has any compliance problems. . . . If electronic equipment is not recycled properly, and it is a hazardous waste, both your company and the recycling facility will be liable for clean-up costs associated with improper disposal of hazardous components." *See* http://epa.ohio.gov/portals/32/pdf/Electronic_Equipment_Guidance.pdf.

d. BAN routinely warns against the dangers to public and health and the environment of e-waste abandonment. *See* http://www.ban.org/news/.

230. Several recent e-waste abandonments and related environmental enforcement actions have been widely reported in the media, and any participant in the e-waste recycling market would have been well aware of the trend, including the Arranger/Transporter Defendants, briefly summarized as follows:

a. A small sampling of recent enforcement actions includes several matters with ties to Defendant Closed Loop: Eco International, LLC / Amandi

Services / Envirocycle (U.S. EPA Region 2 Consent Agreement and Final Order dated Sept. 30, 2015 arising out of speculative accumulation violations and associated e-waste abandonment of approximately 13,000 tons of CRTs and other e-waste; Mr. Cauchi was a principal in a predecessor entity); E-World Recyclers, LLC (U.S. District Court for the Southern District of California indictment arising out of fraudulent e-waste recycling services, dated Dec. 18, 2014; Defendant Erie was the Chief Executive Officer of both E-World Recyclers, LLC and Defendant E-World, which arranged for the transport of at least 11.6 million pounds of CRTs and other e-waste to Defendant Closed Loop); and 2TRG / E-Waste Systems (Ohio EPA NOV dated July 24, 2014 involving e-waste abandonment in Cincinnati, Ohio, much of which was later shipped to the Properties).

b. At least one of the 25 states with e-waste recycling laws denied recycling credit to original equipment manufacturers for CRTs sent to the Closed Loop Defendants.

(i) In or about December 2014, the Wisconsin Department of Natural Resources ("Wisconsin DNR") issued a statewide warning to e-waste recyclers that Defendant Closed Loop lacked the capacity to process CRTs and that any CRTs sent to Defendant Closed Loop would accordingly not be counted toward manufacturer credit under the E-Cycle Wisconsin Program.

(ii) The warning provided: "Until the furnace is up and running and processing CRT glass, the weight of any glass sent to Closed Loop

and stored at any of its facilities may not be counted for manufacturer credit under E-Cycle Wisconsin."

231.    The fact that Defendant Closed Loop was stockpiling CRTs at the Properties in violation of speculative accumulation requirements was widely known in the e-waste industry for several years prior to 2016 and was known or should have been known by the Arranger/Transporter Defendants. For example:

a.    Resource Recycling, Inc., an e-waste trade publication, not only tracks e-waste abandonment, but has reported specifically on Defendant Closed Loop since at least 2014.

b.    A sampling of relevant Resource Recycling, Inc. articles includes: E-Scrap News, *CRT Player Closed Loop Receives Notice of Violation* (Nov. 6, 2014); E-Scrap News, *Under Regulatory Pressure, Closed Loop Explores Options* (Nov. 21, 2014); E-Scrap News, *Stored CRT Glass in Arizona is Set to Move* (June 18, 2015); E-Scrap News, *Auditor Voices Concerns about CRT Processor* (Feb. 25, 2016); E-Scrap News, *CRT Outlet Closed Loop Nears Collapse* (Apr. 15, 2016); E-Scrap News, *Closed Loop Leaves Ohio Facility* (May 5, 2016); E-Scrap News, *From Promises to Piles* (June 2016); E-Scrap News, U.*S. EPA Offers Information on CRT Regulations* (Oct. 6, 2016) (citing a U.S. EPA official's discussion of Defendant Closed Loop as one of the recent high-profile CRT issues in the U.S.).

232.    The fact that Defendant Closed Loop was otherwise not operating in compliance with federal and state hazardous waste laws was widely known in the e-waste industry for several years and was known or should have been known by the Arranger/Transporter Defendants because, among other reasons:

63

a.   The Consent Order with ADEQ entered into on April 28, 2015 made national news. *See* E-Scrap News, *Stored CRT glass in Arizona is set to move* (June 18, 2015).

b.   Anyone conducting the most basic environmental due diligence on downstream recipients of CRTs would have or should have consulted the U.S. EPA's ECHO (Enforcement and Compliance History Online) database, which provides a detailed history on noncompliance with hazardous waste and air quality laws at the Properties.

233.   The fact that Defendant Closed Loop did not have a glass furnace was widely known in the e-waste industry for several years and was known or should have been known by the Arranger/Transporter Defendants.

234.   There were only a small number of glass furnaces that could extract lead from processed CRT glass in North America, and the existence of an additional option would have attracted widespread industry attention.

a.   Defendant Closed Loop advised its customer base in an August 2011 newsletter that "the primary furnaces that recycle CRT glass are shutting down left and right" and that "[t]oday there are only two furnaces that accept CRT glass from North America; both of those facilities are expected to cease operations by 2013."

b.   As Mr. Benham noted in his Answer, para. 60, "[t]he only market in the United States for the funnel glass in 2012 was a secondary smelter in Missouri, which at that time was at maximum volume."

c. As Mr. Benham noted in his Answer, para. 59, "[d]ue to regulation, permitting, and construction complexities, development of new American furnaces faced substantial lead time for development."

235. The fact that there were few, if any, other glass furnaces operating worldwide was also known or should have been known by the Arranger/Transporter Defendants.

a. As Mr. Benham noted in his Answer, para. 2, "[i]n late summer, 2012, nine of the twelve CRT furnaces operating worldwide shut down, leaving only one in India (Videocon); one in Malaysia (open for Japan only); and one in China (no imports going forward)."

b. As Mr. Benham noted in his Answer, para. 60, "Videocon was too expensive for shipping from the Closed Loop Ohio operation" and "Mexican regulatory border restrictions prevented Closed Loop from using [the secondary lead smelters and other potential users (copper smelters) in] these markets."

236. The fact that Defendant Closed Loop lacked other downstream markets to manage crushed CRT glass was widely known in the e-waste industry for several years because it directly impacted the revenue streams of nearly every entity involved in the CRT recycling chain, including the Arranger/Transporter Defendants.

237. As early as 2008, four years prior to launching operations in Ohio, downstream markets for "glass block, decorative tile, glass rock, and other products . . . . dependent on construction industry" were "in decline," as Mr. Benham noted in this Answer, para. 60.

238. Moreover, as Mr. Benham also noted in his Answer, para. 60, "[g]iven the limited third-party potential end users, the Closed Loop furnace technology became the only real business answer to the worldwide market given the regulatory and volume limitations on taking leaded glass." Put differently, the viability of the global CRT recycling market was entirely contingent on a furnace that did not, and never would, exist, given that there were no other downstream options.

239. At all times relevant, the Arranger/Transporter Defendants knew or should have known, and had an objectively reasonable basis to believe, that the crushed CRT glass at the Properties would not be recycled in accordance with the CRT conditional exclusion, including its speculative accumulation requirement.

240. The CRTs and other e-waste that the Arranger/Transporter Defendants transported and/or arranged to be transported to the Properties were not "destined for recycling" in keeping with 40 C.F.R. § 261.39(a) and Ohio Admin. Code 3745-51-39(a); did not otherwise qualify for the CRT conditional exclusion; and therefore constituted hazardous wastes at the time the arrangements were made to transport them to the Properties.

241. The CRTs and other e-waste transported to the Properties were "wastes" and "discarded materials" as defined in 40 C.F.R. § 261.2 and Ohio Admin. Code 3745-51-02 at the time of collection and transport that did not and do not qualify for any exclusion from hazardous waste regulations.

242. Thus, for all of the reasons noted above, the Arranger/Transporter Defendants transported and/or arranged for the transport of CRTs and other e-waste to the Properties, despite the fact that they knew or should have known that Defendant Closed

Loop did not qualify for, and lacked the capacity to qualify for, the CRT conditional exclusion.

### a. Defendant UNICOR

243. Records produced by Defendant Closed Loop indicate that Defendant UNICOR arranged for the transport of more than 4.6 million pounds of CRTs and other e-waste to the Properties starting in or around May 2012 and extending into or around December 2015.

244. Records produced by Defendant Closed Loop indicate that Defendant UNICOR arranged for the transport of these CRTs and other e-waste to the Properties from at least four different locations: (a) Marianna Federal Prison Industries, UNICOR Recycling, Marianna, Florida; (b) Fort Dix Federal Prison Industries, UNICOR Recycling, Fort Dix, New Jersey; (c) Lewisburg Federal Prison Industries, UNICOR Recycling, Lewisburg, Pennsylvania; and (d) Tucson Federal Prison Industries, UNICOR Recycling, Tucson, Arizona.

245. Records produced by Closed Loop indicate that, among other e-waste streams, Defendant UNICOR arranged for the disposal of, and paid Defendant Closed Loop to accept, e-waste characterized as "Scrap-Glass," which has a negative net value.

246. Defendant UNICOR and Defendant Closed Loop entered into a series of contracts to arrange for the transport of CRTs and other e-waste to the Properties for as low as $0.0750 per pound.

247. Defendant UNICOR knew or should have known that the artificially low prices being charged by Defendant Closed Loop substantially undercut the prevailing market with a price point that no reasonable industry participant could have believed to be sufficient to cover the costs of a legitimate recycling operation. Thus, Defendant UNICOR

knew or should have known that Defendant Closed Loop was running a sham recycling scheme, but chose to do business with it anyway in an attempt to benefit from its misconduct.

248. In or about June 2016, E-Scrap News reported that Defendant UNICOR paid Defendant Closed Loop nearly $2.5 million in e-waste recycling services from August 2011 through January 2015. *See* E-Scrap News, *From promises to piles* (June 2016).

249. Defendant UNICOR has a long history of noncompliance with federal and state hazardous waste laws, including with the CRT conditional exclusion.

250. In or about October 2010, the U.S. Department of Justice Office of the Inspector General ("DOJ OIG") released a 433-page report entitled "A Review of Federal Prison Industries' Electronic-Waste Recycling Program."

 a. The report concluded that "management of the e-waste recycling program resulted in numerous violations of health, safety, and environmental laws, regulations, and BOP [Bureau of Prisons] policies."

 b. With respect to CRTs, the report noted:

> "According to staff, inmates, and UNICOR customers, open gaylord boxes and dumpster containers containing broken CRTs were routinely left outdoors at the UNICOR warehouse at FCI Elkton, some for months at a time, allowing for the release of dust and glass debris to the air, soil, and storm drains through wind or rainwater runoff. Staff at USP Atwater also stated that boxes of broken monitor glass were stored outdoors uncovered. After conferring with the EPA, we concluded that the activities described above constitute unlawful disposals and storage of hazardous waste."

251. Particularly in light of the extensive scrutiny from DOJ OIG, Defendant UNICOR had the sophistication and experience in the e-waste industry necessary to ascertain the true nature of Defendant Closed Loop's sham recycling operations.

252. Defendant UNICOR, however, failed to exercise reasonable care to determine whether Defendant Closed Loop was operating in compliance with applicable

68

law, including whether Defendant Closed Loop qualified for the CRT conditional exclusion.

253.    On or about November 19, 2014, a competitor of Defendant Closed Loop e-mailed Defendant UNICOR, advising them that Defendant Closed Loop "does not recycle the funnel glass" and was not running a legitimate end-use e-waste recycling operation.

254.    Nevertheless, Defendant UNICOR continued to ship vast quantities of CRTs and other e-waste to the Properties to take advantage of Defendant Closed Loop's artificially low prices.

255.    Records produced by Defendant Closed Loop indicate that the drivers for Defendant UNICOR made at least 126 different deliveries to the Properties.

256.    Upon information and belief, these drivers observed firsthand that Defendant Closed Loop's e-waste recycling operation was not a legitimate enterprise and amounted to sham recycling.

257.    These drivers would have witnessed the fact that Defendant Closed Loop was stockpiling CRTs and other e-waste in such immense quantities that they could not possibly be recycled in the course of a single calendar year or otherwise as part of a legitimate and economically viable recycling operation.

258.    These drivers would have witnessed how Defendant Closed Loop was disposing of the CRTs, including the hundreds of pallets of deteriorating Gaylords and broken CRTs stored outside that led to the October 17, 2013 NOV; the deteriorating Gaylords stacked 15-20 feet high inside the Properties without sufficient aisle space in which to manage them, which led to the April 11, 2016 NOV; and the hazardous leaded

dust dispersed throughout the Properties given the lack of appropriate dust containment that contributed to the OSHA violations.

259.    Thus, at all times relevant, Defendant UNICOR knew or should have known that Defendant Closed Loop did not qualify for the CRT conditional exclusion, because Defendant UNICOR knew or should have known that Defendant Closed Loop was speculatively accumulating CRTs, had no feasible means of recycling them, was disposing of them, and was otherwise not engaged in legitimate recycling.

260.    Nevertheless, enticed by the artificially low prices offered by a sham recycling operation, Defendant UNICOR selected Defendant Closed Loop as its downstream e-waste "recycler," arranging for the transport of more than 4.6 million pounds of CRTs and other e-waste to the Properties over a 3-4 year period, from 2012 through 2015.

### b.    The Kuusakoski Defendants

261.    Records produced by Defendant Closed Loop indicate that the Kuusakoski Defendants, including, but possibly not limited to, Defendants Kuusakoski Recycling, Kuusakoski US LLC (via VTKK, LLC), and Vintage Tech, arranged for the transport of more than 46 million pounds of CRTs and other e-waste to the Properties, representing more than 35% of the total amount of e-waste abandoned at the Properties, starting in or around August 2012 and extending into or around February 2016.

262.    The Kuusakoski Defendants, including, but possibly not limited to, Defendants Kuusakoski Recycling, Kuusakoski US LLC (via VTKK, LLC), and Vintage Tech, and Defendant Closed Loop entered into a series of contracts to arrange for the transport of CRTs and other e-waste to the Properties for as low as $0.0750 per pound.

263. The Kuusakoski Defendants, including, but possibly not limited to, Defendants Kuusakoski Recycling, Kuusakoski US LLC (via VTKK, LLC), and Vintage Tech, knew or should have known that the artificially low prices being charged by Defendant Closed Loop substantially undercut the prevailing market with a price point that no reasonable industry participant could have believed to be sufficient to cover the costs of a legitimate recycling operation. Thus, the Kuusakoski Defendants, including, but possibly not limited to, Defendants Kuusakoski Recycling, Kuusakoski US LLC (via VTKK, LLC), and Vintage Tech, knew or should have known that Defendant Closed Loop was running a sham recycling scheme, but chose to do business with it anyway in an attempt to benefit from its misconduct.

264. The Kuusakoski Defendants, including, but possibly not limited to, Defendants Kuusakoski Recycling, Kuusakoski US LLC (via VTKK, LLC), and Vintage Tech, were the highest volume shippers to Defendant Closed Loop from 2012 through 2016, despite issuing several guarantees on their website that they do not contribute to stockpiling CRTs:

    a.    "We guarantee that CRT electronics and material sent to us is not stockpiled or shipped internationally."

        *See* http://www.kuusakoski.us/our-services/e-scrap-processing/.

    b.    "We absolutely, positively do not stockpile CRT devices or CRT glass. You never have to worry that your hazardous, lead-containing CRT glass is sitting in a warehouse or empty lot for years."

        *See* http://www.kuusakoski.us/what-we-recycle/crts-crt-recycling/.

    c.    "[W]e ensure our customers that their materials are properly handled, processed, and recycled."

71

*See* http://www.kuusakoski.us/what-we-recycle/.

d.      "We work only with certified, audited downstream vendors that process and

handle materials in safe, legal, and planet-friendly ways."

*See* http://www.kuusakoski.us/our-services/e-scrap-processing/.

265.    The Kuusakoski Defendants continued to arrange for the transport of CRTs and other e-waste to the Properties even after Defendant Closed Loop's R2 certification was suspended, which occurred on or about February 19, 2016.

266.    The Kuusakoski Defendants had the sophistication and experience in the e-waste industry necessary to ascertain the true nature of Defendant Closed Loop's sham recycling operations.

267.    The Kuusakoski Defendants assert that they have "deep industry expertise," that they have "streamlined [their] processes to be among the best in the world," and that they "cover 48 states in the U.S., with processing facilities on the East Coast and centrally in the mid-West." *See* http://www.kuusakoski.us/our-services/e-scrap-processing/.

268.    Nevertheless, the Kuusakoski Defendants failed to exercise reasonable care to determine whether Defendant Closed Loop was operating in compliance with applicable law, including whether Defendant Closed Loop qualified for the CRT conditional exclusion.

269.    On or around January 5, 2013, Defendant Closed Loop provided the Kuusakoski Defendants, including, but possibly not limited to, Defendant Vintage Tech, with a proposal entitled "Strategic Partnership for Vintage Tech Recyclers & Closed Loop Refining & Recovery, Inc.," in which the Kuusakoski Defendants, including, but possibly not limited to, Defendant Vintage Tech, would "provide funding to [Defendant Closed

Loop] for the first CRT commercial (Pb) lead recovery and glass furnace in the North America."

270. The proposal, which was never accepted, evidences the fact that the Kuusakoski Defendants including, but possibly not limited to, Defendant Vintage Tech, knew that Defendant Closed Loop not only lacked the funding to build its own furnace, but that there were no other furnaces in all of North America to handle the vast amounts of CRTs that the Kuusakoski Defendants, including, but possibly not limited to, Defendants Kuusakoski Recycling, Kuusakoski US LLC (via VTKK, LLC), and Vintage Tech, had already transported to the Properties and would continue to transport to the Properties for an additional three years.

271. In or around August 2013, the Kuusakoski Defendants, including, but possibly not limited to, Defendant Kuusakoski Recycling, issued a white paper entitled "An Analysis of the Demand for CRT Glass Processing in the U.S." As pertinent, the white paper:

    a.    concludes that there is insufficient capacity to manage the quantity of CRTs reaching end-of-life and that "[t]here [were] only four end-use markets processing CRT glass in North America" and that "[o]f these, only one is located in the U.S." (citing Doe Run (Missouri), Teck Resources (British Columbia, Canada), Xstrata Zinc (New Brunswick, Canada), and Cali Resources/TDM (Baja California, Mexico));

    b.    provides an extensive accounting of recent e-waste abandonments, citing to Resource Recycling, Inc., among other publications, and noting: "Various reports within the past year have indicated some processors are stockpiling

CRTs due to a lack of market capacity or affordable access to market capacity";

c.　cites to a CRT stockpiling study, which concluded: "Recyclers 'setting aside' the cost of managing CRT glass while enjoying revenue from commodities is the single largest contributor to stockpiling CRT glass";

d.　explains that market conditions are "further compounded because recyclers are reportedly eager to secure contracts from the OEMs [original equipment manufacturers], and they may therefore bid contracts with aggressively low pricing"; and

e.　tracks Defendant Closed Loop, citing to a "personal communication," for the premise that Defendant Closed Loop was offering the lowest price point in the U.S. for inbound CRTs.

272.　In or around October 2014, the Kuusakoski Defendants, including, but possibly not limited to, Defendant Kuusakoski Recycling, issued a second white paper entitled "CRT Glass Processing Update: Industry and Regulatory Developments." The white paper:

a.　concludes that the overall conclusions of the first white paper "remain unchanged," *i.e.*, CRT glass continues to be stockpiled; that existing end-use markets fall far short of current demand; and that proposed future capacity is "at best, only available at some unknown point in the future (when the strongest demand exists today) or, at worst, speculative in nature";

    b.      reiterates many of the concerns regarding e-waste abandonment, noting that the "continued reporting of abandoned CRT stockpiles is empirical evidence that there is a lack of viable processing capacity";

    c.      tracks the lack of progress with Defendant Closed Loop's proposed glass furnaces in Arizona and Ohio;

    d.      notes: "Given the extended periods of time that proposed facilities are taking to be developed, it is apparent that proposed facilities cannot be relied upon to provide real capacity until they are operating and demonstrate the ability to meet their design capacity"; and

    e.      quotes Mr. Cauchi, who admitted that Defendant Closed Loop had no feasible means of recycling and could not meet the speculative accumulation requirements: "The fact of the matter is the amount of glass that's being generated cannot be consumed by the glass furnaces today, even if [all prospective operations] go on-line . . . . There's a five-year backlog on the ground."

273.    In or around September 2016, the Kuusakoski Defendants, including, but possibly not limited to, Defendant Kuusakoski Recycling, issued a third white paper entitled "CRT Glass Processing Capacity and Latest Enhancement to the Kuusakoski / PDC CRT Glass Solution (Third Update)."

    a.      The white paper devoted a significant amount of attention to the demise of Defendant Closed Loop, which prior white papers had been tracking.

    b.      The Kuusakoski Defendants including, but possibly not limited to, Defendant Kuusakoski Recycling, quoted Mr. Benham's efforts to blame everyone: "[T]he customers and the OEMs that allowed shipment to our site

[were well aware] of what we were doing. . . . No one was hiding the pickle."

c.   Mr. Benham's comments that the customers and OEMs were aware of Defendant Closed Loop's business practices confirms that they, too, were beneficiaries and willing participants in Defendant Closed Loop's scheme to defraud Garrison.

d.   Further, citing Defendant Closed Loop's furnaces that were never built, the Kuusakoski Defendants, including, but possibly not limited to, Defendant Kuusakoski Recycling, admitted that a reasonable duty of care in the industry would involve some modicum of due diligence by OEMs, customers, and others upstream in the chain:

"[C]aution and prudence must be exercised with end-use markets that are accumulating inventories of CRT glass in advance of a facility actually commencing processing operations . . . . (as in the case of Closed Loop) . . . . [A]dditional due diligence of end-use processors may be required by upstream processors and OEMs beyond the reported capacity of the end-use processor. The fact that an end-use market may be allowed by one of the certification organizations (Sustainable Electronics Recycling International, formerly R2 Solutions, and e-Stewards) has never been a guarantee that material is being properly handled. GES was R2 certified, and although an audit of the facility identified serious nonconformities, the burying of CRTs was discovered by a news channel. A demonstrated, long-term track record in handling CRT glass would be an important due diligence criterion."

274.   Thus, by their own admission, the highest volume shippers to Defendant Closed Loop knew or should have known that it did not qualify for the CRT conditional exclusion and yet transported and/or arranged for the transport of more than 46 million pounds of CRTs and other e-waste to them anyway.

