**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

GARRISON SOUTHFIELD PARK, LLC,                )
                                              )
                    Plaintiff,                )          Case No. 2:17-cv-00783
                                              )
v.                                            )          Judge Sargus
                                              )          Magistrate Judge Preston Deavers
CLOSED LOOP REFINING AND                      )
RECOVERY, INC., et al.,                       )
                                              )
                    Defendants.               )

**DEFENDANT MOSHE SILAGI'S**
**REPLY IN SUPPORT OF MOTION TO DISMISS**

## I.   INTRODUCTION

Plaintiff Garrison Southfield Park LLC ("Plaintiff" or "Garrison") does not dispute, in its Opposition Brief ("Opp.") that Defendant Moshe Silagi's ("Silagi's") only connection to this matter is that he was the sole member of MS-South, which sold two warehouses to Garrison in early 2013 as part of a larger property transaction, and that MS-South leased one of the two warehouses at issue to Closed Loop for less than a year prior to Garrison's purchase.  Plaintiff also does not dispute that, prior to the sale, the lease between MS-South and Closed Loop, which specifically described Closed Loop's intention to use the property for CRT demanufacturing, was provided to Garrison.  Garrison further does not dispute that it was able to conduct a Phase I Environmental Site Assessment to inspect the properties and to talk with the tenants.  Garrison does not and cannot dispute that it knew full well what Closed Loop's business was before it bought the property.

Garrison also does not refute (and, in fact, Garrison has admitted in the First Amended Complaint ("FAC")) that, well *after* Garrison purchased the property and CRTs and other materials

1

were piling up, Garrison extended additional leases to Closed Loop, allowing it to expand its footprint.  Garrison knew what Closed Loop did and was comfortable enough with it to later lease additional space to the recycling operation.  In the years since the sale, Garrison never claimed any breach of contract or fraud against MS-South.  Garrison only now—once it is faced with clean-up costs caused by its tenant—and only in its Opposition Brief—cries fraud by Silagi, in an unfounded attempt to bring Silagi personally into this CERCLA action.

As set forth in Silagi's Motion to Dismiss ("Motion"), Garrison has failed to sufficiently plead any facts that would support the extraordinary remedy of piercing the corporate veil, and no allegations in the FAC bring this case within the "rare exception" when a member of a limited liability company may be liable for the company's alleged liabilities.  Plaintiff has not alleged sufficient "control" by Silagi over MS-South, and has certainly not alleged that Silagi committed fraud or an unlawful act.

Recognizing the weakness of the allegations set forth in the FAC, Garrison's Opposition brief attempts to assert a "fraudulent transfer" theory.  The problem is, the FAC is completely devoid of any allegation that MS-South made any transfer after Garrison's CERCLA claim arose, or that Silagi or MS-South had any knowledge of any claim or this lawsuit at the time of any transfer.  Thus, the elements of a fraudulent conveyance are not pleaded.  Further, as set forth *infra*, the law in the 6th Circuit is clear that a claim of fraudulent transfer pursuant to R.C. 1336.05 is not sufficient to support the extraordinary remedy of piercing the corporate veil.  (See *Waste Conversion Techs., Inc. v. Warren Recycling, Inc.*, 191 Fed. Appx. 430 (6th Cir. 2006), discussed *infra.*)

Garrison's Opposition does nothing to save its claims against Silagi.

## II.    LAW AND ARGUMENT

In Ohio, as in most jurisdictions, the corporate form is accorded a great deal of respect. Courts generally recognize that "[l]imited liability is the rule, not the exception; and on that assumption large undertakings are rested, vast enterprises are launched, and huge sums of capital are attracted." *Anderson v. Abbott,* 321 U.S. 349 (1944).  The Ohio Supreme Court has cautioned that Courts should apply the doctrine of corporate veil-piercing "only in instances of extreme shareholder misconduct." *Dombroski v. WellPoint, Inc.*, 119 Ohio St.3d 506, 513 (Ohio 2008). Limited shareholder liability remains the "rule," while piercing the corporate veil is the "rare exception." *Id.* at 512.

