UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

GARRISON SOUTHFIELD
PARK LLC,

        Plaintiff,

v.

CLOSED LOOP REFINING
AND RECOVERY, INC., *et al.*,

        Defendants.

Case No. 2:17-cv-783
JUDGE EDMUND A. SARGUS, JR.
Chief Magistrate Judge Elizabeth P. Deavers

## OPINION AND ORDER

This matter is before the Court on Defendant Moshe Silagi's ("Defendant Silagi") Motion to Dismiss (ECF No. 256); Plaintiff Garrison Southfield Park LLC's Response in Opposition (ECF No. 365); and Defendant Silagi's Reply (ECF No. 395). For the reasons that follow, the Court **DENIES** Defendant Silagi's Motion to Dismiss. (ECF No. 256).

### I.

**A. Factual Background**

Defendant Silagi is the former managing member of California limited liability company MS-South, LLC ("MS-South"). (Pl.'s Am. Compl. ¶ 11, ECF No. 85). Plaintiff is a limited liability company organized in Delaware, with its principal place of business in New York. (*Id.* ¶ 9). Plaintiff brings this action alleging that Defendant Silagi and numerous co-defendants caused environmental contamination at two warehouses owned by Plaintiff, located at 1655 and 1675 Watkins Road, Columbus, Ohio 43207 (the "Properties"). (*Id.* ¶ 1). Specifically, Plaintiff alleges the Properties contain "more than 64,000 tons (128 million pounds) of hazardous electronic waste ('e-waste')" as a result of an "elaborate sham recycling scheme." (*Id.* ¶ 2).

MS-South was Plaintiff's predecessor-in-interest to the Properties. (*Id.* ¶ 62). On or about April 6, 2012, MS-South entered into a Lease Agreement with Defendant Closed Loop Refining and Recovery, Inc. ("Defendant Closed Loop") for the permitted use of "[w]arehousing, distribution, electronic recycling and de-manufacturing of cathode ray tubes" at 1675 Watkins Road. (*Id.* ¶ 62(a)). The Lease Agreement also provided Defendant Closed Loop with an option to lease 100,000 square feet at the premises on 1655 Watkins Road. (*Id.* ¶ 62(d)). Plaintiff alleges that, under the terms of the Lease Agreement, Defendant Closed Loop was required to comply with federal and state hazardous waste laws. (*Id.* ¶ 62(c)).

According to the First Amended Complaint, cathode ray tubes ("CRTs") contain lead, "a toxic substance that can cause delayed neurological development in children and other adverse health effects in adults." (*Id.* ¶ 83). Plaintiff maintains that the Resource Conservation and Recovery Act ("RCRA") "regulates the generation, transportation, treatment, storage, and disposal of hazardous wastes and provides for a conditional exclusion for legitimate CRT recycling operations—but only if certain criteria are met." (*Id.* ¶ 85) (citing 40 C.F.R. §§ 261.39 & 261.1(c)(8) and O.R.C. 3745-51-39 & 3745-51-01(C)(8)). For instance, the CRT conditional exclusion requires a showing that: "during the calendar year commencing January first, the amount of material that is recycled, or transferred to a different site for recycling, equals at least seventy-five percent by weight or volume of the amount of that material accumulated at the beginning of the calendar year." (*Id.* ¶ 106).

Plaintiff alleges that from 2012 to 2016, Defendant Closed Loop misrepresented that it qualified for the CRT conditional exclusion by "process[ing] inbound CRTs through disassembly and glass breaking within the calendar year during which they were received, but then . . . indefinitely [storing] the vast majority of the crushed CRT glass in the center of the warehouse at

1675 Watkins Road." (*Id.* ¶ 108–109). In addition, Plaintiff claims that Defendant Closed Loop accepted "pre-processed CRT glass at a higher price-per-pound to help fund the enterprise, despite the fact that it had no capacity to recycle this stream any further, within the calendar year or otherwise." (*Id.* ¶ 110). Thus, Plaintiff estimates that Defendant Closed Loop "speculatively accumulated and abandoned" approximately 30,000 pallet-sized containers of crushed CRT glass and 14,500 pallet-sized containers of intact CRTs at the Properties. (*Id.* ¶ 112).