275.   The white papers authored by the Kuusakoski Defendants, including, but possibly not limited to, Defendant Kuusakoski Recycling, also established that they had their own capacity to process CRTs as an end-use market:

a.   The 2013 white paper promotes a new CRT recycling facility under development by the Kuusakoski Defendants, including, but possibly not limited to, Defendant Kuusakoski Recycling, in Peoria, Illinois that would ostensibly "treat" crushed CRT glass and use the treated material as "alternative daily cover" for municipal landfills through a process called "KleanKover."

b.   The 2014 white paper indicates that the Kuusakoski Defendants, including, but possibly not limited to, Defendant Kuusakoski Recycling, have "processed millions of pounds of CRT material" through the "KleanKover Recycling Solution," which has "been successfully operating since November 2013."

c.   The 2014 white paper also promotes yet another new method of handling CRT glass under development by the Kuusakoski Defendants, including, but possibly not limited to, Defendant Kuusakoski Recycling, in which "treated CRT glass will be stored in a dedicated [landfill] cell that will permit future mining of the material if future end-use markets for leaded glass are developed."

d.   The 2016 white paper indicates that the new method of retrievable landfill storage cells has been operational since July 2015 and that the Kuusakoski Defendants, including, but possibly not limited to, Defendant Kuusakoski

Recycling, had been providing a "guaranteed, defined market for 50,000 tons per year of CRT glass."

276. Nevertheless, the Kuusakoski Defendants, including, but possibly not limited to, Defendants Kuusakoski Recycling, Kuusakoski US LLC (via VTKK, LLC), and Vintage Tech, continued to ship vast quantities of CRTs and other e-waste to the Properties to take advantage of Defendant Closed Loop's artificially low prices.

277. In or around September 23-24, 2014, Anssi Takala, on behalf of at least one of the Kuusakoski Defendants, and Mr. Benham participated in the "Sustainable Materials Management (SMM) Electronics Recycling Forum" ("SSM Forum") in Arlington, Virginia, which was hosted by U.S. EPA as part of an effort "to address the challenges of Cathode Ray Tube (CRT) stockpiling."

278. The SSM Forum began with the following "CRT Problem Statement":

"CRTs and CRT glass were once easily recycled into new CRTs; however, the demand for new CRTs has collapsed in favor of new flat panel technologies. Because of rising costs, negative economic incentives, and shifts in CRT glass markets, some CRT processors and recyclers are choosing to store the glass indefinitely rather than send it for recycling (or disposal), which increases the risk of mismanagement and/or abandonment of the CRTs."

279. U.S. EPA summarized the "Factors Leading to the Problem" in a subsequent publication about the SSM Forum; these factors included, among other things:

a. "Financial incentive for entities to get paid to receive CRTs and then not pay to recycle (or dispose)."

b. "'Cherry-picking' high-value parts lowers value down the chain."

c. "Shipments out of state can't be regulated by original jurisdiction."

d. "Barriers to [market] entry are low."

e. "Recyclers aren't charging enough to cover costs for recycling."

f. "Thin operating margins, insufficient funds held."

280.    Records produced by Defendant Closed Loop indicate that the drivers for the Kuusakoski Defendants, including, but possibly not limited to, Defendants Kuusakoski Recycling, Kuusakoski US LLC (via VTKK, LLC), and Vintage Tech, nevertheless made at least 1247 different deliveries to the Properties.

281.    Upon information and belief, these drivers observed firsthand that Defendant Closed Loop's e-waste recycling operation was not a legitimate enterprise and amounted to sham recycling.

282.    These drivers would have witnessed the fact that Defendant Closed Loop was stockpiling CRTs and other e-waste in such immense quantities that they could not possibly be recycled in the course of a single calendar year or otherwise as part of a legitimate and economically viable recycling operation.

283.    These drivers would have witnessed firsthand how Defendant Closed Loop was disposing of the CRTs, including the hundreds of pallets of deteriorating Gaylords and broken CRTs stored outside that led to the October 17, 2013 NOV; the deteriorating Gaylords stacked 15-20 feet high inside the Properties without sufficient aisle space in which to manage them, which led to the April 11, 2016 NOV; and the hazardous leaded dust dispersed throughout the Properties given the lack of appropriate dust containment that contributed to the OSHA violations.

284.    Upon information and belief, the Kuusakoski Defendants' business model appears to be based on generating revenue from sham recycling operations, then profiting again off the cleanup.  *See* http://www.kuusakoski.us/our-services/crt-glass-clean-ups/.

285.    Upon information and belief, the Kuusaksoski Defendants arranged for the disposal or treatment of CRTs and other e-waste at the Properties, generating millions of

dollars in profit, knowing that they would have an additional opportunity to profit off the cleanup of the Properties after Defendant Closed Loop abandoned them.

286.    On or about April 28, 2016, the Kuusakoski Defendants, including, but possibly not limited to, Defendant Kuusakoski Recycling, without acknowledging they were the top CRT shipper to the Properties, submitted a bid to Garrison to clean up the e-waste that Defendant Closed Loop had abandoned, which included the millions of pounds of e-waste that the Kuusakoski Defendants themselves had transported or arranged to be transported previously.

287.    Their bids ranged from $16.5 million to $20.9 million, in what would likely have been one of the most lucrative contracts for e-waste remediation in U.S. history.

288.    On or about June 7, 2017, a representative of Defendant Kuusakoski Recycling sent a letter providing a revised (and unsolicited) second bid, explaining that it should not be disqualified from the bidding process because it "did not ship any e-waste to the Site."

289.    Records produced by Closed Loop indicate that Kuusakoski Recycling transported at least 75,760 pounds of "Rear Projection Lenses with Fluid" to the Properties.

290.    Projection lenses are one of the most difficult types of CRTs to process, and the fluid they contain is ethylene glycol, a CERCLA hazardous substance listed in the 40 C.F.R. § 302.4 table.

291.    The letter from the representative for Defendant Kuusakoski Recycling sent on or about June 7, 2017, blamed Defendant Vintage Tech, which was described as a "sister entity" of Defendant Kuusakoski Recycling, for contributing to the abandonment at the Properties.

292. On or about July 10, 2017, a "Sam" from Defendant Vintage Tech left a voice mail for a representative of Garrison requesting an opportunity to submit a bid of its own to remediate the Properties.

293. The Kuusakoski Defendants including, but possibly not limited to, Defendant Kuusakoski Recycling and Defendant Vintage Tech, thus sought to bootstrap the revenues they had generated from Defendant Closed Loop's artificially low prices by offering to clean up the very same mess they had knowingly created.

294. Thus, at all times relevant, the Kuusakoski Defendants knew or should have known that Defendant Closed Loop did not qualify for the CRT conditional exclusion, because the Kuusakoski Defendants knew or should have known that Defendant Closed Loop was speculatively accumulating CRTs, had no feasible means of recycling them, was disposing of them, and was otherwise not engaged in legitimate recycling.

295. Nevertheless, enticed by the artificially low prices offered by a sham recycling operation, the Kuusakoski Defendants, including, but possibly not limited to, Defendants Kuusakoski Recycling, Kuusakoski US LLC (via VTKK, LLC), and Vintage Tech, selected Defendant Closed Loop as their downstream e-waste "recycler," arranging for the transport of more than 46 million pounds of CRTs and other e-waste to the Properties over a four-year period, from 2012 through 2016.

### c. Other Arranger/Transporter Defendants

### 1. Defendant Accurate IT

296. Records produced by Defendant Closed Loop indicate that Defendant Accurate IT arranged for the transport of at least 135,110 pounds of CRTs and other e-waste to the Properties starting in or around December 2012 and extending into or around September 2014.

297.    Defendant Accurate IT entered into a series of contracts with Defendant Closed Loop to arrange for the transport of CRTs and other e-waste to the Properties for as low as $0.0725 per pound.

298.    Defendant Accurate IT knew or should have known that the artificially low prices being charged by Defendant Closed Loop substantially undercut the prevailing market with a price point that no reasonable industry participant could have believed to be sufficient to cover the costs of a legitimate recycling operation.  Thus, Defendant Accurate IT knew or should have known that Defendant Closed Loop was running a sham recycling scheme, but chose to do business with it anyway in an attempt to benefit from its misconduct.

299.    Defendant Accurate IT, however, failed to exercise reasonable care to determine whether Defendant Closed Loop was operating in compliance with applicable law and whether Defendant Closed Loop had a feasible means of recycling the millions of pounds of CRTs and other e-waste it was accumulating.

300.    Records produced by Defendant Closed Loop indicate that, among other e-waste streams, Defendant Accurate IT arranged for the disposal or treatment of, and paid Defendant Closed Loop to accept, e-waste characterized as "mixed broken glass," which has a negative net value.

301.    Defendant Accurate IT asserts that "[a]ll downstream vendors are scrutinized to ensure applicable permits, licenses, and certifications associated with recycling."                    *See*                    http://ait-recycle.com/component/content/index.php?option=com_content&view=article&id=49.

302.    Nevertheless, Defendant Accurate IT continued to ship vast quantities of CRTs and other e-waste to the Properties to take advantage of Defendant Closed Loop's artificially low prices.

303.    Records produced by Defendant Closed Loop indicate that the drivers for Defendant Accurate IT made at least 22 different deliveries to the Properties.

304.    Upon information and belief, these drivers observed firsthand that Defendant Closed Loop's e-waste recycling operation was not a legitimate enterprise and amounted to sham recycling.

305.    These drivers would have witnessed the fact that Defendant Closed Loop was stockpiling CRTs and other e-waste in such immense quantities that they could not possibly be recycled in the course of a single calendar year or otherwise as part of a legitimate and economically viable recycling operation.

306.    These drivers would have witnessed how Defendant Closed Loop was disposing of the CRTs, including the hundreds of pallets of deteriorating Gaylords and broken CRTs stored outside that led to the October 17, 2013 NOV; the deteriorating Gaylords stacked 15-20 feet high inside the Properties without sufficient aisle space in which to manage them, which led to the April 11, 2016 NOV; and the hazardous leaded dust dispersed throughout the Properties given the lack of appropriate dust containment that contributed to the OSHA violations.

307.    Thus, at all times relevant, Defendant Accurate IT knew or should have known that Defendant Closed Loop did not qualify for the CRT conditional exclusion, because Defendant Accurate IT knew or should have known that Defendant Closed Loop was speculatively accumulating CRTs, had no feasible means of recycling them, was disposing of them, and was otherwise not engaged in legitimate recycling.

308.    Nevertheless, enticed by the artificially low prices offered by a sham recycling operation, Defendant Accurate IT selected Defendant Closed Loop as its downstream e-waste "recycler," routinely arranging for the transport of CRTs and other e-waste to the Properties over nearly a three-year period.

## 2.    Defendant ATR

309.    Records produced by Defendant Closed Loop indicate that Defendant ATR arranged for the transport of at least 91,750 pounds of CRTs and other e-waste to the Properties starting in or around June 2015 and extending into or around February 2016.

310.    Defendant ATR entered into a series of contracts with Defendant Closed Loop to arrange for the transport of CRTs and other e-waste to the Properties for as low as $0.0900 per pound.

311.    Defendant ATR knew or should have known that the artificially low prices being charged by Defendant Closed Loop substantially undercut the prevailing market with a price point that no reasonable industry participant could have believed to be sufficient to cover the costs of a legitimate recycling operation.  Thus, Defendant ATR knew or should have known that Defendant Closed Loop was running a sham recycling scheme, but chose to do business with it anyway in an attempt to benefit from its misconduct.

312.    Defendant ATR, however, failed to exercise reasonable care to determine whether Defendant Closed Loop was operating in compliance with applicable law and whether Defendant Closed Loop had a feasible means of recycling the millions of pounds of CRTs and other e-waste it was accumulating.

313.    Defendant ATR asserts that it is an "industry leader for E-waste management in the US." *See* https://wmsbf.org/members/advanced-technology-recycling/.

314.    Nevertheless, Defendant ATR continued to ship vast quantities of CRTs and other e-waste to the Properties to take advantage of Defendant Closed Loop's artificially low prices.

315.    On or about August 20, 2017, Defendant ATR issued an article indicating that it had "discontinued using Closed Loop for CRT glass processing many years ago due to inconsistencies in their downstream audits and questionable storage practice" (emphasis added), notwithstanding the fact that Defendant ATR was using Defendant Closed Loop for CRT glass processing as recently as February 2016.

316.    Records produced by Defendant Closed Loop indicate that the drivers for Defendant ATR made at least four different deliveries to the Properties.

317.    Upon information and belief, these drivers observed firsthand that Defendant Closed Loop's e-waste recycling operation was not a legitimate enterprise and amounted to sham recycling.

318.    These drivers would have witnessed the fact that Defendant Closed Loop was stockpiling CRTs and other e-waste in such immense quantities that they could not possibly be recycled in the course of a single calendar year or otherwise as part of a legitimate and economically viable recycling operation.

319.    These drivers would have witnessed how Defendant Closed Loop was disposing of the CRTs, including the hundreds of pallets of deteriorating Gaylords and broken CRTs stored outside that led to the October 17, 2013 NOV; the deteriorating Gaylords stacked 15-20 feet high inside the Properties without sufficient aisle space in which to manage them, which led to the April 11, 2016 NOV; and the hazardous leaded dust dispersed throughout the Properties given the lack of appropriate dust containment that contributed to the OSHA violation .

320.     Thus, at all times relevant, Defendant ATR knew or should have known that Defendant Closed Loop did not qualify for the CRT conditional exclusion, because Defendant ATR knew or should have known that Defendant Closed Loop was speculatively accumulating CRTs, had no feasible means of recycling them, was disposing of them, and was otherwise not engaged in legitimate recycling.

321.     Nevertheless, enticed by the artificially low prices offered by a sham recycling operation, Defendant ATR selected Defendant Closed Loop as its downstream e-waste "recycler," routinely arranging for the transport of CRTs and other e-waste to the Properties over approximately an eight-month period.

### 3.     Defendant AIM

322.     Records produced by Defendant Closed Loop indicate that Defendant AIM arranged for the transport of at least 114,303 pounds of CRTs and other e-waste to the Properties starting in or around June 2013 and extending into or around November 2014.

323.     Defendant AIM entered into a series of contracts with Defendant Closed Loop to arrange for the transport of CRTs and other e-waste to the Properties for as low as $0.1000 per pound.

324.     Defendant AIM knew or should have known that the artificially low prices being charged by Defendant Closed Loop substantially undercut the prevailing market with a price point that no reasonable industry participant could have believed to be sufficient to cover the costs of a legitimate recycling operation.  Thus, Defendant AIM knew or should have known that Defendant Closed Loop was running a sham recycling scheme, but chose to do business with it anyway in an attempt to benefit from its misconduct.

325.     Defendant AIM, however, failed to exercise reasonable care to determine whether Defendant Closed Loop was operating in compliance with applicable law and

whether Defendant Closed Loop had a feasible means of recycling the millions of pounds of CRTs and other e-waste it was accumulating.

326. Defendant AIM asserts that it is a "leader in E-Waste Recycling Collection." *See* http://www.aimecycling.com/services/e-waste/.

327. Nevertheless, Defendant AIM continued to ship vast quantities of CRTs and other e-waste to the Properties to take advantage of Defendant Closed Loop's artificially low prices.

328. Records produced by Defendant Closed Loop indicate that the drivers for Defendant AIM made at least nine different deliveries to the Properties.

329. Upon information and belief, these drivers observed firsthand that Defendant Closed Loop's e-waste recycling operation was not a legitimate enterprise and amounted to sham recycling.

330. These drivers would have witnessed the fact that Defendant Closed Loop was stockpiling CRTs and other e-waste in such immense quantities that they could not possibly be recycled in the course of a single calendar year or otherwise as part of a legitimate and economically viable recycling operation.

331. These drivers would have witnessed how Defendant Closed Loop was disposing of the CRTs, including the hundreds of pallets of deteriorating Gaylords and broken CRTs stored outside that led to the October 17, 2013 NOV; the deteriorating Gaylords stacked 15-20 feet high inside the Properties without sufficient aisle space in which to manage them, which led to the April 11, 2016 NOV; and the hazardous leaded dust dispersed throughout the Properties given the lack of appropriate dust containment that contributed to the OSHA violations.

332. Thus, at all times relevant, Defendant AIM knew or should have known that Defendant Closed Loop did not qualify for the CRT conditional exclusion, because Defendant AIM knew or should have known that Defendant Closed Loop was speculatively accumulating CRTs, had no feasible means of recycling them, was disposing of them, and was otherwise not engaged in legitimate recycling.

333. Nevertheless, enticed by the artificially low prices offered by a sham recycling operation, Defendant AIM selected Defendant Closed Loop as its downstream e-waste "recycler," routinely arranging for the transport of CRTs and other e-waste to the Properties over approximately a 1-2 year period.

### 4. Defendant ARI

334. Records produced by Defendant Closed Loop indicate that Defendant ARI arranged for the transport of at least 2,528,422 pounds of CRTs and other e-waste to the Properties starting in or around May 2012 and extending into or around January 2014.

335. Defendant ARI entered into a series of contracts with Defendant Closed Loop to arrange for the transport of CRTs and other e-waste to the Properties for as low as $0.0750 per pound.

336. Defendant ARI knew or should have known that the artificially low prices being charged by Defendant Closed Loop substantially undercut the prevailing market with a price point that no reasonable industry participant could have believed to be sufficient to cover the costs of a legitimate recycling operation. Thus, Defendant ARI knew or should have known that Defendant Closed Loop was running a sham recycling scheme, but chose to do business with it anyway in an attempt to benefit from its misconduct.

337. Defendant ARI, however, failed to exercise reasonable care to determine whether Defendant Closed Loop was operating in compliance with applicable law and

whether Defendant Closed Loop had a feasible means of recycling the millions of pounds of CRTs and other e-waste it was accumulating.

338.    Defendant ARI asserts that it is "one of the region's leading 'e-waste' recycling operations." *See* http://www.retroworks.net/.

339.    Defendant ARI has readily acknowledged that "[w]ith a couple of easy questions, you can get a good idea what your recycling company is up to" and that "[b]ecause there are relatively few glass furnaces or lead smelters recycling post-consumer CRT glass, it shouldn't be a 'trade secret' where your CRT glass goes." *See* http://www.retroworks.net/Good-Point/CRTGlassTest_final.PDF.

340.    Defendant ARI has also readily acknowledged that "EPA could hold you, the generator, liable for cleanup of CRTs dumped or abandoned by a 3rd party recycler" and that "[y]ou have a right to check the CRT glass destination." *See* http://www.retroworks.net/Good-Point/CRTGlassTest_final.PDF.

341.    As is evidenced by the more than 64,000 tons of CRTs and other e-waste abandoned in the Properties, Defendant ARI apparently never bothered to check the "CRT glass destination" for the 2,528,422 pounds of CRTs and other e-waste it had transported or arranged to be transported to the Properties.

342.    Nevertheless, Defendant ARI continued to ship vast quantities of CRTs and other e-waste to the Properties to take advantage of Defendant Closed Loop's artificially low prices.

343.    Records produced by Defendant Closed Loop indicate that the drivers for Defendant ARI made at least 62 different deliveries to the Properties.

344. Upon information and belief, these drivers observed firsthand that Defendant Closed Loop's e-waste recycling operation was not a legitimate enterprise and amounted to sham recycling.

345. These drivers would have witnessed the fact that Defendant Closed Loop was stockpiling CRTs and other e-waste in such immense quantities that they could not possibly be recycled in the course of a single calendar year or otherwise as part of a legitimate and economically viable recycling operation.

346. These drivers would have witnessed how Defendant Closed Loop was disposing of the CRTs, including the hundreds of pallets of deteriorating Gaylords and broken CRTs stored outside that led to the October 17, 2013 NOV; the deteriorating Gaylords stacked 15-20 feet high inside the Properties without sufficient aisle space in which to manage them, which led to the April 11, 2016 NOV; and the hazardous leaded dust dispersed throughout the Properties given the lack of appropriate dust containment that contributed to the OSHA violations.

347. Thus, at all times relevant, Defendant ARI knew or should have known that Defendant Closed Loop did not qualify for the CRT conditional exclusion, because Defendant ARI knew or should have known that Defendant Closed Loop was speculatively accumulating CRTs, had no feasible means of recycling them, was disposing of them, and was otherwise not engaged in legitimate recycling.

348. Nevertheless, enticed by the artificially low prices offered by a sham recycling operation, Defendant ARI selected Defendant Closed Loop as its downstream e-waste "recycler," routinely arranging for the transport of CRTs and other e-waste to the Properties over approximately a 1-2 year period.

### 5.      Defendant ARG

349.    Records produced by Defendant Closed Loop indicate that Defendant ARG arranged for the transport of at least 324,626 pounds of CRTs and other e-waste to the Properties starting in or around April 2012 and extending into or around November 2012.

350.    Defendant ARG entered into a series of contracts with Defendant Closed Loop to arrange for the transport of CRTs and other e-waste to the Properties for as low as $0.0875 per pound.

351.    Defendant ARG knew or should have known that the artificially low prices being charged by Defendant Closed Loop substantially undercut the prevailing market with a price point that no reasonable industry participant could have believed to be sufficient to cover the costs of a legitimate recycling operation.  Thus, Defendant ARG knew or should have known that Defendant Closed Loop was running a sham recycling scheme, but chose to do business with it anyway in an attempt to benefit from its misconduct.

352.    Defendant ARG, however, failed to exercise reasonable care to determine whether Defendant Closed Loop was operating in compliance with applicable law and whether Defendant Closed Loop had a feasible means of recycling the millions of pounds of CRTs and other e-waste it was accumulating.

353.    Records produced by Defendant Closed Loop indicate that, among other e-waste streams, Defendant ARG arranged for the disposal or treatment of, and paid Defendant Closed Loop to accept, e-waste characterized as "load of glass," funnel glass," broken glass," and "coated funnel glass," each of which has a negative net value.

354.    Records produced by Defendant Closed Loop indicate that the drivers for Defendant ARG made at least 13 different deliveries to the Properties.

355.    Upon information and belief, these drivers observed firsthand that Defendant Closed Loop's e-waste recycling operation was not a legitimate enterprise and amounted to sham recycling.

356.    These drivers would have witnessed the fact that Defendant Closed Loop was stockpiling CRTs and other e-waste in such immense quantities that they could not possibly be recycled in the course of a single calendar year or otherwise as part of a legitimate and economically viable recycling operation.