"Under Ohio law, the Court may disregard the corporate form only when:  '(1) control over the corporation by those to be held liable was so complete that the corporation has no separate mind, will, or existence of its own, (2) control over the corporation by those to be held liable was exercised in such a manner as to commit fraud or an illegal act [or a similarly unlawful act] against the person seeking to disregard the corporate entity, and (3) injury or unjust loss resulted to the plaintiff from such control and wrong.'" *Ackison Surveying, LLC v. Focus Fiber Sols., LLC*, No. 2:15-cv-2044, 2017 BL 77980, at *3 (S.D. Ohio Mar. 13, 2017), *quoting Belvedere Condominium Unit Owners' Assn. v. R.E. Roark Cos., Inc.*, 67 Ohio St.3d 274, 617 N.E.2d 1075, 1086 (Ohio 1993) and *Dombroski*, *supra*) (the "*Belvedere-Dombroski* test").

To survive a motion to dismiss, each of the bases of the *Belvedere-Dombroski* test "must be specifically pleaded … showing that the pleader is entitle to relief." *Ackison*, at *3 (internal quotations omitted); *see also Dombroski*, at ¶29.  In addition, "[w]hen a cause of action seeks to pierce the corporate veil on the basis of fraud, it is subject to the heightened pleading requirements

3

of Rule 9(b)." *Medchoice Financial, LLC v. ADS Alliance Data Sys., Inc.*, 857 F. Supp.2d 665, 676 (S.D. Ohio 2012).

Applying applicable law, Plaintiff has not sufficiently pleaded the elements of the *Belvedere-Dombroski* test.

### A. Plaintiff Has Failed To Allege That Silagi and MS-South Were "Fundamentally Indistinguishable."

"The first prong of the *Belvedere-Dombroski* test … requires that plaintiff show that the parent and the subsidiary are 'fundamentally indistinguishable.'" *Ackison*, at *4, quoting Taylor Steel, Inc. v. Keeton*, 417 F.3d 598, 605 (6th Cir. 2005). When making this determination, Ohio courts, and federal courts applying Ohio law, consider the following:

> (1) grossly inadequate capitalization, (2) failure to observe corporate formalities, (3) insolvency of the debtor corporation at the time the debt is incurred, (4) [the parent] holding [itself] out as personally liable for certain corporate obligations, (5) diversion of funds or other property of the company (sic), (6) absence of corporate records, and (7) the fact that the corporation was a mere façade for the operations of the [parent company].

*Ackison*, at *4. While it is true that the above factors are not "exclusive or exhaustive," it is also true that, to meet the first prong of the *Belvedere-Dombroski* test, the plaintiff must plead enough facts to plausibly plead that "the parent and subsidiary are 'fundamentally indistinguishable.'" *Id*. The "control" element, like the other two elements, "must be sufficiently well-pleaded 'showing that the pleader is entitled to relief.'" *Cap City Dental Lab, LLC v. Ladd*, Case No. 2:15-CV-2407, 2016 BL 287043, at *12, 2016 US Dist. LEXIS 118570 (S.D. Ohio, Sept. 1, 2016).

### 1. Plaintiff's Allegations Are Conclusory.

Plaintiff does not dispute the following fundamental principle recited in the Motion: The "Court does not accept as true allegations that state legal conclusions, such as '[Defendant] is the alter ego of [its parent]' and '[the parent's] control of [Defendant] was so complete that

4

[Defendant] had no separate mind, will, or existence of its own'[.]"  (Motion at 9-10, *citing Ackison*, at *4.)  Similarly, allegations based on "information and belief" that a defendant "exercised total dominion and control," when unsupported by concrete factual allegations, are "little more than conclusory statements" and, as such, "are not sufficient to plausibly support an inference of the requisite level of control."  *Id*., citing *Cap City Dental Lab, LLC*, at *12.