Plaintiff further alleges that Defendant Silagi "exercised extensive and exclusive control" over MS-South, therefore "manag[ing], direct[ing], and conduct[ing] the operations of MS-South LLC as they related to tenant disposal of hazardous waste and/or tenant compliance with environmental regulations." (*Id.* ¶ 215 & 217). On or about April 29, 2013, Plaintiff purchased the Properties from MS-South and "assumed all right, title and interest" in the Properties. (*Id.* ¶ 64 & 72). Additionally, Plaintiff asserts that it assumed all rights and obligations as landlord under the Lease Agreement with Defendant Closed Loop. (*Id.* ¶ 64).

According to Plaintiff, Defendant Silagi made misrepresentations to Plaintiff in the April 29, 2013 Purchase and Sale Agreement ("PSA") by averring that:

> [t]o Seller's knowledge, except as set forth on Schedule 3.1.10 . . . during Seller's term of ownership, the Property [which included 1675 Watkins Road] has not been used for industrial purposes or for the storage, treatment or disposal of Hazardous Substances (as hereinafter defined), other than products customarily used or stored incidental to the operation and/or maintenance of the Property, all of which are stored and used in accordance with all applicable Environmental Laws.

(*Id.* ¶ 220 (citing Def.'s Ex. 1, ECF No. 256-1)).[1]

---

[1] "Documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to [its] claim." *Weiner v. Klais & Co.*, 108 F.3d 86, 88 (6th Cir. 1997). Plaintiff cites to the PSA in its First Amended Complaint, and Defendant Silagi attaches the PSA as Exhibit 1 to his Motion to Dismiss. Accordingly, the Court will properly consider the PSA as part of the pleadings.

Plaintiff further alleges that Schedule 3.1.10 listed no exceptions, and the PSA defined "Hazardous Substances" to include lead. (*Id.* ¶ 220(a)–(b) (citing Def.'s Ex. 1)). Additionally, Plaintiff avers that the PSA "unconditionally guarantee[d] to [Plaintiff] the full and faithful payment and performance by [MS-South] of all of its obligations to [Plaintiff]." (*Id.* ¶ 221 (citing Def.'s Ex. 1)).

Plaintiff avers that Defendant Silagi dissolved MS-South on or about October 3, 2017, less than one month after Plaintiff filed its Complaint. (*Id.* ¶ 222). Plaintiff alleges Defendant Silagi dissolved MS-South in "an effort to avoid liability in connection with the CRTs and other e-waste that were stockpiled and speculatively accumulated at 1675 Watkins Road during MS-South LLC's period of ownership from April 6, 2012 through April 29, 2013." (*Id.* ¶ 223).

## B. Procedural History

Plaintiff initiated the instant action on September 5, 2017, asserting claims against Defendant Closed Loop and eight other defendants under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"). (*See generally* Compl., ECF No. 1). On March 29, 2019, Plaintiff filed its First Amended Complaint to add an additional forty defendants, including Defendant Silagi. Plaintiff asserts the following claims against Defendant Silagi: (1) declaratory judgment pursuant to 28 U.S.C. §§ 2201–2202 and 42 U.S.C. § 9613(g); (2) cost recovery under CERCLA § 107(a)(3) and 42 U.S.C. § 9607(a)(3); and (3) recovery of preliminary investigative costs under CERCLA. (*Id.* ¶ 802–830).[2]

On June 28, 2019, Defendant Silagi moved to dismiss Plaintiff's claims for failing to state a claim upon which relief may be granted under Federal Rule of Civil Procedure 12(b)(6). (ECF No. 256). Plaintiff responded (ECF No. 365), and Defendant Silagi replied (ECF No. 395).

---

[2] Plaintiff specifically excludes Defendant Silagi from Count IV: common law negligence and negligence per se, and Count V: private nuisance. (*Id.* ¶ 832 & 853).

4

## II.

To determine whether a complaint states a claim upon which relief can be granted, the Court must: (1) accept the factual allegations contained in the pleadings as true, and (2) determine whether the factual allegations present any plausible claim. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) (clarifying the plausibility standard articulated in *Twombly*). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. The factual allegations of a pleading "must be enough to raise a right to relief above the speculative level . . ." *Twombly*, 550 U.S. at 555.