357.    These drivers would have witnessed how Defendant Closed Loop was disposing of the CRTs, including the hundreds of pallets of deteriorating Gaylords and broken CRTs stored outside that led to the October 17, 2013 NOV; the deteriorating Gaylords stacked 15-20 feet high inside the Properties without sufficient aisle space in which to manage them, which led to the April 11, 2016 NOV; and the hazardous leaded dust dispersed throughout the Properties given the lack of appropriate dust containment that contributed to the OSHA violations.

358.    Thus, at all times relevant, Defendant ARG knew or should have known that Defendant Closed Loop did not qualify for the CRT conditional exclusion, because Defendant ARG knew or should have known that Defendant Closed Loop was speculatively accumulating CRTs, had no feasible means of recycling them, was disposing of them, and was otherwise not engaged in legitimate recycling.

359.    Nevertheless, enticed by the artificially low prices offered by a sham recycling operation, Defendant ARG selected Defendant Closed Loop as its downstream e-waste "recycler," routinely arranging for the transport of CRTs and other e-waste to the Properties over approximately an eight-month period.

### 6. Defendant C2

360. Records produced by Defendant Closed Loop indicate that Defendant C2 arranged for the transport of at least 1,178,106 pounds of CRTs and other e-waste to the Properties starting in or around May 2014 and extending into or around February 2016.

361. Defendant C2 entered into a series of contracts with Defendant Closed Loop to arrange for the transport of CRTs and other e-waste to the Properties for as low as $0.0800 per pound.

362. Defendant C2 knew or should have known that the artificially low prices being charged by Defendant Closed Loop substantially undercut the prevailing market with a price point that no reasonable industry participant could have believed to be sufficient to cover the costs of a legitimate recycling operation. Thus, Defendant C2 knew or should have known that Defendant Closed Loop was running a sham recycling scheme, but chose to do business with it anyway in an attempt to benefit from its misconduct.

363. Defendant C2, however, failed to exercise reasonable care to determine whether Defendant Closed Loop was operating in compliance with applicable law and whether Defendant Closed Loop had a feasible means of recycling the millions of pounds of CRTs and other e-waste it was accumulating.

364. Records produced by Defendant Closed Loop indicate that, among other e-waste streams, Defendant C2 arranged for the disposal or treatment of, and paid Defendant Closed Loop to accept, e-waste characterized as "mirror glass" and "flat panel glass only," each of which has a negative net value.

365. Defendant C2 continued to arrange for the transport of CRTs and other e-waste to the Properties even after Defendant Closed Loop's R2 certification was suspended, which occurred on or about February 19, 2016.

366. Defendant C2 asserts that it is an "industry leader" and an "expert[] in e-waste recycling." *See* http://www.tryc2.com/.

367. Nevertheless, Defendant C2 continued to ship vast quantities of CRTs and other e-waste to the Properties to take advantage of Defendant Closed Loop's artificially low prices.

368. Records produced by Defendant Closed Loop indicate that the drivers for Defendant C2 made at least 56 different deliveries to the Properties.

369. Upon information and belief, these drivers observed firsthand that Defendant Closed Loop's e-waste recycling operation was not a legitimate enterprise and amounted to sham recycling.

370. These drivers would have witnessed the fact that Defendant Closed Loop was stockpiling CRTs and other e-waste in such immense quantities that they could not possibly be recycled in the course of a single calendar year or otherwise as part of a legitimate and economically viable recycling operation.

371. These drivers would have witnessed how Defendant Closed Loop was disposing of the CRTs, including the hundreds of pallets of deteriorating Gaylords and broken CRTs stored outside that led to the October 17, 2013 NOV; the deteriorating Gaylords stacked 15-20 feet high inside the Properties without sufficient aisle space in which to manage them, which led to the April 11, 2016 NOV; and the hazardous leaded dust dispersed throughout the Properties given the lack of appropriate dust containment that contributed to the OSHA violations.

372. Thus, at all times relevant, Defendant C2 knew or should have known that Defendant Closed Loop did not qualify for the CRT conditional exclusion, because Defendant C2 knew or should have known that Defendant Closed Loop was speculatively

accumulating CRTs, had no feasible means of recycling them, was disposing of them, and was otherwise not engaged in legitimate recycling.

373. Nevertheless, enticed by the artificially low prices offered by a sham recycling operation, Defendant C2 selected Defendant Closed Loop as its downstream e-waste "recycler," routinely arranging for the transport of CRTs and other e-waste to the Properties over nearly a two-year period.

### 7. Defendant Cohen

374. Records produced by Defendant Closed Loop indicate that Defendant Cohen arranged for the transport of at least 909,106 pounds of CRTs and other e-waste to the Properties starting in or around August 2013 and extending into or around June 2015.

375. Defendant Cohen entered into a series of contracts with Defendant Closed Loop to arrange for the transport of CRTs and other e-waste to the Properties for as low as $0.0850 per pound.

376. Defendant Cohen knew or should have known that the artificially low prices being charged by Defendant Closed Loop substantially undercut the prevailing market with a price point that no reasonable industry participant could have believed to be sufficient to cover the costs of a legitimate recycling operation. Thus, Defendant Cohen knew or should have known that Defendant Closed Loop was running a sham recycling scheme, but chose to do business with it anyway in an attempt to benefit from its misconduct.

377. Defendant Cohen, however, failed to exercise reasonable care to determine whether Defendant Closed Loop was operating in compliance with applicable law and whether Defendant Closed Loop had a feasible means of recycling the millions of pounds of CRTs and other e-waste it was accumulating.

378.     Records produced by Defendant Closed Loop indicate that, among other e-waste streams, Defendant Cohen arranged for the disposal or treatment of, and paid Defendant Closed Loop to accept, e-waste characterized as "broken mixed glass," "coated funnel glass," "clean panel glass," "skids-glass," "pallets-glass," "mixed glass," and "broken glass," each of which has a negative net value.

379.     Defendant Cohen asserts that it its "strict downstream auditing process ensures all materials are handled properly" and "guarantees your electronics are recycled in a safe, effective manner." *See* http://cohenusa.com/electronics-recycling.

380.     Nevertheless, Defendant Cohen continued to ship vast quantities of CRTs and other e-waste to the Properties to take advantage of Defendant Closed Loop's artificially low prices.

381.     Records produced by Defendant Closed Loop indicate that the drivers for Defendant Cohen made at least 26 different deliveries to the Properties.

382.     Upon information and belief, these drivers observed firsthand that Defendant Closed Loop's e-waste recycling operation was not a legitimate enterprise and amounted to sham recycling.

383.     These drivers would have witnessed the fact that Defendant Closed Loop was stockpiling CRTs and other e-waste in such immense quantities that they could not possibly be recycled in the course of a single calendar year or otherwise as part of a legitimate and economically viable recycling operation.

384.     These drivers would have witnessed how Defendant Closed Loop was disposing of the CRTs, including the hundreds of pallets of deteriorating Gaylords and broken CRTs stored outside that led to the October 17, 2013 NOV; the deteriorating Gaylords stacked 15-20 feet high inside the Properties without sufficient aisle space in

which to manage them, which led to the April 11, 2016 NOV; and the hazardous leaded dust dispersed throughout the Properties given the lack of appropriate dust containment that contributed to the OSHA violations.

385.    Thus, at all times relevant, Defendant Cohen knew or should have known that Defendant Closed Loop did not qualify for the CRT conditional exclusion, because Defendant Cohen knew or should have known that Defendant Closed Loop was speculatively accumulating CRTs, had no feasible means of recycling them, was disposing of them, and was otherwise not engaged in legitimate recycling.

386.    Nevertheless, enticed by the artificially low prices offered by a sham recycling operation, Defendant Cohen selected Defendant Closed Loop as its downstream e-waste "recycler," routinely arranging for the transport of CRTs and other e-waste to the Properties over approximately a two-year period.

### 8.    Defendant CRS

387.    Records produced by Defendant Closed Loop indicate that Defendant CRS arranged for the transport of at least 525,738 pounds of CRTs and other e-waste to the Properties starting in or around April 2015 and extending into or around December 2015.

388.    Defendant CRS entered into a series of contracts with Defendant Closed Loop to arrange for the transport of CRTs and other e-waste to the Properties for as low as $0.0800 per pound.

389.    Defendant CRS knew or should have known that the artificially low prices being charged by Defendant Closed Loop substantially undercut the prevailing market with a price point that no reasonable industry participant could have believed to be sufficient to cover the costs of a legitimate recycling operation.  Thus, Defendant CRS knew or should

have known that Defendant Closed Loop was running a sham recycling scheme, but chose to do business with it anyway in an attempt to benefit from its misconduct.

390.    Defendant CRS, however, failed to exercise reasonable care to determine whether Defendant Closed Loop was operating in compliance with applicable law and whether Defendant Closed Loop had a feasible means of recycling the millions of pounds of CRTs and other e-waste it was accumulating.

391.    Defendant CRS asserts that it has "over 50 years of combined industry experience, ensuring the ability to properly service and create the recycling solution required for anyone." *See* http://www.crsrecycle.com/about.html.

392.    Nevertheless, Defendant CRS continued to ship vast quantities of CRTs and other e-waste to the Properties to take advantage of Defendant Closed Loop's artificially low prices.

393.    Records produced by Defendant Closed Loop indicate that the drivers for Defendant CRS made at least 15 different deliveries to the Properties.

394.    Upon information and belief, these drivers observed firsthand that Defendant Closed Loop's e-waste recycling operation was not a legitimate enterprise and amounted to sham recycling.

395.    These drivers would have witnessed the fact that Defendant Closed Loop was stockpiling CRTs and other e-waste in such immense quantities that they could not possibly be recycled in the course of a single calendar year or otherwise as part of a legitimate and economically viable recycling operation.

396.    These drivers would have witnessed how Defendant Closed Loop was disposing of the CRTs, including the hundreds of pallets of deteriorating Gaylords and broken CRTs stored outside that led to the October 17, 2013 NOV; the deteriorating

Gaylords stacked 15-20 feet high inside the Properties without sufficient aisle space in which to manage them, which led to the April 11, 2016 NOV; and the hazardous leaded dust dispersed throughout the Properties given the lack of appropriate dust containment that contributed to the OSHA violations.

397. Thus, at all times relevant, Defendant CRS knew or should have known that Defendant Closed Loop did not qualify for the CRT conditional exclusion, because Defendant CRS knew or should have known that Defendant Closed Loop was speculatively accumulating CRTs, had no feasible means of recycling them, was disposing of them, and was otherwise not engaged in legitimate recycling.

398. Nevertheless, enticed by the artificially low prices offered by a sham recycling operation, Defendant CRS selected Defendant Closed Loop as its downstream e-waste "recycler," routinely arranging for the transport of CRTs and other e-waste to the Properties over approximately a nine-month period.

### 9. Defendant Comprenew

399. Records produced by Defendant Closed Loop indicate that Defendant Comprenew arranged for the transport of at least 332,826 pounds of CRTs and other e-waste to the Properties starting in or around July 2015 and extending into or around February 2016.

400. Defendant Comprenew entered into a series of contracts with Defendant Closed Loop to arrange for the transport of CRTs and other e-waste to the Properties for as low as $0.0800 per pound.

401. Defendant Comprenew knew or should have known that the artificially low prices being charged by Defendant Closed Loop substantially undercut the prevailing market with a price point that no reasonable industry participant could have believed to be

sufficient to cover the costs of a legitimate recycling operation. Thus, Defendant Comprenew knew or should have known that Defendant Closed Loop was running a sham recycling scheme, but chose to do business with it anyway in an attempt to benefit from its misconduct.

402. Defendant Comprenew, however, failed to exercise reasonable care to determine whether Defendant Closed Loop was operating in compliance with applicable law and whether Defendant Closed Loop had a feasible means of recycling the millions of pounds of CRTs and other e-waste it was accumulating.

403. Defendant Comprenew continued to arrange for the transport of CRTs and other e-waste to the Properties even after Defendant Closed Loop's R2 certification was suspended, which occurred on or about February 19, 2016.

404. Records produced by Defendant Closed Loop indicate that the drivers for Defendant Comprenew made at least 12 different deliveries to the Properties.

405. Upon information and belief, these drivers observed firsthand that Defendant Closed Loop's e-waste recycling operation was not a legitimate enterprise and amounted to sham recycling.

406. These drivers would have witnessed the fact that Defendant Closed Loop was stockpiling CRTs and other e-waste in such immense quantities that they could not possibly be recycled in the course of a single calendar year or otherwise as part of a legitimate and economically viable recycling operation.

407. These drivers would have witnessed how Defendant Closed Loop was disposing of the CRTs, including the hundreds of pallets of deteriorating Gaylords and broken CRTs stored outside that led to the October 17, 2013 NOV; the deteriorating Gaylords stacked 15-20 feet high inside the Properties without sufficient aisle space in

which to manage them, which led to the April 11, 2016 NOV; and the hazardous leaded dust dispersed throughout the Properties given the lack of appropriate dust containment that contributed to the OSHA violations.

408.    Thus, at all times relevant, Defendant Comprenew knew or should have known that Defendant Closed Loop did not qualify for the CRT conditional exclusion, because Defendant Comprenew knew or should have known that Defendant Closed Loop was speculatively accumulating CRTs, had no feasible means of recycling them, was disposing of them, and was otherwise not engaged in legitimate recycling.

409.    Nevertheless, enticed by the artificially low prices offered by a sham recycling operation, Defendant Comprenew selected Defendant Closed Loop as its downstream e-waste "recycler," routinely arranging for the transport of CRTs and other e-waste to the Properties over approximately an eight-month period.

### 10.    Defendant CompuPoint

410.    Records produced by Defendant Closed Loop indicate that Defendant CompuPoint arranged for the transport of at least 2,926,499 pounds of CRTs and other e-waste to the Properties starting in or around August 2012 and extending into or around January 2016.

411.    Defendant CompuPoint entered into a series of contracts with Defendant Closed Loop to arrange for the transport of CRTs and other e-waste to the Properties for as low as $0.0775 per pound.

412.    Defendant CompuPoint knew or should have known that the artificially low prices being charged by Defendant Closed Loop substantially undercut the prevailing market with a price point that no reasonable industry participant could have believed to be sufficient to cover the costs of a legitimate recycling operation. Thus, Defendant

CompuPoint knew or should have known that Defendant Closed Loop was running a sham recycling scheme, but chose to do business with it anyway in an attempt to benefit from its misconduct.

413. Defendant CompuPoint, however, failed to exercise reasonable care to determine whether Defendant Closed Loop was operating in compliance with applicable law and whether Defendant Closed Loop had a feasible means of recycling the millions of pounds of CRTs and other e-waste it was accumulating.

414. Defendant CompuPoint asserts that it conducts "due diligence of downstream vendors" and that it "eliminate[s] the risks associated with electronics recycling by managing the entire asset disposition process from collection to final destination." *See* http://www.compupointusa.com/why-choose-a-r2-certified-facility/ and http://www.compupointusa.com/about-us.

415. Nevertheless, Defendant CompuPoint continued to ship vast quantities of CRTs and other e-waste to the Properties to take advantage of Defendant Closed Loop's artificially low prices.

416. Records produced by Defendant Closed Loop indicate that the drivers for Defendant CompuPoint made at least 76 different deliveries to the Properties.

417. Upon information and belief, these drivers observed firsthand that Defendant Closed Loop's e-waste recycling operation was not a legitimate enterprise and amounted to sham recycling.

418. These drivers would have witnessed the fact that Defendant Closed Loop was stockpiling CRTs and other e-waste in such immense quantities that they could not possibly be recycled in the course of a single calendar year or otherwise as part of a legitimate and economically viable recycling operation.

419.    These drivers would have witnessed how Defendant Closed Loop was disposing of the CRTs, including the hundreds of pallets of deteriorating Gaylords and broken CRTs stored outside that led to the October 17, 2013 NOV; the deteriorating Gaylords stacked 15-20 feet high inside the Properties without sufficient aisle space in which to manage them, which led to the April 11, 2016 NOV; and the hazardous leaded dust dispersed throughout the Properties given the lack of appropriate dust containment that contributed to the OSHA violations.

420.    Thus, at all times relevant, Defendant CompuPoint knew or should have known that Defendant Closed Loop did not qualify for the CRT conditional exclusion, because Defendant CompuPoint knew or should have known that Defendant Closed Loop was speculatively accumulating CRTs, had no feasible means of recycling them, was disposing of them, and was otherwise not engaged in legitimate recycling.

421.    Nevertheless, enticed by the artificially low prices offered by a sham recycling operation, Defendant CompuPoint selected Defendant Closed Loop as its downstream e-waste "recycler," routinely arranging for the transport of CRTs and other e-waste to the Properties over approximately a 3-4 year period.

### 11.    Defendant CRV

422.    Records produced by Defendant Closed Loop indicate that Defendant CRV arranged for the transport of at least 153,253 pounds of CRTs and other e-waste to the Properties starting in or around July 2015 and extending into or around February 2016.

423.    Defendant CRV entered into a series of contracts with Defendant Closed Loop to arrange for the transport of CRTs and other e-waste to the Properties for as low as $0.0900 per pound.

424.     Defendant CRV knew or should have known that the artificially low prices being charged by Defendant Closed Loop substantially undercut the prevailing market with a price point that no reasonable industry participant could have believed to be sufficient to cover the costs of a legitimate recycling operation. Thus, Defendant CRV knew or should have known that Defendant Closed Loop was running a sham recycling scheme, but chose to do business with it anyway in an attempt to benefit from its misconduct.

425.     Defendant CRV, however, failed to exercise reasonable care to determine whether Defendant Closed Loop was operating in compliance with applicable law and whether Defendant Closed Loop had a feasible means of recycling the millions of pounds of CRTs and other e-waste it was accumulating.

426.     Records produced by Defendant Closed Loop indicate that the drivers for Defendant CRV made at least six different deliveries to the Properties.

427.     Upon information and belief, these drivers observed firsthand that Defendant Closed Loop's e-waste recycling operation was not a legitimate enterprise and amounted to sham recycling.

428.     These drivers would have witnessed the fact that Defendant Closed Loop was stockpiling CRTs and other e-waste in such immense quantities that they could not possibly be recycled in the course of a single calendar year or otherwise as part of a legitimate and economically viable recycling operation.

429.     These drivers would have witnessed how Defendant Closed Loop was disposing of the CRTs, including the hundreds of pallets of deteriorating Gaylords and broken CRTs stored outside that led to the October 17, 2013 NOV; the deteriorating Gaylords stacked 15-20 feet high inside the Properties without sufficient aisle space in which to manage them, which led to the April 11, 2016 NOV; and the hazardous leaded

dust dispersed throughout the Properties given the lack of appropriate dust containment that contributed to the OSHA violations.

430. Thus, at all times relevant, Defendant CRV knew or should have known that Defendant Closed Loop did not qualify for the CRT conditional exclusion, because Defendant CRV knew or should have known that Defendant Closed Loop was speculatively accumulating CRTs, had no feasible means of recycling them, was disposing of them, and was otherwise not engaged in legitimate recycling.

431. Nevertheless, enticed by the artificially low prices offered by a sham recycling operation, Defendant CRV selected Defendant Closed Loop as its downstream e-waste "recycler," routinely arranging for the transport of CRTs and other e-waste to the Properties over approximately an eight-month period.

### 12. Defendant Dynamic

432. Records produced by Defendant Closed Loop indicate that Defendant Dynamic arranged for the transport of at least 5,273,233 pounds of CRTs and other e-waste to the Properties starting in or around January 2013 and extending into or around March 2016.

433. Defendant Dynamic entered into a series of contracts with Defendant Closed Loop to arrange for the transport of CRTs and other e-waste to the Properties for as low as $0.0750 per pound.

434. Defendant Dynamic knew or should have known that the artificially low prices being charged by Defendant Closed Loop substantially undercut the prevailing market with a price point that no reasonable industry participant could have believed to be sufficient to cover the costs of a legitimate recycling operation. Thus, Defendant Dynamic knew or should have known that Defendant Closed Loop was running a sham recycling

scheme, but chose to do business with it anyway in an attempt to benefit from its misconduct.

435. Defendant Dynamic, however, failed to exercise reasonable care to determine whether Defendant Closed Loop was operating in compliance with applicable law and whether Defendant Closed Loop had a feasible means of recycling the millions of pounds of CRTs and other e-waste it was accumulating.

436. Records produced by Defendant Closed Loop indicate that, among other e-waste streams, Defendant Dynamic arranged for the disposal or treatment of, and paid Defendant Closed Loop to accept, e-waste characterized as "coated funnel glass," which has a negative net value.

437. Defendant Dynamic continued to arrange for the transport of CRTs and other e-waste to the Properties even after Defendant Closed Loop's R2 certification was suspended, which occurred on or about February 19, 2016.

438. Defendant Dynamic was well aware of industry-wide concerns with the speculative accumulation of e-waste, having itself acquired the assets of Wisconsin-based Materials Processing Corporation ("MPC") in or around August 2015, in the wake of MPC's shutdown in response to state fines for stockpiling CRTs.

439. Defendant Dynamic asserts that it is "an industry leader" and provides a guarantee that "your recycled electronics – and the environment – are safe with us." *See* https://thinkdynamic.com/solutions/e-recycling/.

440. On at least three separate occasions, Defendant Dynamic and Defendant Closed Loop exchanged information that should have led Defendant Dynamic to conclude that Defendant Closed Loop was violating the CRT conditional exclusion.

a. On or about December 3, 2014, Defendant Dynamic e-mailed Defendant Closed Loop regarding concerns raised by the Wisconsin DNR that Defendant Closed Loop had been unable to provide documentation showing that the "pounds of glass Dynamic sen[t] to Closed Loop . . . were sent to legitimate end markets, until the point where Closed Loop is operating its furnace."

b. On or about December 9, 2014, Defendant Dynamic e-mailed Defendant Closed Loop a second time requesting "documentation showing that Closed Loop sent all of our CRT weight from July 2014 through the present to viable end markets."

c. On or about June 15, 2015, Defendant Dynamic e-mailed the Defendant Closed Loop for a third time expressing "serious concerns with your furnace not up and running yet" and requesting a "60-day guarantee of pound for pound, zero accumulation."

441. Nevertheless, Defendant Dynamic continued to ship vast quantities of CRTs and other e-waste to the Properties for an additional seven months to take advantage of Defendant Closed Loop's artificially low prices.

442. Records produced by Defendant Closed Loop indicate that the drivers for Defendant Dynamic made at least 143 different deliveries to the Properties.