The ten allegations Plaintiff recites on pages 7-8 of its Opposition constitute the sum total of all allegations relating to Silagi in the entire 186-page complaint, which spans more than 850 paragraphs.  These ten allegations are wholly premised on precisely the type of conclusory and "upon information and belief" assertions that must be disregarded.  At bottom, with regard to the question of whether Silagi exercised the extraordinary "control" necessary to pierce the corporate veil, the allegations assert only the following facts:  Silagi was the sole member of MS-South and was its registered agent; Silagi Development and Management Inc. and MS-South shared a mailing address; and Silagi signed a personal guaranty in connection with the sale of the Property to Garrison.  These allegations demonstrate nothing special or extraordinary.  In addition, the allegation also contained in the FAC that Kevin McLewee was the "general manager of the Property" held by MS-South (¶220(c)) cuts *against* the notion that Silagi was indistinguishable from the company.

Thus, the few factual allegations of the FAC relating to Silagi, even if true, do not state a plausible claim that Silagi and MS-South are "fundamentally indistinguishable."  For if *these* allegations showed the requisite control—if the *ordinary* arrangements present in the multitude of single-member limited liability companies across the country were sufficient to claim "alter ego" status—then the limited liability statues would be gutted, and their purpose entirely frustrated.

## 2.    Plaintiff's Cases Are Inapposite.

None of the cases Plaintiff cites holds that mere status as a single member or shareholder of a company is sufficient to plausibly plead that the member/shareholder and the company are "fundamentally indistinguishable" and that the company has "no separate mind, will, or existence of its own."  While it is true that no particular factor is "required" in order to find a corporation to be the alter ego of its member(s), that does not mean that such a finding can be made without *any* indicia of extraordinary control.  Indeed, to the extent Plaintiff cites cases that permit a veil-piercing claim to proceed, those decisions rest on much more than mere status as a single member/shareholder.

In *Taylor Steel, Inc. v. Keeton*, 417 F.3d 598 (6th Cir. 2005) (Opp. at 4), for example, the determination that the company "had no mind or will of its own and was nothing but Keeton's alter ego" was "[b]ased on the evidence that Keeton used Keeton Corp. and the other Great Events, Inc. d/b/a entities as a convenient forum for her various personal business ventures."  *Id*. at 607.  That "Keeton used her various business accounts interchangeably, that she made irregular transfers from her Keeton Corp. account to her personal account, that she failed to keep financial statements, and that she failed to register the Keeton Corp. alias in Georgia" provided sufficient evidence that Taylor Steel would "meet its burden of showing failure to maintain corporate formalities and at least some degree of commingling."  *Id*. at 608.  There are no such allegations in this case.

Similarly, the Ohio cases Plaintiff cites on page 6 of its Opposition do not support Plaintiff's assertion that Ohio courts regard an individual's status as the sole shareholder to be sufficient to support an alter ego theory.  In *Stypula v. Chandler*, Case No. 2002-G-2468, 2003 WL 22844296 (11th Dist. Nov. 26, 2003), the Court affirmed that "[a] corporation is a separate legal entity from its shareholder even where there is only one shareholder in the corporation."  *Id.*,

¶15.  The Court in *Stypula* credited "additional evidence" beyond mere status as the sole shareholder in affirming the veil-piercing claim, which evidence supported that the corporation "was used as a means to channel large sums of money to Chandler as bonuses from other, non-related corporations, so as to save taxes."  *Id*. at ¶16.  No such allegation is present here.

The Court in *Zimmerman v. Eagle Morg. Corp.*, 110 Ohio App.3d 762, 675 N.E.2d 480 (2nd Dist. 1996) also reaffirmed that "[a] corporation is a separate legal entity from its shareholders even where there is only one shareholder in the corporation."  *Id*. at 771.  Indeed, *Zimmerman* has been relied upon by at least one federal court in Ohio for the proposition that "[a] corporation having one shareholder **does not, without additional evidence, mean that the shareholder exercised complete control over the corporation**."  *See Sequatchie Mountain Creditors v. Detwiler (In re Detwiler)*, Case No. 09-63377, 2016 Bankr. LEXIS 230, at *29 (Bankr. N.D. Ohio Jan. 25, 2016) (emphasis added).  *See also Erb Poultry, Inc. v. CEME, LLC*, 2014-Ohio-4504, P19 (2d. Dist. 2014) ("Sole control of a corporation, by itself, is insufficient to establish the first *Belvedere* factor.").  Moreover, the opinion in *Zimmerman* makes clear that it was not the mere *status* as sole shareholder but, rather, the use of that status to exercise extraordinary control and disregard corporate formalities that mattered.  The Court stated as follows,