## III.

CERCLA was enacted in 1980 "to facilitate the prompt cleanup of hazardous waste sites by placing the ultimate financial responsibility for cleanup on those responsible for hazardous wastes." *United States v. R.W. Meyer, Inc.*, 889 F.2d 1497, 1500 (6th Cir. 1989) (internal citations omitted). To establish a *prima facie* case for response cost recovery, a plaintiff must establish four elements, including: (1) the property is a facility; (2) there has been a "release" or a "threatened release" of a hazardous substance; (3) the release has caused the plaintiff to incur necessary costs of response that are consistent with the National Contingency Plan ("NCP"); and (4) the defendant is in one of four categories of potentially responsible parties. *Reg'l Airport Auth. v. LFG, LLC*, 460 F.3d 697, 703 (6th Cir. 2006) (citing *Franklin County Convention Facilities Auth. v. Am. Premier Underwriters, Inc.*, 240 F.3d 534, 541 (6th Cir. 2001)). The Sixth Circuit has held "that 'preliminary' or 'initial' investigative costs may be recovered even if the plaintiff did not comply with the NCP." *Krygoski Const. Co., Inc. v. City of Menominee*, 431 F. Supp. 2d 755, 762 (W.D. Mi. 2006) (citing *Pierson Sand v. Gravel, Inc.*, 89 F.3d 835 (6th Cir. 1996)).

"CERCLA imposes strict liability on four types of potentially responsible parties: (1) the owner or operator of a facility; (2) the owner or operator of a facility at the time a hazardous substance was released; (3) any person who arranged for disposal of a hazardous substance at a facility; and (4) any person who accepts hazardous waste for transport to disposal or treatment facilities." *Duke Energy Fla, LLC v. FirstEnergy Corp.*, 731 Fed. App'x 385, 389–390 (6th Cir. 2018) (citing 42 U.S.C. § 9607(a)(1)–(4)). Notably, state law governs the propriety of piercing the corporate veil for indirect liability claims in CERCLA cases. *Id.* at 390; *see also Pilgrim v. Universal Health Card, L.L.C.*, 660 F.3d 943, 946 (6th Cir. 2011). Under this approach, the court presumes "that the law of the place of the injury controls unless another jurisdiction has a more significant relationship to the lawsuit." *Id.* (quoting *Morgan v. Biro Mfg. Co.*, 15 Ohio St.3d 339, 342 (Ohio 1984)).

In this case, Defendant Silagi contends that Plaintiff failed to properly plead the fourth element of a CERCLA claim, i.e., that Defendant Silagi is a potentially responsible party under the terms of the statute. Specifically, Defendant Silagi argues that Plaintiff failed to plead sufficient facts to plausibly pierce the corporate veil of MS-South and hold him personally liable under CERCLA. In Plaintiff's view, "[Defendant] Silagi's pervasive control over MS South justifies piercing the company's veil to hold [Defendant] Silagi personally liable for his misconduct." (Opp'n at 2, ECF No. 365). Both parties apply Ohio law in their briefs. (Mot. to Dismiss at 7–8; Opp'n at 3). Accordingly, the Court will analyze the parties' veil-piercing arguments under Ohio law.

### A. Piercing the Corporate Veil

In *Belvedere Condo. United Owners' Ass'n v. R.E. Roark Cos., Inc.*, the Supreme Court of Ohio articulated a three-prong test for determining whether a shareholder is personally liable for the wrongdoing of his corporation. 67 Ohio St. 3d 274 (Ohio 1993). Under the test

> the corporate form may be disregarded and individual shareholders held liable for corporate misdeeds when (1) control over the corporation by those to be held liable was so complete that the corporation has no separate mind, will, or existence of its own, (2) control over the corporation by those to be held liable was exercised in such a manner as to commit fraud or an illegal act against the person seeking to disregard the corporate entity, and (3) injury or unjust loss resulted to the plaintiff from such control and wrong.

*Id.* at 288; *see also Dombroski v. Wellpoint, Inc.*, 119 Ohio St. 3d 506 (Ohio 2008). Like corporations, limited liability companies are subject to the veil-piercing doctrine. *Denny v. Breawick, LLC*, No. 5-18-12, 2019 WL 2266690, at *3 (Ohio Ct. App. May 28, 2019). Defendant Silagi argues that Plaintiff failed to sufficiently allege facts that would support piercing the corporate veil.