443. Upon information and belief, these drivers observed firsthand that Defendant Closed Loop's e-waste recycling operation was not a legitimate enterprise and amounted to sham recycling.

444. These drivers would have witnessed the fact that Defendant Closed Loop was stockpiling CRTs and other e-waste in such immense quantities that they could not

possibly be recycled in the course of a single calendar year or otherwise as part of a legitimate and economically viable recycling operation.

445. These drivers would have witnessed how Defendant Closed Loop was disposing of the CRTs, including the hundreds of pallets of deteriorating Gaylords and broken CRTs stored outside that led to the October 17, 2013 NOV; the deteriorating Gaylords stacked 15-20 feet high inside the Properties without sufficient aisle space in which to manage them, which led to the April 11, 2016 NOV; and the hazardous leaded dust dispersed throughout the Properties given the lack of appropriate dust containment that contributed to the OSHA violations.

446. Thus, at all times relevant, Defendant Dynamic knew or should have known that Defendant Closed Loop did not qualify for the CRT conditional exclusion, because Defendant Dynamic knew or should have known that Defendant Closed Loop was speculatively accumulating CRTs, had no feasible means of recycling them, was disposing of them, and was otherwise not engaged in legitimate recycling.

447. Nevertheless, enticed by the artificially low prices offered by a sham recycling operation, Defendant Dynamic selected Defendant Closed Loop as its downstream e-waste "recycler," routinely arranging for the transport of CRTs and other e-waste to the Properties over approximately a three-year period.

### 13. Defendant eCycle

448. Records produced by Defendant Closed Loop indicate that Defendant eCycle arranged for the transport of at least 7,054,560 pounds of CRTs and other e-waste to the Properties starting in or around June 2012 and extending into or around September 2015.

449. Defendant eCycle entered into a series of contracts with Defendant Closed Loop to arrange for the transport of CRTs and other e-waste to the Properties for as low as $0.0800 per pound.

450. Defendant eCycle knew or should have known that the artificially low prices being charged by Defendant Closed Loop substantially undercut the prevailing market with a price point that no reasonable industry participant could have believed to be sufficient to cover the costs of a legitimate recycling operation. Thus, Defendant eCycle knew or should have known that Defendant Closed Loop was running a sham recycling scheme, but chose to do business with it anyway in an attempt to benefit from its misconduct.

451. Defendant eCycle, however, failed to exercise reasonable care to determine whether Defendant Closed Loop was operating in compliance with applicable law and whether Defendant Closed Loop had a feasible means of recycling the millions of pounds of CRTs and other e-waste it was accumulating.

452. The transactions for many of the CRTs and e-waste that Defendant eCycle arranged to be transported to the Properties were brokered in collusion with Defendant E-World, whose CEO served time in federal prison for e-waste fraud.

453. Records produced by Defendant Closed Loop indicate that, among other e-waste streams, Defendant eCycle arranged for the disposal or treatment of, and paid Defendant Closed Loop to accept, e-waste characterized as "broken mixed glass," "cullet," and "broken glass," each of which has a negative net value.

454. Defendant eCycle asserts on its website that it is an "industry leading electronics recycling company," and that "you are assured that your equipment, including servers, PCs, monitors, televisions, telecom systems, cell phones/smart phones and medical

equipment          will          be          managed          responsibly." *See*

http://www.ecyclesecure.com/ElectronicsRecycling.html.

455.    Nevertheless, Defendant eCycle continued to ship vast quantities of CRTs

and other e-waste to the Properties to take advantage of Defendant Closed Loop's

artificially low prices.

456.    On or about April 25, 2014, E-Scrap News reported that Defendant eCycle

provided bills of lading to the North Carolina Department of Environment and Natural

Resources that confirmed the shipments of approximately 317 tons (634,000 pounds) to

the Properties from Defendant eCycle's warehouse at 1236 Industrial Avenue in Gastonia,

North Carolina as of April 25, 2014, and that Defendant eCycle was continuing to send

large amounts of processed CRT glass to downstream recipients to avoid running afoul of

its own federal speculative accumulation requirements.

457.    Records produced by Defendant Closed Loop indicate that the drivers for

Defendant eCycle made at least 181 different deliveries to the Properties.

458.    Upon information and belief, these drivers observed firsthand that

Defendant Closed Loop's e-waste recycling operation was not a legitimate enterprise and

amounted to sham recycling.

459.    These drivers would have witnessed the fact that Defendant Closed Loop

was stockpiling CRTs and other e-waste in such immense quantities that they could not

possibly be recycled in the course of a single calendar year or otherwise as part of a

legitimate and economically viable recycling operation.

460.    These drivers would have witnessed how Defendant Closed Loop was

disposing of the CRTs, including the hundreds of pallets of deteriorating Gaylords and

broken CRTs stored outside that led to the October 17, 2013 NOV; the deteriorating

Gaylords stacked 15-20 feet high inside the Properties without sufficient aisle space in which to manage them, which led to the April 11, 2016 NOV; and the hazardous leaded dust dispersed throughout the Properties given the lack of appropriate dust containment that contributed to the OSHA violations.

461.    On or about July 7, 2017, Defendant eCycle contacted a representative of Garrison to submit a bid to Garrison to clean up the e-waste that Defendant Closed Loop had abandoned, which included the millions of pounds e-waste that Defendant eCycle itself had transported or arranged to be transported previously.

462.    Defendant eCycle thus sought to bootstrap the revenues it had generated from Defendant Closed Loop's artificially low prices by offering to clean up the very same mess it had knowingly created.

463.    Thus, at all times relevant, Defendant eCycle knew or should have known that Defendant Closed Loop did not qualify for the CRT conditional exclusion, because Defendant eCycle knew or should have known that Defendant Closed Loop was speculatively accumulating CRTs, had no feasible means of recycling them, was disposing of them, and was otherwise not engaged in legitimate recycling.

464.    Nevertheless, enticed by the artificially low prices offered by a sham recycling operation, Defendant eCycle selected Defendant Closed Loop as its downstream e-waste "recycler," routinely arranging for the transport of CRTs and other e-waste to the Properties over approximately a three-year period.

### 14.    Defendant eLot

465.    Records produced by Defendant Closed Loop indicate that Defendant eLot arranged for the transport of at least 204,828 pounds of CRTs and other e-waste to the Properties in or around April 2015.

466.     Defendant eLot entered into a series of contracts with Defendant Closed Loop to arrange for the transport of CRTs and other e-waste to the Properties for as low as $0.0800 per pound.

467.     Defendant eLot knew or should have known that the artificially low prices being charged by Defendant Closed Loop substantially undercut the prevailing market with a price point that no reasonable industry participant could have believed to be sufficient to cover the costs of a legitimate recycling operation. Thus, Defendant eLot knew or should have known that Defendant Closed Loop was running a sham recycling scheme, but chose to do business with it anyway in an attempt to benefit from its misconduct.

468.     Defendant eLot, however, failed to exercise reasonable care to determine whether Defendant Closed Loop was operating in compliance with applicable law and whether Defendant Closed Loop had a feasible means of recycling the millions of pounds of CRTs and other e-waste it was accumulating.

469.     Defendant eLot has a history of noncompliance with e-waste laws.  On or about May 31, 2018, Defendant eLot agreed to pay $15,700 in civil penalties to the New York State Department of Environmental Conservation ("NYDEC") for improperly containerized CRTs, storage of hazardous e-waste without a permit, improper waste storage, and other concerns identified in an April 2016 NYDEC inspection.

470.     Records produced by Defendant Closed Loop indicate that the drivers for Defendant eLot made at least 10 different deliveries to the Properties.

471.     Upon information and belief, these drivers observed firsthand that Defendant Closed Loop's e-waste recycling operation was not a legitimate enterprise and amounted to sham recycling.

472.     These drivers would have witnessed the fact that Defendant Closed Loop was stockpiling CRTs and other e-waste in such immense quantities that they could not possibly be recycled in the course of a single calendar year or otherwise as part of a legitimate and economically viable recycling operation.

473.     These drivers would have witnessed how Defendant Closed Loop was disposing of the CRTs, including the hundreds of pallets of deteriorating Gaylords and broken CRTs stored outside that led to the October 17, 2013 NOV; the deteriorating Gaylords stacked 15-20 feet high inside the Properties without sufficient aisle space in which to manage them, which led to the April 11, 2016 NOV; and the hazardous leaded dust dispersed throughout the Properties given the lack of appropriate dust containment that contributed to the OSHA violations.

474.     Thus, at all times relevant, Defendant eLot knew or should have known that Defendant Closed Loop did not qualify for the CRT conditional exclusion, because Defendant eLot knew or should have known that Defendant Closed Loop was speculatively accumulating CRTs, had no feasible means of recycling them, was disposing of them, and was otherwise not engaged in legitimate recycling.

475.     Nevertheless, enticed by the artificially low prices offered by a sham recycling operation, Defendant eLot selected Defendant Closed Loop as its downstream e-waste "recycler," routinely arranging for the transport of CRTs and other e-waste to the Properties over approximately a one-month period.

### 15.     Defendant ECSR

476.     Records produced by Defendant Closed Loop indicate that Defendant ECSR arranged for the transport of at least 320,834 pounds of CRTs and other e-waste to the Properties starting in or around June 2012 and extending into or around July 2014.

477.    Defendant ECSR entered into a series of contracts with Defendant Closed Loop to arrange for the transport of CRTs and other e-waste to the Properties for as low as $0.0800 per pound.

478.    Defendant ECSR knew or should have known that the artificially low prices being charged by Defendant Closed Loop substantially undercut the prevailing market with a price point that no reasonable industry participant could have believed to be sufficient to cover the costs of a legitimate recycling operation.  Thus, Defendant ECSR knew or should have known that Defendant Closed Loop was running a sham recycling scheme, but chose to do business with it anyway in an attempt to benefit from its misconduct.

479.    Defendant ECSR, however, failed to exercise reasonable care to determine whether Defendant Closed Loop was operating in compliance with applicable law and whether Defendant Closed Loop had a feasible means of recycling the millions of pounds of CRTs and other e-waste it was accumulating.

480.    Records produced by Defendant Closed Loop indicate that, among other e-waste streams, Defendant ECSR arranged for the disposal or treatment of, and paid Defendant Closed Loop to accept, e-waste characterized as "glass," which has a negative net value.

481.    Records produced by Defendant Closed Loop indicate that the drivers for Defendant ECSR made at least 12 different deliveries to the Properties.

482.    Upon information and belief, these drivers observed firsthand that Defendant Closed Loop's e-waste recycling operation was not a legitimate enterprise and amounted to sham recycling.

483.    These drivers would have witnessed the fact that Defendant Closed Loop was stockpiling CRTs and other e-waste in such immense quantities that they could not

possibly be recycled in the course of a single calendar year or otherwise as part of a legitimate and economically viable recycling operation.

484. These drivers would have witnessed how Defendant Closed Loop was disposing of the CRTs, including the hundreds of pallets of deteriorating Gaylords and broken CRTs stored outside that led to the October 17, 2013 NOV; the deteriorating Gaylords stacked 15-20 feet high inside the Properties without sufficient aisle space in which to manage them, which led to the April 11, 2016 NOV; and the hazardous leaded dust dispersed throughout the Properties given the lack of appropriate dust containment that contributed to the OSHA violations .

485. Thus, at all times relevant, Defendant ECSR knew or should have known that Defendant Closed Loop did not qualify for the CRT conditional exclusion, because Defendant ECSR knew or should have known that Defendant Closed Loop was speculatively accumulating CRTs, had no feasible means of recycling them, was disposing of them, and was otherwise not engaged in legitimate recycling.

486. Nevertheless, enticed by the artificially low prices offered by a sham recycling operation, Defendant ECSR selected Defendant Closed Loop as its downstream e-waste "recycler," routinely arranging for the transport of CRTs and other e-waste to the Properties over approximately a three-year period.

### 16. Defendant eRevival

487. Records produced by Defendant Closed Loop indicate that Defendant eRevival arranged for the transport of at least 593,767 pounds of CRTs and other e-waste to the Properties starting in or around July 2014 and extending into or around October 2015.

488. Defendant eRevival entered into a series of contracts with Defendant Closed Loop to arrange for the transport of CRTs and other e-waste to the Properties for as low as $0.0750 per pound.

489. Defendant eRevival knew or should have known that the artificially low prices being charged by Defendant Closed Loop substantially undercut the prevailing market with a price point that no reasonable industry participant could have believed to be sufficient to cover the costs of a legitimate recycling operation. Thus, Defendant eRevival knew or should have known that Defendant Closed Loop was running a sham recycling scheme, but chose to do business with it anyway in an attempt to benefit from its misconduct.

490. Defendant eRevival, however, failed to exercise reasonable care to determine whether Defendant Closed Loop was operating in compliance with applicable law and whether Defendant Closed Loop had a feasible means of recycling the millions of pounds of CRTs and other e-waste it was accumulating.

491. Defendant eRevival asserts that it is "one of the leading electronics and computer recycling companies in the east coast." *See* http://www.erevival.net/.

492. Nevertheless, Defendant eRevival continued to ship vast quantities of CRTs and other e-waste to the Properties to take advantage of Defendant Closed Loop's artificially low prices.

493. Records produced by Defendant Closed Loop indicate that the drivers for Defendant eRevival made at least 15 different deliveries to the Properties.

494. Upon information and belief, these drivers observed firsthand that Defendant Closed Loop's e-waste recycling operation was not a legitimate enterprise and amounted to sham recycling.

495. These drivers would have witnessed the fact that Defendant Closed Loop was stockpiling CRTs and other e-waste in such immense quantities that they could not possibly be recycled in the course of a single calendar year or otherwise as part of a legitimate and economically viable recycling operation.

496. These drivers would have witnessed how Defendant Closed Loop was disposing of the CRTs, including the hundreds of pallets of deteriorating Gaylords and broken CRTs stored outside that led to the October 17, 2013 NOV; the deteriorating Gaylords stacked 15-20 feet high inside the Properties without sufficient aisle space in which to manage them, which led to the April 11, 2016 NOV; and the hazardous leaded dust dispersed throughout the Properties given the lack of appropriate dust containment that contributed to the OSHA violations.

497. Thus, at all times relevant, Defendant eRevival knew or should have known that Defendant Closed Loop did not qualify for the CRT conditional exclusion, because Defendant eRevival knew or should have known that Defendant Closed Loop was speculatively accumulating CRTs, had no feasible means of recycling them, was disposing of them, and was otherwise not engaged in legitimate recycling.

498. Nevertheless, enticed by the artificially low prices offered by a sham recycling operation, Defendant eRevival selected Defendant Closed Loop as its downstream e-waste "recycler," routinely arranging for the transport of CRTs and other e-waste to the Properties over approximately a 1-2 year period.

### 17. Defendant eWaste Recycling

499. Records produced by Defendant Closed Loop indicate that Defendant eWaste Recycling arranged for the transport of at least 1,670,776 pounds of CRTs and

other e-waste to the Properties starting in or around August 2012 and extending into or around March 2013.

500. Defendant eWaste Recycling entered into a series of contracts with Defendant Closed Loop to arrange for the transport of CRTs and other e-waste to the Properties for as low as $0.0825 per pound.

501. Defendant eWaste Recycling knew or should have known that the artificially low prices being charged by Defendant Closed Loop substantially undercut the prevailing market with a price point that no reasonable industry participant could have believed to be sufficient to cover the costs of a legitimate recycling operation. Thus, Defendant eWaste Recycling knew or should have known that Defendant Closed Loop was running a sham recycling scheme, but chose to do business with it anyway in an attempt to benefit from its misconduct.

502. Defendant eWaste Recycling, however, failed to exercise reasonable care to determine whether Defendant Closed Loop was operating in compliance with applicable law and whether Defendant Closed Loop had a feasible means of recycling the millions of pounds of CRTs and other e-waste it was accumulating.

503. The transactions for many of the CRTs and e-waste that Defendant eWaste Recycling arranged to be transported to the Properties were brokered in collusion with Defendant E-World, whose CEO served time in federal prison for e-waste fraud.

504. Records produced by Defendant Closed Loop indicate that, among other e-waste streams, Defendant eWaste Recycling arranged for the disposal or treatment of, and paid Defendant Closed Loop to accept, e-waste characterized as "leaded cullet," broken glass," and "coated funnel glass," each of which has a negative net value.

505.    Defendant eWaste Recycling asserts that it has "55 years combined experience in the electronics recycling industry" and "utilizes only responsible recycling practices." *See* http://www.ewastemaine.com/about.html.

506.    Nevertheless, Defendant eWaste Recycling continued to ship vast quantities of CRTs and other e-waste to the Properties to take advantage of Defendant Closed Loop's artificially low prices.

507.    Records produced by Defendant Closed Loop indicate that the drivers for Defendant eWaste Recycling made at least 45 different deliveries to the Properties.

508.    Upon information and belief, these drivers observed firsthand that Defendant Closed Loop's e-waste recycling operation was not a legitimate enterprise and amounted to sham recycling.

509.    These drivers would have witnessed the fact that Defendant Closed Loop was stockpiling CRTs and other e-waste in such immense quantities that they could not possibly be recycled in the course of a single calendar year or otherwise as part of a legitimate and economically viable recycling operation.

510.    These drivers would have witnessed how Defendant Closed Loop was disposing of the CRTs, including the hundreds of pallets of deteriorating Gaylords and broken CRTs stored outside that led to the October 17, 2013 NOV; the deteriorating Gaylords stacked 15-20 feet high inside the Properties without sufficient aisle space in which to manage them, which led to the April 11, 2016 NOV; and the hazardous leaded dust dispersed throughout the Properties given the lack of appropriate dust containment that contributed to the OSHA violations.

511.    Thus, at all times relevant, Defendant eWaste Recycling knew or should have known that Defendant Closed Loop did not qualify for the CRT conditional exclusion,

because Defendant eWaste Recycling knew or should have known that Defendant Closed Loop was speculatively accumulating CRTs, had no feasible means of recycling them, was disposing of them, and was otherwise not engaged in legitimate recycling.

512. Nevertheless, enticed by the artificially low prices offered by a sham recycling operation, Defendant eWaste Recycling selected Defendant Closed Loop as its downstream e-waste "recycler," routinely arranging for the transport of CRTs and other e-waste to the Properties over approximately an eight-month period.

### 18. Defendant eWorks

513. Records produced by Defendant Closed Loop indicate that Defendant eWorks arranged for the transport of at least 370,205 pounds of CRTs and other e-waste to the Properties starting in or around January 2016 and extending into or around February 2016.

514. Defendant eWorks entered into a series of contracts with Defendant Closed Loop to arrange for the transport of CRTs and other e-waste to the Properties for as low as $0.1050 per pound.

515. Defendant eWorks knew or should have known that the artificially low prices being charged by Defendant Closed Loop substantially undercut the prevailing market with a price point that no reasonable industry participant could have believed to be sufficient to cover the costs of a legitimate recycling operation. Thus, Defendant eWorks knew or should have known that Defendant Closed Loop was running a sham recycling scheme, but chose to do business with it anyway in an attempt to benefit from its misconduct.

516. Defendant eWorks, however, failed to exercise reasonable care to determine whether Defendant Closed Loop was operating in compliance with applicable law and

whether Defendant Closed Loop had a feasible means of recycling the millions of pounds of CRTs and other e-waste it was accumulating.

517.   Records produced by Defendant Closed Loop indicate that, among other e-waste streams, Defendant eWorks arranged for the disposal or treatment of, and paid Defendant Closed Loop to accept, e-waste characterized as "broken mixed glass," which has a negative net value.

518.   Defendant eWorks asserts that "[a]ll equipment is processed in accordance with today's strict electronic waste standards." *See* http://www.eworksesi.org/.

519.   Nevertheless, Defendant eWorks continued to ship vast quantities of CRTs and other e-waste to the Properties to take advantage of Defendant Closed Loop's artificially low prices.

520.   Records produced by Defendant Closed Loop indicate that the drivers for Defendant eWorks made at least 18 different deliveries to the Properties.

521.   Upon information and belief, these drivers observed firsthand that Defendant Closed Loop's e-waste recycling operation was not a legitimate enterprise and amounted to sham recycling.

522.   These drivers would have witnessed the fact that Defendant Closed Loop was stockpiling CRTs and other e-waste in such immense quantities that they could not possibly be recycled in the course of a single calendar year or otherwise as part of a legitimate and economically viable recycling operation.

523.   These drivers would have witnessed how Defendant Closed Loop was disposing of the CRTs, including the hundreds of pallets of deteriorating Gaylords and broken CRTs stored outside that led to the October 17, 2013 NOV; the deteriorating Gaylords stacked 15-20 feet high inside the Properties without sufficient aisle space in

which to manage them, which led to the April 11, 2016 NOV; and the hazardous leaded dust dispersed throughout the Properties given the lack of appropriate dust containment that contributed to the OSHA violations.

524. Thus, at all times relevant, Defendant eWorks knew or should have known that Defendant Closed Loop did not qualify for the CRT conditional exclusion, because Defendant eWorks knew or should have known that Defendant Closed Loop was speculatively accumulating CRTs, had no feasible means of recycling them, was disposing of them, and was otherwise not engaged in legitimate recycling.

525. Nevertheless, enticed by the artificially low prices offered by a sham recycling operation, Defendant eWorks selected Defendant Closed Loop as its downstream e-waste "recycler," routinely arranging for the transport of CRTs and other e-waste to the Properties over approximately a two-month period.

### 19. Defendant E-World and Defendant Erie

526. Records produced by Defendant Closed Loop indicate that Defendants E-World and Erie arranged for the transport of at least 11,583,163 pounds of CRTs and other e-waste to the Properties starting in or around June 2012 and extending into or around November 2014.

527. Defendant E-World entered into a series of contracts with Defendant Closed Loop, as well with certain Arranger/Transporter Defendants, to arrange for the transport of CRTs and other e-waste to the Properties for as low as $0.0775 per pound.

528. Defendants E-World and Erie knew or should have known that the artificially low prices being charged by Defendant Closed Loop substantially undercut the prevailing market with a price point that no reasonable industry participant could have believed to be sufficient to cover the costs of a legitimate recycling operation. Thus,

Defendants E-World and Erie knew or should have known that Defendant Closed Loop was running a sham recycling scheme, but chose to do business with it anyway in an attempt to benefit from its misconduct.

529. Defendants E-World and Erie, however, failed to exercise reasonable care to determine whether Defendant Closed Loop was operating in compliance with applicable law and whether Defendant Closed Loop had a feasible means of recycling the millions of pounds of CRTs and other e-waste it was accumulating.