> As the sole shareholder and president of Eagle, Musgrave exercised complete control over the corporation.  After the initial incorporation of Eagle, Musgrave chose not to hold any shareholder or director meetings of the company, whether annual or otherwise.  On numerous occasions, Musgrave disbursed corporate assets to himself for personal use, and later claimed them as dividends without corporate declaration.  Moreover, corporate officers were appointed and replaced by Musgrave without the knowledge of the individual being appointed or replaced.

*Id*. at 770.    These decisions actually support that something *beyond* mere status as a sole shareholder—itself a very common occurrence—is necessary before a proper finding of the type of control necessary to the "exceptional" remedy of piercing the corporate veil.[1]

Plaintiff also relies heavily on *Carter-Jones Lumber Co. v. LTV Steel Co.*, 237 F.3d 745 (6th Cir. 2001).  However, that case does not support a finding of alter ego on the facts alleged in the instant complaint.  In *Carter-Jones*, the shareholder (Denune) was found to have personally controlled *the underlying CERCLA violations*.  *Id*. at 747.  As the Court noted,

> Denune was personally involved in [a scheme] to hide [PCB-laden] transformers from the EPA…  Denune misled the Ohio EPA inspector, Thomas Buchan, concerning the number of transformers containing PCBs he or Dixie owned. Denune personally checked on the trailers containing the PCB-laden transformers at least twice.  He sold to Tracy Westfall three of the seven transformers he had already sold to Top Dollar.  According to Westfall, Denune personally arranged for the transportation of four transformers from the Herndon Road property to a property in Columbus owned by Denune and leased by Westfall.  When the Ohio EPA finally found those transformers, the serial numbers had been destroyed…."

*Id*. at 747-48.  The FAC does not and cannot allege that Silagi played any role in the management of any hazardous materials at the Garrison properties or was otherwise involved in any manner in the underlying CERCLA violations at issue in this matter, and *Carter-Jones* is therefore wholly distinguishable.[2]

Because the FAC alleges no more than that Silagi acted as a typical single member of a limited liability company would act, the FAC does not allege facts that, if proven, would support

---

[1] The third Ohio case Plaintiff cites on page 6, *Intergy, Inc. v. Carrigan*, Case No. 62210, 1993 WL 127089 (8th Dist., Apr. 22, 1993), was decided *before* the Ohio Supreme Court decision in *Belvedere*, and is therefore inapposite.

[2] While Plaintiff asserts in its Opposition that Silagi has "personal involvement in and control over the fraudulent activities from which Garrison's claims against him arose" (Opp. at 8), as set forth below, the FAC does not adequately plead fraud by MS-South or Silagi, including for the reason that he did not commit any fraud, further distinguishing this case from the facts of *Carter-Jones*.

the extraordinary finding that MS-South was "fundamentally indistinguishable" and had no separate existence from him.

### 3. This Court May Dismiss The Claims Based On The First *Belvedere-Dombroski* Prong.

Aware that its allegations do not satisfy the first prong of the *Belvedere-Dombroski* test, Plaintiff next argues that the Court should permit it to conduct discovery to enable it to overcome its deficient pleading.  However, the case law Plaintiff cites does not support Plaintiff's position.