#### 1. Did Plaintiff Sufficiently Allege that Defendant Silagi was the Alter Ego for MS-South?

As noted by the Sixth Circuit in *Taylor Steel, Inc. v. Keeton*, the first element of the *Belvedere-Dombroski* test "is a restatement of the alter-ego doctrine, which requires that plaintiff 'show that the individual and the corporation are fundamentally indistinguishable.'" 417 F.3d 598, 605 (6th Cir. 2005) (quoting *Belvedere*, 67 Ohio St. 3d at 288). When determining whether the company is an alter ego of the individual shareholder, Ohio courts consider the following factors:

> (1) Grossly inadequate capitalization, (2) failure to observe corporate formalities, (3) insolvency of the debtor corporation at the time the debt is incurred, (4) shareholders holding themselves out as personally liable for certain corporate obligations, (5) diversion of funds or other property of the company property for personal use, (6) absence of corporate records, and (7) the fact that the corporation was a mere facade for the operations of the dominant shareholder(s).

*LeRoux's Billyle Supper Club v. Ma*, 77 Ohio App. 3d 417, 422–423 (Ohio Ct. App. 1991).

Defendant Silagi argues that Plaintiff's First Amended Complaint "contains precisely the kind of unsupported allegations found . . . to be little more than conclusory." (Mot. to Dismiss at 10) (internal quotations omitted). In Defendant Silagi's view, Plaintiff's assertions that Defendant Silagi "managed, directed, and conducted the operations of MS-South, LLC" and that "Defendant Silagi and MS-South LLC are legally indistinct" are not sufficient to pierce the corporate veil. (*Id.*) (quoting First Am. Compl. ¶ 218 & 821). According to Defendant Silagi, "[i]f the fact that a limited liability company has one member were enough to establish that the member and the company are 'fundamentally indistinguishable,' then every validly-formed, single-member limited liability company would arguably be at risk." (*Id.*).

Plaintiff disagrees, asserting that veil-piercing is an equitable doctrine with no "exclusive or exhaustive" list of necessary factors. (Opp'n at 4) (citing *Carter-Jones Lumber Co. v. LTV Steel Co.*, 237 F.3d 745, 749 (6th Cir. 2001); *see also Redhawk Glob., LLC v. World Projects Int'l, Inc.*, No. 2:11-CV-666, 2017 WL 4862485, at *10 (S.D. Ohio Sept. 26, 2017) ("none of these [*Taylor Steel*] factors is a prerequisite to a finding that the corporate form has been violated")). Plaintiff relies on *Taylor Steel*, in which the Sixth Circuit held that "the existence of only a single shareholder can be a powerful indicator of that shareholder's exercising control so complete over the corporation that it had no separate mind, will or existence of its own." (*Id.* at 6) (quoting *Taylor Steel*, 417 F.3d at 607). Plaintiff's arguments are well taken.

Plaintiff alleges not only that Defendant Silagi was the sole member of MS-South, Plaintiff also alleges numerous additional facts that point to Defendant Silagi's alter ego, including: (1) Defendant Silagi signed the Lease Agreement, (2) Defendant Silagi made representations in the PSA, (3) the PSA defined the "Guarantor" as Defendant Silagi, and (4) Defendant Silagi dissolved

MS-South. (*Id.* at 6–8). Accordingly, the Court declines to dismiss Plaintiff's CERCLA claims under the alter ego prong of the *Belvedere-Dombroski* test.

### 2. Did Plaintiff Sufficiently Allege that Defendant Silagi Misrepresented the Contents of the Warehouse and Fraudulently Dissolved MS-South in an Attempt to Evade Plaintiff's Claims?

The Supreme Court of Ohio clarified the second prong of the *Belvedere* test in *Dombroski v. Wellpoint, Inc.* 119 Ohio St. 3d at 513. Specifically, the *Dombroski* court held that "to fulfill the second prong of the *Belvedere* test for piercing the corporate veil, the plaintiff must demonstrate that the defendant shareholder exercised control over the corporation in such a manner as to commit fraud, an illegal act, or a similarly unlawful act." *Id.* The Supreme Court of Ohio went on to state that courts "should apply this limited expansion cautiously toward the goal of piercing the corporate veil only in instances of extreme shareholder misconduct." *Id.* In other words, "the corporate veil cannot be pierced simply where control of the corporation was exercised to commit unjust or inequitable acts; rather, it requires for the control to have been exercised for 'specific egregious acts.'" *Orrand v. Kin Contractors, LLC*, No. 2:09 CV 1129, 2011 WL 1238301, at *4 (S.D. Ohio Mar. 30, 2011).