530. Records produced by Defendant Closed Loop indicate that, among other e-waste streams, Defendants E-World and Erie arranged for the disposal or treatment of, and paid Defendant Closed Loop to accept, e-waste characterized as "leaded cullet," "broken glass," mixed co-mingled," "leaded glass," "coated funnel glass," and "broken mixed glass," each of which has a negative net value.

531. Defendant E-World's LinkedIn profile indicates that "E-World specializes in effectively managing the environmental and social responsibilities of end of life electronic equipment."

532. Defendant Erie's LinkedIn profile indicates that he is "one of the most well known and active leaders in the U.S. electronic waste and recycling industry" and that his "vision and subsequent implementation have created partnerships across the globe all geared toward the greening of the electronics industry by reducing the carbon footprint, creating local jobs, and minimizing the costs for environmentally sound recycling."

533. On or about February 26, 2014, Defendant E-World e-mailed the Closed Loop Defendants stating "[w]e look forward to the furnace hopefully next year," which reflected Defendant E-World's understanding that Defendant Closed Loop had no feasible means of recycling at that time.

534.     Nevertheless, Defendant E-World continued to ship vast quantities of CRTs and other e-waste to the Properties to take advantage of Defendant Closed Loop's artificially low prices.

535.     Defendants E-World and Erie have a history of illegal activity arising out of the provision of e-waste recycling services.

536.     Defendant E-World entered into a Consent Order with the California Department of Toxic Substances Control on or about March 5, 2014, to resolve allegations that included failure to "contain CRTs and CRT devices in a proper containers [sic] that were structurally sound and adequate to prevent breakage" in exchange for a civil penalty.

537.     Defendant Erie was indicted by a federal grand jury in the United States District Court for the Southern District of California on or about September 24, 2015, for conspiracy and trafficking in counterfeit goods in connection with an agreement to perform electronic recycling services. He pled guilty and served time in federal prison.

538.     Lyle J. De Stigter, Defendant E-World's Chief Operating Officer, was also indicted by a federal grand jury in the United States District Court for the Southern District of California on or about September 24, 2015, for conspiracy and trafficking in counterfeit goods in connection with an agreement to perform electronic recycling services. He, too, pled guilty.

539.     Records produced by Defendant Closed Loop indicate that the drivers working on behalf of Defendant E-World, or in otherwise connection with its brokerage services, made at least 391 different deliveries to the Properties.

540.     Upon information and belief, these drivers observed firsthand that Defendant Closed Loop's e-waste recycling operation was not a legitimate enterprise and amounted to sham recycling.

541. These drivers would have witnessed the fact that Defendant Closed Loop was stockpiling CRTs and other e-waste in such immense quantities that they could not possibly be recycled in the course of a single calendar year or otherwise as part of a legitimate and economically viable recycling operation.

542. These drivers would have witnessed how Defendant Closed Loop was disposing of the CRTs, including the hundreds of pallets of deteriorating Gaylords and broken CRTs stored outside that led to the October 17, 2013 NOV; the deteriorating Gaylords stacked 15-20 feet high inside the Properties without sufficient aisle space in which to manage them, which led to the April 11, 2016 NOV; and the hazardous leaded dust dispersed throughout the Properties given the lack of appropriate dust containment that contributed to the OSHA violations

543. On or about June 9, 2017, Defendant Erie contacted Garrison to submit a bid to clean up the e-waste that Defendant Closed Loop had abandoned, which included the millions of pounds e-waste that his company, Defendant E-World, itself had transported or arranged to be transported previously.

544. Defendants E-World and Erie thus sought to bootstrap the revenues they had generated from Defendant Closed Loop's artificially low prices by offering to clean up the very same mess they had knowingly created.

545. Thus, at all times relevant, Defendants E-World and Erie knew or should have known that Defendant Closed Loop did not qualify for the CRT conditional exclusion, because Defendants E-World and Erie knew or should have known that Defendant Closed Loop was speculatively accumulating CRTs, had no feasible means of recycling them, was disposing of them, and was otherwise not engaged in legitimate recycling.

546. Nevertheless, enticed by the artificially low prices offered by a sham recycling operation, Defendants E-World and Erie selected Defendant Closed Loop as their downstream e-waste "recycler," routinely arranging for the transport of CRTs and other e-waste to the Properties over approximately a 2-3 year period.

### 20. Defendant GEEP and Defendant GEEP USA

547. Records produced by Defendant Closed Loop indicate that Defendants GEEP and GEEP USA arranged for the transport of at least 3,890,650 pounds of CRTs and other e-waste to the Properties starting in or around September 2012 and extending into or around May 2015.

548. Defendants GEEP and GEEP USA entered into a series of contracts with Defendant Closed Loop to arrange for the transport of CRTs and other e-waste to the Properties for as low as $0.0875 per pound.

549. Defendants GEEP and GEEP USA knew or should have known that the artificially low prices being charged by Defendant Closed Loop substantially undercut the prevailing market with a price point that no reasonable industry participant could have believed to be sufficient to cover the costs of a legitimate recycling operation. Thus, Defendants GEEP and GEEP USA knew or should have known that Defendant Closed Loop was running a sham recycling scheme, but chose to do business with it anyway in an attempt to benefit from its misconduct.

550. Defendants GEEP and GEEP USA, however, failed to exercise reasonable care to determine whether Defendant Closed Loop was operating in compliance with applicable law and whether Defendant Closed Loop had a feasible means of recycling the millions of pounds of CRTs and other e-waste it was accumulating.

551.    Records produced by Defendant Closed Loop indicate that, among other e-waste streams, Defendants GEEP and GEEP USA arranged for the disposal or treatment of, and paid Defendant Closed Loop to accept, e-waste characterized as "glass from monitors," "computer scrap (glass)," and "leaded glass," each of which has a negative net value.

552.    Defendants GEEP and GEEP USA asserts that they are a "leading provider of cost effective, environmentally responsible electronics waste recycling." *See* http://www.geepglobal.com/services/end-of-life-recycling/.

553.    On or about December 10, 2014, Defendant GEEP USA advised Defendant Closed Loop that "until further notice Closed Loop is not an approved facility for any material," which the author of the communication believed was "due to the issues and violations that were issued at your AZ facility recently."

554.    Nevertheless, Defendants GEEP and GEEP USA continued to ship vast quantities of CRTs and other e-waste to the Properties to take advantage of Defendant Closed Loop's artificially low prices, for approximately another three months.

555.    Records produced by Defendant Closed Loop indicate that the drivers for Defendants GEEP and GEEP USA made at least 98 different deliveries to the Properties.

556.    Upon information and belief, these drivers observed firsthand that Defendant Closed Loop's e-waste recycling operation was not a legitimate enterprise and amounted to sham recycling.

557.    These drivers would have witnessed the fact that Defendant Closed Loop was stockpiling CRTs and other e-waste in such immense quantities that they could not possibly be recycled in the course of a single calendar year or otherwise as part of a legitimate and economically viable recycling operation.

558.    These drivers would have witnessed how Defendant Closed Loop was disposing of the CRTs, including the hundreds of pallets of deteriorating Gaylords and broken CRTs stored outside that led to the October 17, 2013 NOV; the deteriorating Gaylords stacked 15-20 feet high inside the Properties without sufficient aisle space in which to manage them, which led to the April 11, 2016 NOV; and the hazardous leaded dust dispersed throughout the Properties given the lack of appropriate dust containment that contributed to the OSHA violations.

559.    Thus, at all times relevant, Defendants GEEP and GEEP USA knew or should have known that Defendant Closed Loop did not qualify for the CRT conditional exclusion, because Defendants GEEP and GEEP USA knew or should have known that Defendant Closed Loop was speculatively accumulating CRTs, had no feasible means of recycling them, was disposing of them, and was otherwise not engaged in legitimate recycling.

560.    Nevertheless, enticed by the artificially low prices offered by a sham recycling operation, Defendants GEEP and GEEP USA selected Defendant Closed Loop as its downstream e-waste "recycler," routinely arranging for the transport of CRTs and other e-waste to the Properties over approximately a 2-3 year period.

### 21.    Defendant Great Lakes

561.    Records produced by Defendant Closed Loop indicate that Defendant Great Lakes arranged for the transport of at least 311,454 pounds of CRTs and other e-waste to the Properties starting in or around September 2015 and extending into or around February 2016.

562.     Defendant Great Lakes entered into a series of contracts with Defendant Closed Loop to arrange for the transport of CRTs and other e-waste to the Properties for as low as $0.0900 per pound.

563.     Defendant Great Lakes knew or should have known that the artificially low prices being charged by Defendant Closed Loop substantially undercut the prevailing market with a price point that no reasonable industry participant could have believed to be sufficient to cover the costs of a legitimate recycling operation.  Thus, Defendant Great Lakes knew or should have known that Defendant Closed Loop was running a sham recycling scheme, but chose to do business with it anyway in an attempt to benefit from its misconduct.

564.     Defendant Great Lakes, however, failed to exercise reasonable care to determine whether Defendant Closed Loop was operating in compliance with applicable law and whether Defendant Closed Loop had a feasible means of recycling the millions of pounds of CRTs and other e-waste it was accumulating.

565.     Defendant Great Lakes continued to arrange for the transport of CRTs and other e-waste to the Properties even after Defendant Closed Loop's R2 certification was suspended, which occurred on or about February 19, 2016.

566.     Defendant Great Lakes asserts that it "has years of experience performing environmentally friendly recycling of electronic products . . . [, and] electronic recycling is our specialty." *See* https://www.ewaste1.com.

567.     Nevertheless, Defendant Great Lakes continued to ship vast quantities of CRTs and other e-waste to the Properties to take advantage of Defendant Closed Loop's artificially low prices.

568.    Records produced by Defendant Closed Loop indicate that the drivers for Defendant Great Lakes made at least 13 different deliveries to the Properties.

569.    Upon information and belief, these drivers observed firsthand that Defendant Closed Loop's e-waste recycling operation was not a legitimate enterprise and amounted to sham recycling.

570.    These drivers would have witnessed the fact that Defendant Closed Loop was stockpiling CRTs and other e-waste in such immense quantities that they could not possibly be recycled in the course of a single calendar year or otherwise as part of a legitimate and economically viable recycling operation.

571.    These drivers would have witnessed how Defendant Closed Loop was disposing of the CRTs, including the hundreds of pallets of deteriorating Gaylords and broken CRTs stored outside that led to the October 17, 2013 NOV; the deteriorating Gaylords stacked 15-20 feet high inside the Properties without sufficient aisle space in which to manage them, which led to the April 11, 2016 NOV; and the hazardous leaded dust dispersed throughout the Properties given the lack of appropriate dust containment that contributed to the OSHA violations.

572.    Thus, at all times relevant, Defendant Great Lakes knew or should have known that Defendant Closed Loop did not qualify for the CRT conditional exclusion, because Defendant Great Lakes knew or should have known that Defendant Closed Loop was speculatively accumulating CRTs, had no feasible means of recycling them, was disposing of them, and was otherwise not engaged in legitimate recycling.

573.    Nevertheless, enticed by the artificially low prices offered by a sham recycling operation, Defendant Great Lakes selected Defendant Closed Loop as its

downstream e-waste "recycler," routinely arranging for the transport of CRTs and other e-waste to the Properties over approximately a six-month period.

## 22. Defendant Green Chip

574.     Records produced by Defendant Closed Loop indicate that Defendant Green Chip arranged for the transport of at least 156,416 pounds of CRTs and other e-waste to the Properties starting in or around August 2013 and extending into or around April 2014.

575.     Defendant Green Chip entered into a series of contracts with Defendant Closed Loop to arrange for the transport of CRTs and other e-waste to the Properties for as low as $0.1000 per pound.

576.     Defendant Green Chip knew or should have known that the artificially low prices being charged by Defendant Closed Loop substantially undercut the prevailing market with a price point that no reasonable industry participant could have believed to be sufficient to cover the costs of a legitimate recycling operation.  Thus, Defendant Green Chip knew or should have known that Defendant Closed Loop was running a sham recycling scheme, but chose to do business with it anyway in an attempt to benefit from its misconduct.

577.     Defendant Green Chip, however, failed to exercise reasonable care to determine whether Defendant Closed Loop was operating in compliance with applicable law and whether Defendant Closed Loop had a feasible means of recycling the millions of pounds of CRTs and other e-waste it was accumulating.

578.     Records produced by Defendant Closed Loop indicate that the drivers for Defendant Green Chip made at least four different deliveries to the Properties.

579.   Upon information and belief, these drivers observed firsthand that Defendant Closed Loop's e-waste recycling operation was not a legitimate enterprise and amounted to sham recycling.

580.   These drivers would have witnessed the fact that Defendant Closed Loop was stockpiling CRTs and other e-waste in such immense quantities that they could not possibly be recycled in the course of a single calendar year or otherwise as part of a legitimate and economically viable recycling operation.

581.   These drivers would have witnessed how Defendant Closed Loop was disposing of the CRTs, including the hundreds of pallets of deteriorating Gaylords and broken CRTs stored outside that led to the October 17, 2013 NOV; the deteriorating Gaylords stacked 15-20 feet high inside the Properties without sufficient aisle space in which to manage them, which led to the April 11, 2016 NOV; and the hazardous leaded dust dispersed throughout the Properties given the lack of appropriate dust containment that contributed to the OSHA violations.

582.   Thus, at all times relevant, Defendant Green Chip knew or should have known that Defendant Closed Loop did not qualify for the CRT conditional exclusion, because Defendant Green Chip knew or should have known that Defendant Closed Loop was speculatively accumulating CRTs, had no feasible means of recycling them, was disposing of them, and was otherwise not engaged in legitimate recycling.

583.   Nevertheless, enticed by the artificially low prices offered by a sham recycling operation, Defendant Green Chip selected Defendant Closed Loop as its downstream e-waste "recycler," routinely arranging for the transport of CRTs and other e-waste to the Properties over approximately a nine-month period.

### 23.    Defendant Green Tech

584.    Records produced by Defendant Closed Loop indicate that Defendant Green Tech arranged for the transport of at least 152,257 pounds of CRTs and other e-waste to the Properties starting in or around June 2015 and extending into or around September 2015.

585.    Defendant Green Tech entered into a series of contracts with Defendant Closed Loop to arrange for the transport of CRTs and other e-waste to the Properties for as low as $0.0775 per pound.

586.    Defendant Green Tech knew or should have known that the artificially low prices being charged by Defendant Closed Loop substantially undercut the prevailing market with a price point that no reasonable industry participant could have believed to be sufficient to cover the costs of a legitimate recycling operation.  Thus, Defendant Green Tech knew or should have known that Defendant Closed Loop was running a sham recycling scheme, but chose to do business with it anyway in an attempt to benefit from its misconduct.

587.    Defendant Green Tech, however, failed to exercise reasonable care to determine whether Defendant Closed Loop was operating in compliance with applicable law and whether Defendant Closed Loop had a feasible means of recycling the millions of pounds of CRTs and other e-waste it was accumulating.

588.    Defendant Green Tech "guarantees that all materials we process are re-purposed, either as a whole unit or as bare materials" and that "[a]ll equipment is processed in–house, eliminating third party handlers." *See* http://greentechrecyclers.com/services/recycling.

589.    Nevertheless, Defendant Green Tech continued to ship vast quantities of CRTs and other e-waste to the Properties to take advantage of Defendant Closed Loop's artificially low prices.

590.    Records produced by Defendant Closed Loop indicate that the drivers for Defendant Green Tech made at least four different deliveries to the Properties.

591.    Upon information and belief, these drivers observed firsthand that Defendant Closed Loop's e-waste recycling operation was not a legitimate enterprise and amounted to sham recycling.

592.    These drivers would have witnessed the fact that Defendant Closed Loop was stockpiling CRTs and other e-waste in such immense quantities that they could not possibly be recycled in the course of a single calendar year or otherwise as part of a legitimate and economically viable recycling operation.

593.    These drivers would have witnessed how Defendant Closed Loop was disposing of the CRTs, including the hundreds of pallets of deteriorating Gaylords and broken CRTs stored outside that led to the October 17, 2013 NOV; the deteriorating Gaylords stacked 15-20 feet high inside the Properties without sufficient aisle space in which to manage them, which led to the April 11, 2016 NOV; and the hazardous leaded dust dispersed throughout the Properties given the lack of appropriate dust containment that contributed to the OSHA violations.

594.    Thus, at all times relevant, Defendant Green Tech knew or should have known that Defendant Closed Loop did not qualify for the CRT conditional exclusion, because Defendant Green Tech knew or should have known that Defendant Closed Loop was speculatively accumulating CRTs, had no feasible means of recycling them, was disposing of them, and was otherwise not engaged in legitimate recycling.

595. Nevertheless, enticed by the artificially low prices offered by a sham recycling operation, Defendant Green Tech selected Defendant Closed Loop as its downstream e-waste "recycler," routinely arranging for the transport of CRTs and other e-waste to the Properties over approximately a four-month period.

### 24. Defendant Green Wave

596. Records produced by Defendant Closed Loop indicate that Defendant Green Wave arranged for the transport of at least 656,154 pounds of CRTs and other e-waste to the Properties starting in or around May 2015 and extending into or around December 2015.

597. Defendant Green Wave entered into a series of contracts with Defendant Closed Loop to arrange for the transport of CRTs and other e-waste to the Properties for as low as $0.0775 per pound.

598. Defendant Green Wave knew or should have known that the artificially low prices being charged by Defendant Closed Loop substantially undercut the prevailing market with a price point that no reasonable industry participant could have believed to be sufficient to cover the costs of a legitimate recycling operation. Thus, Defendant Green Wave knew or should have known that Defendant Closed Loop was running a sham recycling scheme, but chose to do business with it anyway in an attempt to benefit from its misconduct.

599. Defendant Green Wave, however, failed to exercise reasonable care to determine whether Defendant Closed Loop was operating in compliance with applicable law and whether Defendant Closed Loop had a feasible means of recycling the millions of pounds of CRTs and other e-waste it was accumulating.

600.    Records produced by Defendant Closed Loop indicate that the drivers for Defendant Green Wave made at least 17 different deliveries to the Properties.

601.    Upon information and belief, these drivers observed firsthand that Defendant Closed Loop's e-waste recycling operation was not a legitimate enterprise and amounted to sham recycling.

602.    These drivers would have witnessed the fact that Defendant Closed Loop was stockpiling CRTs and other e-waste in such immense quantities that they could not possibly be recycled in the course of a single calendar year or otherwise as part of a legitimate and economically viable recycling operation.

603.    These drivers would have witnessed how Defendant Closed Loop was disposing of the CRTs, including the hundreds of pallets of deteriorating Gaylords and broken CRTs stored outside that led to the October 17, 2013 NOV; the deteriorating Gaylords stacked 15-20 feet high inside the Properties without sufficient aisle space in which to manage them, which led to the April 11, 2016 NOV; and the hazardous leaded dust dispersed throughout the Properties given the lack of appropriate dust containment that contributed to the OSHA violations.

604.    Thus, at all times relevant, Defendant Green Wave knew or should have known that Defendant Closed Loop did not qualify for the CRT conditional exclusion, because Defendant Green Wave knew or should have known that Defendant Closed Loop was speculatively accumulating CRTs, had no feasible means of recycling them, was disposing of them, and was otherwise not engaged in legitimate recycling.

605.    Nevertheless, enticed by the artificially low prices offered by a sham recycling operation, Defendant Green Wave selected Defendant Closed Loop as its

downstream e-waste "recycler," routinely arranging for the transport of CRTs and other e-waste to the Properties over approximately an eight-month period.

## 25. Defendant IMS

606. Records produced by Defendant Closed Loop indicate that Defendant IMS arranged for the transport of at least 5,598,819 pounds of CRTs and other e-waste to the Properties starting in or around February 2014 and extending into or around February 2016.

607. Defendant IMS entered into a series of contracts with Defendant Closed Loop to arrange for the transport of CRTs and other e-waste to the Properties for as low as $0.0700 per pound.

608. Defendant IMS knew or should have known that the artificially low prices being charged by Defendant Closed Loop substantially undercut the prevailing market with a price point that no reasonable industry participant could have believed to be sufficient to cover the costs of a legitimate recycling operation. Thus, Defendant IMS knew or should have known that Defendant Closed Loop was running a sham recycling scheme, but chose to do business with it anyway in an attempt to benefit from its misconduct.

609. Defendant IMS also knew or should have known that Defendant Closed Loop was running a sham recycling scheme because Patrick O'Hara served as the Sales/Plant Manager for Defendant Closed Loop before serving as the Business Development Manager at Defendant IMS.

610. Defendant IMS, however, failed to exercise reasonable care to determine whether Defendant Closed Loop was operating in compliance with applicable law and whether Defendant Closed Loop had a feasible means of recycling the millions of pounds of CRTs and other e-waste it was accumulating.

611. Defendant IMS continued to arrange for the transport of CRTs and other e-waste to the Properties even after Defendant Closed Loop's R2 certification was suspended, which occurred on or about February 19, 2016.

612. Defendant IMS asserts that it provides its customers with "secure processing of electronic waste throughout the recycling chain." *See* http://www.imselectronics.com/about-us/our-policy/.

613. On or about November 12, 2014, in purview of the Wisconsin DNR decision to ban shipments to Defendant Closed Loop from receiving manufacturer credit, Defendant IMS advised Mssrs. Benham and Cauchi of Defendant Closed Loop that "[w]e now have a problem in Ohio."

614. Nevertheless, Defendant IMS continued to ship vast quantities of CRTs and other e-waste to the Properties to take advantage of Defendant Closed Loop's artificially low prices, for another three years.

615. On or about November 29, 2012, Garrison's predecessor-in-interest, MS-South LLC, as the landlord, entered into a lease agreement with Defendant IMS, as the tenant for the warehouse premises located at 1635 Watkins Road ("IMS Lease Agreement").

616. On or about April 29, 2013, Garrison acquired 1635 Watkins Road from MS-South LLC in exchange for good and valuable consideration and thereafter assumed all right, title and interest in that property, which included an assignment of all rights and obligations as landlord under the IMS Lease Agreement.

617. The IMS Lease Agreement provides:

"Tenant shall pay any fines, charges, fees, expenses, costs of clean-up, or response costs arising from any Environmental Law and shall indemnify and hold Landlord harmless therefrom, but in each case only to the extent the need for such clean-up

was caused by Tenant's activities on the Premises, or the activities of Tenant's agents, employees, contractors or invitees."