First, Plaintiff completely ignores the prior precedent of this Court in *Ackison Surveying, LLC v. Focus Fiber Solutions, LLC*, Case No. 2:15-CV-2044, 2017 BL 77980, (S.D. Ohio, Mar. 13, 2017).  (See Motion at 8-9.)  In that case, this Court dismissed the veil-piercing claim, in part based on the conclusion that Plaintiff had "failed to meet prong one of the *Belvedere-Dombroski* test."  There, as here, the "veil piercing claim [was] rife with … legal conclusions," and this Court did *not* afford the plaintiff an opportunity to conduct discovery in order to supplement its deficient complaint. *Id.* at *9-10.

The three cases cited by Plaintiff in its Opposition all pre-date *Ackison* and are all premised upon *Bledsoe v. Emery Worldwide Airlines*, 258 F. Supp.2d 780 (S.D. Ohio 2003).  *Bledsoe* was not a veil-piercing case.  It was a WARN Act case, and the question at issue was whether one of the defendants (CNF) exercised sufficient control over its Ohio subsidiary (Emery) such that CNF could be considered a "de facto employer" under Department of Labor regulations applicable to the WARN Act and, if so, be subject to jurisdiction in Ohio.  *Id*. at 786-87.  The issue arose in the context of a motion to dismiss for lack of personal jurisdiction under Fed. Civ. R. 12(b)(2) and, in response to the affidavit of the movant (permitted in the context of a motion under R. 12(b)(2)), the Court held off on making the determination to afford time to permit discovery on the issue.  *Id*. at *787.

In *Orrand v. Kin Contractors, LLC*, Case No. 2:09 CV 1129, 2011 BL 84235, 2011 US Dist. LEXIS 34303 (S.D. Ohio, March 30, 2011), this court, *in dicta*, referred to *Bledsoe* in a veil-piercing analysis.  *Id*. at *4.  However, the Court in *Orrand* found that the complaint did not adequately allege *any* of the three prongs of the *Belvedere-Dombroski* test, and dismissed the alter ego claim.  *Id*. at *5-6.  Thus, the outcome of *Orrand* did not depend on *Bledsoe.*  The Courts in *Allied Diversified Constr., Inc. v. Elite Mech., Inc.*, Case No. 1:16CV334, 2016 WL 7034238 (S.D. Ohio, Dec. 2, 2016) and *Cap City Dental Lab, LLC v. Ladd*, Case No. 2:15-CV-2407, 2016 WL 4573993 (S.D. Ohio, Sept. 1, 2016), appear to have then relied on the *dicta* in *Orrand* and the language drawn from *Bledsoe.*  To the extent Plaintiff cites these cases to argue that the first prong of *Belvedere-Dombroski* may not be decided on a motion to dismiss, that is not universally the case, as *Ackison* demonstrates.  Silagi further respectfully asserts that the different procedural and substantive posture of *Bledsoe* makes that decision less applicable to a veil-piercing analysis.

However, even if these cases are relevant authorities, *Allied Diversified* and *Cap City Dental Lab* are distinguishable in that they both present some basis for concluding that discovery would be productive on the issue.  In *Allied Diversified*, for example, the complaint alleged, among other things, that the founder and owner of Elite "failed to observe corporate formalities and was grossly undercapitalized so that Elite was unable to pay contractors and subcontractors."  *Allied Diversified*, 2016 BL 401854, at *5.  The FAC against Silagi is devoid of even these types of allegations.  Similarly, in *Cap City Dental Lab*, the Plaintiff at least identified and described the information that it believed discovery would produce.  *Cap City Dental Lab*, 2016 BL 287043, at *14 (requesting discovery believed to "show how the defendants' assets have jumped from entity to entity").  Again, such allegations are not pleaded here, nor does Garrison identify in its Opposition any specific relevant facts it would expect to develop through discovery.

10

In addition, and importantly, these cases are all distinguishable from the instant case in terms of the prejudice to Silagi if he is required to remain in and defend this litigation through discovery while the Plaintiff searches for support.  The cases cited above involve very few parties and the shareholders' companies were going to be involved in defending the litigation irrespective of whether the shareholder was a party.  By contrast, here, the outcome of this Motion will determine whether Mr. Silagi is required to personally participate in and fund several years' worth of very expensive discovery, including document discovery and depositions of nearly fifty parties, as well as engagement of and discovery concerning expert witnesses.  The injustice here would be if Silagi is being forced to defend incredibly expensive litigation, on the speculative hope that Garrison might come up with some unpled fact through discovery to prop up its deficient and spurious alter ego claim.