To state a claim for common law fraud under Ohio law, a plaintiff must allege:

> (1) A representation (or concealment of a fact when there is a duty to disclose), (2) that is material to the transaction at hand, (3) made falsely, with knowledge of its falsity or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, and (4) with intent to mislead another into relying upon it, (5) justifiable reliance, and (6) resulting injury proximately caused by the reliance.

*Volbers-Klarich v. Middletown Mgt., Inc.*, 929 N.E.2d 434, 440 (Ohio 2010). "When a cause of action seeks to pierce the corporate veil on the basis of fraud, it is subject to the heightened pleading requirements of Rule 9(b)." *MedChoice Fin., LLC v. ADS All. Data Sys., Inc.*, 857 F. Supp. 2d 665, 676 (S.D. Ohio 2012) (citing *Ruffing v. Masterbuilt Tool & Die, LLC*, No. 08-1264,

9

2009 WL 185950, at *14 (N.D. Ohio Jan. 23, 2009)). Thus, to meet Rule 9(b)'s requirements, Plaintiff must "allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." *Id.* (quoting *Bennett v. MIS Corp.*, 607 F.3d 1076, 1100 (6th Cir. 2010)).

Defendant Silagi maintains that the only paragraphs of the First Amended Complaint that potentially raise a cause of action for common law fraud are as follows:

> Defendant Silagi signed the Lease Agreement with Defendant Closed Loop for 1675 Watkins Road in the presence of a notary public on or about April 9, 2012; the Lease Agreement expressly permitted the "electronic recycling . . . of cathode ray tubes," which contain lead.
>
> Defendant Silagi thereafter misrepresented to Garrison in a Purchase and Sale Agreement ("PSA") dated April 29, 2013, that "[t]o Seller's knowledge, except as set forth on Schedule 3.1.10 . . . during Seller's term of ownership, the Property [which included 1675 Watkins Road] has not been used for industrial purposes or for the storage, treatment or disposal of Hazardous Substances (as hereinafter defined), other than products customarily used or stored incidental to the operation and/or maintenance of the Property, all of which are stored and used in accordance with all applicable Environmental Laws."
>
>     a. The PSA, Schedule 3.1.10, listed no scheduled exceptions.
>
>     b. The PSA defined "Hazardous Substances" to include "lead."
>
>     c. The PSA defined "to Seller's Knowledge" as "the actual current knowledge of Guarantor, after due inquiry of (i) the individuals in Seller's organization who have knowledge of the matters contained herein and (ii) Kevin McLewee, the general manager of the Property, and an employee of Cassidy Turley."
>
>     d. The PSA defined "Guarantor" as Defendant Silagi.

(First Am. Compl. ¶ 220).

In Defendant Silagi's view, "[m]any of the elements of fraud are completely absent from the complaint against [him], and they certainly are not pleaded with particularity." (Mot. to Dismiss at 12). He argues "there is no allegation that [Defendant] Silagi knew something

10

[Plaintiff] did not." (*Id.* at 13). In addition, Defendant Silagi points out the First Amended Complaint "contains absolutely no allegations relating to, suggesting or supporting that [Defendant] Silagi had an *intention* to mislead," or that Plaintiff was "*actually misled*." (*Id.*) (emphasis in original). This Court disagrees.

The allegations set out in the First Amended Complaint satisfy the second *Belvedere-Dombroski* prong because it pleaded with specificity common law fraud. (Opp'n at 10–11). As to the first three elements of a common law fraud claim, Plaintiff alleges with specificity that Defendant Silagi made a false representation that is material to the transaction at hand, or made the representation with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred. Specifically, Plaintiff alleges that Defendant Silagi in the PSA dated April 29, 2013, falsely represented that "[t]o Seller's knowledge, except as set forth on Schedule 3.1.10 . . . during Seller's term of ownership, the Property [which included 1675 Watkins Road] has not been used for industrial purposes or for the storage, treatment or disposal of Hazardous Substances (as hereinafter defined), other than products customarily used or stored incidental to the operation and/or maintenance of the Property, all of which are stored and used in accordance with all applicable Environmental Laws." (Am. Compl., ¶ 220.) Plaintiff alleges that Defendant Silagi had knowledge of Hazardous Waste (lead) being disposed of on the Property because he previously signed a Lease Agreement which expressly permitted the recycling of Hazardous Waste, i.e., cathode ray tubes. (*Id.* ¶ 219).