618. Records produced by Defendant Closed Loop indicate that Defendant IMS arranged for the transport of at least 3,481,959 pounds of CRTs and other e-waste from 1635 Watkins Road to the Properties, in violation of environmental laws.

619. Records produced by Defendant Closed Loop indicate that the drivers for Defendant IMS made at least 152 different deliveries to the Properties.

620. Upon information and belief, these drivers observed firsthand that Defendant Closed Loop's e-waste recycling operation was not a legitimate enterprise and amounted to sham recycling.

621. These drivers would have witnessed the fact that Defendant Closed Loop was stockpiling CRTs and other e-waste in such immense quantities that they could not possibly be recycled in the course of a single calendar year or otherwise as part of a legitimate and economically viable recycling operation.

622. These drivers would have witnessed how Defendant Closed Loop was disposing of the CRTs, including the hundreds of pallets of deteriorating Gaylords and broken CRTs stored outside that led to the October 17, 2013 NOV; the deteriorating Gaylords stacked 15-20 feet high inside the Properties without sufficient aisle space in which to manage them, which led to the April 11, 2016 NOV; and the hazardous leaded dust dispersed throughout the Properties given the lack of appropriate dust containment that contributed to the OSHA violations.

623. Thus, at all times relevant, Defendant IMS knew or should have known that Defendant Closed Loop did not qualify for the CRT conditional exclusion, because Defendant IMS knew or should have known that Defendant Closed Loop was speculatively

accumulating CRTs, had no feasible means of recycling them, was disposing of them, and was otherwise not engaged in legitimate recycling.

624.    Nevertheless, enticed by the artificially low prices offered by a sham recycling operation, Defendant IMS selected Defendant Closed Loop as its downstream e-waste "recycler," routinely arranging for the transport of CRTs and other e-waste to the Properties over approximately a three-year period.

### 26.    Defendant Interco

625.    Records produced by Defendant Closed Loop indicate that Defendant Interco arranged for the transport of at least 52,604 pounds of CRTs and other e-waste to the Properties starting in or around October 2015 and extending into or around January 2016.

626.    Defendant Interco entered into a series of contracts with Defendant Closed Loop to arrange for the transport of CRTs and other e-waste to the Properties for as low as $0.0900 per pound.

627.    Defendant Interco knew or should have known that the artificially low prices being charged by Defendant Closed Loop substantially undercut the prevailing market with a price point that no reasonable industry participant could have believed to be sufficient to cover the costs of a legitimate recycling operation.  Thus, Defendant Interco knew or should have known that Defendant Closed Loop was running a sham recycling scheme, but chose to do business with it anyway in an attempt to benefit from its misconduct.

628.    Defendant Interco, however, failed to exercise reasonable care to determine whether Defendant Closed Loop was operating in compliance with applicable law and

whether Defendant Closed Loop had a feasible means of recycling the millions of pounds of CRTs and other e-waste it was accumulating.

629.    Records produced by Defendant Closed Loop indicate that the drivers for Defendant Interco made at least two different deliveries to the Properties.

630.    Upon information and belief, these drivers observed firsthand that Defendant Closed Loop's e-waste recycling operation was not a legitimate enterprise and amounted to sham recycling.

631.    These drivers would have witnessed the fact that Defendant Closed Loop was stockpiling CRTs and other e-waste in such immense quantities that they could not possibly be recycled in the course of a single calendar year or otherwise as part of a legitimate and economically viable recycling operation.

632.    These drivers would have witnessed how Defendant Closed Loop was disposing of the CRTs, including the hundreds of pallets of deteriorating Gaylords and broken CRTs stored outside that led to the October 17, 2013 NOV; the deteriorating Gaylords stacked 15-20 feet high inside the Properties without sufficient aisle space in which to manage them, which led to the April 11, 2016 NOV; and the hazardous leaded dust dispersed throughout the Properties given the lack of appropriate dust containment that contributed to the OSHA violations.

633.    Thus, at all times relevant, Defendant Interco knew or should have known that Defendant Closed Loop did not qualify for the CRT conditional exclusion, because Defendant Interco knew or should have known that Defendant Closed Loop was speculatively accumulating CRTs, had no feasible means of recycling them, was disposing of them, and was otherwise not engaged in legitimate recycling.

634.     Nevertheless, enticed by the artificially low prices offered by a sham recycling operation, Defendant Interco selected Defendant Closed Loop as its downstream e-waste "recycler," routinely arranging for the transport of CRTs and other e-waste to the Properties over approximately a four-month period.

### 27.     Defendant JD Beavers

635.     Records produced by Defendant Closed Loop indicate that Defendant JD Beavers arranged for the transport of at least 75,591 pounds of CRTs and other e-waste to the Properties starting in November 2013 and extending into February 2015.

636.     Defendant JD Beavers entered into a series of contracts with Defendant Closed Loop to arrange for the transport of CRTs and other e-waste to the Properties for as low as $0.0800 per pound.

637.     Defendant JD Beavers knew or should have known that the artificially low prices being charged by Defendant Closed Loop substantially undercut the prevailing market with a price point that no reasonable industry participant could have believed to be sufficient to cover the costs of a legitimate recycling operation.  Thus, Defendant JD Beavers knew or should have known that Defendant Closed Loop was running a sham recycling scheme, but chose to do business with it anyway in an attempt to benefit from its misconduct.

638.     Defendant JD Beavers, however, failed to exercise reasonable care to determine whether Defendant Closed Loop was operating in compliance with applicable law and whether Defendant Closed Loop had a feasible means of recycling the millions of pounds of CRTs and other e-waste it was accumulating.

639.    Defendant JD Beavers asserts that "[a]s a leader in the scrap metal processing industry, we guarantee a prompt, professional, ethical and environmentally safe approach to handling your material."  See https://www.beaversco.com/1/148/index.asp.

640.    Nevertheless, Defendant JD Beavers continued to ship vast quantities of CRTs and other e-waste to the Properties to take advantage of Defendant Closed Loop's artificially low prices.

641.    Records produced by Defendant Closed Loop indicate that the drivers for Defendant JD Beavers made at least two different deliveries to the Properties.

642.    Upon information and belief, these drivers observed firsthand that Defendant Closed Loop's e-waste recycling operation was not a legitimate enterprise and amounted to sham recycling.

643.    These drivers would have witnessed the fact that Defendant Closed Loop was stockpiling CRTs and other e-waste in such immense quantities that they could not possibly be recycled in the course of a single calendar year or otherwise as part of a legitimate and economically viable recycling operation.

644.    These drivers would have witnessed how Defendant Closed Loop was disposing of the CRTs, including the hundreds of pallets of deteriorating Gaylords and broken CRTs stored outside that led to the October 17, 2013 NOV; the deteriorating Gaylords stacked 15-20 feet high inside the Properties without sufficient aisle space in which to manage them, which led to the April 11, 2016 NOV; and the hazardous leaded dust dispersed throughout the Properties given the lack of appropriate dust containment that contributed to the OSHA violations.

645.    Thus, at all times relevant, Defendant JD Beavers knew or should have known that Defendant Closed Loop did not qualify for the CRT conditional exclusion,

because Defendant JD Beavers knew or should have known that Defendant Closed Loop was speculatively accumulating CRTs, had no feasible means of recycling them, was disposing of them, and was otherwise not engaged in legitimate recycling.

646.    Nevertheless, enticed by the artificially low prices offered by a sham recycling operation, Defendant JD Beavers selected Defendant Closed Loop as its downstream e-waste "recycler," routinely arranging for the transport of CRTs and other e-waste to the Properties over approximately a fifteen-month period.

### 28.    Defendant MRC

647.    Records produced by Defendant Closed Loop indicate that Defendant MRC arranged for the transport of at least 288,348 pounds of CRTs and other e-waste to the Properties starting in or around October 2015 and extending into or around February 2016.

648.    Defendant MRC entered into a series of contracts with Defendant Closed Loop to arrange for the transport of CRTs and other e-waste to the Properties for as low as $0.0850 per pound.

649.    Defendant MRC knew or should have known that the artificially low prices being charged by Defendant Closed Loop substantially undercut the prevailing market with a price point that no reasonable industry participant could have believed to be sufficient to cover the costs of a legitimate recycling operation.  Thus, Defendant MRC knew or should have known that Defendant Closed Loop was running a sham recycling scheme, but chose to do business with it anyway in an attempt to benefit from its misconduct.

650.    Defendant MRC, however, failed to exercise reasonable care to determine whether Defendant Closed Loop was operating in compliance with applicable law and whether Defendant Closed Loop had a feasible means of recycling the millions of pounds of CRTs and other e-waste it was accumulating.

651.    Records produced by Defendant Closed Loop indicate that the drivers for Defendant MRC made at least eight different deliveries to the Properties.

652.    Upon information and belief, these drivers observed firsthand that Defendant Closed Loop's e-waste recycling operation was not a legitimate enterprise and amounted to sham recycling.

653.    These drivers would have witnessed the fact that Defendant Closed Loop was stockpiling CRTs and other e-waste in such immense quantities that they could not possibly be recycled in the course of a single calendar year or otherwise as part of a legitimate and economically viable recycling operation.

654.    These drivers would have witnessed how Defendant Closed Loop was disposing of the CRTs, including the hundreds of pallets of deteriorating Gaylords and broken CRTs stored outside that led to the October 17, 2013 NOV; the deteriorating Gaylords stacked 15-20 feet high inside the Properties without sufficient aisle space in which to manage them, which led to the April 11, 2016 NOV; and the hazardous leaded dust dispersed throughout the Properties given the lack of appropriate dust containment that contributed to the OSHA violations.

655.    Thus, at all times relevant, Defendant MRC knew or should have known that Defendant Closed Loop did not qualify for the CRT conditional exclusion, because Defendant MRC knew or should have known that Defendant Closed Loop was speculatively accumulating CRTs, had no feasible means of recycling them, was disposing of them, and was otherwise not engaged in legitimate recycling.

656.    Nevertheless, enticed by the artificially low prices offered by a sham recycling operation, Defendant MRC selected Defendant Closed Loop as its downstream

e-waste "recycler," routinely arranging for the transport of CRTs and other e-waste to the Properties over approximately a five-month period.

### 29.    Defendant Ohio Drop Off

657.    Records produced by Defendant Closed Loop indicate that Defendant Ohio Drop Off arranged for the transport of at least 175,847 pounds of CRTs and other e-waste to the Properties starting in or around July 2015 and extending into or around March 2016.

658.    Defendant Ohio Drop Off entered into a series of contracts with Defendant Closed Loop to arrange for the transport of CRTs and other e-waste to the Properties for as low as $0.0900 per pound.

659.    Defendant Ohio Drop Off knew or should have known that the artificially low prices being charged by Defendant Closed Loop substantially undercut the prevailing market with a price point that no reasonable industry participant could have believed to be sufficient to cover the costs of a legitimate recycling operation.  Thus, Defendant Ohio Drop Off knew or should have known that Defendant Closed Loop was running a sham recycling scheme, but chose to do business with it anyway in an attempt to benefit from its misconduct.

660.    Defendant Ohio Drop Off, however, failed to exercise reasonable care to determine whether Defendant Closed Loop was operating in compliance with applicable law and whether Defendant Closed Loop had a feasible means of recycling the millions of pounds of CRTs and other e-waste it was accumulating.

661.    Defendant Ohio Drop Off continued to arrange for the transport of CRTs and other e-waste to the Properties even after Defendant Closed Loop's R2 certification was suspended, which occurred on or about February 19, 2016.

662.    Records produced by Defendant Closed Loop indicate that the drivers for Defendant Ohio Drop Off made at least 18 different deliveries to the Properties.

663.    Upon information and belief, these drivers observed firsthand that Defendant Closed Loop's e-waste recycling operation was not a legitimate enterprise and amounted to sham recycling.

664.    These drivers would have witnessed the fact that Defendant Closed Loop was stockpiling CRTs and other e-waste in such immense quantities that they could not possibly be recycled in the course of a single calendar year or otherwise as part of a legitimate and economically viable recycling operation.

665.    These drivers would have witnessed how Defendant Closed Loop was disposing of the CRTs, including the hundreds of pallets of deteriorating Gaylords and broken CRTs stored outside that led to the October 17, 2013 NOV; the deteriorating Gaylords stacked 15-20 feet high inside the Properties without sufficient aisle space in which to manage them, which led to the April 11, 2016 NOV; and the hazardous leaded dust dispersed throughout the Properties given the lack of appropriate dust containment that contributed to the OSHA violations.

666.    Thus, at all times relevant, Defendant Ohio Drop Off knew or should have known that Defendant Closed Loop did not qualify for the CRT conditional exclusion, because Defendant Ohio Drop Off knew or should have known that Defendant Closed Loop was speculatively accumulating CRTs, had no feasible means of recycling them, was disposing of them, and was otherwise not engaged in legitimate recycling.

667.    Nevertheless, enticed by the artificially low prices offered by a sham recycling operation, Defendant Ohio Drop Off selected Defendant Closed Loop as its

downstream e-waste "recycler," routinely arranging for the transport of CRTs and other e-waste to the Properties over approximately a nine-month period.

### 30.    Defendant Potomac

668.    Records produced by Defendant Closed Loop indicate that Defendant Potomac arranged for the transport of at least 76,791 pounds of CRTs and other e-waste to the Properties starting in or around June 2015 and extending into or around October 2015.

669.    Defendant Potomac entered into a series of contracts with Defendant Closed Loop to arrange for the transport of CRTs and other e-waste to the Properties for as low as $0.0875 per pound.

670.    Defendant Potomac knew or should have known that the artificially low prices being charged by Defendant Closed Loop substantially undercut the prevailing market with a price point that no reasonable industry participant could have believed to be sufficient to cover the costs of a legitimate recycling operation.  Thus, Defendant Potomac knew or should have known that Defendant Closed Loop was running a sham recycling scheme, but chose to do business with it anyway in an attempt to benefit from its misconduct.

671.    Defendant Potomac, however, failed to exercise reasonable care to determine whether Defendant Closed Loop was operating in compliance with applicable law and whether Defendant Closed Loop had a feasible means of recycling the millions of pounds of CRTs and other e-waste it was accumulating.

672.    Defendant Potomac asserts that it conducts "downstream due diligence on all vendors handling focus materials to ensure materials are handled properly throughout the chain of custody" and purportedly warns its potential customers of the increasing prevalence of e-waste abandonments. *See* http://potomacecycle.com/about/.

673.    Nevertheless, Defendant Potomac continued to ship vast quantities of CRTs and other e-waste to the Properties to take advantage of Defendant Closed Loop's artificially low prices.

674.    Records produced by Defendant Closed Loop indicate that the drivers for Defendant Potomac made at least two different deliveries to the Properties.

675.    Upon information and belief, these drivers observed firsthand that Defendant Closed Loop's e-waste recycling operation was not a legitimate enterprise and amounted to sham recycling.

676.    These drivers would have witnessed the fact that Defendant Closed Loop was stockpiling CRTs and other e-waste in such immense quantities that they could not possibly be recycled in the course of a single calendar year or otherwise as part of a legitimate and economically viable recycling operation.

677.    These drivers would have witnessed how Defendant Closed Loop was disposing of the CRTs, including the hundreds of pallets of deteriorating Gaylords and broken CRTs stored outside that led to the October 17, 2013 NOV; the deteriorating Gaylords stacked 15-20 feet high inside the Properties without sufficient aisle space in which to manage them, which led to the April 11, 2016 NOV; and the hazardous leaded dust dispersed throughout the Properties given the lack of appropriate dust containment that contributed to the OSHA violations.

678.    Thus, at all times relevant, Defendant Potomac knew or should have known that Defendant Closed Loop did not qualify for the CRT conditional exclusion, because Defendant Potomac knew or should have known that Defendant Closed Loop was speculatively accumulating CRTs, had no feasible means of recycling them, was disposing of them, and was otherwise not engaged in legitimate recycling.

679.    Nevertheless, enticed by the artificially low prices offered by a sham recycling operation, Defendant Potomac selected Defendant Closed Loop as its downstream e-waste "recycler," routinely arranging for the transport of CRTs and other e-waste to the Properties over approximately a five-month period.

### 31.    Defendant Quicksilver

680.    Records produced by Defendant Closed Loop indicate that Defendant Quicksilver arranged for the transport of at least 237,703 pounds of CRTs and other e-waste to the Properties starting in or around January 2013 and extending into or around May 2015.

681.    Defendant Quicksilver entered into a series of contracts with Defendant Closed Loop to arrange for the transport of CRTs and other e-waste to the Properties for as low as $0.0825 per pound.

682.    Defendant Quicksilver knew or should have known that the artificially low prices being charged by Defendant Closed Loop substantially undercut the prevailing market with a price point that no reasonable industry participant could have believed to be sufficient to cover the costs of a legitimate recycling operation.  Thus, Defendant Quicksilver knew or should have known that Defendant Closed Loop was running a sham recycling scheme, but chose to do business with it anyway in an attempt to benefit from its misconduct.

683.    Defendant Quicksilver, however, failed to exercise reasonable care to determine whether Defendant Closed Loop was operating in compliance with applicable law and whether Defendant Closed Loop had a feasible means of recycling the millions of pounds of CRTs and other e-waste it was accumulating.

684.    The transactions for many of the CRTs and e-waste that Defendant Quicksilver arranged to be transported to the Properties were brokered in collusion with Defendant E-World, whose CEO served time in federal prison for e-waste fraud.

685.    Records produced by Defendant Closed Loop indicate that, among other e-waste streams, Defendant Quicksilver arranged for the disposal or treatment of, and paid Defendant Closed Loop to accept, e-waste characterized as "broken mixed glass," "mixed broken CRT glass recycling," "mixed co-mingled," and "broken glass," each of which has a negative net value.

686.    Records produced by Defendant Closed Loop indicate that the drivers for Defendant Quicksilver made at least eight different deliveries to the Properties.

687.    Upon information and belief, these drivers observed firsthand that Defendant Closed Loop's e-waste recycling operation was not a legitimate enterprise and amounted to sham recycling.

688.    These drivers would have witnessed the fact that Defendant Closed Loop was stockpiling CRTs and other e-waste in such immense quantities that they could not possibly be recycled in the course of a single calendar year or otherwise as part of a legitimate and economically viable recycling operation.

689.    These drivers would have witnessed how Defendant Closed Loop was disposing of the CRTs, including the hundreds of pallets of deteriorating Gaylords and broken CRTs stored outside that led to the October 17, 2013 NOV; the deteriorating Gaylords stacked 15-20 feet high inside the Properties without sufficient aisle space in which to manage them, which led to the April 11, 2016 NOV; and the hazardous leaded dust dispersed throughout the Properties given the lack of appropriate dust containment that contributed to the OSHA violations.

690.     Thus, at all times relevant, Defendant Quicksilver knew or should have known that Defendant Closed Loop did not qualify for the CRT conditional exclusion, because Defendant Quicksilver knew or should have known that Defendant Closed Loop was speculatively accumulating CRTs, had no feasible means of recycling them, was disposing of them, and was otherwise not engaged in legitimate recycling.

691.     Nevertheless, enticed by the artificially low prices offered by a sham recycling operation, Defendant Quicksilver selected Defendant Closed Loop as its downstream e-waste "recycler," routinely arranging for the transport of CRTs and other e-waste to the Properties over approximately a 2-3 year period.

### 32.     Defendant RMG

692.     Records produced by Defendant Closed Loop indicate that Defendant RMG arranged for the transport of 1,486,580 pounds of CRTs and other e-waste to the Properties starting in or around November 2012 and extending into or around February 2014.

693.     Defendant RMG entered into a series of contracts with Defendant Closed Loop to arrange for the transport of CRTs and other e-waste to the Properties for as low as $0.0850 per pound.

694.     Defendant RMG knew or should have known that the artificially low prices being charged by Defendant Closed Loop substantially undercut the prevailing market with a price point that no reasonable industry participant could have believed to be sufficient to cover the costs of a legitimate recycling operation.  Thus, Defendant RMG knew or should have known that Defendant Closed Loop was running a sham recycling scheme, but chose to do business with it anyway in an attempt to benefit from its misconduct.

695.     Defendant RMG failed to exercise reasonable care to determine whether Defendant Closed Loop was operating in compliance with applicable law and whether

Defendant Closed Loop had a feasible means of recycling the millions of pounds of CRTs and other e-waste it was accumulating.

696. Records produced by Defendant Closed Loop indicate that, among other e-waste streams, Defendant RMG arranged for the disposal or treatment of, and paid Defendant Closed Loop to accept, e-waste characterized as "glass to be recycled," "broken glass," "lead glass," and/or "coated funnel glass," each of which has a negative net value.

697. Defendant RMG asserts that it "has been recycling electronics in New England for more than 15 years." *See* https://www.rmgenterprise.com/recycling-services.

698. Nevertheless, Defendant RMG continued to ship vast quantities of CRTs and other e-waste to the Properties to take advantage of Defendant Closed Loop's artificially low prices.

699. Records produced by Defendant Closed Loop indicate that the drivers for Defendant RMG made at least 37 different deliveries to the Properties.

700. Upon information and belief, these drivers observed firsthand that Defendant Closed Loop's e-waste recycling operation was not a legitimate enterprise and amounted to sham recycling.

701. These drivers would have witnessed the fact that Defendant Closed Loop was stockpiling CRTs and other e-waste in such immense quantities that they could not possibly be recycled in the course of a single calendar year or otherwise as part of a legitimate and economically viable recycling operation.

702. These drivers would have witnessed how Defendant Closed Loop was disposing of the CRTs, including the hundreds of pallets of deteriorating Gaylords and broken CRTs stored outside that led to the October 17, 2013 NOV; the deteriorating Gaylords stacked 15-20 feet high inside the Properties without sufficient aisle space in

which to manage them, which led to the April 11, 2016 NOV; and the hazardous leaded dust dispersed throughout the Properties given the lack of appropriate dust containment that contributed to the OSHA violations.

703.    Thus, at all times relevant, Defendant RMG knew or should have known that Defendant Closed Loop did not qualify for the CRT conditional exclusion, because Defendant RMG knew or should have known that Defendant Closed Loop was speculatively accumulating CRTs, had no feasible means of recycling them, was disposing of them, and was otherwise not engaged in legitimate recycling.