Even if this Court were to determine Plaintiff met the first *Belvedere-Dombroski* prong, Silagi's Motion should still be granted, because Plaintiff has not pleaded facts to meet the remaining prongs.

**B.  Plaintiff Has Failed To Allege That Silagi Exercised Control To Commit Fraud Or An Illegal Act.**

**1.  Plaintiff Fails To Allege Fraud.**

Plaintiff does not dispute that it must plead common law fraud with particularity.  Nor does Plaintiff deny that the FAC contains a single paragraph—paragraph 220—that even arguably relates to an allegation of common law fraud by MS-South or Silagi.  (Opp. at 10.)

The sum total of Plaintiff's common law fraud allegation amounts to a claim that Silagi represented in the Purchase and Sale Agreement that, to his knowledge, the Property (including 1675 Watkins Road) had not been used for the storage, treatment or disposal of Hazardous Substances," when the lease agreement between MS-South and Closed Loop for 1675 Watkins

Road expressly *permitted* "electronic recycling … of cathode ray tubes." (*Id.*, ¶219.) However, this allegation does not allege that Silagi knew cathode ray tubes contain lead or otherwise constitute "Hazardous Substances." Moreover, knowledge of the terms of the Lease Agreement cannot form the basis of a claim of fraud by Garrison, because Garrison *also knew* the terms of the Lease Agreement at the time of the purchase of the property, and continued to lease the property to Closed Loop for four years.

Garrison does not dispute that it knew about the Closed Loop lease terms at the time of the purchase. Indeed, Garrison has admitted in pleadings filed in this case that it knew, at the time of the purchase, "that Defendant Closed Loop was using 1675 Watkins Road for "[w]arehousing, distribution, electronic recycling and demanufacturing of cathode ray tubes." (See, e.g., Doc. #378, ¶18 and Doc. #387, ¶21, responding to allegations concerning knowledge at the time of purchase.)

Because the FAC contains absolutely no allegation that Silagi had knowledge of some condition at the property that Garrison did not, the FAC fails to assert the necessary elements of a fraud claim, including knowledge of falsity and justifiable reliance. The FAC similarly contains absolutely no allegation relating to, suggesting or supporting that Silagi had an *intention* to mislead. Finally, the FAC does not allege that Garrison *was actually misled!* Garrison's assertion in Opposition that "Silagi obviously intended for Garrison to rely" (Opp. p. 11) is speculative, and does not resurrect its deficient complaint, particularly in light of Garrison's firsthand knowledge of Closed Loop's tenancy and business via its pre-purchase due diligence assessment.

Finally, Garrison's new suggestion that Silagi "misrepresented that he made 'due inquiry'" is too little, too late. The FAC does not contain an allegation that Silagi failed to make "due inquiry," and Plaintiff cannot attempt to create an entirely new fraud claim through its Opposition

Case: 2:17-cv-00783-EAS-EPD Doc #: 395 Filed: 08/15/19 Page: 13 of 18  PAGEID #: 4457

brief.  The FAC does not allege Silagi committed fraud, and he did not commit fraud.  This canard should end here.

### 2.     The FAC Does Not Allege A Constructive Fraud Claim.

In an effort to save its claim against Silagi, Plaintiff now claims, for the first time in its Opposition brief, that the second *Belvedere-Dombroski* element is met by allegations of a fraudulent conveyance under Ohio Revised Code §1336.05(A).  (Opp. at 11.)   This assertion fails because the allegations of the FAC do not plead the elements of a fraudulent conveyance.  O.R.C. §1336.05(A) states,

> A transfer made or an obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

Thus, to plead a fraudulent conveyance under this provision, Plaintiff would need to have included in the FAC allegations of at least the following:  (1) a transfer made or an obligation incurred; (2) by a "debtor"; (3) the transfer or obligation occurred *after* a "claim" arose; (4) the debtor did not receive reasonably equivalent value in exchange; and (5) the debtor was insolvent at the time or became insolvent as a result.