Further, in the PSA Defendant Silagi represented that he had made due inquiry of the individuals who had knowledge of this matter. Plaintiff therefore alleges that Defendant Silagi knew that Closed Loop was storing the hazardous substances other than products customarily used or stored incidental to the operation and/or maintenance of the Property. Alternatively, the

11

allegations support that, at the least, Defendant Silagi made the representation with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred. Further, as Plaintiff correctly notes, if Defendant Silagi did not conduct the inquiry necessary to determine the accuracy of his representation about hazardous substances, then he misrepresented that he had made "due inquiry" about this subject.

Plaintiff has also sufficiently alleged the remaining elements of common law fraud—intent to mislead, justifiable reliance, and resulting injury proximately caused by the reliance. For example, taking Plaintiff's allegations as true, Defendant Silagi made misleading statements to induce Plaintiff to purchase the Property; Plaintiff justifiably relied on those statements to purchase the Property, which Plaintiff claims caused his injuries; and, as a result, Plaintiff now owns property with leaded electronic Hazardous Waste that has been speculatively accumulating since 2012 without any feasible means of recycling it. (*Id.* ¶ 223). Accordingly, Plaintiff's First Amended Complaint sufficiently articulates a claim for common law fraud.

### 3. Did Plaintiff Sufficiently Allege that Defendant Silagi Proximately Caused Injury from his Control?

The third prerequisite for piercing the corporate veil requires "that the shareholder's control over the corporation proximately caused the plaintiff's injury or loss." *Belvedere*, 67 Ohio St. 3d at 288-89. Plaintiff asserts that its injuries "occurred (i) when Garrison was stuck with a huge cleanup bill to address the hazardous substances in the warehouse, and (ii) when Silagi plundered MS-South's assets to prevent Garrison from obtaining the company's contribution to the remediation costs, sticking Garrison with a huge remediation bill." (Opp'n at 13). Defendant Silagi argues:

> [t]he "huge cleanup bill" was not caused by Silagi or MS-South. Garrison knew full well what business Closed Loop was in and chose to (1) purchase the property; (2)

continue to lease to Closed Loop; and (3) increase Closed Loop's access and footprint. Silagi had nothing to do with that and did not cause Garrison's situation. (Reply at 16). This argument is not well taken because it attacks the veracity of Plaintiff's allegations rather than addressing whether they plausibly establish a legal claim.

Upon consideration of Plaintiff's allegations, the Court finds Plaintiff pled facts that establish Defendant Silagi's control of MS-South proximately caused the alleged injuries. According to Plaintiff's Amended Complaint, the hazardous substances were brought to the Properties and still remain there because of Defendant Silagi's actions as the sole director of MS-South. (*See* Pl.'s Am. Compl. at ¶ 215 & 217) (claiming Defendant Silagi "exercised extensive and exclusive control" over MS-South, which he used to "manage, direct, and conduct the operations of MS-South LLC as they related to tenant disposal of hazardous waste and/or tenant compliance with environmental regulations"). And Plaintiff asserts that it faces substantial costs to remediate those hazardous substances because Defendant Silagi—under the guise of MS-South—fraudulently induced Plaintiff to purchase the contaminated Properties, thereby assuming all their rights, titles, interests, and obligations. (*See Id.* at ¶ 64 & 72). Finally, Plaintiff claims Defendant Silagi plundered MS-South's assets to prevent Plaintiff from recovering future remediation costs, further injuring Plaintiff. (*Id.* at ¶ 222-23; *see also* Opp'n at 13 (relying on *Kays v. Schregardus*, 138 Ohio App.3d 225, 230-31 (11th Dist. 2000) for the proposition that a person's asset transfer to avoid the cost of remediating waste produces an unjust result that merits the application of the third *Belvedere* prong). Accordingly, the allegations in the Amended Complaint, as quoted throughout this decision, and all reasonable inferences drawn therefrom sufficiently allege that Defendant Silagi proximately caused Plaintiff's injury.

In conclusion, Plaintiff has adequately pled facts to pierce the corporate veil of MS-South and hold Defendant Silagi personally liable. Thus, Defendant Silagi's argument that Plaintiff

failed to properly plead that Defendant Silagi is a potentially responsible party under CERCLA lacks merit.

**IV.**

According, the Court **DENIES** Defendant Silagi's Motion to Dismiss. (ECF No. 256).

**IT IS SO ORDERED.**

11-13-2019
**DATE**

**EDMUND A. SARGUS, JR.**
**CHIEF UNITED STATES DISTRICT JUDGE**