704.    Nevertheless, enticed by the artificially low prices offered by a sham recycling operation, Defendant RMG selected Defendant Closed Loop as its downstream e-waste "recycler," routinely arranging for the transport of CRTs and other e-waste to the Properties over approximately a 1-2 year period.

### 33.    Defendant RCRR

705.    Records produced by Defendant Closed Loop indicate that Defendant RCRR arranged for the transport of at least 16,417,553 pounds of CRTs and other e-waste to the Properties starting in June 2012 and extending into March 2016.

706.    Defendant RCRR is second only to the Kuusakoski Defendants in terms of the volume of CRTs and other e-waste arranged to be transported to the Properties.

707.    Defendant RCRR entered into a series of contracts with Defendant Closed Loop to arrange for the transport of CRTs and other e-waste to the Properties for as low as $0.0775 per pound.

708.    Defendant RCRR knew or should have known that the artificially low prices being charged by Defendant Closed Loop substantially undercut the prevailing market with a price point that no reasonable industry participant could have believed to be sufficient to

cover the costs of a legitimate recycling operation. Thus, Defendant RCRR knew or should have known that Defendant Closed Loop was running a sham recycling scheme, but chose to do business with it anyway in an attempt to benefit from its misconduct.

709. Defendant RCRR, however, failed to exercise reasonable care to determine whether Defendant Closed Loop was operating in compliance with applicable law and whether Defendant Closed Loop had a feasible means of recycling the millions of pounds of CRTs and other e-waste it was accumulating.

710. The transactions for many of the CRTs and e-waste that Defendant RCRR arranged to be transported to the Properties were brokered in collusion with Defendant E-World, whose CEO served time in federal prison for e-waste fraud.

711. Records produced by Defendant Closed Loop indicate that, among other e-waste streams, Defendant RCRR arranged for the disposal or treatment of, and paid Defendant Closed Loop to accept, e-waste characterized as "broken mixed glass," which has a negative net value.

712. Defendant RCRR continued to arrange for the transport of CRTs and other e-waste to the Properties even after Defendant Closed Loop's R2 certification was suspended, which occurred on or about February 19, 2016.

713. Defendant RCRR asserts that it is "the region's foremost leader in EWASTE recycling" and that "[w]e operate our facilities to the highest industry and government standards, and we handle everything from start to finish." *See* http://www.ewaste.com/about-us/why-us/.

714. Nevertheless, Defendant RCRR continued to ship vast quantities of CRTs and other e-waste to the Properties to take advantage of Defendant Closed Loop's artificially low prices.

715. Records produced by Defendant Closed Loop indicate that the drivers for Defendant RCRR made at least 715 different deliveries to the Properties.

716. Upon information and belief, these drivers observed firsthand that Defendant Closed Loop's e-waste recycling operation was not a legitimate enterprise and amounted to sham recycling.

717. These drivers would have witnessed the fact that Defendant Closed Loop was stockpiling CRTs and other e-waste in such immense quantities that they could not possibly be recycled in the course of a single calendar year or otherwise as part of a legitimate and economically viable recycling operation.

718. These drivers would have witnessed how Defendant Closed Loop was disposing of the CRTs, including the hundreds of pallets of deteriorating Gaylords and broken CRTs stored outside that led to the October 17, 2013 NOV; the deteriorating Gaylords stacked 15-20 feet high inside the Properties without sufficient aisle space in which to manage them, which led to the April 11, 2016 NOV; and the hazardous leaded dust dispersed throughout the Properties given the lack of appropriate dust containment that contributed to the OSHA violations.

719. Thus, at all times relevant, Defendant RCRR knew or should have known that Defendant Closed Loop did not qualify for the CRT conditional exclusion, because Defendant RCRR knew or should have known that Defendant Closed Loop was speculatively accumulating CRTs, had no feasible means of recycling them, was disposing of them, and was otherwise not engaged in legitimate recycling.

720. Nevertheless, enticed by the artificially low prices offered by a sham recycling operation, Defendant RCRR selected Defendant Closed Loop as its downstream

e-waste "recycler," routinely arranging for the transport of CRTs and other e-waste to the Properties over approximately a 3-4 year period.

## 34. Defendant Siam

721.     Records produced by Defendant Closed Loop indicate that Defendant Siam arranged for the transport of at least 85,896 pounds of CRTs and other e-waste to the Properties in or around February 2013.

722.     Defendant Siam entered into a series of contracts with Defendant Closed Loop to arrange for the transport of CRTs and other e-waste to the Properties for as low as $0.0775 per pound.

723.     Defendant Siam knew or should have known that the artificially low prices being charged by Defendant Closed Loop substantially undercut the prevailing market with a price point that no reasonable industry participant could have believed to be sufficient to cover the costs of a legitimate recycling operation. Thus, Defendant Siam knew or should have known that Defendant Closed Loop was running a sham recycling scheme, but chose to do business with it anyway in an attempt to benefit from its misconduct.

724.     Defendant Siam, however, failed to exercise reasonable care to determine whether Defendant Closed Loop was operating in compliance with applicable law and whether Defendant Closed Loop had a feasible means of recycling the millions of pounds of CRTs and other e-waste it was accumulating.

725.     Records produced by Defendant Closed Loop indicate that the drivers for Defendant Siam made at least three different deliveries to the Properties.

726.     Upon information and belief, these drivers observed firsthand that Defendant Closed Loop's e-waste recycling operation was not a legitimate enterprise and amounted to sham recycling.

727. These drivers would have witnessed the fact that Defendant Closed Loop was stockpiling CRTs and other e-waste in such immense quantities that they could not possibly be recycled in the course of a single calendar year or otherwise as part of a legitimate and economically viable recycling operation.

728. These drivers would have witnessed how Defendant Closed Loop was disposing of the CRTs, including the hundreds of pallets of deteriorating Gaylords and broken CRTs stored outside that led to the October 17, 2013 NOV; the deteriorating Gaylords stacked 15-20 feet high inside the Properties without sufficient aisle space in which to manage them, which led to the April 11, 2016 NOV; and the hazardous leaded dust dispersed throughout the Properties given the lack of appropriate dust containment that contributed to the OSHA violations.

729. Thus, at all times relevant, Defendant Siam knew or should have known that Defendant Closed Loop did not qualify for the CRT conditional exclusion, because Defendant Siam knew or should have known that Defendant Closed Loop was speculatively accumulating CRTs, had no feasible means of recycling them, was disposing of them, and was otherwise not engaged in legitimate recycling.

Nevertheless, enticed by the artificially low prices offered by a sham recycling operation, Defendant Siam selected Defendant Closed Loop as its downstream e-waste "recycler," routinely arranging for the transport of CRTs and other e-waste to the Properties over approximately a one-month period.

### 35. Defendant Strickland

730. Records produced by Defendant Closed Loop indicate that Defendant Strickland arranged for the transport of at least 230,665 pounds of CRTs and other e-waste

to the Properties starting in or around October 2014 and extending into or around February 2016.

731.    Defendant Strickland entered into a series of contracts with Defendant Closed Loop to arrange for the transport of CRTs and other e-waste to the Properties for as low as $0.08 per pound.

732.    Defendant Strickland knew or should have known that the artificially low prices being charged by Defendant Closed Loop substantially undercut the prevailing market with a price point that no reasonable industry participant could have believed to be sufficient to cover the costs of a legitimate recycling operation.  Thus, Defendant Strickland knew or should have known that Defendant Closed Loop was running a sham recycling scheme, but chose to do business with it anyway in an attempt to benefit from its misconduct.

733.    Defendant Strickland, however, failed to exercise reasonable care to determine whether Defendant Closed Loop was operating in compliance with applicable law and whether Defendant Closed Loop had a feasible means of recycling the millions of pounds of CRTs and other e-waste it was accumulating.

734.    Nevertheless, Defendant Strickland continued to ship vast quantities of CRTs and other e-waste to the Properties to take advantage of Defendant Closed Loop's artificially low prices.

735.    Records produced by Defendant Closed Loop indicate that the drivers for Defendant Strickland made at least six different deliveries to the Properties.

736.    Upon information and belief, these drivers observed firsthand that Defendant Closed Loop's e-waste recycling operation was not a legitimate enterprise and amounted to sham recycling.

737.    These drivers would have witnessed the fact that Defendant Closed Loop was stockpiling CRTs and other e-waste in such immense quantities that they could not possibly be recycled in the course of a single calendar year or otherwise as part of a legitimate and economically viable recycling operation.

738.    These drivers would have witnessed how Defendant Closed Loop was disposing of the CRTs, including the hundreds of pallets of deteriorating Gaylords and broken CRTs stored outside that led to the October 17, 2013 NOV; the deteriorating Gaylords stacked 15-20 feet high inside the Properties without sufficient aisle space in which to manage them, which led to the April 11, 2016 NOV; and the hazardous leaded dust dispersed throughout the Properties given the lack of appropriate dust containment that contributed to the OSHA violations.

739.    Thus, at all times relevant, Defendant Strickland knew or should have known that Defendant Closed Loop did not qualify for the CRT conditional exclusion, because Defendant Strickland knew or should have known that Defendant Closed Loop was speculatively accumulating CRTs, had no feasible means of recycling them, was disposing of them, and was otherwise not engaged in legitimate recycling.

740.    Nevertheless, enticed by the artificially low prices offered by a sham recycling operation, Defendant Strickland selected Defendant Closed Loop as its downstream e-waste "recycler," routinely arranging for the transport of CRTs and other e-waste to the Properties over approximately a 1-2 year period.

### 36.    Defendant Sunnking

741.    Records produced by Defendant Closed Loop indicate that Defendant Sunnking arranged for the transport of at least 636,367 pounds of CRTs and other e-waste

to the Properties starting in or around October 2014 and extending into or around December 2014.

742. Defendant Sunnking entered into a series of contracts with Defendant Closed Loop to arrange for the transport of CRTs and other e-waste to the Properties for as low as $0.0775 per pound.

743. Defendant Sunnking knew or should have known that the artificially low prices being charged by Defendant Closed Loop substantially undercut the prevailing market with a price point that no reasonable industry participant could have believed to be sufficient to cover the costs of a legitimate recycling operation. Thus, Defendant Sunnking knew or should have known that Defendant Closed Loop was running a sham recycling scheme, but chose to do business with it anyway in an attempt to benefit from its misconduct.

744. Defendant Sunnking, however, failed to exercise reasonable care to determine whether Defendant Closed Loop was operating in compliance with applicable law and whether Defendant Closed Loop had a feasible means of recycling the millions of pounds of CRTs and other e-waste it was accumulating.

745. Defendant Sunnking asserts that it exercises "due diligence in ensuring that downstream recyclers and processors manage recycled materials appropriately, throughout the downstream recycling chain." *See* https://www.sunnking.com/about/about-us/r2-certification/.

746. Nevertheless, Defendant Sunnking continued to ship vast quantities of CRTs and other e-waste to the Properties to take advantage of Defendant Closed Loop's artificially low prices.

747. Records produced by Defendant Closed Loop indicate that the drivers for Defendant Sunnking made at least 24 different deliveries to the Properties.

748. Upon information and belief, these drivers observed firsthand that Defendant Closed Loop's e-waste recycling operation was not a legitimate enterprise and amounted to sham recycling.

749. These drivers would have witnessed the fact that Defendant Closed Loop was stockpiling CRTs and other e-waste in such immense quantities that they could not possibly be recycled in the course of a single calendar year or otherwise as part of a legitimate and economically viable recycling operation.

750. These drivers would have witnessed how Defendant Closed Loop was disposing of the CRTs, including the hundreds of pallets of deteriorating Gaylords and broken CRTs stored outside that led to the October 17, 2013 NOV; the deteriorating Gaylords stacked 15-20 feet high inside the Properties without sufficient aisle space in which to manage them, which led to the April 11, 2016 NOV; and the hazardous leaded dust dispersed throughout the Properties given the lack of appropriate dust containment that contributed to the OSHA violations.

751. Thus, at all times relevant, Defendant Sunnking knew or should have known that Defendant Closed Loop did not qualify for the CRT conditional exclusion, because Defendant Sunnking knew or should have known that Defendant Closed Loop was speculatively accumulating CRTs, had no feasible means of recycling them, was disposing of them, and was otherwise not engaged in legitimate recycling.

752. Nevertheless, enticed by the artificially low prices offered by a sham recycling operation, Defendant Sunnking selected Defendant Closed Loop as its

downstream e-waste "recycler," routinely arranging for the transport of CRTs and other e-waste to the Properties over approximately a three-month period.

### 37. Defendant TK6

753. Records produced by Defendant Closed Loop indicate that Defendant TK6 arranged for the transport of at least 384,336 pounds of CRTs and other e-waste to the Properties starting in or around April 2015 and extending into or around February 2016.

754. Defendant TK6 entered into a series of contracts with Defendant Closed Loop to arrange for the transport of CRTs and other e-waste to the Properties for as low as $0.075 per pound.

755. Defendant TK6 knew or should have known that the artificially low prices being charged by Defendant Closed Loop substantially undercut the prevailing market with a price point that no reasonable industry participant could have believed to be sufficient to cover the costs of a legitimate recycling operation. Thus, Defendant TK6 knew or should have known that Defendant Closed Loop was running a sham recycling scheme, but chose to do business with it anyway in an attempt to benefit from its misconduct.

756. Defendant TK6, however, failed to exercise reasonable care to determine whether Defendant Closed Loop was operating in compliance with applicable law and whether Defendant Closed Loop had a feasible means of recycling the millions of pounds of CRTs and other e-waste it was accumulating.

757. Defendant TK6 continued to arrange for the transport of CRTs and other e-waste to the Properties even after Defendant Closed Loop's R2 certification was suspended, which occurred on or about February 19, 2016.

758. Defendant TK6 assures its customers that it "will ship the E-Waste to one of our downstream vendors where the E-Waste will be thoroughly de-manufactured down

to its base commodities and ultimately used as feedstock to manufacture new products."
*See* http://www.tk6worldwide.com/services/asset-recovery-and-recycling/.

759. Nevertheless, Defendant TK6 continued to ship vast quantities of CRTs and other e-waste to the Properties to take advantage of Defendant Closed Loop's artificially low prices.

760. Records produced by Defendant Closed Loop indicate that the drivers for Defendant TK6 made at least 36 different deliveries to the Properties.

761. Upon information and belief, these drivers observed firsthand that Defendant Closed Loop's e-waste recycling operation was not a legitimate enterprise and amounted to sham recycling.

762. These drivers would have witnessed the fact that Defendant Closed Loop was stockpiling CRTs and other e-waste in such immense quantities that they could not possibly be recycled in the course of a single calendar year or otherwise as part of a legitimate and economically viable recycling operation.

763. These drivers would have witnessed how Defendant Closed Loop was disposing of the CRTs, including the hundreds of pallets of deteriorating Gaylords and broken CRTs stored outside that led to the October 17, 2013 NOV; the deteriorating Gaylords stacked 15-20 feet high inside the Properties without sufficient aisle space in which to manage them, which led to the April 11, 2016 NOV; and the hazardous leaded dust dispersed throughout the Properties given the lack of appropriate dust containment that contributed to the OSHA violations.

764. Thus, at all times relevant, Defendant TK6 knew or should have known that Defendant Closed Loop did not qualify for the CRT conditional exclusion, because Defendant TK6 knew or should have known that Defendant Closed Loop was speculatively

accumulating CRTs, had no feasible means of recycling them, was disposing of them, and was otherwise not engaged in legitimate recycling.

765.    Nevertheless, enticed by the artificially low prices offered by a sham recycling operation, Defendant TK6 selected Defendant Closed Loop as its downstream e-waste "recycler," routinely arranging for the transport of CRTs and other e-waste to the Properties over nearly a one-year period.

## 38.    Defendant USB

766.    Records produced by Defendant Closed Loop indicate that Defendant USB arranged for the transport of at least 178,054 pounds of CRTs and other e-waste to the Properties starting in or around June 2015 and extending into or around February 2016.

767.    Defendant USB entered into a series of contracts with Defendant Closed Loop to arrange for the transport of CRTs and other e-waste to the Properties for as low as $0.09 per pound.

768.    Defendant USB knew or should have known that the artificially low prices being charged by Defendant Closed Loop substantially undercut the prevailing market with a price point that no reasonable industry participant could have believed to be sufficient to cover the costs of a legitimate recycling operation.  Thus, Defendant USB knew or should have known that Defendant Closed Loop was running a sham recycling scheme, but chose to do business with it anyway in an attempt to benefit from its misconduct.

769.    Defendant USB, however, failed to exercise reasonable care to determine whether Defendant Closed Loop was operating in compliance with applicable law and whether Defendant Closed Loop had a feasible means of recycling the millions of pounds of CRTs and other e-waste it was accumulating.

770. Defendant USB continued to arrange for the transport of CRTs and other e-waste to the Properties even after Defendant Closed Loop's R2 certification was suspended, which occurred on or about February 19, 2016.

771. Nevertheless, Defendant USB continued to ship vast quantities of CRTs and other e-waste to the Properties to take advantage of Defendant Closed Loop's artificially low prices.

772. Records produced by Defendant Closed Loop indicate that the drivers for Defendant USB made at least seven different deliveries to the Properties.

773. Upon information and belief, these drivers observed firsthand that Defendant Closed Loop's e-waste recycling operation was not a legitimate enterprise and amounted to sham recycling.

774. These drivers would have witnessed the fact that Defendant Closed Loop was stockpiling CRTs and other e-waste in such immense quantities that they could not possibly be recycled in the course of a single calendar year or otherwise as part of a legitimate and economically viable recycling operation.

775. These drivers would have witnessed how Defendant Closed Loop was disposing of the CRTs, including the hundreds of pallets of deteriorating Gaylords and broken CRTs stored outside that led to the October 17, 2013 NOV; the deteriorating Gaylords stacked 15-20 feet high inside the Properties without sufficient aisle space in which to manage them, which led to the April 11, 2016 NOV; and the hazardous leaded dust dispersed throughout the Properties given the lack of appropriate dust containment that contributed to the OSHA violations.

776. Thus, at all times relevant, Defendant USB knew or should have known that Defendant Closed Loop did not qualify for the CRT conditional exclusion, because

Defendant USB knew or should have known that Defendant Closed Loop was speculatively accumulating CRTs, had no feasible means of recycling them, was disposing of them, and was otherwise not engaged in legitimate recycling.

777.    Nevertheless, enticed by the artificially low prices offered by a sham recycling operation, Defendant USB selected Defendant Closed Loop as its downstream e-waste "recycler," routinely arranging for the transport of CRTs and other e-waste to the Properties over approximately a nine-month period.

### 39.    Defendant Waste Commission

778.    Records produced by Defendant Closed Loop indicate that Defendant Waste Commission arranged for the transport of at least 1,469,881 pounds of CRTs and other e-waste to the Properties starting in or around September 2014 and extending into or around February 2016.

779.    Defendant Waste Commission entered into a series of contracts with Defendant Closed Loop to arrange for the transport of CRTs and other e-waste to the Properties for as low as $0.0775 per pound.

780.    Defendant Waste Commission knew or should have known that the artificially low prices being charged by Defendant Closed Loop substantially undercut the prevailing market with a price point that no reasonable industry participant could have believed to be sufficient to cover the costs of a legitimate recycling operation. Thus, Defendant Waste Commission knew or should have known that Defendant Closed Loop was running a sham recycling scheme, but chose to do business with it anyway in an attempt to benefit from its misconduct.

781.    Defendant Waste Commission, however, failed to exercise reasonable care to determine whether Defendant Closed Loop was operating in compliance with applicable

law and whether Defendant Closed Loop had a feasible means of recycling the millions of pounds of CRTs and other e-waste it was accumulating.

782.    Records produced by Defendant Closed Loop indicate that, among other e-waste streams, Defendant Waste Commission arranged for the disposal or treatment of, and paid Defendant Closed Loop to accept, e-waste characterized as "broken mixed glass" and "mixed broken CRT glass," which have a negative net value.

783.    Defendant Waste Commission asserts that it performs "downstream due diligence of potentially hazardous materials to final disposition." *See* http://www.wastecom.com/content/business-industry/electronic-waste.aspx?PF=True.

784.    Nevertheless, Defendant Waste Commission continued to ship vast quantities of CRTs and other e-waste to the Properties to take advantage of Defendant Closed Loop's artificially low prices.

785.    Records produced by Defendant Closed Loop indicate that the drivers for Defendant Waste Commission made at least 37 different deliveries to the Properties.

786.    Upon information and belief, these drivers observed firsthand that Defendant Closed Loop's e-waste recycling operation was not a legitimate enterprise and amounted to sham recycling.

787.    These drivers would have witnessed the fact that Defendant Closed Loop was stockpiling CRTs and other e-waste in such immense quantities that they could not possibly be recycled in the course of a single calendar year or otherwise as part of a legitimate and economically viable recycling operation.

788.    These drivers would have witnessed how Defendant Closed Loop was disposing of the CRTs, including the hundreds of pallets of deteriorating Gaylords and broken CRTs stored outside that led to the October 17, 2013 NOV; the deteriorating

Gaylords stacked 15-20 feet high inside the Properties without sufficient aisle space in which to manage them, which led to the April 11, 2016 NOV; and the hazardous leaded dust dispersed throughout the Properties given the lack of appropriate dust containment that contributed to the OSHA violations.

789. Thus, at all times relevant, Defendant Waste Commission knew or should have known that Defendant Closed Loop did not qualify for the CRT conditional exclusion, because Defendant Waste Commission knew or should have known that Defendant Closed Loop was speculatively accumulating CRTs, had no feasible means of recycling them, was disposing of them, and was otherwise not engaged in legitimate recycling.

790. Nevertheless, enticed by the artificially low prices offered by a sham recycling operation, Defendant Waste Commission selected Defendant Closed Loop as its downstream e-waste "recycler," routinely arranging for the transport of CRTs and other e-waste to the Properties over approximately a 1-2 year period.

### 40. Defendant We

791. Records produced by Defendant Closed Loop indicate that Defendant We arranged for the transport of at least 126,420 pounds of CRTs and other e-waste to the Properties starting in or around May 2015 and extending into or around August 2015.

792. Defendant We entered into a series of contracts with Defendant Closed Loop to arrange for the transport of CRTs and other e-waste to the Properties for as low as $0.0950 per pound.

793. Defendant We knew or should have known that the artificially low prices being charged by Defendant Closed Loop substantially undercut the prevailing market with a price point that no reasonable industry participant could have believed to be sufficient to cover the costs of a legitimate recycling operation. Thus, Defendant We knew or should

169

have known that Defendant Closed Loop was running a sham recycling scheme, but chose to do business with it anyway in an attempt to benefit from its misconduct.