None of these elements are pled.  The *only* allegation of the FAC that arguably relates to this claim is that MS-South was dissolved.[3]  The FAC does not allege even the most fundamental element—a transfer made or obligation incurred.  In addition, O.R.C. §1336.05(A) pertains only

---

[3] Paragraph 223 also alleges, "[u]pon information and belief," that the dissolution took place to avoid liability.  However, conclusory allegations made "upon information and belief," without any underlying facts, are not well-pled.  *Ackison, supra*, at *4, citing *Cap City Dental Lab, LLC*, at *12.

to transfers made or obligations incurred *after* the claim arose, and the FAC certainly does not allege a transfer or obligation after the claim in this case arose.

The "claim" at issue in this case is for recovery of costs under §107 of CERCLA. (FAC, ¶809.) In order to bring such a claim, the plaintiff must have incurred "necessary costs of response." *See, e.g. Kalamazoo River Study Grp. v. Menasha Corp.*, 228 F.3d 648, 653 (6th Cir. 2000) (CERCLA provides causes of action "[o]nce a site has been cleaned up" and plaintiff must prove it incurred "necessary costs of response"); *Milford v. K-H Holding Corp.*, 390 F.3d 926, 933 (6th Cir. 2004) (plaintiff must prove, *inter alia*, that "the release caused the plaintiff to incur necessary costs of response"). Thus, Garrison's claim arose, at earliest, when it first incurred necessary costs of response. The FAC does not disclose when Plaintiff claims it first incurred "necessary costs of response," but Plaintiff alleges that Closed Loop did not abandon and vacate the property until late March of 2016. (FAC, ¶105.) Therefore, Plaintiff had no claim before at least March of 2016. Because Plaintiff has not alleged a transfer of property at all, and has certainly not alleged a transfer of property *after* it began incurring necessary costs of response, Plaintiff's assertion that fraudulent conveyance allegations supply the second prong of the *Belvedere-Dombroski* test is demonstrably wrong.

*Stewart v. R.A. Eberts Co.*, 2009-Ohio-4418 (4th Dist. 2009), and *Flagstar Bank*, 2010-Ohio-3951 (12th Dist. 2010) (Opp. at 11), are inapplicable here. In both of those cases, the alleged facts are clear that (1) the claims arose well before the alleged transfers; (2) the shareholder *knew* of the claims; and (3) the shareholder transferred assets. In *Flagstar Bank*, the plaintiff had demanded repurchase of non-conforming loans, after which the sole member of the mortgage company upon whom the demand had been made closed the company and transferred its assets to another company he owned for little or no value. *Id*. at ¶¶18-21. Similarly, in *Stewart*, the plaintiff

14

was owed money under an agreement for the sale of his interests in a business. The shareholders of the debtor dissolved the debtor company, transferred the assets to another company, and transferred the debt to Stewart to an insolvent entity. *Id*. at ¶23. Thus, unlike here, the entity was already a creditor at the time of the alleged transfers, and the shareholders had knowledge of the debt.

While the Ohio Supreme Court in *Dombroski* created a very limited exception to shareholder immunity in the case of "similarly unlawful acts," that Court made clear that it "remains a 'rare exception,'" to be applied only in exceptional and "egregious" circumstances. *Dombroski*, at ¶¶26-27. While knowing transfer of assets to avoid a known debt may qualify as egregious, the decisions Plaintiff cites do not support its effort to pierce the corporate veil in the circumstance presented here, where the claim had not yet been asserted, the shareholder had no knowledge of a potential claim, and in any event there is no "transfer" alleged.

Plaintiff's assertion that Ohio courts do not require allegations of fraudulent conveyance "to be alleged at all" (Opp. at 12) is simply wrong. Plaintiff cites *Flagstar Bank*, but that case does not so hold. Rather, the applicable case law is clear that, when attempting to pierce the corporate veil, each of the bases of the *Belvedere-Dombroski* test "must be specifically pleaded … showing that the pleader is entitle to relief." *Ackison*, at *3 (internal quotations omitted); *see also Dombroski*, at ¶29.