794.   Defendant We, however, failed to exercise reasonable care to determine whether Defendant Closed Loop was operating in compliance with applicable law and whether Defendant Closed Loop had a feasible means of recycling the millions of pounds of CRTs and other e-waste it was accumulating.

795.   Nevertheless, Defendant We continued to ship vast quantities of CRTs and other e-waste to the Properties to take advantage of Defendant Closed Loop's artificially low prices.

796.   Records produced by Defendant Closed Loop indicate that the drivers for Defendant We made at least seven different deliveries to the Properties.

797.   Upon information and belief, these drivers observed firsthand that Defendant Closed Loop's e-waste recycling operation was not a legitimate enterprise and amounted to sham recycling.

798.   These drivers would have witnessed the fact that Defendant Closed Loop was stockpiling CRTs and other e-waste in such immense quantities that they could not possibly be recycled in the course of a single calendar year or otherwise as part of a legitimate and economically viable recycling operation.

799.   These drivers would have witnessed how Defendant Closed Loop was disposing of the CRTs, including the hundreds of pallets of deteriorating Gaylords and broken CRTs stored outside that led to the October 17, 2013 NOV; the deteriorating Gaylords stacked 15-20 feet high inside the Properties without sufficient aisle space in which to manage them, which led to the April 11, 2016 NOV; and the hazardous leaded

dust dispersed throughout the Properties given the lack of appropriate dust containment that contributed to the OSHA violations.

800.     Thus, at all times relevant, Defendant We knew or should have known that Defendant Closed Loop did not qualify for the CRT conditional exclusion, because Defendant We knew or should have known that Defendant Closed Loop was speculatively accumulating CRTs, had no feasible means of recycling them, was disposing of them, and was otherwise not engaged in legitimate recycling.

801.     Nevertheless, enticed by the artificially low prices offered by a sham recycling operation, Defendant We selected Defendant Closed Loop as its downstream e-waste "recycler," routinely arranging for the transport of CRTs and other e-waste to the Properties over approximately a four-month period.

## V.     CAUSES OF ACTION

### A.     First Cause of Action (Declaratory Judgment)

802.     Plaintiff repeats and realleges the allegations in Paragraphs 1 through 801 of this Complaint as if fully set forth herein.

803.     This claim arises under the provisions of the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, which authorizes this Court to render declaratory judgment as to the allocation of liability for response costs and damages.

804.     An actual, substantial, and justiciable controversy exists between Garrison and all Defendants regarding their respective rights and obligations for the response costs and/or damages that have been and will be incurred in connection with the release and/or threatened release of hazardous substances at the Properties.

805.     Declaratory relief is necessary because, without a ruling on the parties'
allocation of liability for response costs and damages, Garrison would be forced to bring
subsequent lawsuits to obtain contribution for future response costs.

806.     This claim also arises under 42 U.S.C. § 9613(g)(2), which provides:

> "[T]he court shall enter a declaratory judgment on liability for response
> costs or damages that will be binding on any subsequent action or actions
> to recover further response costs or damages.  A subsequent action or
> actions under section 9607 of this title for further response costs at the vessel
> or facility may be maintained at any time during the response action, but
> must be commenced no later than 3 years after the date of completion of all
> response action.  Except as otherwise provided in this paragraph, an action
> may be commenced under section 9607 of this title for recovery of costs at
> any time after such costs have been incurred."

807.     Garrison seeks a declaratory judgment against Defendants under 28 U.S.C.
§§ 2201-2202 and 42 U.S.C. § 9613(g), holding all Defendants strictly liable for all of
response costs incurred and to be incurred at the Properties, which will bind the parties in
any subsequent action to recover further response costs or damages.

**B.     Second Cause of Action (CERCLA Cost Recovery)**

808.     Garrison repeats and realleges the allegations in Paragraphs 1 through 807
of this Complaint as if fully set forth herein.

809.     Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), imposes strict and joint
and several retroactive liability on:

a.     "the owner and operator of a vessel or a facility";

b.     "any person who at the time of disposal of any hazardous substance owned
       or operated any facility at which such hazardous substances were disposed
       of";

c.     "any person who by contract, agreement, or otherwise arranged for disposal
       or treatment, or arranged with a transporter for transport for disposal or
       treatment, of hazardous substances owned or possessed by such person, by
       any other party or entity, at any facility or incineration vessel owned or
       operated by another party or entity and containing such hazardous
       substances, and";

172

      d.      "any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance . . . ."

810.    The U.S. EPA has taken the position that if the "indoor CRT glass pile becomes abandoned (for example, the recycler goes out of business), or if the CRT glass is released, or poses a threat of release, from the building, businesses or facility owners/operators may become liable for the removal and proper management of the glass under [CERCLA]." *See* https://www.epa.gov/hw/frequent-questions-about-regulation-used-cathode-ray-tubes-crts-and-crt-glass.

811.    The Ohio EPA has taken the position that: "In addition to being familiar with the manner in which electronics will be recycled, it is important to research the recycling facility to determine if it has any compliance problems. . . . If electronic equipment is not recycled properly, and it is a hazardous waste, both your company and the recycling facility will be liable for clean-up costs associated with improper disposal of hazardous components." *See* http://epa.ohio.gov/portals/32/pdf/Electronic_Equipment_Guidance.pdf.

812.    Each Defendant is a "person" as defined by 42 U.S.C. § 9601(21).

813.    The Properties constitute a "facility" within the meaning of 42 U.S.C. § 9601(9).

814.    "[H]azardous substance[s]," within the meaning of 42 U.S.C. § 9601(14), including, but not limited, to lead, leaded dust, and lead-containing waste, were disposed of or treated at the Properties during the period in which Defendant Closed Loop leased and operated the facility at the Properties and during the period in which the

173

Arranger/Transporter Defendants transported or arranged to be transported CRTs and other e-waste to the Properties.

815.    There was a "disposal" of hazardous substances at the Properties within the meaning of 42 U.S.C. §§ 9610(29) & 6903(3).

816.    There was "treatment" of hazardous substances at the Properties within the meaning of 42 U.S.C. §§ 9610(29) & 6903(34).

817.    There have been and continue to be "releases" and/or "threatened releases" of hazardous substances at, on, to or from the Properties, within the meaning of 42 U.S.C. §§ 9601(22) and 9607(a).

      a.    CERCLA defines "release" as including "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant)." 42 U.S.C. § 9601(22).

      b.    The vast majority of the e-waste in the Properties consists of used CRT glass, much or all of which was not maintained in appropriate containers and much of which was released from its initial confinement, spilling to the floor as a result.

      c.    CRT processing, which involves breaking leaded glass, releases hazardous leaded dust, which became airborne and has released and dispersed throughout the Properties and the warehouse perimeter; has become embedded in the CRT processing equipment, surrounding structures, bay

174

doors, and e-waste; has collected on the floor and adhered to the walls and rafters; and was tracked by workers throughout the warehouses.

d.  A "release" occurred at the Properties, regardless of whether the leaded glass or leaded dust escaped from initial confinement, given that Congress expressly defined the term "release" in CERCLA as "including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant."

e.  "[T]hreatened releases" occurred at the Properties, because hazardous leaded dust can contaminate articles and personal protective equipment removed from the warehouses; because persons walking through the buildings can track hazardous leaded dust outside on their shoes and clothing; because damaged bay doors pose a threatened release of hazardous leaded dust outdoors prior to their repair and replacement; and because hazardous leaded dust can escape through open air conduits under, and through cracks in, bay doors and man doors, as well as other outlets.

f.  Defendant Closed Loop's failure to comply with the speculative accumulation requirements set forth in 40 C.F.R. §§ 261.4(a)(22) & 261.39 and Ohio Admin. Code 3745-51-04(A)(22) & 3745-51-39 constitute a threatened release.

g.  The past and future transfers of broken CRT glass from trucks into and out of the Properties likewise posed and will pose a threatened release of hazardous leaded dust.

h.  The underlying purpose of the CRT conditional exclusion, which Defendant Closed Loop failed to maintain, is to "minimize releases to the environment

of CRT glass (including fine solid materials)." *See* 40 C.F.R. § 261.39 and Ohio Admin. Code 3745-51-39. *See also* 71 Fed. Reg. 42,928, 42,931 (July 28, 2006) ("[B]roken CRTs and processed CRT glass are likely to pose a greater immediate risk of environmental releases" than intact CRTs.)

818. As a result of the releases and/or threatened releases of hazardous substances, Garrison has incurred and continues to incur response costs within the meaning of 42 U.S.C. §§ 9601(23) and (25).

a. To date, Garrison has incurred in excess of $140,000 in such costs. Garrison will continue to incur response costs in the future.

b. All of Garrison's response costs for which recovery is sought were and are being incurred consistent with CERCLA's NCP, 42 U.S.C. § 9605(a) and 40 C.F.R. Part 300.

c. These costs are "necessary" costs of response as described in 42 U.S.C. § 9607(a)(4)(B), *inter alia*, because they were incurred: (i) to prevent trespassers from vandalizing the Properties; (ii) to prevent further deterioration of the CRTs and other e-waste, which releases additional lead; (iii) to seal the warehouses, to the extent possible, to prevent lead dust from escaping outdoors; (iv) to characterize the contents, nature, and quantity of the hazardous substances so that they can be properly stored prior to removal, remedial action, recycling and/or disposal; (v) to identify potential options, locations, and cost estimates for recycling or disposing of the wastes so that they can be effectively removed and disposed of; and (vi) to prepare a health and safety procedures plan to avoid injuries to the workers who clean up the warehouses.

819.     Defendant Closed Loop had the authority to direct, manage and control, and did direct, manage and control, the acceptance, intake, handling, disposition, treatment, storage and disposal of the CRTs and other e-waste at the Properties.

820.     CERCLA § 107(a)(2), 42 U.S.C. § 9607(a)(2), provides, in pertinent part, that any person who at the time of disposal of any hazardous substance operated a facility at which such hazardous substances were disposed of is liable to any person who, as a result of a release or threatened release of hazardous substances from the facility, incurs response costs consistent with the NCP. As such, Defendant Closed Loop is jointly and severally liable under CERCLA for all of Garrison's response costs for the Properties.

821.     CERCLA § 107(a)(2), 42 U.S.C. § 9607(a)(2), provides that any person who at the time of disposal of any hazardous substance owned any facility at which such hazardous substances were disposed of is liable to any person who, as a result of a release or threatened release of hazardous substances from the facility, incurs response costs consistent with the NCP. The corporate veil of MS-South LLC should be pierced given the extensive and exclusive control exercised by Defendant Silagi. As such, Defendant Silagi is jointly and severally liable under CERCLA for all of Garrison's response costs for the Properties.

822.     CERCLA § 107(a)(3), 42 U.S.C. § 9607(a)(3), provides that any person who arranged for the disposal or treatment of hazardous substances owned or possessed by such persons at any facility owned or operated by another party or entity is liable to any person who, as a result of a release or threatened release of hazardous substances from the facility, incurs response costs consistent with the NCP.  As such, the other Defendants and their predecessors are each jointly and severally liable under CERCLA to Garrison for all of Garrison's response costs for the Properties.

823.    CERCLA § 107(a)(4), 42 U.S.C. § 9607(a)(3), provides that any person who accepted hazardous substances for transport to sites selected by such person is liable to any other person who, as a result of a release or threatened release of hazardous substances from the facility, incurs response costs consistent with the NCP.  As such, the other Defendants and their predecessors are also each jointly and severally liable under CERCLA to Garrison for all of Garrison's response costs for the Properties.

824.    Given the manner in which Defendant Closed Loop processed, disassembled, stockpiled, and cross-contaminated CRTs and other e-waste, the harm caused by Defendant Closed Loop, Defendant Silagi, and the Arranger/Transporter Defendants at the Properties is indivisible and incapable of apportionment.

825.    Defendant Closed Loop operated the Properties at the time of the disposal and treatment of hazardous substances; therefore, it is strictly, jointly and severally liable for environmental cleanup costs under CERCLA as the harm caused to Garrison is indivisible and is incapable of apportionment.

826.    Defendant Silagi owned the Properties at the time of the disposal and treatment of hazardous substances; therefore, he is strictly, jointly and severally liable for environmental cleanup costs under CERCLA as the harm caused to Garrison is indivisible and is incapable of apportionment.

827.    The Arranger/Transporter Defendants transported and/or arranged for the transport of hazardous substances to the Properties for disposal or treatment; therefore, they are strictly, jointly and severally liable for environmental cleanup costs under CERCLA as the harm caused to Garrison is indivisible and is incapable of apportionment.

828.    Plaintiffs are also entitled to statutory interest pursuant to 42 U.S.C. § 9607(a)(4).

### C. Third Cause of Action (Recovery of Preliminary Investigative Costs under CERCLA)

829.    Garrison repeats and realleges the allegations in Paragraphs. 1 through 828 of this Complaint as if fully set forth herein.

830.    Certain costs incurred by Garrison as described in this Complaint are the costs of initial or preliminary investigation, site-assessment, evaluation of the impacts of releases and threatened releases, and monitoring costs for which Defendants are liable to Garrison under 42 U.S.C. § 9607(a), whether or not these costs are consistent with the NCP. Garrison will continue to incur such costs.

### D. Fourth Cause of Action (Common Law Negligence and Negligence Per Se)

831.    Garrison repeats and realleges the allegations in Paragraphs 1 through 830 of this Complaint as if fully set forth herein.

832.    For purposes of the Fourth Cause of Action, "Defendants" do not include Defendant UNICOR or Defendant Silagi.

833.    Each of the Defendants owed a common law duty to Garrison, the owner of the Properties, to use reasonable care to avoid causing reasonably foreseeable damage to the Properties.

834.    A reasonable and prudent person engaged in the transport of, or arranging for the transport of, CRTs and other e-waste exercises due diligence on downstream recipients to avoid causing injury to public health, property, or the environment.

835.    Ohio Rev. Code § 3734.02(F) prohibits a person from storing, treating, or disposing of hazardous waste at any premises other than the types of facilities described in Paragraphs (1) through (5) of that section.

836. Ohio Rev. Code § 3734.02(F) prohibits a person from transporting hazardous waste or causing hazardous waste to be transported to any premises other than the types of facilities described in Paragraphs (1) through (5) of that section.

837. The Properties are not among the types of facilities that are described in Paragraphs (1) through (5) of Ohio Rev. Code § 3734.02(F).

838. The Defendants had a statutory duty to Garrison to refrain from engaging in the activities prohibited by Ohio Rev. Code § 3734.02(F) on the Properties.

839. Defendant Closed Loop violated its common law duty and statutory duty under Ohio Rev. Code § 3734.02(F) by storing, treating, and disposing of hazardous waste at the Properties and by causing hazardous waste to be transported to the Properties.

840. The Arranger/Transporter Defendants violated their common law duty and statutory duty under Ohio Rev. Code § 3734.02(F) by transporting hazardous waste to the Properties, causing hazardous waste to be transported to the Properties, and/or disposing of hazardous waste at the Properties.

841. Ohio Rev. Code § 3734.02(F) was promulgated to prevent damage to persons such as Garrison from the illegal disposal of hazardous wastes at locations not authorized to receive those wastes; the damage to Garrison resulted from violations of that prohibition.

842. At all times relevant, Garrison detrimentally relied on Defendant Closed Loop's representations that it had a feasible means of recycling the CRTs that were accumulated at the Properties.

843. At all times relevant, Garrison detrimentally relied on the Arranger/Transporter Defendants' due diligence on Defendant Closed Loop as well as on the Arranger/Transporter Defendants' failure to perform their contractual obligations to

Defendant Closed Loop in compliance with applicable federal and state hazardous waste law, which required a feasible means of recycling the CRTs and other e-waste disposed of at the Properties.

844.    The Arranger/Transporter Defendants created the condition that caused damage to Garrison by transporting and/or arranging for the transport for CRTs and other e-waste to the Properties, and disposing of these wastes at the Properties, despite the fact that there was no feasible means of recycling them, whereas such acts and omissions advanced to a point so as to have launched a force or instrument of harm against Garrison, as the owner of the Properties.

845.    By the acts and omissions of Defendants, Defendants were negligent and breached their duties to Garrison, thereby causing reasonably foreseeable damage to Garrison, as the owner of the Properties.

846.    Because their acts and omissions violated Ohio Rev. Code § 3734.02(F), the Defendants were negligent per se.

847.    As a direct and proximate result of the acts and omissions of Defendants, Garrison cannot rent or sell the Properties in their present condition and has suffered and continues to suffer physical harm to the Properties as well as economic harm, including, but not limited to, loss of rent, loss of business opportunity, and costs of environmental cleanup.

848.    Garrison has lost at least $2.6 million in rent starting in April 2016, due to the presence of the CRTs and other e-waste at the Properties and will continue to incur these losses until the Properties are remediated.

849.    The Defendants' sham recycling scheme was designed to shift the costs of disposing of the CRTs and other e-waste in the Properties directly to Garrison, the owner of the Properties.

850.    The Defendants knew or should have known that their actions created strict liability under CERCLA and RCRA and their state corollaries for owners of properties at which there are releases or threated releases of hazardous substances or wastes, even when those properties are contaminated by third parties.

851.    Furthermore, the Defendants acted with conscious disregard for the hazards associated with the hazardous substances they handled at the Properties, and through their reckless acts and omissions caused the release or threatened release of hazardous substances and wastes at the Properties for which the owner of the Properties may be held liable under federal and state hazardous waste law.

**E.     Fifth Cause of Action (Private Nuisance)**

852.    Garrison repeats and realleges the allegations in Paragraphs 1 through 851 of this Complaint as if fully set forth herein.

853.    For purposes of the Fifth Cause of Action, "Defendants" do not include Defendant UNICOR or Defendant Silagi.

854.    The actions and omissions of the Defendants have created and maintained a private nuisance at the Properties.

855.    The actions and omissions of the Defendants have unreasonably interfered with Plaintiff's private use and enjoyment of the Properties.  This nuisance exists today and will continue to exist unless and until the Defendants either take action to abate the nuisance or otherwise compensate Plaintiff for the costs of abating the nuisance.

856.    The nuisance that exists at the Properties constitutes an absolute nuisance. The intentional conduct and/or abnormally dangerous conditions that have been created by the Defendants cannot be maintained without injury to the Property, no matter what care is taken.

857.    The nuisance at the Properties also constitutes a qualified nuisance.  The Defendants caused and have maintained conditions at the Properties that create an unreasonable risk of harm that has resulted or will ultimately result in injury to the Properties.

858.    The damages suffered by Plaintiff, which directly arise from the nuisance created by the Defendants, include, but are not limited to, damages for environmental cleanup, the loss of the Properties' value, the loss in the value of Plaintiff's use of the Properties (including lost rent and loss of business opportunity), and Plaintiff's annoyance and inconvenience.

## VI.    REQUEST FOR RELIEF

WHEREFORE, Plaintiff Garrison Southfield Park LLC respectfully requests entry of judgment in its favor:

A.      With respect to the First Cause of Action, declaring that Garrison is entitled to cost recovery for its removal and remedial actions to address the lead, leaded dust, and lead-containing e-waste, including CRTs and other e-waste, and that the Defendants are jointly and severally liable for these response costs and damages;

B.      With respect to the Second Cause of Action, awarding Garrison response costs and damages in the amount of at least $14,247,354.96 from the Defendants jointly and severally;

C.      With respect to the Third Cause of Action, awarding Garrison its costs for initial or preliminary investigation, site-assessment, evaluation of the impacts of releases and threatened releases, and monitoring;

D.      With respect to the Fourth Cause of Action, awarding Garrison damages in the amount of at least $14,247,354.96 for remediating the Properties, as well as damages for the loss of past rent in the amount of $2,605,740.32, the loss of future rent until remediation is complete, and the loss of business opportunity;

E.      With respect to Fifth Cause of Action, awarding damages for the loss of the Properties' value, the loss in the value of Garrison's use of the Properties (including lost rent and loss of business opportunity), and Garrison's annoyance and inconvenience, as well as ordering or otherwise requiring the Defendants to abate the nuisance that exists on the Properties or awarding compensation to Garrison for the costs of abating the nuisance;

F.      Awarding prejudgment interest to Garrison pursuant to 42 U.S.C. § 9607(a) on all sums it has expended;

G.      Awarding Garrison its legal costs, expert witness fees, and attorney fees to the extent authorized by law; and

H.      Granting such other and further relief in law or equity as the Court may deem proper.

Dated: March 29, 2019

Respectfully submitted,

*Trial Attorney*:

 /s/  Jack A. Van Kley
By: Jack A. Van Kley  (#0016961)
VAN KLEY & WALKER, LLC
132 Northwoods Blvd., Suite C-1
Columbus, Ohio 43235
Telephone: (614) 431-8900
Facsimile: (614) 431-8905
Email:  jvankley@vankleywalker.com

*Of Counsel*:

Karl R. Heisler
(*Pro Hac Vice*)
KATTEN MUCHIN ROSENMAN LLP
525 West Monroe Street
Chicago, IL 60661
Telephone: (312) 902-5430
Facsimile: (312) 902-1061
Email:  karl.heisler@kattenlaw.com

Matthew Parrott
(*Pro Hac Vice*)
FRIED, FRANK, HARRIS, SHRIVER &
JACOBSON LLP
One New York Plaza
New York, NY 10004
Telephone: (212) 859-8996
Facsimile: (212) 859-4000
Email:  M.Parrott@friedfrank.com

*Attorneys for Plaintiff Garrison Southfield Park
LLC*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that, on March 29, 2019, a copy of the foregoing

First Amended Complaint was filed electronically with the Court's CM/ECF system, which

will send notification to all attorneys registered to receive such service.  Parties may access

this filing through the Court's electronic filing system.

In addition, a copy of the foregoing First Amended Complaint was sent on March

29, 2019 by electronic mail to David Cauchi, 128 Nevada Way, #1050, Gilbert, AZ

85233, at dcauchi@djc-usa.com, Brian LaPoint, 5953 W. Gary Drive, Chandler, AZ

85226, at blapoint@gmail.com, and Brent Benham, 31704 N. 139th Place, Scottsdale, AZ

85262, at brentb@babenham.com, per their written consent to receive filings by email.

/s Jack A. Van Kley_____
Jack A. Van Kley (#0016961)
Trial Attorney