Assuming, *arguendo*, Plaintiff had sufficiently pled a fraudulent transfer under R.C. 1336.05(A), it still would not be entitled to pierce the corporate veil. The United States Court of Appeals for the Sixth Circuit has repeatedly held that the remedy for fraudulent transfers is limited to the value of the asset fraudulently transferred or the creditor's claim, whichever is less. *Waste*

*Conversion Techs., Inc. v. Warren Recycling, Inc.*, 191 Fed. Appx. 429, 434-435, 2006 U.S. App. LEXIS 20301 (6th Cir. 2006). The Sixth Circuit Court of Appeals Court has stated,

> The type of fraud that [plaintiff] alleges is precisely that protected by fraudulent conveyance law and does not rise to the level required to pierce the corporate veil. . . . conveyance law is more carefully tailored to the interests of all parties than the blunt instrument of piercing the corporate veil. . . . The remedy in fraudulent conveyance stands in sharp contrast with the general remedy in veil piercing. When the corporation's veil is pierced, the individual shareholders are liable for the corporation's debts, which could exceed the value of the assets fraudulently conveyed.

*CNH Capital Am. LLC v. Hunt Tractor, Inc.*, 2014 U.S. App. LEXIS 12722, *18-19, (6th Cir. 2014) (Citing *Waste Conversion Techs., Inc. v. Warren Recycling, Inc.*, 191 F. App'x 429, 434-35 (6th Cir. 2006).

Plaintiff has failed to satisfy the bare minimum pleading requirements applied to claims made pursuant to R.C. 1336.05(A). Furthermore, even if the Plaintiff adequately pled its claims, the remedy sought, piercing the veil of MS-South, is inappropriate and inequitable.

### C.     Plaintiff Has Failed To Allege An Injury Proximately Resulting From Silagi's "Control."

Garrison fails to allege facts to support the third prong of the *Belvedere-Dombroski* test for the same reasons the second prong fails.  Garrison has not pleaded any facts to support that Silagi committed a wrong that proximately caused injury to Garrison.

The "huge cleanup bill" was not caused by Silagi or MS-South.  Garrison knew full well what business Closed Loop was in and chose to (1) purchase the property; (2) continue to lease to Closed Loop; and (3) increase Closed Loop's access and footprint.  Silagi had nothing to do with that and did not cause Garrison's situation.   The complaint fails to assert any fact which demonstrates that statements made or actions taken by Silagi proximately caused Garrison's injury.

Garrison's new theory that "Silagi plundered MS-South's assets … sticking Garrison with

a huge remediation bill" is equally unfounded and unpled.  The FAC does not contain a single allegation that Silagi transferred any asset at any time, and certainly not at any relevant time.  The absence of allegations to plausibly plead this third element provides yet another independent basis for granting Silagi's motion to dismiss.

## III.    CONCLUSION

For all the foregoing reasons, Garrison's First Amended Complaint fails to state a claim upon which relief may be granted against Moshe Silagi, and Silagi respectfully requests that the First Amended Complaint be dismissed in its entirety, with respect to him.

Respectfully submitted,

/s/Loriann E. Fuhrer
Loriann E. Fuhrer            (0068037)
Scott M. Doran              (0037150)
Kegler Brown Hill + Ritter Co., LPA
65 East State Street, Suite 1800
Columbus, Ohio 43215
Phone: 615-462-5400
Fax: 614-464-2634
lfuhrer@keglerbrown.com
sdoran@keglerbrown.com

*Attorneys for Defendant Moshe Silagi*

## CERTIFICATE OF SERVICE

I hereby certify that on August 15, 2019, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to all attorneys of record, and that I sent a copy by regular mail to any non-answering parties not served electronically.


/s/Loriann E. Fuhrer
Loriann E. Fuhrer          (0068037)